Nos. 2025-1039, -1076

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ATLAS GLOBAL TECHNOLOGIES LLC,

*Plaintiff-Appellee,*

*v.*

LIANZHOU TECHNOLOGIES CO., LTD., fka TP-Link Technologies Co., Ltd., TP-LINK CORPORATION LTD., fka TP-Link International Ltd.,

*Defendants-Appellants.*

Appeals from the United States District Court for the Eastern District of Texas, No. 2:21-cv-00430-JRG, Chief Judge J. Rodney Gilstrap

## NON-CONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLANTS LIANZHOU TECHNOLOGIES CO., LTD. AND TP-LINK CORPORATION LTD.

HEATH A. BROOKS
ALLISON M. SCHULTZ
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

KRISTOPHER L. REED
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, TX  75201
(214) 627-1753

February 7, 2025

MARK C. FLEMING
CYNTHIA D. VREELAND
JASON H. LISS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Defendants-Appellants
Lianzhou Technologies Co., Ltd.
and TP-Link Corporation Ltd.*

# PATENT CLAIMS AT ISSUE

## U.S. Patent No. 9,532,187

**Claim 1.**    A method for transmitting data to a plurality of Stations (STAs) through a transmission channel by an Access Point (AP) in a Wireless Local Area Network (WLAN) system, wherein the transmission channel is divided into a plurality of resource units which are allocated to the plurality of STAs respectively, the method comprising: interleaving a plurality of data units for the plurality of STAs based on sizes of the plurality of resource units allocated to the plurality of STAs to generate a plurality of interleaved data units; and transmitting, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including the plurality of interleaved data units respectively on the plurality of resource units to the plurality of STAs, wherein a set of sizes available to a resource unit allocated to a first STA among the plurality of STAs includes a first size and a second size, wherein the interleaving of the plurality of data units for the plurality of STAs comprises: when the size of the resource unit allocated to the first STA is the first size, interleaving a data unit for the first STA using a first set of interleaving parameter values; and when the size of the resource unit allocated to the first STA is the second size, interleaving the data unit for the first STA using a second set of interleaving parameter values, and wherein the first size is smaller than a size of the transmission channel, the second size is smaller than the first size, and the second set of interleaving parameter values is different from the first set of interleaving parameter value.

**Claim 4.**    The method according to claim 1, wherein the set of sizes available to the resource unit allocated to the first STA among the plurality of STAs further includes a third size, wherein the interleaving of the plurality of data units for the plurality of STAs further comprises: when the size of the resource unit allocated to the first STA is the third size, interleaving the data unit for the first STA using a third set of interleaving parameter values, and wherein the third size is smaller than the second size, and the third set of interleaving parameter values is different from the second set of interleaving parameter values.

**Claim 12.**    The method according to claim 10, wherein the set of sizes available to the resource unit allocated to the first STA further includes a third size, wherein the deinterleaving of the data unit for the first STA further comprises, when the size of the resource unit allocated to the first STA is the third size, deinterleaving the data unit for the first STA using a third set of interleaving parameter values, and wherein the third size is smaller than the second size, and the third set of

interleaving parameter values is different from the second set of interleaving parameter values.

## U.S. Patent No. 9,763,259

**Claim 1.** A sounding method by a first receiving device, the method comprising: receiving a null data packet announcement (NDPA) frame from a transmitting device; receiving a null data packet (NDP) frame from the transmitting device after receiving the NPDA frame; and transmitting to the transmitting device a feedback frame including subchannel information measured on a first subchannel after receiving the NDP frame, the first subchannel being a subchannel that is allocated to the first receiving device among a plurality of subchannels into which a predetermined band is divided, wherein transmitting the feedback frame includes: transmitting the feedback frame to the transmitting device while a second feedback frame including subchannel information measured on the second subchannel is transmitted to the transmitting device by a second receiving device, the second subchannel being a subchannel that is allocated to the second receiving device among the plurality of subchannels.

**Claim 18.** A sounding method by a transmitting device, the method comprising: transmitting a null data packet announcement (NDPA) frame to a plurality of receiving devices; transmitting a null data packet (NDP) frame to the plurality of receiving devices after transmitting the NPDA frame; and receiving from each receiving device a feedback frame including subchannel information measured on a subchannel that is allocated to each receiving device among a plurality of subchannels into which a band is divided, after transmitting the NDP frame, wherein the plurality of feedback frames from the plurality of receiving devices are received at a same time, and the NDPA frame includes allocation information of the plurality of subchannels.

## U.S. Patent No. 9,825,738

**Claim 1.** A method of operating an access point in a wireless communication network, the method comprising: generating downlink data; generating uplink setup information, the uplink setup information including a first information to be used for uplink multi-user transmission; transmitting the downlink data and the uplink setup information in a single physical downlink frame to a plurality of stations; simultaneously receiving multiple uplink frames from multiple stations of the plurality of stations; and transmitting an acknowledgement frame to the multiple stations after a successful reception of the multiple uplink frames, wherein

the uplink setup information includes a common information portion and a dedicated information portion, the common information portion includes a second information being common to all of the plurality of stations to receive the uplink setup information, and the dedicated information portion includes respective third information specific to each of the plurality of stations to receive the uplink setup information, and wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames.

## U.S. Patent No. 9,912,513

**Claim 1.**     An apparatus for facilitating wireless communication, the apparatus comprising: one or more memories; and one or more processors coupled to the one or more memories, the one or more processors configured to cause: receiving, in a trigger frame transmitted by an access point, an indication of a first guard interval length, wherein the trigger frame allocates one or more resources for an uplink (UL) multi-user (MU) transmission and solicits the UL MU transmission, wherein a value of the first guard interval length is to be used by each of a plurality of stations, including the apparatus, associated with the UL MU transmission, generating an uplink frame for the UL MU transmission solicited by the trigger frame, wherein the uplink frame comprises a payload and a physical layer (PHY) header, and transmitting the uplink frame using a resource allocated by the trigger frame to the apparatus, wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length.

**Claim 15.**     A computer-implemented method of facilitating wireless communication, the method comprising: determining, by an access point, a first guard interval to be used by a set of stations participating in a multi-user (MU) uplink (UL) transmission; creating, by the access point, a trigger frame, wherein the trigger frame includes information indicating the first guard interval for the UL MU transmission, wherein the trigger frame allocates resources for the UL MU transmission and solicits the UL MU transmission; transmitting, by the access point, the trigger frame to the set of stations; and processing an uplink frame comprising a plurality of frames from the set of stations based on the resources for the UL MU transmission, wherein each of the plurality of frames comprises a respective payload, and wherein at least a portion of the respective payload is associated with the first guard interval.

**U.S. Patent No. 9,917,679**

**Claim 1.**     A method for transmitting an acknowledgement frame for notifying successful data reception by a station (STA) to an access point (AP) in a wireless local area network, the method comprising: receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and transmitting, to the AP, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame, wherein transmitting the acknowledgment frame comprises: when the acknowledgement information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource, transmitting the acknowledgement frame in the MU format on the allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA, and when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, transmitting the acknowledgement frame in SU format.

**Claim 6.**     A method for receiving an acknowledgement frame for notifying successful data reception by an access point (AP) from a station (STA) in a wireless local area network, the method comprising: transmitting, to the STA, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and receiving, from the STA, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame, wherein receiving the acknowledgment frame comprises: when the acknowledgement information represents that the STA is requested to transmit the acknowledgement frame in the MU format, receiving the acknowledgement frame in the MU format on an allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA, and when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, receiving the acknowledgement frame in SU format.

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants Lianzhou Technologies Co., Ltd. and TP-Link Corporation Ltd. certifies the following:

**1.     Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Lianzhou Technologies Co., Ltd., fka TP-Link Technologies Co., Ltd.

TP-Link Corporation Ltd., fka TP-Link International Ltd.

**2.     Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.     Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Lianzhou Technologies Co., Ltd., formerly known as TP-Link Technologies Co., Ltd., is a wholly owned subsidiary of Lianzhou International Co., Ltd., a privately held company organized under the laws of the People's Republic of China.  Lianzhou International Co., Ltd. is a wholly owned subsidiary of TP-Link Corporation Ltd.

TP-Link Corporation Ltd. is a wholly owned subsidiary of TP-Link Corporation PTE Ltd., a privately held company organized under the laws of the Republic of Singapore.  TP-Link Corporation PTE Ltd. is a wholly owned subsidiary of Diamond Creek Global Ltd., a privately held company organized under the laws of the British Virgin Islands.  Diamond Creek Global Ltd. is a wholly owned subsidiary of TP-Link Systems, Inc., a privately held corporation organized under the laws of the State of California.  TP-Link Systems, Inc. is a wholly owned subsidiary of Diamond Creek Corporation, a privately held company organized under the laws of the State of California.  Diamond Creek Corporation is a wholly owned subsidiary of JH-1 Zhao Holdings LLC, a privately held company organized under the laws of the State of Delaware.  No parent corporation or publicly held company owns 10% or more of the stock in JH-1 Zhao Holdings LLC.

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

KILPATRICK TOWNSEND & STOCKTON LLP:  Andrew Nathan Saul, Christopher P. Damitio, Cole Base Ramey, Edward John Mayle, Kathleen Geyer, Kevin M. Bell, Steven David Moore

GILLAM & SMITH LLP:  Andrew Thompson Gorham, James Travis Underwood, Melissa Richards Smith

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

 X   Yes (file separate notice; see below)          No          N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

Already filed.

**6.    Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  February 7, 2025                    /s/ Mark C. Fleming
                                            MARK C. FLEMING
                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                            60 State Street
                                            Boston, MA  02109
                                            (617) 526-6000

# TABLE OF CONTENTS

Page

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ................................................................. vii

STATEMENT OF RELATED CASES ..................................................1

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF ISSUES ...................................................................4

STATEMENT OF THE CASE..............................................................5

    A.    Appellants' Lack Of Contacts With Texas .............................5

    B.    Atlas's Allegations Of Infringement ......................................6

    C.    The District Court's Imposition Of Sanctions ......................7

    D.    Trial .........................................................................................13

        1.    Atlas's infringement assertions...................................13

            a.    Atlas's direct-infringement assertions. ...........13

            b.    Atlas's induced infringement assertions.........15

        2.    Evidence relating to damages. ...................................17

    E.    Verdict And Post-Trial Proceedings ...................................18

SUMMARY OF ARGUMENT .............................................................18

ARGUMENT .........................................................................................20

I.    STANDARD OF REVIEW...............................................................20

II.    THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER
       APPELLANTS ................................................................................21

       A.    Appellants Are Not Subject To Personal Jurisdiction In
             Texas............................................................................21

             1.    Appellants do not have minimum contacts with
                   Texas. ...........................................................22

                   a.    Plaintiff failed to show that Appellants knew
                         that accused products would be sold in
                         Texas................................................24

                   b.    Plaintiff failed to show that Appellants
                         purposefully directed their conduct toward
                         Texas................................................28

             2.    The exercise of personal jurisdiction was
                   unreasonable...................................................31

       B.    The District Court Erred In Holding That Personal
             Jurisdiction Would Be Proper Under Rule 4(k)(2) ............34

III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN IMPOSING
       SANCTIONS, RESULTING IN AN UNFAIR TRIAL AND AN
       EXCESSIVE DAMAGES AWARD.........................................................35

       A.    The Sanctions Ruling Was An Abuse Of Discretion .........35

             1.    Appellants did not fail to provide testimony under
                   Rule 30(b)(6).................................................36

             2.    Appellants did not misrepresent their relationship
                   to non-party TP-Link USA. .....................................38

             3.    The district court's sanctions were excessive and
                   improper. ......................................................40

       B.    The Sanctions Order Unfairly Prejudiced Appellants.........41

IV.   THE INFRINGEMENT VERDICT SHOULD BE REVERSED OR
      VACATED ................................................................................. 44

      A.    Atlas Offered No Substantial Evidence Of Acts Of Direct
            Infringement ...................................................................... 44

            1.    Atlas did not show that Appellants made offers for
                  sale in the United States. ........................................... 45

            2.    Atlas did not show that Appellants imported
                  accused products into the United States. .................. 48

      B.    Atlas Offered No Substantial Evidence Of Indirect
            Infringement ...................................................................... 49

            1.    Atlas did not prove pre-suit knowledge of the
                  patents or their alleged infringement. ...................... 49

            2.    General marketing materials cannot demonstrate
                  specific intent to induce infringement. .................... 53

      C.    Failure Of Either Infringement Theory Requires Vacatur
            Of The Entire Judgment ..................................................... 55

V.    THE DAMAGES AWARD SHOULD BE REVERSED OR VACATED ...................... 57

      A.    Atlas's Expert Used An Unreliable Methodology That
            Failed To Apportion Damages To The Patented
            Technologies ...................................................................... 57

      B.    The Damages Award Was Contrary To The
            Hypothetical-Negotiation Framework ............................... 61

CONCLUSION ................................................................................... 65

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from pages 32, 59, 61 of the brief and pages Appx10 and Appx14-17 of the addendum contains business information that Atlas has designated as confidential and was sealed in the district court.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACCO Brands, Inc. v. ABA Locks Manufacturers Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) ......................................................20

*Adasa Inc. v. Avery Dennison Corp.*,
  55 F.4th 900 (Fed. Cir. 2022) ........................................................20

*AlexSam, Inc. v. Aetna, Inc.*,
  119 F.4th 27 (Fed. Cir. 2024) ........................................................50

*Amarin Pharma, Inc. v. Hikma Pharmaceuticals USA Inc.*,
  104 F.4th 1370 (Fed. Cir. 2024) ....................................................54

*Asahi Metal Industry Co. v. Superior Court of California*,
  480 U.S. 102 (1987)....................................................23, 24, 29, 30

*Asarco, Inc. v. Glenara, Ltd.*,
  912 F.2d 785 (5th Cir. 1990) ...........................................................5

*Bank of New York Mellon as Trustee of Registered Holders of
  CWABS, Inc., Asset-Backed Certificates, Series 2004-5 v. Riley*,
  No. 21-40383, 2022 WL 1773364 (5th Cir. June 1, 2022)
  (nonprecedential) ..........................................................................37

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
  21 F.3d 1558 (Fed. Cir. 1994) .............................................24, 26-27

*Boit v. Gar-Tec Products, Inc.*,
  967 F.2d 671 (1st Cir. 1992)...........................................................29

*Bridgeport Music, Inc. v. Still N The Water Publishing*,
  327 F.3d 472 (6th Cir. 2003) ..........................................................29

*Bristol-Myers Squibb Co. v. Superior Court of California*,
  582 U.S. 255 (2017)..................................................................31, 33

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)..................................................................64, 65

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985)..............................................................28, 29, 31

*Celgard, LLC v. SK Innovation Co.,*
   792 F.3d 1373 (Fed. Cir. 2015) ...........................................24, 26, 30

*Commil USA, LLC v. Cisco Systems, Inc.,*
   575 U.S. 632 (2015).....................................................................49, 55

*Commil USA, LLC v. Cisco Systems, Inc.,*
   720 F.3d 1361 (Fed. Cir. 2013), *vacated on other grounds*, 575
   U.S. 632 (2015)..................................................................................56

*Curry v. Revolution Laboratories, LLC,*
   949 F.3d 385 (7th Cir. 2020) ...........................................................35

*Dossett v. First State Bank,*
   399 F.3d 940 (8th Cir. 2005) ...........................................................43

*Enplas Display Device Corp. v. Seoul Semiconductor Co.,*
   909 F.3d 398 (Fed. Cir. 2018) ..........................................................53

*Ericsson Inc. v. TCL Communication Technology Holdings Ltd.,*
   955 F.3d 1317 (Fed. Cir. 2020) ........................................................53

*Ericsson, Inc. v. D-Link Systems, Inc.,*
   773 F.3d 1201 (Fed. Cir. 2014) ........................................................55

*Ford Motor Co. v. Montana Eighth Judicial District Court,*
   592 U.S. 351 (2021).........................................................................30

*Fuentes v. Classica Cruise Operator Ltd.,*
   32 F.4th 1311 (11th Cir. 2022) ........................................................37

*Fujitsu Ltd. v. Netgear Inc.,*
   620 F.3d 1321 (Fed. Cir. 2010) ........................................................50

*Gasoline Products Co. v. Champlin Refining Co.,*
   283 U.S. 494 (1931).........................................................................43

*Gemtron Corp. v. Saint-Gobain Corp.,*
   572 F.3d 1371 (Fed. Cir. 2009) ........................................................46

*General Motors Corp. v. Devex Corp.*,
  461 U.S. 648 (1983) ....................................................................64

*Global-Tech Appliances v. SEB S.A.*,
  563 U.S. 754 (2011) ....................................................................49

*Grober v. Mako Products, Inc.*,
  686 F.3d 1335 (Fed. Cir. 2012) ...............................................20, 21

*Highmark Inc. v. Allcare Health Management System, Inc.*,
  572 U.S. 559 (2014) ....................................................................21

*HTC Corp. v. IPCom GmbH & Co., KG*,
  667 F.3d 1270 (Fed. Cir. 2012) .................................................53

*ICON Health & Fitness, Inc. v. Horizon Fitness, Inc.*,
  No. 5:08CV26, 2009 WL 1025467 (E.D. Tex. Mar. 26, 2009) ........27

*In re Stingray IP Solutions, LLC*,
  56 F.4th 1379 (Fed. Cir. 2023) .................................................34

*In re TP-Link Technologies Co.*,
  No. 2023-123, 2023 WL 2881314 (Fed. Cir. Apr. 11, 2023)
  (nonprecedential) .......................................................................1

*Insituform Technologies, Inc. v. Cat Contracting, Inc.*,
  161 F.3d 688 (Fed. Cir. 1998) ...................................................53

*J. McIntyre Machinery, Ltd. v. Nicastro*,
  564 U.S. 873 (2011) ....................................................................29

*King v. Pratt & Whitney*,
  161 F.R.D. 475 (S.D. Fla. 1995) ...............................................37

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) .....................................................21

*Largan Precision Co. v. Ability Opto-Electronics Technology Co.*,
  No. 4:19-cv-696, 2020 WL 569815 (E.D. Tex. Feb. 5, 2020) ........27

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) .....................................................63

*Layton v. Green Valley Village Community Association*,
  No. 2:14-cv-1347-GMN-EJY, 2024 WL 1446185 (D. Nev. Mar.
  26, 2024) ...............................................................................................37

*Lesnick v. Hollingsworth & Vose Co.*,
  35 F.3d 939 (4th Cir. 1994) ...............................................................29

*Liberty Insurance Corp. v. Brodeur*,
  41 F.4th 1185 (9th Cir. 2022) ............................................................38

*Litecubes, LLC v. Northern Light Products, Inc.*,
  523 F.3d 1353 (Fed. Cir. 2008) ..........................................................48

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .....................................................21, 63

*M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*,
  890 F.3d 995 (Fed. Cir. 2018) ............................................................34

*Meaux Surface Protection, Inc. v. Fogleman*,
  607 F.3d 161 (5th Cir. 2010) ..............................................................21

*MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
  420 F.3d 1369 (Fed. Cir. 2005) ..........................................................49

*Mobile Equity Corp. v. Walmart Inc.*,
  No. 2:21-cv-00126-JRG-RSP, 2022 WL 4587554 (E.D. Tex. Sept.
  8, 2022), *report and recommendation adopted*, 2022 WL 4587499
  (E.D. Tex. Sept. 27, 2022) ...................................................................51

*Moore v. Ashland Chemical Inc.*,
  151 F.3d 269 (5th Cir. 1998) ..............................................................61

*Muth v. Ford Motor Co.*,
  461 F.3d 557 (5th Cir. 2006) ..............................................................55

*NexStep, Inc. v. Comcast Cable Communications, LLC*,
  119 F.4th 1355 (Fed. Cir. 2024) .........................................................45

*Nichols Construction Corp. v. Cessna Aircraft Co.*,
  808 F.2d 340 (5th Cir. 1985) ..............................................................53

*Nuance Communications, Inc. v. Abbyy Software House*,
   626 F.3d 1222 (Fed. Cir. 2010) .......................................................... 33

*Polar Electro Oy v. Suunto Oy*,
   829 F.3d 1343 (Fed. Cir. 2016) ................................................... 23, 26

*Rotec Industries, Inc. v. Mitsubishi Corp.*,
   215 F.3d 1246 (Fed. Cir. 2000) .......................................................... 46

*Smith v. Garlock Equipment Co.*,
   658 F. App'x 1017 (Fed. Cir. 2016) (nonprecedential) .................... 46

*Spir Star AG v. Kimich*,
   310 S.W.3d 868 (Tex. 2010) .............................................................. 29

*Stingray IP Solutions, LLC v. TP-Link Technologies Co.*,
   No. 2:21-CV-00045-JRG, 2022 WL 17357774 (E.D. Tex. Oct. 13,
   2022) ..................................................................................................... 8

*Superior Industries, LLC v. Thor Global Enterprises Ltd.*,
   700 F.3d 1287 (Fed. Cir. 2012) .......................................................... 54

*Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical Corp.*,
   785 F.3d 625 (Fed. Cir. 2015) .................................................... 54, 55

*Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics
   America, Inc.*,
   895 F.3d 1304 (Fed. Cir. 2018) .......................................................... 44

*Topalian v. Ehrman*,
   3 F.3d 931 (5th Cir. 1993) .......................................................... 40, 41

*Touchom, Inc. v. Bereskin & Parr*,
   574 F.3d 1403 (Fed. Cir. 2009) .......................................................... 34

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors
   U.S.A, Inc.*,
   617 F.3d 1296 (Fed. Cir. 2010) .......................................................... 47

*Trimble Inc. v. PerDiemCo LLC*,
   997 F.3d 1147 (Fed. Cir. 2021) ............................................. 31, 32, 33

*United States v. $49,000 Currency*,
   330 F.3d 371 (5th Cir. 2003) ...............................................20, 38, 40

*Verizon Services Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ...........................................56

*Versata Software, Inc. v. SAP America, Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013) ...................................64, 65

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
   824 F.3d 1344 (Fed. Cir. 2016) ...........................................52

*Watson v. Johnson Mobile Homes*,
   284 F.3d 568 (5th Cir. 2002) ........................................ 55-56

*Williams v. Slade*,
   431 F.2d 605 (5th Cir. 1970) ........................................43, 44

*Wilmington Star Mining Co. v. Fulton*,
   205 U.S. 60 (1907)..............................................................55

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)......................................................30, 32

*Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*,
   848 F.3d 1346 (Fed. Cir. 2017) ....................................22, 31

*Ziilabs Inc., Ltd. v. Samsung Electronics Co.*,
   No. 2:14-CV-203-JRG-RSP, 2015 WL 1456540 (E.D. Tex. Mar.
   30, 2015) ................................................................... 50-51

## STATUTES AND RULES

28 U.S.C.
   § 1295(a)(1) .........................................................................4
   § 1331...................................................................................3
   § 1338...................................................................................3
   § 1391(b)............................................................................35
   § 1404(a) .............................................................................1

35 U.S.C.
§ 271(a) ................................................................................44, 49
§ 284..............................................................................................64
§ 285..............................................................................................64

Fed. R. Civ. P.
Rule 4 cmt. ...................................................................................22
Rule 4(k)(2) ............................................................. *passim*
Rule 30(b)(6) ...............................................................................37

## OTHER AUTHORITIES

*Restatement (Second) of Contracts* § 24 (1979) .......................................................46

## STATEMENT OF RELATED CASES

This Court previously denied a mandamus petition challenging the district court's order denying a motion to transfer this case pursuant to 28 U.S.C. § 1404(a).  *See In re TP-Link Technologies Co., Ltd.*, No. 2023-123, 2023 WL 2881314, at *1 (Fed. Cir. Apr. 11, 2023) (Lourie, Prost, & Wallach, JJ.).

Counsel for Defendants-Appellants Lianzhou Technologies Co., Ltd., fka TP-Link Technologies Co. and TP-Link Corporation Ltd., fka TP-Link International Ltd. (together "Appellants") are unaware of any other case pending in this Court or any other court that will directly affect or be directly affected by the Court's decision in this appeal.

## INTRODUCTION

Appellants are foreign corporations that maintain no presence and conduct no business in the United States.  Appellants sell the accused wireless networking devices to a single U.S. distributor located in California.  Atlas secured venue in Texas by suing only Appellants—and not their distributor, which would have required venue in California—but then attempted to prove infringement and damages through the non-party distributor.  That strategic decision led to multiple pervasive errors, all improperly adverse to Appellants.

***First***, the case should never have proceeded in Texas, because the district court lacked personal jurisdiction over Appellants under any formulation of the

stream-of-commerce test. And because Appellants established that they would be subject to personal jurisdiction in California, the district court also erred in holding that personal jurisdiction was proper under Fed. R. Civ. P. 4(k)(2).

**Second**, Atlas demanded that Appellants provide discovery from their California distributor even though it was, at all relevant times, a separate, independent entity. Ignoring Atlas's overreach and Appellants' compliance with both their general discovery obligations and the district court's specific orders, the district court imposed a severe and baseless evidentiary sanction that admitted inflated damages evidence, forbade Appellants from refuting it, and permitted unwarranted criticism of Appellants' credibility that Appellants were likewise prohibited from rebutting.

**Third**, for the sole asserted apparatus claim, Atlas based its direct infringement theory on the California distributor's importation of accused products—even though its purchases from Appellants were completed overseas—and the distributor's independent marketing of the accused products. The district court failed to recognize that Appellants cannot be liable for direct infringement based on the conduct of a separate entity.

**Fourth**, for alleged induced infringement of the asserted method claims, the district court improperly faulted Appellants for failing to prove that they did ***not*** receive a purported pre-suit notice letter, which was ***not*** addressed or sent to them,

and which did not allege infringement or even identify the asserted patents. Separately, the marketing materials Atlas relied on for purported inducement did not address any of the relevant features of the accused products.

Because Appellants did not infringe either directly or indirectly, the judgment should be reversed.  Reversal on either direct infringement or indirect infringement requires vacatur of the damages award because the verdict form did not distinguish between those causes of action, which were brought regarding separate patents.

***Finally***, the damages award should additionally be vacated because (1) the district court erroneously permitted Atlas's damages expert to present an unreliable methodology that failed to properly apportion damages to the claimed features; and (2) Atlas's damages expert failed to adhere to the willing-licensee assumption of the hypothetical-negotiation framework, instead improperly inviting the jury to award an inflated royalty rate based on Appellants' decision to defend against Atlas's lawsuit.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, although it lacked personal jurisdiction over Appellants.  *See infra* pp. 21-35. Judgment entered on December 13, 2023 (Appx21874-21875), and an amended final judgment entered on September 3, 2024.  Appx4-65.  Appellants timely

appealed on October 3, 2024. Appx21876-21878. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.      Whether the district court lacked personal jurisdiction over Appellants, which do not conduct any business in the United States and have no connection to Texas.

2.      Whether the district court abused its discretion in imposing a sanction without finding any discovery violation or other sanctionable conduct, resulting in the jury hearing a false narrative and receiving inaccurate damages evidence that Appellants were forbidden from rebutting.

3.      Whether the judgment should be reversed or vacated because no reasonable juror could have found:

  a.      that Appellants engaged in any act of direct infringement, given that they sell the accused products outside the United States; and/or

  b.      that Appellants are liable for induced infringement, given the absence of evidence of pre-suit notice of infringement and of specific intent to infringe.

4.    Whether the damages award should be reversed or vacated because Atlas's expert failed to exclude the value of unpatented features and failed to apply the fundamental assumptions of the hypothetical-negotiation framework.

## STATEMENT OF THE CASE

### A.    Appellants' Lack Of Contacts With Texas

Appellants manufacture and sell wireless networking devices in Asia. Appellant Lianzhou Technologies Co., Ltd. (formerly known as TP-Link Technologies Co., Ltd., referred to herein as "TP-Link China" or "Lianzhou") is a Chinese corporation with a principal place of business in Shenzhen, China. Appx20374.  Lianzhou manufactures products in China, Appx20854, and sells them to Appellant TP-Link Corporation Ltd. (formerly known as TP-Link International Ltd., referred to herein as "TP-Link Hong Kong"), a company incorporated and based in Hong Kong.  Appx20822(55:21-22); Appx20377.  TP-Link Hong Kong then sells the products to non-party TP-Link Systems (formerly known as TP-Link USA Corporation, referred to herein as "TP-Link USA"), a California corporation with its principal place of business in Irvine, California. Appx20823(56:3-4); Appx20374.[1]

---

[1] The facts herein are stated as of the time of the filing of the complaint. *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 785, 787 n.1 (5th Cir. 1990) (for purposes of evaluating personal jurisdiction, the facts are assessed as of the filing of the complaint).  Though the companies have since reorganized, at all relevant times

TP-Link Hong Kong completes the sale and delivery of products to TP-Link USA in either Hong Kong or mainland China.  Appx20823(56:5-25).  The products are then shipped to TP-Link USA's California address.  Appx20705-20708.  Non-party TP-Link USA is solely responsible for selling the accused products in the United States.  Appx20374-20375(¶4); Appx20377(¶3); Appx20842(138:9-17); Appx20849.  Pursuant to the distribution agreement between TP-Link Hong Kong and TP-Link USA, TP-Link USA is to maintain its own "independent marketing channels," "pay for necessary advertisements and promotions," and "handle all customer service and technical support obligations" in the United States.  Appx20862-20863.

Appellants have no contacts with Texas.  They do not have employees, offices, or other facilities in Texas; do not design, manufacture, sell, or advertise products in Texas; and do not ship products into Texas.  Appx20377(¶3).

## B.     Atlas's Allegations Of Infringement

Plaintiff Atlas Global Technologies LLC ("Atlas"), a wholly owned subsidiary of Acacia Research, was formed in 2020 for the purpose of "hold[ing] patents."  Appx21083(13:5-14); Appx21087(29:8-20).

---

TP-Link USA was a wholly owned subsidiary of non-party TP-Link UK, Ltd. Appx20374-20375(¶4).  At no relevant time has TP-Link USA been a subsidiary of either Appellant TP-Link China or Appellant TP-Link Hong Kong.  Appx20375. During this appeal, TP-Link China became a subsidiary of TP-Link Hong Kong, which in turn became a subsidiary of TP-Link USA.

Atlas's complaint, filed November 22, 2021, asserted direct and indirect infringement of eight patents allegedly essential to the IEEE 802.11ax-2021 ("Wi-Fi 6") standard.  Appx20019-20022(¶¶47-49).  Five patents remained by the time of trial: (1) U.S. Patent No. 9,532,187, relating to bit "interleaving"; (2) U.S. Patent No. 9,763,259, relating to channel "sounding"; (3) U.S. Patent No. 9,825,738, relating to simultaneous "multiuser exchanges"; (4) U.S. Patent No. 9,912,513, relating to a "guard interval"; and (5) U.S. Patent No. 9,917,679, relating to a packet "Ack[nowledgment] format."  Appx1389-1390(385:21-386:13); Appx1467-1468(463:22-464:9); Appx1500-1501(493:4-494:6).

## C.    The District Court's Imposition Of Sanctions

Atlas notably did ***not*** sue TP-Link USA, even though TP-Link USA was Appellants' sole U.S. distributor.  This was no doubt a strategic decision to support venue in Texas, which would have been improper as to California-based TP-Link USA.

Despite this strategic choice, when Atlas wanted sales data from TP-Link USA, Atlas did not issue a third-party subpoena, but rather propounded discovery requests ***to Appellants***.  Appx21454-21458; Appx21465-21469.  Appellants objected, explaining that they did not own, were not affiliated with, and had no control over TP-Link USA.  Appx21472-21475; Appx20854.  Rather, as Appellants repeatedly explained, including in their earlier motion to dismiss for

lack of personal jurisdiction, TP-Link USA was owned by another unrelated entity (TP-Link UK) and—as the district court itself recognized in a separate litigation—"share[d] no common corporate leadership" with Appellants. *Stingray IP Solutions, LLC v. TP-Link Techs. Co.*, No. 2:21-CV-00045-JRG, 2022 WL 17357774, at *5 (E.D. Tex. Oct. 13, 2022) (quotation marks omitted); *see also* Appx20798; Appx21473; Appx21808; Appx21816; Appx21807; Appx21813; Appx21765-21766; Appx20374-20375(¶4).

Although Appellants had previously produced data reflecting their own sales of accused products to TP-Link USA, Atlas moved to compel Appellants to produce, inter alia, TP-Link USA's data regarding its own sales of accused products. Appx21454-21458; Appx21465-21469. On March 5, 2023, the magistrate judge ordered that Appellants produce sales and financial information "[w]ithin the [p]ossession of TP-Link USA" and "attributable to TP-Link USA," and to do so by "a time agreed upon by the parties." Appx21490-21491. Appellants objected to the order. Appx21492-21497. Nonetheless, in an effort to comply with the order "even before [the district court] ruled on [their] objections," Appellants themselves issued a subpoena to TP-Link USA for the requested sales data. Appx21548-21550; Appx21572-21573. TP-Link USA produced that data to Appellants who, on March 24, 2023, promptly produced the data to Atlas, thus complying with the March 5 order. Appx21548-21549; Appx21572-21573. The

district court overruled Appellants' objections on March 27, 2023.  Appx21492-
21497; Appx21505-21506.

Four days later, Atlas took a Rule 30(b)(6) deposition of Appellants.
Although Atlas's Rule 30(b)(6) notice did not identify any topics related to TP-
Link USA's corporate ownership or a company called Ivy Grove Limited—an
entity unrelated to Appellants and three levels above non-party TP-Link USA in its
corporate ownership chain—Atlas's counsel nevertheless asked Appellants'
designee questions about Ivy Grove.  Appx21531.  The witness answered,
accurately, that he was not familiar with that company.  Appx21531(42:22-43:6).

After the deposition, Appellants offered to resolve the dispute over these
questions by stipulating regarding the ownership of TP-Link USA.  Appx21731;
Appx21544; Appx21551.  Atlas then allowed the motion-to-compel deadline to
pass.  Appx21551.

Two weeks after that deadline, however, Atlas moved for sanctions,
complaining that Appellants had failed to show that they lacked a corporate
relationship with TP-Link USA and that Appellants' sales data did not match TP-
Link USA's sales data.  Atlas asked the district court to order that unauthenticated,
inadmissible sales data generated by a third-party industry analyst group,
International Data Corporation ("IDC"), be treated as "established."  Appx21508;
Appx21514; Appx21675-21678.  The IDC data does not identify any particular

entity as the source of the referenced sales, referring only to "TP-Link," and shows sales and forecasts of accused products more than double those of Appellants' actual verified sales data (i.e., data reflecting TP-Link Hong Kong's sales to TP-Link USA).  Appx1608(601:17-25); Appx21872(¶4); Appx21761-21762; Appx21523.  IDC advertises the *un*reliability of its data, "expressly disclaim[ing] … any warranties as to the accuracy and completeness of any information provided."  Appx21577.

Appellants opposed the sanctions motion, pointing out that the discovery issue had been resolved because Appellants obtained the requested sales information from TP-Link USA via subpoena and produced it to Atlas. Appx21550.  Appellants also explained that there were no "discrepancies" between the data Appellants produced (reflecting their sales to TP-Link USA) and the data they subpoenaed from TP-Link USA (reflecting its own sales), including because TP-Link USA's data included three more months of sales than the data Appellants had initially produced, because distributors like TP-Link USA typically sell products at a higher price than they pay to buy them, because there is typically a lag between OEM and distributor sales, and because distributors usually accumulate product inventory to prevent shortages.  Appx21553-21554.

On June 29, 2023, while the sanctions motion was pending, Appellant TP-Link Hong Kong was purchased by Big Field Global Pte. Limited, a Singapore

company that was, at that time, a subsidiary of Ivy Grove Limited.  As a result, one of the Appellants—TP-Link Hong Kong—became, for the first time since the case was filed almost two years earlier, affiliated with TP-Link USA.  Appx21724-21725; Appx21732; Appx21740-21743; Appx1726-1727(719:21-720:13).  Appellants promptly filed a Supplemental Corporate Disclosure Statement on July 20, 2023.  Appx21724-21726.

On August 2, 2023, the district court granted Atlas's sanctions motion, identifying Appellants' supposedly sanctionable conduct in a single two-sentence paragraph.  Appx77.  The court criticized the Rule 30(b)(6) witness's lack of knowledge regarding Ivy Grove Limited, though it did not grapple with the facts that the 30(b)(6) notice did not seek testimony regarding that company, that Appellants had no relationship with Ivy Grove Limited at the time of the deposition, or that Atlas had not taken any steps to obtain additional testimony on that topic.  *Id.*  The court also criticized Appellants' previous representations that "TP-Link USA was an independent third party," but did not cite any evidence that those representations were inaccurate when made.  *Id.*  Instead, the court cited the ***post-deposition*** change to Appellants' corporate structure and stated that

"Defendants and TP-Link USA are commonly owned entities."[2]  *Id.*; Appx21724-21725; Appx21732; Appx21740-21743; Appx1726-1727(719:21-720:13).  The court deemed the IDC data "as established facts" and forbade Appellants from introducing their actual sales data or questioning the IDC data (notwithstanding IDC's own disclaimer of its accuracy).  Appx77-78.

Atlas took full advantage, using the "established" IDC data to support a $37 million damages request—over ***$15 million higher*** than Atlas's own number based on Appellants' actual sales data.  Appx1608(601:17-25); Appx21872(¶4); Appx21761-21762.

Atlas also used the court's sanctions order to unfairly undermine Appellants' credibility before the jury.  Before trial, Appellants had sent Atlas an offer letter proposing a patent license on fair, reasonable, and non-discriminatory ("FRAND") terms, with a projected sales estimate based on Appellants' own sales figures.  Appx5093-5096.  At trial, Atlas repeatedly compared the sales estimate in that letter to the ***IDC data*** that the court's sanctions order forced Appellants to treat as "established."  Appx1709(702:6-13); Appx1924-1927(913:16-916:19); Appx2076(1062:13-18).  Because the sanctions order forbade Appellants from

---

[2] The district court was incorrect that "Defendants" and TP-Link USA were commonly owned.  Appellant TP-Link Technologies Co., Ltd. (now Lianzhou) was not an affiliate of TP-Link USA at the time.

mentioning their actual sales data or questioning the IDC data, they could not explain the apparent discrepancy to the jury.

**D.    Trial**

**1.    Atlas's infringement assertions.**

Atlas asserted infringement of nine claims across five patents.  Atlas argued direct infringement for claim 1 of the '513 patent, the only apparatus claim and the only asserted claim of that patent, and induced infringement for the remaining eight method claims.  Appx1968-1969(957:20-958:5).

*a.    Atlas's direct-infringement assertions.*

Atlas's technical expert, Dr. Matthew Shoemake, testified that Appellants directly infringed the sole asserted apparatus claim by "offering to sell the infringing products inside the United States on their website."  Appx1432(428:19-22).  Dr. Shoemake relied on a compilation of pages from the website, "tp-link.com/us," on which he testified "they offer infringing products … [a]nd there's a button that says 'shop now' that allows you to purchase the product." Appx1433(429:6-7); Appx5384.  Dr. Shoemake testified that Appellant TP-Link Hong Kong "is actually providing this U.S. advertising" because the tp-link.com Terms of Use state that "[t]he services defined herein are provided by TP-Link Corporation Limited" and that "TP-Link Corporation Limited" "provides," among

other things, the "website[] that may be accessed at https://www.tp-link.com/us."
Appx1433-1435(429:23-431:9); Appx6195.

Mr. Feiyue Liu, an employee of TP-Link China, testified that neither
Appellant controls the website tp-link.com/us—rather, non-party TP-Link USA
controls the website, is responsible for all its content, and is the only entity using
the website to advertise the accused products for sale in the U.S. Appx1601(594:4-
18); Appx1603-1604(596:19-25, 597:13-21). Mr. Liu also testified that neither
Appellant offers or fulfills sales in the U.S., controls the list of retailers authorized
to sell the accused products in the U.S., or controls the terms of any sales in the
U.S. Appx1596-1604(589:6-8, 589:20-591:1, 591:9-16, 591:23-592:3, 596:19-25,
597:13-21).

Atlas also argued that Appellants directly infringed the apparatus claim by
importing accused products into the U.S., relying on invoices relating to sales of
accused products by Appellant TP-Link Hong Kong to non-party TP-Link USA.
Appx5010-5040; Appx1435-1436(431:10-432:12). As Dr. Shoemake admitted,
however, the invoice he presented to the jury showed that the "goods change[d]
hands" in Hong Kong, and that under the "FCA" international shipping term
specified on that invoice, "the buyer, [non-party] TP-Link USA, takes possession
and responsibility" for the products in Hong Kong. Appx1575-1576(568:25-
569:11). Likewise, Ms. Rita Zhang, the Operations Director of Appellant TP-Link

China, testified that the entire sales transaction from TP-Link China to TP-Link

Hong Kong to TP-Link USA takes place in Asia.  Appx1589-1590(582:18-583:16)

("The shipment and the delivery are completed in Asia.").  Ms. Zhang further

testified—and the sales documents confirm—that under "[o]ur trade terms" ("FOB

HONGKONG" and "FCA SHENZHEN"), "the delivery would be completed" in

either mainland China or Hong Kong.[3]  Appx1590(583:9-16); Appx5010-5040.

### b.     *Atlas's induced infringement assertions.*

Atlas argued that Appellants learned of the asserted patents on June 8, 2021,

the date Atlas sent letters to three individuals at the offices of non-party TP-Link

USA in California.  Appx1971-1972(960:15-961:7); Appx5001-5009.  Appellant

TP-Link Hong Kong's Director, Ms. Vivian Sun, testified—without

contradiction—that Appellants had never received Atlas's letters.

Appx1711(704:20-24).  Ms. Sun also explained that none of the letters' addressees

was an employee of either Appellant.  Appx1709-1711(702:17-704:12).  Atlas's

president and CEO, Craig Yudell, confirmed that he simply sent the letters to

individuals he found on the internet, and conceded that his company chose not to

---

[3] Dr. Shoemake agreed that "FCA" (free carrier) and "FOB" (free on board) are
"acronyms issued by the International Chamber of Commerce which define the
responsibilities of buyers and sellers for goods in international transactions."
Appx1574-1576(567:22-569:11).

sue TP-Link USA, the company to whose address the letters were sent.
Appx1361-1362(357:1-3; 358:10-13).

Atlas's letters offered "an opportunity for TP-Link to license Standard
Essential Patents (SEP) in Wi-Fi 6" and stated that Atlas's "patent portfolio covers
key improvements in Wi-Fi … adopted in the IEEE 802.11ax standard."
Appx5001-5009.  The letters did not allege infringement and did not identify the
asserted patents (or any other specific patents), any specific products, or any
specific allegedly patented features.  *Id.*

As purported evidence of intent to infringe, Atlas relied on Dr. Shoemake's
testimony regarding various marketing, product documentation, and technical
support materials for the accused products, all generally referring to Wi-Fi 6 and
generally encouraging consumers to buy or use accused products.  Appx1436-
1440(432:13-436:6); Appx5082-5092; Appx5097; Appx5384; Appx6183-6186;
Appx6212-6213; Appx6214-6219; Appx1436-1440(432:13-436:6).  Dr. Shoemake
drew no connection between those materials and either Appellant (as opposed to,
e.g., non-party TP-Link USA).  And none of those materials refers to the claimed
features of the asserted patents: i.e., interleaving ('187 patent), sounding ('259
patent), multi-user exchanges ('287 patent), guard intervals ('513 patent), or Ack
formats ('679 patent).

### 2.    Evidence relating to damages.

Through its expert Roy Weinstein, Atlas presented both lump-sum and running-royalty damages theories.  Appx1608-1609(601:17-602:7).  Both theories relied on the "established" IDC sales data that the district court prohibited Appellants from challenging.  Appx1693-1694(686:9-687:1).

Mr. Weinstein presented a starting royalty rate of $0.92 per unit based on the purported benefits of Atlas's Wi-Fi 6 patent portfolio over Wi-Fi 5 and allegedly comparable licenses to Atlas's entire patent portfolio (including the asserted patents).  Appx1633-1634(626:23-627:24); Appx1639-1640(632:17-633:10); Appx5071.  He then purported to apportion that rate down to $0.79 per unit.  *Id.*  In doing so, however, he used a methodology that produces nonsensical results, analyzed only some of Atlas's patents, and failed to factor out the value of features not covered by the asserted patents.  *See infra* pp. 57-61.

Mr. Weinstein recognized that he needed to reduce his proposed royalty rate to reflect certain "discounts" that Atlas applied in other real-world portfolio licenses, such as (in the case of a lump-sum royalty) a volume discount of 15% and a fully-paid-up discount of 50%.  Appx1645-1646(638:23-639:23).  However, Mr. Weinstein refused to apply other discounts extended to other licensees, such as Atlas's standard pre-litigation discount of 50% or early-adopter discount of 40%, even though at the time of the hypothetical negotiation in January 2019, Appellants

undisputedly would have qualified for both discounts. Appx1663-1666(656:15-659:15); Appx1284-1285(280:1-281:15).

### E.    Verdict And Post-Trial Proceedings

The verdict form asked whether Appellants "infringed ANY of the Asserted Claims." The jury answered "Yes" and awarded Atlas its full damages demand—a lump-sum royalty of $37,481,264. Appx69-70.

After the district court entered judgment, Appx21874-21875, Appellants timely moved for judgment as a matter of law (JMOL) and a new trial. The court denied Defendants' motions and entered an amended judgment. Appx1-3; Appx4-65.

## SUMMARY OF ARGUMENT

I.    The district court lacked personal jurisdiction over Appellants. Appellants have no Texas contacts, and jurisdiction is improper under any formulation of the stream-of-commerce test because Appellants did not know that their products would end up in Texas or purposefully target the state. The exercise of personal jurisdiction was independently unreasonable given Texas's lack of interest in litigating this case. The district court's alternative reliance on Federal Rule of Civil Procedure 4(k)(2) was also misplaced because Appellants established that they would be subject to personal jurisdiction in California.

II.   The district court abused its discretion in sanctioning Appellants. Appellants did not commit any discovery violation, and they remedied the alleged problem before the sanction was ordered.  Further, the sanction imposed was unrelated and grossly disproportionate to the alleged violation, resulting in a false narrative at trial that unfairly undermined Appellants' credibility and inflated the damages evidence.

III.   Atlas failed to prove that Appellants engaged in any act of direct infringement in the United States.  Rather, the alleged sales and offers for sale in the United States were made by non-party TP Link USA via a website Appellants did not control, and TP-Link USA—not Appellants—imported the accused products into the United States.

Atlas also failed to prove induced infringement of the method claims. Appellants' general marketing materials do not address the specifically accused features and cannot establish intent to infringe.  Further, Atlas failed to prove pre-suit knowledge because its alleged notice letter did not assert infringement or identify the asserted patents, and because there was no evidence Appellants ever received the letter.

Because Atlas failed to prove both direct and indirect infringement, the judgment should be reversed entirely.  Should the Court conclude that Atlas failed to prove one infringement theory but not the other, the judgment should be vacated

and a new trial on damages ordered because the verdict form, over Appellants'
objection, did not distinguish between the two theories.

IV.    The damages award also should be vacated because Atlas's damages
expert's testimony rested on an unreliable methodology that failed to apportion out
the value of unpatented features.  Atlas's expert also failed to apply the basic
hypothetical-negotiation assumption that the alleged infringer is a willing licensee,
instead testifying that damages should be higher because Appellants chose to
defend themselves in litigation.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court "reviews a determination of personal jurisdiction without
deference," "apply[ing] Federal Circuit law."  *Grober v. Mako Prods., Inc.*, 686
F.3d 1335, 1345 (Fed. Cir. 2012).

A discovery sanctions order is reviewed under regional circuit law.  *Adasa
Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 916 (Fed. Cir. 2022).  The Fifth
Circuit reviews the grant of sanctions for abuse of discretion, which includes "a
mistake of fact or law" "in the context of Rule 37 sanctions."  *United States v.
$49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003).

The Fifth Circuit reviews the denial of JMOL de novo.  *ACCO Brands, Inc.
v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1311-1312 (Fed. Cir. 2007).  Infringement

and damages are reviewed for substantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309-1310 (Fed. Cir. 2009). Evidentiary rulings are reviewed for abuse of discretion. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007); *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010). An "erroneous view of the law" is "necessarily" an abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014).

## II.   THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER APPELLANTS

### A.   Appellants Are Not Subject To Personal Jurisdiction In Texas

Specific personal jurisdiction over a nonresident defendant exists only where "(1) the defendant purposefully directed its activities at residents of the forum state, (2) the claim arises out of or relates to the defendant's activities with the forum state, and (3) assertion of personal jurisdiction is reasonable and fair." *Grober*, 686 F.3d at 1346 (quotation marks omitted). The plaintiff bears the burden of proving the first two prongs and, if that burden is met, "the burden shifts to the defendant to prove that personal jurisdiction is unreasonable." *Id.* Here, Atlas failed to show that Appellants purposefully directed any activities toward Texas residents, knew that their products would be sold in Texas, or targeted markets in Texas. Exercising personal jurisdiction was separately unreasonable

because neither Atlas nor Texas has a real interest in resolving the dispute in Texas.

### 1.    Appellants do not have minimum contacts with Texas.

To establish minimum contacts, "it is essential … that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities *within the forum State*." *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1353 (Fed. Cir. 2017).[4]  Leaving aside Rule 4(k)(2)—discussed *infra* pp. 34-35—the relevant contacts must be with the forum state. *See* Fed. R. Civ. P. 4 cmt. to 1993 Amendment (prior to Rule 4(k)(2), defendants with "insufficient contact with any single state to support jurisdiction" could not be subject to jurisdiction anywhere in the United States).

Appellants have performed no acts in or directed at Texas.  TP-Link China is headquartered and has its principal place of business in China.  Appx20374(¶¶1-2). TP-Link Hong Kong is headquartered and has its principal place of business in Hong Kong.  Appx20377(¶3).  These companies have no employees or agents in Texas; do not own, lease, or operate any offices or other facilities in Texas; do not design, manufacture, or offer for sale any products in Texas; do not ship products to Texas; and do not conduct any marketing or advertising in Texas. Appx20374(¶3); Appx20377(¶3).

---

[4] Emphases are added unless otherwise indicated.

Given the absence of any conduct in or targeted at Texas, the district court
relied on the stream-of-commerce theory of personal jurisdiction, the bounds of
which remain unsettled. In *Asahi Metal Industry Co. v. Superior Court of
California*, 480 U.S. 102 (1987), Justice O'Connor, writing for a four-Justice
plurality, concluded that "a defendant's awareness that the stream of commerce
may or will sweep the product into the forum State does not convert the mere act
of placing the product into the stream into an act purposefully directed toward the
forum State." *Id.* at 112. Rather, long-standing due-process principles require
additional evidence of "an intent or purpose to serve the market in the forum
State," such as "designing the product for the market in the forum State" or
"advertising in the forum State." *Id.* Justice Brennan, also writing for four
Justices, adopted the alternative view that personal jurisdiction is permissible
where a defendant places a product in the stream of commerce and "is aware that
the final product is being marketed in the forum State." *Id.* at 117 (Brennan, J.,
concurring in the judgment). This Court has not "take[n] a side on the *Asahi*
divide" because, in each case raising the stream-of-commerce issue, "the result
would [have been] the same under all articulations." *Polar Electro Oy v. Suunto
Oy*, 829 F.3d 1343, 1350 (Fed. Cir. 2016).

Here, personal jurisdiction is improper under either test. There is no evidence that Appellants either knew their products would be offered for sale in Texas or intentionally targeted a Texas market.

### a.   *Plaintiff failed to show that Appellants knew that accused products would be sold in Texas.*

Personal jurisdiction would be improper under Justice Brennan's approach, because there is no evidence that Appellants were "aware that the [accused] product[s] [were] being marketed in" in Texas. *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in the judgment). That is dispositive because knowledge—or, at a minimum, reasonable foreseeability—is key to Justice Brennan's test. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed. Cir. 1994). "The defendant's knowledge gives rise to both the direct benefit from the retail sale of the defendant's product and the indirect benefits related to the laws enabling commerce in the forum state." *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1380, 1382 (Fed. Cir. 2015).

Here, there is no evidence that Appellants knew or could have reasonably foreseen that the accused products would be sold in Texas. TP-Link China sold its products to TP-Link Hong Kong in Asia. Appx20822(55:18-22). TP-Link Hong Kong then sold those products to customers in Asia, including non-party TP-Link

USA.  Appx20822-20823(55:23-56:25).[5]  As the invoices corroborate, delivery

from TP-Link Hong Kong to TP-Link USA was completed in either Hong Kong or

mainland China, Appx20823(56:11-25), and, once TP-Link USA took ownership,

goods were shipped to TP-Link USA's California address.  Appx20692(56:7-25);

Appx20706; Appx20708.  TP-Link USA then decided "where it [was] going to …

sell the TP-Link products, and how they conduct[ed] the sales."

Appx20842(138:9-17); *accord* Appx20374-20375(¶4) (TP-Link USA is solely

responsible for selling TP-Link products in the U.S. and TP-Link China "does not

direct or control the activities of TP-Link USA"); Appx20377(¶3) (same, with

respect to TP-Link Hong Kong); Appx20849 (TP-Link Hong Kong "does not

monitor" TP-Link USA's sales).  Pursuant to the distribution agreement between

TP-Link Hong Kong and TP-Link USA, the latter was to "have and maintain its

own independent marketing channels."  Appx20862.  Appellants took no steps to

encourage sales in Texas, and "lack[ed] knowledge as to all of TP-Link USA

Corporation's sales activities."  Appx20814.

The district court's exercise of personal jurisdiction was thus improper under

even Justice Brennan's broad articulation of the stream-of-commerce test.  As in

---

[5] At the time the Complaint was filed, TP-Link USA was a wholly owned
subsidiary of non-party TP-Link UK, Ltd., and was not affiliated with Appellants
at all.  Appx20374-20375(¶4); Appx20854.

*Celgard*, Atlas "has not provided evidence that [Appellants] w[ere] aware that [their] accused [products] were marketed in [Texas]." 792 F.3d at 1382. Rather, as in *Celgard*, the evidence shows only that Appellants sold products to another company that, in turn, was solely responsible for determining where and to whom the accused products would be sold in the U.S. *Id.* That is an insufficient basis for exercising personal jurisdiction.

*Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343 (Fed. Cir. 2016), confirms that conclusion. There, as here, the defendant was a foreign corporation that sold products to a separate entity that, in turn, shipped the products to retailers in the U.S. *Id.* at 1346. But in *Polar*, unlike here, the foreign defendant packaged products for shipping and "coordinat[ed] the freight to the destination specified by [the distributor]," including destinations in the forum state. *Id.* at 1350. The defendant was subject to personal jurisdiction because it "fully expect[ed] that its products would then be sold [in the forum state] as a result of its activities." *Id.* at 1350-1351. Here, by contrast, Appellants knew only that non-party TP-Link USA was importing the products into California. Appx20706. There is no evidence that Appellants had any knowledge of, or role in deciding, where and how those products were then distributed.

*Beverly Hills Fan Co. v. Royal Sovereign Corp.* is not to the contrary. There, jurisdiction was proper due to "uncontroverted" allegations and evidence

that the defendants "knew the likely destination of the products." 21 F.3d 1558, 1566 (Fed. Cir. 1994). Here, as discussed, the evidence shows just the opposite.

The district court's contrary conclusion rested on a clear error of fact; it was incorrect that "defendants do not deny knowledge of the sale of accused products in Texas." Appx21420. In fact, Appellants explained that they "have no knowledge of where in the United States non-party TP-Link USA ultimately sells the [accused] products," and neither Atlas nor the district court pointed to any contrary evidence. Appx20800.

The district court also relied on two unpublished and inapposite Eastern District of Texas decisions that it maintained supported a "presum[ption]" that "defendants reasonably anticipated that [their] products would be sold in Texas." Appx21421. Neither case justifies any such presumption here. In *ICON Health & Fitness, Inc. v. Horizon Fitness, Inc.*, No. 5:08CV26, 2009 WL 1025467 (E.D. Tex. Mar. 26, 2009), the defendant sold products to a U.S. entity with a "Dallas Sales Office" and knew that its products were "developed specifically for sale at" retailers with large Texas presences. *Id.* at *10 & n.6. And in *Largan Precision Co. v. Ability Opto-Electronics Technology Co.*, the evidence showed "negotiation and cooperation" between the defendants and the ultimate U.S. importer and seller regarding what products to manufacture, how many, and to whom to sell them. No. 4:19-cv-696, 2020 WL 569815, at *7 (E.D. Tex. Feb. 5, 2020). Here, by

contrast, the U.S. seller (TP-Link USA) simply submits a purchase order for finished products, accepts those products in China or Hong Kong for delivery to its own offices in California, and then has complete control over their distribution in the U.S.  Appx20838-20839(119:7-120:12); Appx20374-20375(¶4); Appx20377(¶3); Appx20861-20864.  It is legal error to apply a "presumption" that a defendant knew or reasonably foresaw that its products would be sold in Texas based simply on a separate distributor's independent conduct.

### b.    Plaintiff failed to show that Appellants purposefully directed their conduct toward Texas.

While the Court need not reach the issue, Justice O'Connor's purposeful-direction test better aligns with longstanding principles of due process than Justice Brennan's approach.  The Court should reverse under Justice O'Connor's approach as well, because there is no evidence that Appellants **purposefully** targeted Texas markets.

Only the purposeful-direction test comports with "the constitutional touchstone" of personal jurisdiction: i.e., "whether the defendant **purposefully established** minimum contacts in the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quotation marks omitted).  The exercise of personal jurisdiction requires that "the defendant *himself* … create[d] a substantial connection with the forum State," and did so "deliberately." *Id.* at 475 (quotation marks omitted) (emphasis in original).  By contrast, and as the Supreme Court "has

consistently held," the mere "foreseeability of causing injury in another State" is

"not a sufficient benchmark for exercising personal jurisdiction." *Id.* at 474

(emphasis and quotation marks omitted); *accord J. McIntyre Machinery, Ltd. v.*

*Nicastro*, 564 U.S. 873, 883 (2011) (plurality op.) ("[I]t is the defendant's actions,

not his expectations, that empower a State's courts to subject him to judgment.").

If the Court reaches the question, it should join the First, Fourth, and Sixth

Circuits, and the Texas Supreme Court, and adopt Justice O'Connor's approach to

the stream-of-commerce test.[6]

Here, there is no evidence that Appellants had "an intent or purpose to serve

the market" in Texas. *Asahi*, 480 U.S. at 112. Appellants did not "take[] any

steps" to "encourage" sales in Texas. Appx20814. And TP-Link USA, not

Appellants, imported and distributed the products in the U.S., "maintain[ed] its

own independent marketing channels," "develop[ed] and pa[id] for necessary

---

[6] *See Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 683 (1st Cir. 1992) ("'[M]ere awareness' that a product may end up in the forum state does not constitute 'purposeful availment[.]'"); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994) ("To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism."); *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 480 (6th Cir. 2003) ("[W]e make clear today our preference for Justice O'Connor's stream of commerce 'plus' approach[.]"); *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (following Justice O'Connor's test).

advertisements and promotions," and "handle[d] all customer service and technical support obligations" in the United States.  Appx20862-20863.

Appellants, in short, simply placed "product[s] into the stream of commerce," which "is not an act … purposefully directed toward [Texas]." *Asahi*, 480 U.S. at 112.  Appellants have not "cultivate[d] a market for [their] product[s] in the forum State," whether by selling, advertising, or providing customer support to consumers in Texas. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 352 (2021) (finding personal jurisdiction only where the defendant sought to create and serve a market in the forum state).  The eventual sale of TP-Link branded products in Texas by an unaffiliated distributor—TP-Link USA— thus resulted not from any "efforts of [Defendants] to serve directly or indirectly, the market for its product[s]" in Texas, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), but from the unilateral acts of TP-Link USA.

The district court improperly relied on evidence of Appellants' efforts to target the United States as a whole, such as English-language product documentation, power components compatible with U.S. electrical supply, and FCC certification.  Appx21420.  None of that, however, supports a finding that defendants "purposefully directed [their activities] … toward the ***forum state***" of Texas, as is required to establish "sufficient minimum contacts ***with the forum state***." *Celgard*, 792 F.3d at 1377, 1379 (quotation marks and brackets omitted).

### 2.    The exercise of personal jurisdiction was unreasonable.

Appellants' lack of minimum contacts is enough to find a lack of personal jurisdiction here.  Separately, however, the exercise of personal jurisdiction did not "comport with fair play and substantial justice."  *Trimble Inc. v. PerDiemCo LLC*, 997 F.3d 1147, 1157 (Fed. Cir. 2021).  Five factors are relevant to this due-process inquiry:  (1) "the burden on the defendant," (2) "the forum State's interest in adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several States in furthering fundamental substantive social policies."  *Burger King*, 471 U.S. at 477 (quotation marks omitted); *accord Trimble*, 997 F.3d at 1153.

Here, taking the first three factors collectively, "the plaintiff's interest and the state's interest in adjudicating the dispute in [Texas] are so attenuated that they are clearly outweighed by the burden of subjecting the defendant[s] to litigation within the forum."  *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1356 (Fed. Cir. 2017) (quotation marks omitted).  This is "a consequence of territorial limitations on the power of the respective States."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 263 (2017) (quotation marks omitted).  Where, as here, the parties' connections to the forum State and the forum State's interest in the litigation are so tenuous, "the Due Process Clause, acting as an

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

instrument of interstate federalism," precludes personal jurisdiction. *World-Wide Volkswagen*, 444 U.S. at 294.

Texas has no significant interest in adjudicating this dispute, and Atlas has no interest in convenient or effective relief that is unique to Texas. While states generally have an interest in protecting the rights of their citizens, Atlas's connection to Texas is gossamer-thin. Atlas was formed about a year before this lawsuit was filed by New York and California-based Acacia Research for the purpose of acquiring and licensing a portfolio including the asserted patents. Appx1277(273:7-10); Appx21083(13:5-14). All of Atlas's officers, directors, and employees are employees of Acacia. *See* Appx21100(78:6-17). Only one resides in Texas, Appx20477; the rest are California residents—including Atlas's CEO and Director, who is also Acacia's CEO. Appx20478-20479; Appx20477; Appx21087(27:19-29:6). Atlas's only physical presence in Texas is a " ▮Size▮ ▮Size▮ " office, where ▮Staffing▮ works. Appx21089(35:25-37:8); Appx21096-21097(65:12-67:23). Where a plaintiff's forum connections are so tenuous—and the result of apparent "forum shopping"—the forum state's interest does not weigh in favor of personal jurisdiction. *Trimble*, 997 F.3d at 1158.

The fourth and fifth factors lead to the same result. Neither the interstate interests in the efficient resolution of controversies nor in furthering social policies supports the exercise of jurisdiction in Texas. There are no efficiencies gained by

litigating in Texas, and no policy conflict between Texas and any other state because "the same body of federal patent law would govern the patent infringement claim irrespective of the forum." *Trimble*, 997 F.3d at 1159 (quotation marks and alteration omitted).  In light of the tenuous connection between the parties, the case, and the forum state, there is no reasonable basis for imposing upon Appellants the burdens of "submitting to the coercive power of" Texas courts.  *Bristol-Myers*, 582 U.S. at 263.

The district court's contrary conclusion rested on its improper disregard for the burden on Appellants.  Relying on *Nuance Communications, Inc. v. Abbyy Software House*, 626 F.3d 1222 (Fed. Cir. 2010), the court concluded that "the relationship between the defendants and TP-Link USA was intended to distribute products into the United States including to the state of Texas," such that litigation in Texas imposed no substantial burden.  Appx21423-21424.  But in *Nuance*, the forum connections were far stronger, as one of the defendants was a U.S.-based distributor headquartered in the forum state.  626 F.3d at 1228, 1232.  Here, given the absence of any similar forum connection, the burden of "submitting to the coercive power of a State" outweighs the state's "little legitimate interest in the claims in question."  *Bristol-Myers*, 582 U.S. at 263.

### B.    The District Court Erred In Holding That Personal Jurisdiction Would Be Proper Under Rule 4(k)(2)

Federal Rule of Civil Procedure 4(k)(2) does not create personal jurisdiction over Appellants in Texas either. "Rule 4(k)(2) allows a court to exercise personal jurisdiction over a defendant if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process." *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995, 999 (Fed. Cir. 2018) (quotation marks omitted). A defendant contesting personal jurisdiction bears the burden to disprove the second prong—the so-called "negation requirement"—by "designat[ing] a suitable forum in which the plaintiff could have brought suit." *Touchom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1415 (Fed. Cir. 2009).

Shortly after the magistrate judge's report and recommendation on personal jurisdiction, this Court clarified that a defendant's consent to jurisdiction in another forum cannot satisfy the negation requirement; rather, a defendant must "identify[] a forum where the plaintiff could have brought suit—a forum where jurisdiction would have been proper at the time of filing, regardless of consent." *In re Stingray IP Solutions, LLC*, 56 F.4th 1379, 1385 (Fed. Cir. 2023).

Despite Atlas's express disavowal of Rule 4(k)(2), Appx21395, the district court relied on that rule as an alternative basis for jurisdiction. The district court concluded that Appellants failed to satisfy the negation requirement because they

- 34 -

argued only that they would submit to jurisdiction in the Central District of

California (where both TP-Link USA and Acacia are located) but not that

jurisdiction would have been proper in California absent consent. Appx21421-

21423. That was wrong. Appellants in fact argued that "venue [would be] proper"

in the Central District of California, Appx20368, which could be true only if there

were personal jurisdiction over Appellants there, *see* 28 U.S.C. § 1391(b).

Appellants also argued, in their response to the magistrate judge's report and

recommendation, that jurisdiction would be proper in California under the stream-

of-commerce test by virtue of their sales to California-based TP-Link USA.

Appx21446-21447. *See Curry v. Revolution Labs., LLC*, 949 F.3d 385, 399 (7th

Cir. 2020) (sales to a forum resident can confer specific personal jurisdiction).

Because Appellants established that jurisdiction would have been proper in

California, the district court's invocation of Rule 4(k)(2) was improper.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN IMPOSING SANCTIONS, RESULTING IN AN UNFAIR TRIAL AND AN EXCESSIVE DAMAGES AWARD

### A. The Sanctions Ruling Was An Abuse Of Discretion

Atlas made a strategic decision to name only TP-Link China and TP-Link

Hong Kong as defendants—presumably to secure venue in Texas—but then

insisted that Appellants provide documents from and testimony regarding non-

party TP-Link USA. Atlas demanded documents concerning TP-Link USA's sales

that Appellants did not have, and 30(b)(6) testimony concerning information about

TP-Link USA's corporate ownership that Appellants' witness did not know and that Atlas had not even specified in its 30(b)(6) notice. *See supra* pp. 7-9. And even though Appellants provided the requested information—including by issuing their own subpoena to TP-Link USA—Atlas ultimately demanded, and the district court granted, severe discovery sanctions. *Id.*

The district court cited two bases for imposing sanctions: (1) that Appellants' 30(b)(6) witness's lack of knowledge of Ivy Grove Limited—a company not identified in Atlas's 30(b)(6) notice and not then related to either Appellant—violated Appellants' discovery obligations; and (2) that Appellants' statements that they were not corporate affiliates of TP-Link USA were inaccurate. Appx77. These findings were clearly erroneous and legal error, and thus abuses of discretion.

### 1. Appellants did not fail to provide testimony under Rule 30(b)(6).

As to the 30(b)(6) deposition, Atlas's deposition notice did ***not*** list any topics requiring knowledge of either Ivy Grove Limited or TP-Link USA's corporate ownership generally. Appx21511. Having failed to propound any topics encompassing Ivy Grove Limited, Atlas was in no position to complain that Appellants' designee was unprepared to address such topics, and its motion for sanctions should have been denied.

As Fed. R. Civ. P. 30(b)(6) confirms, a party noticing a 30(b)(6) deposition "***must*** describe with ***reasonable particularity*** the matters for examination."  A party is not entitled to testimony—and certainly not to sanctions—where, as here, the party fails to provide fair notice of its intended topics.  *See, e.g.*, *Bank of N.Y. Mellon as Tr. of Registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2004-5 v. Riley*, No. 21-40383, 2022 WL 1773364, at *5 (5th Cir. June 1, 2022) (nonprecedential) (affirming denial of motion to compel where movant "failed to explain the matters to be examined"); *Fuentes v. Classica Cruise Operator Ltd.*, 32 F.4th 1311, 1323 (11th Cir. 2022) (corporate witness's inability to answer questions outside scope of noticed topics not sanctionable); *King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995) ("[I]f the deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem."); *Layton v. Green Valley Village Community Ass'n*, No. 2:14-cv-1347-GMN-EJY, 2024 WL 1446185, at *3 (D. Nev. Mar. 26, 2024) (denying motion to compel and sanctions request because plaintiff failed to serve a notice with "reasonably particular topics").  Given that Atlas said nothing about Ivy Grove Limited in its notice—and that Appellants' witness was not testifying on behalf of TP-Link USA, which was not a party, and which Atlas did not subpoena—it was neither surprising nor improper that he was unaware of Ivy Grove Limited.

The court's sanctions order did not address the scope of Atlas's 30(b)(6)

topics, or otherwise explain how Appellants' testimony constituted a "failure to

disclose" with respect to TP-Link USA.  Appx77.  The order also did not identify

any topic actually within the scope of the Rule 30(b)(6) notice on which Appellants

failed to provide testimony.[7]  Appx72-78.  Thus, the district court abused its

discretion by failing to identify a valid factual basis for sanctions.  *See United*

*States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003) ("[I]n the context of

Rule 37 sanctions, a district court abuses its discretion when it makes a mistake of

fact or law."); *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1190 (9th Cir. 2022)

(reversing sanction "for failure to disclose a witness" because the witness had, in

fact, been "properly identified").

> ## 2.    Appellants did not misrepresent their relationship to non-party TP-Link USA.

Nor did the court identify a valid basis for finding that Appellants somehow

misrepresented a corporate affiliation with TP-Link USA.  Appx77; Appx10-11.

The court cited evidence that TP-Link USA was "formerly" a subsidiary of

Appellant TP-Link China, but also acknowledged that this status changed in the

---

[7] In its motion, Atlas argued that the definition of "You" in its notice included
"agents" or "representatives" and thus was broad enough to include TP-Link USA.
Appx21511.  But TP-Link USA was Appellants' ***customer***, not its agent or
representative.  And even if the topics had clearly encompassed TP-Link USA—
though they did not—they did not identify as a topic its corporate ownership.

2016-2017 timeframe—at least four years before Atlas filed suit.  Appx73.

Appellants submitted sworn—and uncontroverted—declarations in 2022

confirming that TP-Link USA was not a subsidiary of, and not directed or

controlled by, TP-Link China.  Appx20374-20375(¶4); Appx20377(¶3).

Appellants also submitted audited financial statements from 2022-2023 (during the

pendency of this case) confirming that TP-Link UK (not either Appellant) owned

TP-Link USA, that Ivy Grove Limited was the ultimate parent of both TP-Link UK

and TP-Link USA, and that none of those entities was affiliated with Appellants.

Appx21808; Appx21816; Appx21807; Appx21813; Appx21765-21766.  The

district court simply ignored this undisputed evidence.  Appx72-78; Appx9-17.

Pursuant to a corporate restructuring on June 29, 2023—three months after

the 30(b)(6) deposition, and two months after Atlas filed its sanctions motion—

Appellant TP-Link Hong Kong became a subsidiary of Ivy Grove Limited, the

ultimate owner of TP-Link USA.  Appx21732; Appx21740-21743.  Appellants

promptly filed a supplemental corporate disclosure on July 20, 2023.  Appx21724-

21726.  On July 31, 2023, Appellants also submitted documentary evidence

confirming the date of the restructuring.[8]  Appx21732; Appx21740-21743;

---

[8] The lack of shared corporate ownership between TP-Link Hong Kong and TP-Link USA—from the filing of the complaint in 2021 to the June 29, 2023 corporate restructuring—was confirmed by sworn trial testimony.  Appx1726-1727(719:21-720:13).

Again ignoring Appellants' uncontroverted evidence, the district court treated the July 20 disclosure as demonstrating that Appellants had misrepresented their affiliation with TP-Link USA all along.  Appx74; Appx77; Appx10-11.  That finding was clearly erroneous, and the court abused its discretion in relying on it as a basis for sanctions.  *See $49,000 Currency*, 330 F.3d at 376.

### 3.     The district court's sanctions were excessive and improper.

Independently, even if some sanction were warranted (none was), it was an abuse of discretion to exclude Appellants' sales data and forbid Appellants from contesting the unreliable IDC data.  *See Topalian v. Ehrman*, 3 F.3d 931, 936 (5th Cir. 1993) ("the sanction should be tailored to fit the particular wrong").  TP-Link USA's corporate ownership had nothing to do with the reliability of ***Appellants' own*** sales data.

The court insinuated that Appellants' sales data was somehow unreliable. Appx77.  To the extent the court was referring to differences between (1) Appellants' sales to TP-Link USA as reflected in Appellants' data, and (2) TP-Link USA's sales to its own customers as reflected in TP-Link USA's subpoenaed data, Appellants fully explained those differences: TP-Link USA has higher revenues than Appellants because TP-Link USA, as an independent distributor, sells products to retailers at a higher price than it pays to Appellants.  Appx21553-21554.  The fact that Appellants sold a different number of units to TP-Link USA

than TP-Link USA sold to customers in the same timeframe was also easily explained: as a distributor, TP-Link USA purchased products from Appellants earlier in time than it sold them to customers.  Appx21554.  At no point did the district court address Appellants' explanations.  And in any event, the accuracy of *Appellants'* sales data should have been a factual issue for the jury—not a basis for forbidding Appellants from even questioning the reliability of *third-party* data.

### B.    The Sanctions Order Unfairly Prejudiced Appellants

Appellants were massively and unfairly prejudiced by the court's erroneous sanctions.  Notwithstanding IDC's own "disclaim[er]" of "any warranties as to the accuracy and completeness of any information provided," and the ambiguity of which company's sales data IDC attempted to estimate, Atlas relied on the "established" IDC data to support a $37.4 million damages request—more than *$15 million higher* than the number Atlas's damages expert computed using Appellants' actual sales data.  Appx1608(601:17-25); Appx21872(¶4); Appx21761-21762; Appx21577.  Accordingly, the court's decision to exclude Appellants' own sales data and forbid Appellants from contesting the unreliable, hearsay IDC data amounted to, at minimum, a sanction exceeding $15 million.  This was far from "the least severe sanctions adequate to accomplish the purpose for which the sanction was imposed." *Topalian*, 3 F.3d at 938.

Appellants were also unfairly prejudiced by Atlas's use of the sanctions order as a sword to attack Appellants' credibility before the jury. Atlas criticized a FRAND offer letter that Appellants sent to Atlas before trial (Appx5093-5096), arguing that Appellants were bad-faith negotiators because the letter assumed only 11.3 million accused units, whereas at trial the sanctions order forced Appellants' expert Dr. McGahee to assume the IDC figure of 45 million accused units. Appx1709(702:6-13); Appx1924-1927(913:16-916:19); Appx2076(1062:13-18). Appellants' counsel specifically asked that Dr. McGahee be permitted to explain the discrepancy, but the district court refused. Appx1925-1927(914:14-916:8).

In its order denying Appellants' new-trial motion, the district court sought to minimize the harm by stating that Dr. McGahee's estimate of sales using Appellants' data was 25-35 million accused units, such that Atlas could have pointed to a similar discrepancy between the letter's 11.3 million units and Dr. McGahee's figure. Appx15-16. But the offer letter was based on projected sales for ***Wi-Fi-6 only***, and expressly excluded sales of products that support "any version of the IEEE 802.11xx Wi-Fi protocol that has not been finalized as of the date of this offer letter … (*e.g.*, Wi-Fi 7, Wi-Fi 8, etc.)." Appx5093 n.1. In contrast, Dr. McGahee's 25-35-million-unit estimate was for a lump sum for the entire lives of the patents, and thus included future sales of Wi-Fi 7, Wi-Fi 8, and beyond. Appx1855(844:6-13); Appx1926(915:12-15); Appx21976; Appx22086;

Appx22090-22095. Dr. McGahee could thus easily have explained the difference between the offer letter's 11.3 million units and the 25-35 million units in his expert report. But because of the sanction, Dr. McGahee could not offer any explanation, and his and Appellants' credibility suffered irretrievably and unfairly.

The prejudice from the sanction requires a new trial on all issues. As the Supreme Court has explained, "a partial new trial … may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931). And the Fifth Circuit has specifically cautioned that "where the damages are excessive and the verdict is the product of passion or prejudice a new trial as to all the issues must be ordered." *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir. 1970); *see also Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005) (similar). Here, Atlas's strategic misrepresentation of Appellants' offer letter (Appx5093-5096)—while the sanctions order tied Appellants' hands—"infected" both the damages and liability issues by painting Appellants as bad-faith negotiators. *See Williams*, 431 F.2d at 608. Atlas took full advantage of Appellants' helplessness in its closing statement, using a demonstrative and a calculator to mock the $1.356 million offer in Appellants' letter. Appx2076(1062:13-18); *see also* Appx1709(702:6-13); Appx1924-1927(913:16-916:19). This attack was only possible because of the

erroneous sanction, which prevented Appellants from explaining the basis for the letter's offer.  Appx77-78; Appx1925-1927(914:14-916:8).  Atlas's distorted picture of Appellants' behavior resulted in a verdict that was "the product of passion or prejudice," necessitating a new trial on all issues.  *See Williams*, 431 F.2d at 609.

## IV.    THE INFRINGEMENT VERDICT SHOULD BE REVERSED OR VACATED

### A.    Atlas Offered No Substantial Evidence Of Acts Of Direct Infringement

Both Appellants are located and operate entirely outside the United States—the accused products were researched and developed in China, are manufactured and packaged for sale in China, and those distributed in the United States are sold to non-party TP-Link USA in either mainland China or Hong Kong.  *See supra* pp. 5-6, 24-28.  Such extraterritorial conduct does not constitute direct infringement. *See* 35 U.S.C. § 271(a); *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1329 (Fed. Cir. 2018) (affirming summary judgment of noninfringement for "accused products … manufactured, packaged, and tested abroad, and … shipped to manufacturers and distributors abroad").

Atlas does not dispute that Appellants operate entirely outside the U.S., and the district court did not find otherwise.  Instead, Atlas argued, and the district court accepted, that Appellants (1) made offers for sale in the U.S. via the website

tp-link.com/us; and (2) imported accused products into the U.S. via their sales to non-party TP-Link USA.  Neither proposition is supported by substantial evidence.

### 1.    Atlas did not show that Appellants made offers for sale in the United States.

Unable to proffer any evidence of Appellants actually selling accused products in the U.S.—because they do not—Atlas attempted to prove that Appellants *offer* the accused products for sale in the U.S. via the website tp-link.com/us through what Dr. Shoemake described as a "shop now" button.  Dr. Shoemake's testimony and website excerpts cannot sustain the judgment.

Dr. Shoemake testified only that the "shop now" button "allows you to purchase the product."  Appx1432-1433(428:24-429:7).  He did not say (and Atlas did not otherwise demonstrate) from whom the "shop now" button allegedly allows someone to purchase the product, who receives the money from sales allegedly initiated by the "shop now" button, or who fulfills such sales.  Dr. Shoemake's conclusory "because I said so" testimony is not sufficient evidence of infringement.  *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1374 (Fed. Cir. 2024) (affirming JMOL of noninfringement).

Given the absence of substantial evidence regarding the functionality of the "shop now" button, the website excerpts Atlas relied on cannot show offers for sale (whether by Appellants or anyone else).  To be liable for an offer for sale, a defendant must "communicate[] a 'manifestation of willingness to enter into a

bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1257 (Fed. Cir. 2000) (quoting *Restatement (Second) of Contracts* § 24 (1979)). Atlas's website excerpts manifest no such willingness; instead, they are "advertisements," which "are not considered offers for sale, but are instead merely solicitations for offers." *Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016) (nonprecedential) (reversing denial of JMOL of noninfringement in part because an "image" which "states a price ('starting at only $1400'), shows [an accused] product, and provides … contact information for the purchase of the product" does not constitute an offer to sell).

In denying Appellants' JMOL motion, the district court cited Atlas's assertion that, through the "shop now" button, "a customer can accept Defendants' offer to sell" the accused products for the indicated price. Appx38-39. The court thus assumed the conclusion that Appellants made an "offer to sell" that could be accepted by selecting "shop now"—the very contention for which Atlas submitted no evidence. Nothing supported that conclusion beyond "unsworn attorney argument," which "is not evidence." *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009). There was, therefore, no basis for the district court's statement that there was a "disputed factual question[]" whether the website

excerpts showed offers to sell by Appellants, Appx39; to the contrary, Atlas did

not offer sufficient evidence to create such a dispute.

Moreover, Appellants submitted uncontroverted testimony from Mr. Liu that

neither Appellant is responsible for the content of tp-link.com/us or makes any

sales in the United States—instead, TP-Link USA does. *See supra* p. 14.  Nor do

Appellants control the price, quantity, or management of any sales of the accused

products made through the tp-link.com/us website. *See supra* p. 14.  Thus, even if

the "shop now" button evidenced an offer to sell (which it did not), the only

permissible inference would have been that non-party TP-Link USA—not either

Appellant—was the entity offering to sell the accused products in the United

States. *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors

U.S.A., Inc.*, 617 F.3d 1296, 1309 (Fed. Cir. 2010) ("the location of the

contemplated sale controls whether there is an offer to sell within the United

States").

The district court cited the website Terms of Use and copyright notice as

evidence that Appellant TP-Link Hong Kong "provide[s]" the website and "claims

to be [its] original author."  Appx36-37.  But neither "providing" a website (on

which a separate company advertises products pursuant to a distribution

agreement) nor being the "original author" of a website "template" (Appx1729-

1730(722:11-723:2)) constitutes an act of direct infringement.  Rather, Atlas

needed to show that (1) the website included "offers for sale" in the United States; and (2) any such offers were made *by Appellants*. As explained above, Atlas offered substantial evidence of neither.

### 2. Atlas did not show that Appellants imported accused products into the United States.

The undisputed evidence showed that the "shipment and delivery" of accused products is "completed" outside the United States, and Atlas's expert Dr. Shoemake agreed that the term "FCA," specified on the invoice he showed the jury, means "the buyer, TP-Link USA, takes possession and responsibility … in Hong Kong." *See supra* pp. 14-15. In other words, TP-Link USA—not Appellants—imported the accused products into the United States.[9]

The district court nevertheless concluded that Appellants' invoices for sales to non-party TP-Link USA, listing "'ship to' and 'bill to' addresses in California and a 'from' address in Hong Kong," were sufficient for the jury to find direct infringement. Appx34. The court was incorrect; "[m]ere knowledge that a product sold overseas will ultimately be imported into the United States is insufficient to

---

[9] The district court cited *Litecubes, LLC v. Northern Light Products, Inc.* for the proposition that international shipping terms are "not dispositive of the issue." Appx33 (citing 523 F.3d 1353, 1370 (Fed. Cir. 2008)). But *Litecubes* did not address importation, the only theory of infringement Atlas presented in relation to Appellants' invoices. *See Litecubes*, 523 F.3d at 1371 ("Since we find substantial evidence of a sale within the United States, we need not determine whether there was also … importation into the United States.").

establish liability under section 271(a)." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1377 (Fed. Cir. 2005). This is particularly true where, as here, the same invoices specified "FCA" or "FOB" transfer of the products overseas.

## B. Atlas Offered No Substantial Evidence Of Indirect Infringement

For the asserted method claims, Atlas alleged that Appellants induced infringement via marketing efforts and product documentation. But Atlas provided no evidence that Appellants knew of the patents or their alleged infringement before Atlas filed this lawsuit, and no evidence that Appellants specifically intended to induce infringement. Instead, Atlas relied on general marketing materials that do not promote the specifically accused features and cannot sustain the judgment.

### 1. Atlas did not prove pre-suit knowledge of the patents or their alleged infringement.

"[L]iability for induced infringement can only attach if the defendant knew of the patent and knew as well that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 640 (2015) (quoting *Global-Tech Appliances v. SEB S.A.*, 563 U.S. 754, 766 (2011)). While Atlas presented evidence of a letter purportedly mailed on June 8, 2021 (roughly five months before it filed suit), that evidence did not establish that Appellants had the required knowledge for two independent reasons.

- 49 -

***First***, Atlas's letter would not put any recipient on notice that its actions would induce patent infringement. Atlas's letter did not allege infringement of the asserted patents (or any other specific patents)—indeed, it did not even ***identify*** any specific patents. *See supra* pp. 15-16. Instead, Atlas merely offered "an opportunity for TP-Link to license Standard Essential Patents (SEP) in Wi-Fi 6," and stated that Atlas's "patent portfolio covers key improvements in Wi-Fi … adopted in the IEEE 802.11ax standard." Appx5001-5009.

Appellants are unaware of any decision of this Court holding such a letter sufficient to satisfy Section 271(b)'s intent requirement. Instead, this Court has required at least the identification of specifically asserted patents. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1332 (Fed. Cir. 2010) (relying on letter identifying allegedly standard-essential patent and standard-compliant products); *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 46 (Fed. Cir. 2024) (relying on letter identifying asserted patent and describing allegedly infringing product categories).

The district court found otherwise based only on its own prior decisions finding that "identification of a portfolio of patents can be sufficient" and "reject[ing] the argument that failing to identify specific patent numbers in a notice letter is fatal to establishing pre-suit inducement." Appx52. But these decisions are not controlling, and did not involve even remotely analogous circumstances. In *Ziilabs Inc., Ltd. v. Samsung Elecs. Co.*, the parties "had continuing

- 50 -

communications about the ZiiLabs patent portfolio, including the Patents-in-suit."
No. 2:14-CV-203-JRG-RSP, 2015 WL 1456540, at *3 (E.D. Tex. Mar. 30, 2015).
And in *Mobile Equity Corp. v. Walmart Inc.*, the parties had substantial contacts,
including phone calls discussing the infringement allegations. No. 2:21-cv-00126-
JRG-RSP, 2022 WL 4587554, at *2 (E.D. Tex. Sept. 8, 2022), *report and
recommendation adopted*, 2022 WL 4587499 (E.D. Tex. Sept. 27, 2022). Here,
Atlas proffered ***nothing*** beyond the text of the letter itself, which does not identify
any patent-in-suit or accuse any product of infringement. No reasonable jury could
find this sufficient, and the Court should so hold.

     ***Second***, Atlas offered no evidence that either Appellant ***received*** Atlas's
letter. Rather, Atlas sent the letter to three individuals ***not*** employed by either
Appellant, at U.S. addresses used ***not*** by either Appellant but by non-party TP-
Link USA. *See supra* pp. 15-16. There was no evidence that any of these
addressees (or anyone else) forwarded the letter to either Appellant. Instead, when
asked "is it your position that … no one forwarded this [letter] to anyone or made
others at TP-Link aware of" the letter, Ms. Sun answered—on behalf of both
Appellants—"[y]es, I did not receive this letter." Appx1711(704:20-24). Atlas
offered no contrary evidence.

     The district court adopted Atlas's argument that because Ms. Sun—who
testified through an interpreter—stated "I did not receive this letter" (rather than,

e.g., "*we* did not receive this letter"), her testimony did not conclusively

demonstrate that *Appellants* did not receive the letter.  Appx49 n.8.  But Ms. Sun

was testifying as a corporate representative of both Appellants, and she began her

response with a definitive and uncontroverted "[y]es."  Appx1700(693:13-17);

Appx1711(704:20-24).  And Atlas's counsel responded "[h]ow do you know," a

question one would not ask if one understood the witness to be testifying to her

own personal non-receipt of a letter.  Appx1711(704:25).

   In any event, it was not *Appellants'* burden to prove that Appellants did *not*

receive the letter.  Rather, "it was [Atlas's] burden to prove" that Appellants "knew

or w[ere] willfully blind to" the patents and their alleged infringement.  *Warsaw*

*Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1348 (Fed. Cir. 2016).  The

district court thus legally erred in faulting Appellants for "fail[ing] to offer

evidence *disproving* they received the letters."  Appx52.  The only ostensibly

affirmative evidence Atlas or the district court cited is that Appellants and non-

party TP-Link USA "are related entities and share a close business relationship."

Appx51-52.  But Appellants were not "related" to non-party TP-Link USA when

Atlas sent its letter in June 2021—they only became related entities two years later.

*See supra* pp. 38-40.  Moreover, the bare existence of a distribution agreement and

indemnification provision between TP-Link Hong Kong and TP-Link USA

(Appx51-52) does not "allow the jury to draw an inference which amounts to mere

speculation and conjecture." *Nichols Constr. Corp. v. Cessna Aircraft Co.*, 808

F.2d 340, 352 (5th Cir. 1985) (quotation marks omitted).  In sum, the fact that

Atlas sent a letter to non-party TP-Link USA does not even suggest, let alone

prove, that two *other* companies received that letter.  *See Insituform Techs., Inc. v.*

*Cat Contracting, Inc.*, 161 F.3d 688, 695 (Fed. Cir. 1998) (district court erred in

finding inducement based on the actions of a "separate corporation").

### 2. General marketing materials cannot demonstrate specific intent to induce infringement.

In addition to knowledge of the patents and their infringement, a plaintiff

asserting induced infringement must prove that the alleged infringer "possess[ed]

specific intent to encourage another's infringement."  *Enplas Display Device Corp.*

*v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018).  Atlas attempted

to demonstrate intent through Dr. Shoemake's review of marketing materials and

documentation relating to the accused products.  That was insufficient.[10]

---

[10] The district court found that Appellants had waived a challenge to post-suit inducement, but addressed the merits of the underlying issue—their challenge to Atlas's reliance on general marketing materials—in relation to pre-suit inducement.  Appx53-54.  Because "[t]he district court 'had an opportunity to, and did, address' the issue with finality," the Court may address the merits.  *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1323 (Fed. Cir. 2020) (quoting *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1281 (Fed. Cir. 2012)).  In any event, reversal as to pre-suit inducement requires a damages retrial, as the verdict does not permit this Court to determine a damages award limited to post-suit inducement.

Atlas asserted that its patents are essential to and implemented in the Wi-Fi 6 standard, a document spanning over 700 pages which encompasses countless features and requirements and thousands of specific technical contributions from numerous companies.  Appx1563-1570(556:8-563:3).  Atlas provided no evidence that Appellants *knew* that the specific asserted patents were essential to the Wi-Fi 6 standard, or even that Atlas *contended* they were before it filed suit.  The general promotion of Wi-Fi 6 and its benefits, therefore, does not evidence specific intent to induce infringement of the asserted patents.  *See Superior Indus., LLC v. Thor Glob. Enterprises Ltd.*, 700 F.3d 1287, 1295-1296 (Fed. Cir. 2012) (citation to "press releases" and offers to sell allegedly infringing technology fell "far short of pleading" induced infringement).

That is true even if the claimed inventions are essential to the use of the Wi-Fi 6 standard, because inducement requires "knowledge that the induced acts constituted patent infringement."  *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1377 (Fed. Cir. 2024).  In *Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical Corp.*, for example, this Court held that "[m]erely 'describ[ing]' an infringing mode is not the same as 'recommend[ing],' 'encourag[ing],' or 'promot[ing]' an infringing use, or suggesting that an infringing use 'should' be performed."  785 F.3d 625, 631 (Fed. Cir. 2015) (citations omitted).  The question of intent "is not just whether instructions

'describ[e] the infringing mode,' but whether the 'instructions teach an infringing use of the device *such that* we are willing to infer from those instructions an affirmative intent to infringe the patent.'" *Id.* (emphasis in original; citations omitted). With no basis for such an inference, Appellants cannot be liable for inducement.[11]

### C.    Failure Of Either Infringement Theory Requires Vacatur Of The Entire Judgment

If the Court concludes, as it should, that Atlas failed to prove both direct infringement of the '513 patent and indirect infringement of the other asserted patents, the Court should reverse and direct entry of judgment of noninfringement.

However, if the Court finds that Atlas proved *either* direct infringement of the '513 patent *or* indirect infringement of the other asserted patents (but not both), the judgment should be vacated and a new trial ordered because a general verdict covering multiple factual bases cannot be sustained if one lacks sufficient evidence. *See Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 79 (1907); *see also Muth v. Ford Motor Co.*, 461 F.3d 557, 564 (5th Cir. 2006); *Watson v.*

---

[11] In *Ericsson, Inc. v. D-Link Systems, Inc.*, this Court affirmed an inducement judgment because the defendant "knew that the patents *potentially* were essential to … a standard with which [the defendant] intentionally complied." 773 F.3d 1201, 1222 (Fed. Cir. 2014). This statement cannot be reconciled with the Supreme Court's subsequent holding that a defendant cannot be liable for inducement if "he did not *know* the acts were infringing," but merely "knew the acts *might* infringe." *Commil*, 575 U.S. at 642.

*Johnson Mobile Homes*, 284 F.3d 568, 574 (5th Cir. 2002). Here, over Appellants'

objection, the district court used a verdict form that failed to differentiate between

the infringement theories that applied to different patents; it simply asked the jury

whether Atlas had "prove[d] by a preponderance of the evidence that [Appellants]

infringed ANY of the Asserted Claims." Appx69; Appx1993(982:6-19); Appx20.

It is therefore impossible to determine whether the jury found direct infringement

of the '513 patent, indirect infringement of one or more of the other asserted

patents, or both. Failure of one requires vacatur for a new trial on the other.

At minimum, because the damages verdict does not differentiate between

direct infringement of the '513 patent and indirect infringement of the other

patents, it is impossible to know what damages are attributable to which patent(s).

Consequently, if the infringement judgment is vacated—even if only in part—the

damages judgment must be vacated in full and remanded for a new trial. *See*

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309-1310 (Fed.

Cir. 2007) (where an infringement verdict as to one patent is vacated and "the jury

rendered a single verdict on damages … the normal rule would require a new trial

as to damages"); *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367 (Fed.

Cir. 2013) (vacating damages award under these circumstances), *vacated on other*

*grounds*, 575 U.S. 632 (2015).

## V.    THE DAMAGES AWARD SHOULD BE REVERSED OR VACATED

### A.    Atlas's Expert Used An Unreliable Methodology That Failed To Apportion Damages To The Patented Technologies

The Court should vacate the damages award because the testimony of Atlas's damages expert, Roy Weinstein, should have been excluded as unreliable for failing to apportion damages to the patented technologies.

Mr. Weinstein first calculated a $0.92 per-unit royalty for a license to Atlas's entire portfolio of 38 families of standard-essential patents ("SEPs"). Appx5071; Appx1676-1677(669:19-670:12); Appx1678(671:3-5).  Mr. Weinstein did so by starting with a $0.29 rate for the Wi-Fi 5 patent pool held by patent licensing company Sisvel, and increasing that rate to $0.92 based on alleged improvements in Wi-Fi 6 over Wi-Fi 5.  Appx5058; Appx5071.  He identified 11 supposed "benefits" of Wi-Fi 6 over Wi-Fi 5 purportedly covered by the Atlas (formerly Newracom) patent portfolio, and used an arbitrary compilation of third-party documents to divine a "Quantitative Multiplier" for each benefit.  Appx5058; Appx5071.  He then multiplied the $0.29 Sisvel Wi-Fi 5 rate by each multiplier to produce a "Newracom Wi-Fi 6 License Rate" for each benefit.  Appx5071.  Next, he divided the sum of those 11 different rates by 11 (the number of benefits) to arrive at his starting rate of $0.92 for the entire portfolio.  *Id.*

Mr. Weinstein then purported to apportion the $0.92 portfolio-wide rate down to a rate corresponding to the five asserted patents.  Based on input from Dr.

Shoemake, Mr. Weinstein determined that three of the supposed benefits related to technologies not covered by the asserted patents, removed these three benefits from the list, divided the sum of the eight remaining benefits by eight, and came up with a $0.79 per-unit rate. *See* Appx5058 (benefits 3, 10, 11); Appx5071 (benefits 2, 9, 11); Appx1430-1431(426:3-427:8); Appx1639-1640(632:17-633:10); Appx1641-1642(634:14-635:10). This rate was the basis for the jury's damages award. Appx1645-1646(638:23-639:23).

Mr. Weinstein's apportionment methodology was unreliable, should have been excluded, and cannot justify the damages award.

***First***, Mr. Weinstein's approach of compiling 11 supposed benefits of Atlas's Wi-Fi 6 portfolio, and then subtracting three of those benefits not covered by the asserted patents, provides only a mirage of apportionment. Mr. Weinstein did not determine an incremental benefit for each "benefit" category, but rather calculated a separate, standalone "license rate" for each category that is totally unrelated to how many other benefits are covered. Appx5071. This leads to absurd results. For example, if ***only*** the "Increase in Throughput from OFDMA" benefit were covered by the asserted patents, the apportioned royalty rate would ***increase*** from $0.79 to $1.74—even though the asserted patents would cover ***seven fewer benefits***. *Id.* (benefit 10) ($1.74 / 1). If the asserted patents covered only "Increase in Throughput from OFDMA" and "Increase in Coverage Area from

Beamforming," the apportioned royalty rate would increase from $0.79 to $1.45—even though the asserted patents would cover *six fewer benefits*, and *less* of an increase than if the patents covered *only* "Increase in Throughput from OFDMA." *Id.* (benefits 8, 10) (($1.16 + $1.74) / 2); *see also* Appx21647-21652(87:12-92:1) (Weinstein admitting that if the asserted patents only covered the "midamble" benefit, the royalty would be ▮Rate▮).  It is mere happenstance that the three benefits Mr. Weinstein removed from his list reduced his royalty rate from $0.92 to $0.79, rather than increasing it.  Because his methodology had no connection to the asserted patents' incremental benefits, it was unreliable and should have been excluded.

*Second*, Mr. Weinstein's apportionment methodology assigned the asserted patents the *entire value* of each supposed benefit of Wi-Fi 6, despite undisputed evidence that those benefits also depend on *unpatented* features.  *See* Appx5071 (for each benefit, multiplying the Sisvel rate by the entirety of each "Value Increase Factor").  For example, Dr. Shoemake admitted that "1024 QAM modulation" contributes to "higher throughput" (speed) in Wi-Fi 6 compared to Wi-Fi 5, and that the asserted patents do not cover this feature.  Appx1568(561:5-15); Appx1691(684:4-7, 684:20-21); Appx1692(685:15-19).  Nevertheless, Mr. Weinstein attributed the entire "value increase factors" for his three higher-throughput benefits to the asserted patents.  Appx5071; Appx5058 (benefits 1, 2,

4); Appx5071 (benefits 1, 6, 10); Appx1691(684:20-21); *see also* Appx1691(684:11-15) ("the increased speed in WiFi 6 … is in fact due to at least three features not covered by the asserted patents").  Similarly, Dr. Shoemake admitted that the use of midambles in Wi-Fi 6 significantly increases speed (throughput), and that the asserted patents do not cover this feature.  Appx1568-1569(561:16-562:2).  But again, Mr. Weinstein attributed the entirety of the three higher-throughput benefits to the asserted patents.  Appx5058 (benefits 1, 2, 4); Appx5071 (benefits 1, 6, 10).  Beyond this, there is no evidence that Mr. Weinstein or Dr. Shoemake reviewed the rest of the 38 patent families in Atlas's portfolio to determine what, if any, contribution they might separately provide to the benefits underlying Mr. Weinstein's rate calculation.  Appx1678(671:3-5).  Nor did they analyze the thousands of other Wi-Fi 6 SEPs held by others to determine whether they contributed to these benefits.  Without ***any*** such analysis, Mr. Weinstein could not reliably opine that the benefits he found should be attributed entirely to the five asserted patents.

***Third***, the unreliability of Mr. Weinstein's apportionment is confirmed by Sisvel's own ***published*** per-unit rate for Wi-Fi 6, which is only $0.50 to $0.60.  Appx1681-1682(674:22-675:12).  That rate is roughly half to two-thirds of Mr. Weinstein's $0.92 projected rate for Sisvel's Wi-Fi 6 portfolio, despite including hundreds of patent families that provide benefits beyond just the eleven Mr.

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

Weinstein relied on.  Appx1681-1682(674:22-675:12); Appx1684(677:15-25); Appx5071; Appx5075.

For these reasons, Atlas failed to meet its burden of showing that Mr. Weinstein's apportionment methodology was reliable.  *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

> ## B.   The Damages Award Was Contrary To The Hypothetical-Negotiation Framework

The Court should also reverse or vacate the damages award for the independent reason that it is not supported by substantial evidence under the hypothetical-negotiation framework Mr. Weinstein purported to apply.

As explained above, Mr. Weinstein started with a $0.92 per-unit royalty rate. That rate was significantly higher than the ▮Rate▮ effective royalty rate of Atlas's other portfolio licenses that included the asserted patents.  Appx1656(649:12-14) (▮Licensee▮); Appx1658(651:13-15) (▮Licensee▮ and ▮Licensee▮); Appx1659(652:16-19) (▮Licensee▮, ▮Size▮); Appx1229(225:7-19).

Mr. Weinstein and Atlas's President, Craig Yudell, tried to explain away this discrepancy by claiming that the ▮Size▮ rate reflected certain "discounts" that were given to the previous licensees.  Appx1626-1627(619:13-620:10); Appx1290-1291(286:10-287:3).  These discounts included a 50% "pre-litigation" discount for taking a license before litigation; a 40% "early adopter" discount for being among the first licensees of Atlas's portfolio; a 50% "fully paid up" discount for taking a

fully-paid, lump-sum license for the life of the patents; and a "volume" discount of up to 30% for having a high volume of licensed sales. Appx1284-1286(280:1-282:17); Appx1290(286:14-24); Appx1626-1627(619:13-620:10).

When analyzing the hypothetical-negotiation scenario ultimately adopted by the jury, Mr. Weinstein applied the fully paid-up (50%) and volume (15%) discounts to the "apportioned" $0.79 rate, but not the early-adopter (40%) and pre-litigation (50%) discounts. Appx1645-1646(638:23-639:23); Appx1663-1666(656:18-659:2); Appx1668-1671(661:17-664:1); Appx70. Thus, Mr. Weinstein's per-unit royalty amounted to $0.336 ($37,481,264 / 111,634,442 units), corresponding to a damages verdict of $37,481,264. Appx1608(601:17-25); Appx2080-2081(1066:23-1067:7); Appx1646(639:17-23); Appx70.

But under the hypothetical-negotiation framework, Appellants were entitled to the pre-litigation and early-adopter discounts. It was undisputed that the hypothetical negotiation would have occurred in January 2019, at which point Atlas had not filed suit and Appellants would have been an early adopter and therefore entitled to the 50% pre-litigation and 40% early-adopter discounts. Appx1619-1620(612:4-613:4); Appx1660(653:5-11); Appx1663-1665(656:18-20, 657:23-658:2); Appx1665(658:9-19); Appx1624(617:19-21); Appx1663(656:18-25); Appx1670(663:2-4). Nevertheless, Mr. Weinstein refused to apply either of these discounts because Appellants did not actually take a license in January 2019,

but instead chose to defend themselves.  Appx1663-1666(656:18-659:2);

Appx1669-1671(662:12-664:1).

This violates the hypothetical-negotiation framework that Mr. Weinstein

purported to adopt, which requires assuming that both parties are willing to agree

to a license to "attempt[] to ascertain the royalty upon which the parties would

have agreed had they successfully negotiated an agreement just before

infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-

1325 (Fed. Cir. 2009).  By awarding Mr. Weinstein's proposed amount, which did

not include the pre-litigation and early-adopter discounts, the jury assumed that in

January 2019 Appellants were *un*willing licensees—entities that would refuse a

license and take the case to trial more than four years later—contrary to the law

and the jury instructions.  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694

F.3d 51, 77 (Fed. Cir. 2012) ("[T]he premise of [*Georgia-Pacific*] assumes a

voluntary agreement will be reached between a willing licensor and a willing

licensee …."); Appx2025-2026(1011:25-1012:9) ("you must assume that … both

parties were willing to enter into an agreement").

Moreover, Mr. Weinstein's rationale for not giving Appellants the

discounts—that they chose to take the case to trial, which was "very expensive" for

Atlas, Appx1663-1666(656:18-659:2); Appx1669-1671(662:12-664:1);

Appx1696(689:14-17)—improperly punishes Appellants for not settling before

trial.  This is tantamount to awarding Atlas enhanced damages or attorneys' fees

without satisfying the requirements of 35 U.S.C. § 284 or § 285.  Prejudgment

interest—not exorbitant royalties—"serves to make the patent owner whole."

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-656 (1983).[12]

The district court did not address these arguments on the merits, finding

them to be an unpreserved *Daubert* argument under *Versata Software, Inc. v. SAP*

*Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013).  Appx27-28; Appx55-58.  But in

*Versata*, the appellant argued that the opposing expert's opinion was "inconsistent

with sound economic principles" and thus "should have been excluded."  *Versata*,

717 F.3d at 1264.  As this Court found, these and other statements made clear that

its challenge was to the ***admissibility*** of the evidence—not whether the evidence

was sufficient to support the verdict—and thus the challenge was a forfeited

*Daubert* argument.  *Id.*  In contrast, Appellants do not challenge the district court's

decision to allow Atlas to present Mr. Weinstein's testimony refusing to apply

certain discounts to Appellants, but rather assert that his testimony did not

constitute substantial evidence and that the verdict was contrary to the great weight

of the evidence.  *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,

509 U.S. 209, 242 (1993) (affirming JMOL because "[w]hen an expert opinion is

---

[12] The district court awarded Atlas prejudgment interest of $3,851,202.
Appx2(¶3).

not supported by sufficient facts to validate it in the eyes of the law … it cannot support a jury's verdict"); *see also id.* at 243 ("Because … this evidence is insufficient as a matter of law to support a finding of [liability], the expert testimony cannot sustain the jury's verdict.").  Consistent with the Supreme Court's guidance, such sufficiency challenges are ***permitted*** by *Versata* itself.  *See Versata*, 717 F.3d at 1264-1267 (addressing failure to show demand for the patented product under *Panduit* factor 1 and prove lost profits with reasonable probability under *Panduit* factor 4).  Mr. Weinstein's damages opinion refusing to apply certain discounts to Appellants was not supported by the evidence in view of the hypothetical-negotiation framework, and thus "cannot support [the] jury's [damages] verdict."  *Brooke Group*, 509 U.S. at 242.

## CONCLUSION

The judgment should be reversed or, alternatively, vacated and remanded for a new trial.

Respectfully submitted,

/s/ Mark C. Fleming

HEATH A. BROOKS                    MARK C. FLEMING
ALLISON SCHULTZ                    CYNTHIA D. VREELAND
WILMER CUTLER PICKERING            JASON H. LISS
   HALE AND DORR LLP              WILMER CUTLER PICKERING
2100 Pennsylvania Avenue, NW          HALE AND DORR LLP
Washington, DC  20037             60 State Street
(202) 663-6000                    Boston, MA  02109
                                  (617) 526-6000
KRISTOPHER L. REED
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500     *Attorneys for Defendants-Appellants*
Dallas, TX  75201                 *Lianzhou Technologies Co., Ltd. and*
(214) 627-1753                    *TP-Link Corporation Ltd.*

February 7, 2025

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Amended Final Judgment, Dkt. No. 350 (Sept. 3, 2024) ............................ Appx1-3

Memorandum Opinion & Order regarding post-trial motions,
Dkt. No. 351 (Sept. 3, 2024) **[FILED UNDER SEAL]** ...................... Appx4-65

Jury Verdict, Dkt. No. 308 (Sept. 14, 2023) ............................................. Appx66-71

Memorandum & Order re Atlas Motion that Certain Facts be
Considered Established. Dkt. No. 261 (Aug. 2, 2023) ....................... Appx72-78

Order re Memo & Order re Atlas Motion that Certain Facts
be Considered Established, Dkt. No. 289 (Aug. 18, 2023) .......................Appx79

## PATENTS-IN-SUIT

U.S. Patent No. 9,532,187 B2 (JX-002) ................................................. Appx80-114

U.S. Patent No. 9,763,259 B2 (JX-003) ............................................... Appx115-153

U.S. Patent No. 9,825,738 B2 (JX-004) ............................................... Appx154-195

U.S. Patent No. 9,912,513 B2 (JX-005) ............................................... Appx196-220

U.S. Patent No. 9,917,679 B2 (JX-006) ............................................... Appx221-267

## CONFIDENTIAL MATERIAL OMITTED

The material omitted from pages Appx10 and Appx14-17 of the addendum
contains business information that Atlas has designated as confidential and was
sealed in the district court.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:21-CV-00430-JRG-RSP |
| | § | |
| TP-LINK TECHNOLOGIES CO., LTD. and | § | |
| TP-LINK CORPORATION LTD., | § | |
| | § | |
| *Defendants*. | § | |

## AMENDED FINAL JUDGMENT

A jury trial commenced in the above-captioned case on September 8, 2023, and on September 14, 2023, the jury reached and returned its unanimous verdict finding that Defendants TP-Link Technologies Co., Ltd. and TP-Link Corporation Ltd. ("Defendants") infringed one or more of Claims 4 and 20 of U.S. Patent No. 9,532,187, Claims 1 and 18 of U.S. Patent No. 9,763,259, Claim 1 of U.S. Patent No. 9,825,738, Claims 1 and 15 of U.S. Patent No. 9,912,513, and Claims 1 and 6 of U.S. Patent No. 9,917,679 (collectively, the "Asserted Claims"); and that Plaintiff Atlas Global Technologies LLC ("Atlas") should recover $37,481,264.00 from Defendants for Defendants' infringement, such recovery to be a one-time lump sum reasonable royalty. (Dkt. No. 309). On December 13, 2023, this Court entered final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure. (Dkt. No. 325). Such final judgment is amended hereby.

The parties jointly moved to amend the judgment under Rules 52 and 59 of the Federal Rules of Civil Procedure. (Dkt. No. 328). The Court granted the parties' motion per separate opinion entered herein.

## Appx1

Accordingly, and pursuant to Rules 52(b), 58, and 59 of the Federal Rules of Civil Procedure, and in accordance with the jury's unanimous verdict and the entirety of the record, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1.   Defendants have infringed one or more of the Asserted Claims;

2.   Atlas is hereby awarded compensatory damages from Defendants and shall accordingly have and recover from Defendants, jointly and severally, the sum of $37,481,264.00 US Dollars for Defendants' infringement, in the form of a one-time lump sum reasonable royalty payment;

3.   Pursuant to 35 U.S.C. § 284 and Supreme Court guidance that "prejudgment interest shall ordinarily be awarded absent some justification for withholding such an award,"[1] the Court awards pre-judgment interest to Atlas to be recovered by Atlas from Defendants and applicable to all sums awarded herein, calculated at the five-year U.S. Treasury Bill rate, compounded monthly, adjusting the effective rate with each and every change in said five-year U.S. Treasury Bill rate from the date the infringement began through the date of judgment in the sum of $3,851,202;

4.   Pursuant to 28 U.S.C. § 1961, the Court awards to Atlas from Defendants post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid; and

5.   Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, Atlas is the prevailing party in this case and shall recover its costs from Defendants. Such costs are approved per a separate order entered herein in the amount of $85,682.39.

---

[1] *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).

**Appx2**

All other requests for relief now pending and requested by either party but not specifically addressed herein are **DENIED**. The Amended Final Judgment is and shall be effective as of the date of the earlier entered Final Judgment amended hereby being December 13, 2023.

**So ORDERED and SIGNED this 3rd day of September, 2024.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**Appx3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:21-CV-00430-JRG-RSP |
| | § | **FILED UNDER SEAL** |
| TP-LINK TECHNOLOGIES CO., LTD. and | § | |
| TP-LINK CORPORATION LTD., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion Pursuant to Fed. R. Civ. P. 59 for a New Trial (the "Motion for New Trial") filed by Defendants TP-Link Technologies Co., Ltd. and TP-Link Corporation Ltd. ("Defendants"). (Dkt. No. 330). Also before the Court is Defendants' Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) (the "JMOL Motion"). (Dkt. No. 331). Finally, before the Court is the Joint Motion to Amend and Alter the Final Judgment (the "Joint Motion to Amend") filed by Defendants and Plaintiff Atlas Global Technologies LLC ("Atlas"). (Dkt. No. 328). Having considered these matters, the Court finds that the Motion for New Trial and the JMOL Motion should be **DENIED** and the Joint Motion to Amend should be **GRANTED**.

## I. DISCUSSION: MOTION FOR NEW TRIAL (DKT. NO. 330)

In the Motion for New Trial, Defendants move "pursuant to Fed. R. Civ. P. 59(a) for a new trial and pursuant to Fed. R. Civ. P. 59(e) to amend or alter the judgment" on six bases. ***First***, Defendants argue that "[t]he Court should vacate the Final Judgment because the Court lacks personal jurisdiction over Defendants and transfer it to the Central District of California under 28 U.S.C. §1406 to cure the jurisdictional defect." (Dkt. No. 330 at 1-2). ***Second***, Defendants argue

**Appx4**

that the Court's imposition of pre-trial sanctions against Defendants was a prejudicial error that resulted in an unfair trial and an excessive damages award. (*Id.* at 2-10). ***Third***, Defendants contend that "by asking a single infringement question for all patents, the verdict form violated Defendants' right to jury unanimity." (*Id.* at 10-11). ***Fourth***, Defendants argue that allowing expert testimony from Dr. Shoemake (Atlas's technical expert) and Mr. Weinstein (Atlas's damages expert) "violated Defendants' right to a fair trial." (*Id.* at 11-13). ***Fifth***, Defendants contend that "[t]he damages verdict was contrary to the weight of the evidence as Defendants qualified for discounts during the hypothetical negotiation not reflected in the jury verdict." (*Id.* at 14-15). ***Sixth***, and finally, Defendants "renew their prior objections to the Magistrate Judge's Report and Recommendation on Claim Construction as to the claims ultimately asserted at trial," concluding that "the jury was improperly instructed regarding the meaning of the disputed terms of the asserted claims." (*Id.* at 15). The Court addresses each in turn but finds that no basis that compels setting aside the jury's verdict and granting a new trial.

### A. Applicable Law

Rule 59 provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-00744-JRG, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith*

**Appx5**

*v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party— is ground for granting a new trial . . . . the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

Under Rule 59(e), a party can move the Court to amend an order or judgment within 28 days of entry. FED. R. CIV. P. 59(e). "Rule 59(e) is properly invoked 'to correct manifest errors of law or fact or to present newly discovered evidence.'" *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002) (internal citations omitted). A motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). Given that "specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (internal citations omitted). Accordingly, relief under Rule 59(e) is appropriate only when (1) there is a manifest error of law or fact; (2) there is newly discovered or previously unavailable evidence; (3) there would otherwise be manifest injustice; or (4) there is an intervening change in controlling law. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). As a result, "[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet*, 367 F.3d at 479.

### B. Whether the Court Should Vacate the Final Judgment Due to Lack of Personal Jurisdiction over Defendants

Defendants argue that "[t]he Court's finding of personal jurisdiction in this matter is contrary to the Court's own prior order in *Stingray IP Sols. LLC v. TP-Link Techs. Co.*, No. 2:21-

CV-00045-JRG." (Dkt. No. 330 at 1). Defendants contend that "[t]he *Stingray* action involved the (i) the same Defendants; (ii) the same distributor of Defendants' products (TP-Link USA); (iii) a plaintiff controlled by the same parent (Acacia) as Atlas; (iv) the exact same jurisdictional Rule 30(b)(6) deposition; and (v) materially identical jurisdictional declarations and documents." (*Id.* at 2). Defendants continue that, "[d]espite these identical facts, the Court's Order adopting the Magistrate Judge's Report and Recommendation finding jurisdiction over Defendants in this case does not cite, distinguish, or otherwise attempt to reconcile the *Stingray* holding where the Court held that there was no personal jurisdiction over Defendants," requiring vacatur of the Final Judgment. (*Id.* (citing Dkt. No. 113)).

In response, Plaintiff contends that Defendants' arguments fail for two reasons. First, Plaintiff argues that "Rule 59 'is not the proper vehicle for rehashing evidence, legal theories, or arguments.'" (Dkt. No. 340 at 2 (citing *Templet*, 367 F.3d at 479)). Second, Plaintiff contends that: (1) "[t]his Court's *Stingray* decision is inapposite because it concerned Rule 4(k)(2)—which the Court in this case cited only as an alternative ground establishing its jurisdiction over Defendants" (*id.* (citing Dkt. No. 92 at 1-6)); and (2) "Defendants conspicuously ignore it was *reversed* by the Federal Circuit and is thus of no help to their position." (*Id.* (citing *In re Stingray IP Sols., LLC*, 56 F.4th 1379 (Fed. Cir. 2023))).

In reply, Defendants argue that the *Stingray* decision addressed both Rule 4(k)(1) and 4(k)(2), and "[t]he Federal Circuit's mandamus order addressed only Rule 4(k)(2) because the *Stingray* plaintiff did not challenge the Court's holding that there was no personal jurisdiction under Rule 4(k)(1)." (Dkt. No. 343 at 1). Defendants recognize that "[t]his dispute has been previously raised previously with the Court (Dkt. 94)"—and decided against Defendants— however, Defendants contend that "the Court has not addressed the incongruity in Rule 4(k)(1)

**Appx7**

holdings on identical facts between Stingray and here" and that it should do so now. (*Id.*).

In sur-reply, Plaintiff argues that "Defendants' Reply utterly fails to show that the Court should revisit its prior finding that it has personal jurisdiction," noting that "Defendants have no answer to hornbook law holding that Rule 59 'is not the proper vehicle for rehashing evidence, legal theories, or arguments.'" (Dkt. No. 347 at 1 (quoting *Templet*, 367 F.3d at 479)). Furthermore, Plaintiff points out that "while Defendants acknowledge they previously made the exact same arguments (Dkt. 94) and the Court rejected them (Dkt. 113), they offer no reason for the Court to revisit that holding other than the unsupported assertion that the Court should." (*Id.*). Finally, Plaintiff argues that not only was the Court's *Stingray* decision vacated by the Federal Circuit, but "the Federal Circuit decision supports Atlas and confirms this Court's jurisdiction." (*Id.*).

First, the Court finds that Defendants do nothing more than re-raise a legal theory regarding lack of personal jurisdiction that they previously brought (Dkt. No. 94 (objecting to the Magistrate Judge's Report and Recommendation)) and that was previously denied by this Court (Dkt. No. 113). As the Fifth Circuit has instructed, a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet*, 367 F.3d at 479. Indeed, "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence," and "[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.* (internal citations and quotations omitted). Asking this Court to distinguish a prior decision of the Court—an argument raised by Defendants previously—does not meet the narrow requirements of Rule 59(e). Such argument identifies neither a manifest error of law or fact nor presents newly discovered evidence.

**Appx8**

Moreover, Defendants' entire argument is premised on a decision of this Court (*Stingray*) that was vacated by the Federal Circuit.[1] That, in and of itself, is an adequate reason to dispose of Defendants' request. Notably, the Federal Circuit in *Stingray* vacated this Court's finding that personal jurisdiction did **not** exist under Rule 4(k)(2) for the TP-Link defendants because this Court improperly relied upon the post-suit consent of the TP-Link. *See In re Stingray IP Sols., LLC*, 56 F.4th at 1386 ("In further proceedings consistent with this order, the district court may find it necessary to assess whether TP-Link can satisfy Rule 4(k)(2)'s negation requirement on the grounds that Stingray 'could have brought suit' in the Central District of California, independent of TP-Link's post-suit consent."). The directive of the Federal Circuit was adhered to in the present case and the conclusion was reached that 4(k)(2)—in addition to 4(k)(1)—provided a basis for personal jurisdiction over Defendants. (Dkt. No. 92 at 3-5 ("Alternatively [to Rule 4(k)(1)], Federal Rule of Civil Procedure 4(k)(2) is applicable. . . . Because defendants cannot merely submit to the personal jurisdiction of the Central District of California for purposes of transfer and because defendants impliedly challenge the personal jurisdiction of the Central District of California, defendants are precluded from relying upon such a submission to defeat the application of Rule 4(k)(2)."). As such, personal jurisdiction exists over Defendants and any further inquiry into the nuances of this Court's 4(k)(1) analysis in the present case as compared to the vacated *Stingray* opinion is of no effect as to this Motion for New Trial. In sum, Defendants' re-urged arguments are rejected once more.

### C. Whether the Imposition of Pre-Trial Sanctions Was Prejudicial Error that Resulted in an Unfair Trial and an Excessive Damages Award

As part of the pre-trial process in this case, the Court, on a motion for sanctions brought by

---

[1] The *Stingray* case settled before the Court was able to re-examine the issue of personal jurisdiction. *See Stingray IP Solutions, LLC*, 2:21-CV-00045-JRG, Dkt. No. 99 (E.D. Tex. Mar. 9, 2023).

**Appx9**

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

Plaintiff (Dkt. No. 175), found that Defendants' failure to comply with its discovery obligations regarding its relationship with TP-Link USA was "nothing short of exceptional." (Dkt. No. 261 (the "Sanctions Order") at 7 (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014))). As a result, the Court imposed a sanction that "the sales figures in the IDC reports relied upon by Plaintiff's expert shall be deemed established and may not be attacked by Defendants." (*Id.*)

Defendants now argue that "[t]his sanction was erroneous and resulted in an unfair trial and an excessive damages award— █████████████████████████████████████ ███████████ (Dkt. No. 330 at 2). Defendants raise five bases for its present dispute: (1) that Defendants did not violate any discovery order; (2) that Defendants' compliance with Federal Rule of Civil Procedure 7.1(b)(2) provided no basis for the Court's sanction; (3) that the sanction imposed was disconnected from the alleged violation; (4) that Atlas exploited the Sanctions Order to advance a false narrative at trial; and (5) the Sanctions Order resulted in excessive damages. (*Id.* at 2-9).

### 1. Defendants' Bases (1), (2), and (3)

In response, Plaintiff first argues that "Defendants are not entitled to relitigate a discovery dispute that the Court already considered, decided, and reaffirmed repeatedly." (Dkt. No. 340 at 3). As Plaintiff correctly notes, "[t]he Court has afforded considerable process to both parties to hear the relevant facts and arguments concerning Defendants' sales data deficiencies, including in three hearings, seven briefs, and four orders." (*Id.*)

The Court agrees with Plaintiff. That Defendants do not like the sanction imposed upon them is no surprise. However, that sanction was necessary to rectify Defendants' exceptional discovery failures and remedy the prejudice Defendants' failures visited upon Plaintiff. Had Defendants properly and timely disclosed their relationship to TP-Link USA, such a sanction

would not have been necessary—Defendants chose not to make that disclosure. The blame rests solely with Defendants. Dissatisfied with shouldering responsibility for their discovery failures, Defendants have twice argued that the sanction against them would be and is improper—first in Defendants' opposition to Plaintiff's motion for sanctions (Dkt. Nos. 184, 259) and then in Defendants' objections to the Sanctions Order (Dkt. No. 282)—with those arguments rejected in each instance. (Dkt. Nos. 261, 289). With an apparent reliance on "the third try is the charm," Defendants once more dispute the propriety of the sanction imposed upon them. However, Defendants cite no authority showing that Rule 59 is an appropriate basis for re-litigating a discovery dispute twice resolved against them. Indeed, this is not the proper posture for such a request. *See Templet*, 367 F.3d at 479 ("This Court has held that [a Rule 59(e)] motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment."); *Raymond v. Blair,* No. CIV.A. No. 09-5507, 2010 WL 3283098, at *3 (E.D. La. Aug. 17, 2010) ("Rule 59(e) should not be used for re-litigating matters that have been resolved to the movant's dissatisfaction."). As the Rules make clear, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial." FED. R. CIV. P. 61.

Ignoring, for purposes of discussion, that Defendants' arguments should be rejected as improperly brought before the Court in the context of a Rule 59 motion, the Court additionally finds that Defendants' arguments are (still) without merit. With respect to Defendants' first three arguments—(1) that Defendants did not violate any discovery order; (2) that Defendants' compliance with Federal Rule of Civil Procedure 7.1(b)(2) provided no basis for the Court's sanction; (3) that the sanction imposed was disconnected from the alleged violation—the Court notes that Defendants advanced the same arguments in opposing the request for sanctions and in

**Appx11**

objecting to the Sanctions Order. *See* (Dkt. No. 282 at 1-3 (arguing that "there was no violation of any discovery order by this Court"), 3-4 (arguing that "filing a [Rule 7.1(b)(2)] supplemental corporate disclosure statement as mandated by the Federal Rules is not a violation of any discovery order"), 4-5 (arguing that "[t]he sanction imposed in the Order was itself clearly erroneous" as disconnected from Defendants' discovery failure); *see also* (Dkt. Nos. 184, 259). As was the case previously when Defendants raised these critiques, the Court is not persuaded. *See* (Dkt. No. 289 (Order overruling Defendants' objections)); *cf. Finesse Wireless LLC v. AT&T Mobility LLC*, No. 2:21-CV-00316-JRG, 2023 WL 5613160, at *4 (E.D. Tex. Aug. 30, 2023) (rejecting re-urged complaints of a pre-trial evidentiary ruling by Magistrate Judge Payne where "Defendants have not come forward with any new arguments showing why this ruling was incorrect in the first place").

Defendants' attempts to downplay their discovery failures as minor and unrelated to the sanction imposed upon them are simply unconvincing. As Magistrate Judge Payne stated in the Sanctions Order, the sanction was necessary because otherwise:

(1) "[t]he added complexity in presenting two separate sets of Defendants' sales data and explaining Defendants' discovery conduct to the jury would distract from addressing the cause of action in the case,"

(2) "the remedy is necessary because Defendants would otherwise undercut the reliability of the IDC sales data," and

(3) "[w]ithout having the information regarding the recurring dispute about Defendants' relationship with TP-Link USA revealed through discovery hearings, the jury would not be able to fully evaluate the lessened reliability of the sales data obtained and produced from the TP-Link Defendants and TP-Link USA, as well as the need for Plaintiff's expert

**Appx12**

to use the IDC data."

(Dkt. No. 261 at 6). Based upon Defendants' discovery failures—discussed in detail in the Sanctions Order (Dkt. No. 261) and Plaintiff's Response to the present Motion for New Trial (Dkt. No. 340 at 4-8)—the Court concluded that treating the "IDC unit counts as established facts in this action is an appropriate remedy to cure the prejudice to Atlas Global that occurred during discovery." (Dkt. No. 261 at 6). Defendants have provided the Court with no reason to reconsider that ruling. In short, and for the reasons explained in the Sanctions Order, the sanction imposed upon Defendants was a proper exercise of the Court's "broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990)*; see also Hernandez v. Rush Enterprises, Inc*., No. 4:19-CV-638, 2020 WL 7041822, at *1 (E.D. Tex. Dec. 1, 2020) (Rule 37 provides the Court with "the option to bar the disobedient party from introducing evidence or direct that certain facts shall be 'taken to be established for purposes of the action'") (citing FED. R. CIV. P. 37(b)(2)(A)(i)).[2]

### 2. *Defendants' Basis (4)*

Defendants' fourth argument is that Plaintiff exploited the Sanctions Order to advance a "false narrative" by "repeatedly compar[ing] a projected unit sales number derived from [a licensing offer] letter *to the IDC data* Defendants' expert was forced to use under the Sanctions Order (43 million units), not to the *actual sales data* on which the offer letter was truly based, to create a false impression of unreasonableness." (Dkt. No. 330 at 8-9 (excerpting two questions asked by Plaintiff's counsel to Defendants' corporate representative)). Defendants contend that "[t]his exploitation of the Sanctions Order to present a false narrative to the jury was unfair and

---

[2] In addition to Rule 37, the Court "also has inherent powers to enter sanctions," *FURminator, Inc. v. PetVac Grp. LLC.*, 2011 WL 3439309, at *5 (E.D. Tex. Aug. 5, 2011), "to punish recalcitrant parties and to deter those similarly situated," *Batson v. Neal Spelce Assoc., Inc.*, 765 F.2d 511, 516 (5th Cir. 1985).

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

prejudicial to Defendants, and can only be corrected by ordering a new trial where Defendants can give the jury the actual context in which the letter was written." (*Id.* at 9).

In response, Plaintiff first argues that "Defendants did not lodge a single objection to either question at trial," and as a result "any argument about whether those questions were properly before the jury has been waived, and Defendants' argument should be rejected on that basis alone." (Dkt. No. 340 at 8). Plaintiff next argues that "there was nothing 'false'" in their narrative, as Plaintiff "showed the jury that the licensing offer Defendants paraded about was unreasonable and made in bad faith because it relied on far fewer unit sales (approximately 11 million) than even their own expert used in his analysis." (*Id.* at 8-9). Specifically, Plaintiff notes that it "could have advanced the *exact same* narrative if the Court had permitted Defendants to present their own sales information" because, ██████████████████████████████████████ ████████████████████████████████████████████████████████ (*Id.* (citing Dkt. No. 319 at 762:18-24)).

In reply, Defendants contend that, while they did not object at trial to the two specific questions they quoted in their brief, they did object "to this line of questioning during trial." (Dkt. No. 344 at 3-4 (citing Dkt. No. 319 at 9:14-10 – 9:16:13)).

In sur-reply, Plaintiff contends that "Defendants failed to preserve objections regarding the[] [two] questions [excerpted in their Motion for New Trial], and Defendants' attempt to raise new questions on Reply that were not cited to in the Motion is improper." (Dkt. No. 347 at 4 (citing (Dkt. No. 319 at 914:30–916:13)).

As an initial matter, the Court finds that Defendants did not waive their objections to this line of questioning. While Defendants did not object specifically to the two questions quoted in their Motion for New Trial, they did object to this line of questioning during trial:

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

> Q. Your projection that you're giving this jury for future sales of just the accused
> products in this case is 45 million units, isn't it?
> MR. BELL: Objection, Your Honor. May I approach?
> THE COURT: Approach the bench. (The following was had outside the hearing
> of the jury.)
> MR. BELL: Your Honor, projections he made were based off the IDC sales data
> that was put into evidence at their request and it is deemed established at their
> request. Doctor McGahee, he made projections based off TP-Link's actual sales
> data had been precluded from being in this court.
> THE COURT: I understand that based on the misconduct the magistrate judge
> on behalf of TP-Link.
> MR. BELL: I understand. ***My point is if they're going to characterize it [*as*, sic]
> four times more***, it's not based on the same data as was based on data that we
> were required to use.

(Dkt. No. 317 at 914:7-24 (emphasis added)). Defendants cited this portion of the transcript in the

Motion for New Trial (Dkt. No. 330 at 9 (citing Dkt. No. 317 at 913:16 - 916:19)), so Plaintiff's

argument that Defendants waived it because it was "not cited in the Motion" fails.

As to the merits, Plaintiff represents that independent of the sanction Plaintiff would have

advanced the same narrative regarding the discrepancy between the number of units in the

licensing offer letter and the number of units relied upon by Defendants' expert (i.e., 11 million

units in the letter versus ███████████████████████ instead of 43 million units

(with the sanction)). Indeed, Plaintiff explained as much at trial in response to Defendants'

objection:

> MS. FAIR: May I be heard?
> THE COURT: Go ahead.
> MS. FAIR: In his original report that Mr. Bell is referring to, his projections are
> still not 11,300,000, so this does not solve his problem. The ███████████
> ████████████████. ***The point on cross still stands even with the
> numbers whether we use the original numbers or what he's presenting to the
> jury, he is not in agreement with TP-Link's projections***. This does not open the
> door to those sales, and Mr. Bell shouldn't be asking that question because it
> suggests that his opinion matched TP-Link's at the time. It never did.

(Dkt. No. 317 at 915:10-21 (emphasis added)). It is difficult to see how Plaintiff's narrative

suddenly becomes "false" simply because Defendants' expert was required to rely on the 43

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

million units from the IDC data. ███████████████████████ may have somewhat "blunted Atlas's criticism of TP-Link's FRAND offer letter" (Dkt. No. 344 at 3), that does not make Plaintiff's narrative "false" or warrant a new trial. The Court finds Defendants' argument on this point unpersuasive.

### 3. *Defendants' Basis (5)*

Finally, Defendants argue that "the sanction imposed was grossly disproportionate to the alleged misconduct" because ███████████████████████████████ ████████████████ (Dkt. No. 330 at 9-10).

In response, Plaintiff argues that "Defendants' assertion that the IDC Order resulted in excessive damages . . . is predicated on a fundamentally incorrect premise," namely that "the cherrypicked data Defendants produced is accurate, but the IDC data is not." (Dkt. No. 340 at 9). Plaintiff contends that, while "there is ample reason to question [the] veracity" of Defendants' produced sales data, including that there exist "inconsisten[cies] with the data produced by TP-Link USA and the discrepancies have never been fully explained or addressed," "the IDC data comes from a reputable third-party that is widely used" including by Defendants and Plaintiff's expert. (*Id.* (citing Dkt. No. 240-3, ¶104 & n.184; Dkt. No. 318 at 686:11-22 (Mr. Weinstein describing the IDC data "as the gold standard"))). Plaintiff concludes that, given "there is no evidence in the record to suggest there is anything erroneous about the methodology employed by the IDC to compile the sales data," the "IDC data is more reliable than Defendants' questionable data, and there is nothing 'excessive' about the jury awarding damages based on such data." (*Id.* at 9-10).

The Court finds Defendants' final argument on this issue is also unpersuasive. In essence, Defendants contend that their liability for damages in this case would be lessened if t███████ ████████████████████████████████. That is immaterial. As the Court has previously

13

**Appx16**

### CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

discussed in imposing the sanction and as elaborated herein, the sanction was properly imposed upon Defendants for their exceptional conduct during discovery. Defendants do not materially contest the reliability of the IDC data, and indeed such would be difficult given Defendants' own reliance upon such IDC data. (Dkt. No. 240-3, ¶104, n.184 (collecting references of Defendants' reliance upon IDC data)). In short, Defendants' final argument re-urges that the sanction is improper because ███████████████████████████████████████████████████

████████ Defendants' argument has been rejected repeatedly and the Court again does so. The sanction was proper, as were the damages the jury deemed appropriate to award in this case.

### D. Whether the Verdict Form Violated Defendants' Right to Jury Unanimity

Defendants argue that "Question 1 of the Court's verdict form asked a single question regarding infringement even though Atlas asserted five separate patents at trial and presented two separate theories of infringement—direct infringement of the one asserted apparatus claim of one patent, and induced infringement of all other asserted method claims," meaning that "[t]he jury's 'Yes' vote did not indicate that all jurors agreed which patent or claim was infringed, or whether Atlas established direct infringement of the single apparatus claim or established on separate facts that Defendants induced infringement of one or more other claims." (Dkt. No. 330 at 10-11). Question 1 of the Verdict Form is shown below:

> **QUESTION NO. 1**
>
> Did Atlas, the Plaintiff, prove by a preponderance of the evidence that TP-Link, the Defendants, infringed ANY of the Asserted Claims?
>
> Yes:___✓___     OR     No: _____

(Dkt. No. 308 at 4).

**Appx17**

Defendants contend that "in response to the question posed on the form, every juror could have believed that a single claim of one of the five patents was infringed, but not agreed which claim or under which theory Defendants infringed." (*Id.* at 11). As such, Defendants contend that "a new trial should be ordered with a proper verdict form that addresses infringement of each asserted claim under each asserted theory of infringement." (*Id.*)

In response, Plaintiff first argues that "Defendants' objections to the infringement question on the verdict form are waived and meritless" because they "were not raised before submission to the jury." (Dkt. No. 340 at 10). Plaintiff contends that "[w]hile Defendants raised other objections, they never asserted that the question, as written, would permit jurors to return a less-than-unanimous verdict." (*Id.* (citing Dkt. No. 320 at 982:6-19)).

Plaintiff next argues that, even if not waived, "Defendants' contention fails on the merits in any event because it runs afoul of the law and facts." (*Id.*) As to the law, Plaintiff notes that "the Federal Circuit has never held that trial courts must use verdict forms presenting claim-by-claim infringement questions" and has endorsed the opposite. (*Id.* at 10-11). As such, Plaintiff concludes that "this Court was well within its discretion to ask the jury to answer a general infringement question." (*Id.* at 11). As to the facts, Plaintiff disputes that "the jury could return a verdict of infringement without unanimously agreeing that any of the asserted claims were infringed" because the "[t]he jury instructions . . . repeatedly instructed the jury that its answers must be unanimous" and that the question of infringement must be determined separately for each claim. (*Id.* at 11).

In reply, Defendants contend that they did not waive their objections as they "objected to the verdict form because a single question on liability was used to cover multiple theories of infringement (direct and indirect) across multiple claims and patents." (Dkt. No. 344 at 4).

15

**Appx18**

Defendants also contend that "the verdict form is not cured by the instructions" because they "never instructed the jury that answering 'yes' to the general question required unanimous agreement as to at least one specific claim under at least one specific infringement theory." (*Id.*).

In sur-reply, Plaintiff argues that Defendants did indeed waive their objection to the verdict on this basis because, while they lodged an objection, "they did not lodge their current objection: the infringement question allowed the jury to return a less-than-unanimous verdict." (Dkt. No. 347 at 4). Finally, Plaintiff contends that Defendants simply ignore the numerous instances in the record in which the Court instructed the jury that "(1) their verdict had to be unanimous . . .; (2) they were to go claim-by-claim and agree as to which claims were infringed . . .; and (3) damages could be awarded "only if you [(the jury collectively)] found one or more of the asserted claims to be infringed." (*Id.* at 4-5 (internal citations omitted)).

As to the question of whether Defendants waived this objection, the Court finds that they have. During the Court's formal charge conference with the parties—at which time the parties were to lodge all objections they had to the verdict form and jury instructions—Defendants provided only the following objection to the Court's infringement question (Question No. 1):

> MS. GEYER: Your Honor, Defendant respectfully objects to Question No. 1 as having a single question related to infringement. There are two distinct allegations of infringement in this case involving distinct parties with distinct actions. There is an allegation of direct infringement of the Defendants TP-Link Technologies and TP-Link Corporation based on selling, offering to sell, or importing into the United States for one claim of the '513 Patent. And then there is a separate distinct allegation of induced infringement based on the actions of TP-Link USA and users of the accused product. And based on those distinct issues and distinct evidence, ***we object and believe it is appropriate to have two questions addressing each of those***.

(Dkt. No. 320 at 982:6-19 (emphasis added)). Notably, Defendants did **not** argue, as they do now, that "[t]he verdict form as presented . . . makes it impossible to know whether the jury was unanimous regarding infringement of a given patent claim, or indeed which one." (Dkt. No. 330

**Appx19**

at 11). It is well established that "a party may not object to an instruction on one ground at trial and then attempt to rely on a different ground on appeal." *Wright v. Ford Motor Co.*, 508 F.3d 263, 272 (5th Cir. 2007) (citing *Coastal Distributing v. NGK Spark Plug Co.,* 779 F.2d 1033, 1039 (5th Cir. 1986)). The same applies for motions for new trial, as Defendants seek here.[3] Defendants' objection that the verdict form's infringement question should be split in two—one question for direct infringement and another for indirect infringement—wholly failed to alert the Court to any concerns regarding jury unanimity as to any given claim. *See Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) ("In fairness to the trial court and to the parties, ***objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error***. Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial.") (emphasis added). Indeed, Defendants' ***own proposal*** at trial of two infringement questions would run into the same concerns regarding jury unanimity now raised, further underscoring Defendants' waiver of the issue. *See Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) (finding that plaintiff, "by its acquiescence in and indeed by its proposal of the verdict form [question disputed on appeal,] waived objection to the verdict form"). As such, the Court finds that Defendants have waived the much broader objection they now bring regarding jury unanimity.

Even if Defendants had not waived this objection by failing to raise it during trial, the Court finds that their jury unanimity concerns fail both as a matter of law and on the specific facts of this case. With respect to the law, Defendants contend that to comply with Rule 48(b)'s requirement

---

[3] *See, e.g.*, 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2554 at 426 ("A party may not state one ground when objecting to an instruction to the jury and attempt to rely on a different ground for an objection on appeal or on a motion for a new trial.").

**Appx20**

of jury unanimity, "[w]here there are multiple claims, the jury should return a separate verdict 'as to each claim.'" (Dkt. No. 330 at 10 (citing *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003))). Defendants' citation of *Zhang* is inapposite. Indeed, *Zhang*—an employment law case from the 9th Circuit—does **not**, as Defendants represent, state that "the jury should return a separate verdict as to each claim"; rather, *Zhang* states: "A jury **may** return multiple general verdicts as to each claim, and each party, in a lawsuit, without undermining the general nature of its verdicts." *Zhang*, 339 F.3d at 1031 (emphasis added). *Zhang* provides no support for Defendants' request for a new trial.

Setting aside Defendants' misrepresentation of non-binding precedent, the relevant law on this subject is quite straightforward. It is undisputed that "[t]he specificity of the verdict is within the discretion of the trial judge." *Hoechst Celanese Corp.*, 78 F.3d at 1581. It is further undisputed that general verdicts by the jury are proper in patent trials. Indeed, as the Federal Circuit has stated, "a trial court may, with proper instructions, present a patent case to a jury for a general verdict encompassing ***all of the issues of validity and infringement***." *Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 720 (Fed. Cir. 1984) (emphasis added). It necessarily follows that if it is proper to present a case to a jury for a general verdict "encompassing all of the issues of validity **and** infringement," then presenting a single question encompassing only the issues of infringement is also proper. Defendants' argument fails for this additional reason.

Finally, Defendants' argument fails on the specific facts of this case. It is black-letter law that "[a] jury always and necessarily makes findings (albeit unwritten) before it reaches its general verdict," and that "a jury necessarily reaches a legal conclusion, ***presumably in accord with the judge's instructions on the law***, before it reaches its general verdict." *R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1514 (Fed. Cir. 1984) (emphasis added). Defendants completely ignore

that the jury is presumed[4] to have followed this Court's jury instructions, which **repeatedly** made it clear that infringement was to be decided on a claim-by-claim basis and that the jury's determinations must be unanimous.

> For instance, the Court instructed the jury that their verdict had to be unanimous:

> A verdict form has been prepared for you, and you will take this verdict form with you to the jury room . . . and when you've reached a unanimous agreement as to your verdict, you will notify the Court Security Officer and you will have your foreperson **fill in the blanks in the verdict form reflecting your *unanimous* answers to those questions**.
> Do not decide who you think should win this case and then answer the questions to reach that result. Again, **your answers and your verdict must be *unanimous***.

(Dkt. No. 322 at 991:21–992:5 (emphases added));

> One more time, let me remind you that **your answers to the questions in the verdict form must be *unanimous***.

(*Id.* at 1069:5–7 (emphases added)); and

> After you've reach [*sic*] a verdict, your foreperson is to **fill in your *unanimous* answers to those questions** in the verdict form, sign it and date it, and then advise the Court Security Officer you've reached a verdict.

(*Id.* at 1070:13–16 (emphases added)).

> The Court further instructed the jury that they were to go claim-by-claim and agree as to which claims were infringed:

> Now, **you must determine *separately and for each of the asserted claims*** whether or not there has been infringement.

(*Id.* at 1006:17–18 (emphases added) (instructing regarding direct infringement)); and

> As with direct infringement, **you must determine whether there has been active inducement *on a claim-by-claim basis***.

(*Id.* at 1008:17–19 (emphases added) (instructing regarding indirect infringement)).

---

[4] Indeed, the jury was frequently instructed that they **must** follow the Court's instructions in answering the questions in the verdict form. *See, e.g.*, Dkt. No. 322 at 1069:1-3 ("Answer each question in the verdict form based on the facts as you find them to be following the instructions that the Court has given you on the law.").

**Appx22**

Finally, the verdict form specifically instructed the jury that damages could be awarded "only if you [(the jury collectively)] found one or more of the asserted claims to be infringed." (Dkt. No. 308 at 5). The Court provided similar instructions to the jury:

> Now, if you decide that ***any asserted claim* has been infringed**, you will then need to decide the amount of money damages, if any, to be awarded to the Plaintiff to compensate it for that infringement.

(Dkt. No. 322 at 1000:8–11 (emphases added)); and

> Now, if you find that TP-Link has **infringed *any claims* of the asserted patents**, then you must then consider what amount of damages, if any, to award to the Plaintiff Atlas.

(*Id.* at 1010:15–17 (emphases added)). As such, Defendants' contention that the Court "never instructed the jury that answering 'yes' to the general question required unanimous agreement as to at least one specific claim under at least one specific infringement theory" (Dkt. No. 344 at 4) is without merit. Furthermore, Defendants' argument that "every juror could have believed that a single claim of one of the five patents was infringed, but not agreed *which* claim or under *which* theory Defendants infringed" (Dkt. No. 330 at 11) is nothing more than speculation without support in the record and running counter to the presumption that the jury followed the Court's instructions.

In sum, and as the Court stated in response to the objection Defendants raised at trial, "with full, complete, and adequate instruction, the Court sees no error in including the issue of infringement, both direct and induced in the single question which is Question No. 1." (Dkt. No. 320 at 982:20-983:2). The same is true for the new objection raised now by Defendants regarding jury unanimity—the full, complete, and adequate instructions provided by the Court (and not substantively disputed by Defendants) alleviated any potential issues of the jury reaching a non-unanimous verdict. For all these reasons, Defendants' argument fails.

**Appx23**

### E. Whether Allowed Expert Testimony Violated Defendants' Right to a Fair Trial

Defendants argue that "[a] new trial should be ordered as the Court allowed expert testimony from Atlas's experts[—Dr. Shoemake and Mr. Weinstein—]that should have been excluded prior to trial, with each of these challenges briefed by Defendants in their motions to exclude testimony." (Dkt. No. 330 at 11 (citing Dkt. Nos. 196 and 201)).

#### 1. Dr. Shoemake

First, Defendants argue that "Dr. Shoemake—who admitted he is not an expert on website terms of service or on shipping terms for invoices—nevertheless offered expert testimony on both topics over Defendants' objections, and such testimony formed the basis for Atlas's theory of direct infringement." (*Id.* at 11-12 (citing Dkt. No. 196 (Motion); Dkt. No. 217 (Reply))). Specifically, Defendants contend that "Dr. Shoemake opined at trial that certain terms of service on a website imply that one of the Defendants, TP-Link Corporation Ltd., offered accused products for sale on a website in the U.S.," and that "Dr. Shoemake's improper opinion testimony was directly refuted by factual testimony from multiple [of] Defendants['] witnesses with direct knowledge." (*Id.* at 12). Defendants further argue that "Dr. Shoemake opined beyond his expertise that certain invoices showed that TP-Link Corporation Ltd. directly infringed by shipping products from Asia to the United States," which "was also refuted by multiple fact witnesses with direct personal knowledge of the invoices and shipping protocols." (*Id.* at 12-13).

In response, Plaintiff argues that "[t]he Court should reaffirm its prior ruling," which has already rejected Defendants' arguments "because Defendants did not 'challenge [Dr. Shoemake's] understanding of direct infringement or his methodology,' and because 'Dr. Shoemake's opinions contain analysis that is helpful to understand disputed facts on the issue of direct infringement.'" (Dkt. No. 340 at 12-13 (quoting Dkt. No. 257 at 6–8 (Order denying Defendants' motion to exclude Dr. Shoemake's opinions))). Plaintiff further contends that "Defendants' argument that Dr.

**Appx24**

Shoemake's testimony about the website terms of service was 'improper' fails to explain how or why," noting that Dr. Shoemake simply "concluded that TP-Link Corporation Limited provides the website 'https://www.tp-link.com/us' because the terms of use on the website *say so* in plain English." (*Id.* at 13 (citing Dkt. No. 316 at 429:23–430:20)). Plaintiff next argues that, "though Defendants claim Dr. Shoemake 'opined beyond his expertise' about Defendants' invoices, they fail to point out any problems with his methodology"; rather, Defendants' complaints "are not about Dr. Shoemake's methodology; they simply disagree with his opinions." (*Id.* at 13-14).

The Court finds that Dr. Shoemake's direct infringement testimony was properly admitted. As Defendants themselves recognize, they have previously raised these exact arguments and they have already been rejected by the Court. *See* (Dkt. No. 330 at 11); (Dkt. No. 257 at 6-8 (Court's Order rejecting Defendants' arguments that Dr. Shoemake's direct infringement opinions should be excluded because (1) "Dr. Shoemake lacks relevant specialized training or knowledge regarding 'offers for sale' or how to interpret 'terms of service' of a website to opine on whether Defendants offered for sale or sold an Accused Product in the United States through a website" and (2) "Dr. Shoemake's opinions as to whether Defendants imported an Accused Product into the country based on certain invoices" are inappropriate). As this Court has expressed on several occasions, "it is improper to use a JMOL motion—or a motion for new trial—as a renewed *Daubert* challenge." *Optis Wireless Tech., LLC v. Apple Inc.*, No. 2:19-cv-00066-JRG, Dkt. No. 740 (E.D. Tex. May 17, 2022); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 2016 WL 362540, at *3–4 (E.D. Tex. Jan. 29, 2016). Indeed, the Federal Circuit has also noted the impropriety of re-arguing *Daubert* issues in the context of post-trial motions:

> Under the guise of sufficiency of the evidence, SAP questions the admissibility of Versata's expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert v.*

> *Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) (stating that raising *Daubert*-type issues in the context of post-trial rulings "is the improper context for deciding questions that . . . boil down to the admissibility of evidence"). Notwithstanding this Court's and the Federal Circuit's guidance to the contrary, Defendants improperly return to their previously-rejected *Daubert* arguments, both here and across their post-trial briefing. Defendants' arguments related to Dr. Shoemake's direct infringement testimony are again rejected on the same grounds. *See* (Dkt. No. 257 at 6-8).

### 2.  Mr. Weinstein

Next, Defendants argue that "Mr. Weinstein, Atlas's damages expert, offered a theory of apportionment that should have been excluded pretrial." (Dkt. No. 330 at 12 (citing Dkt. No. 201 (Motion); Dkt. No. 226 (Reply))). Defendants concede that "[a]t trial, Mr. Weinstein testified that he had marginally apportioned his base-line royalty rate of $0.92 for Atlas's entire Wi-Fi 6 portfolio down to $0.79 to account for the value of features covered by non-asserted patents from that portfolio." (Dkt. No. 330 at 13). However, Defendants argue that "as shown both in Defendants' pretrial motion to exclude and at trial, Mr. Weinstein's 'apportionment' failed to account for the fact that Atlas was asserting at trial only a tiny fraction of its patent portfolio." (*Id.* at 13). As such, Defendants contend that "a new trial should be ordered with Mr. Weinstein's unapportioned royalty theory excluded." (*Id.*)

In response, Plaintiff contend that Defendants simply argue that Mr. Weinstein "should have apportioned further," but "as this Court has already correctly held, that argument 'target[s] the correctness of Mr. Weinstein's opinions,' not the reliability of his methodology." (Dkt. No.

340 at 14 (quoting Dkt. No. 267 at 5)). As such, Plaintiff contends that "[e]xclusion is not required or appropriate." (*Id.*)

The Court finds that Mr. Weinstein's damages opinions were properly admitted. As with Defendants' objections to Dr. Shoemake's testimony at trial, Defendants simply re-urge *Daubert* arguments that the Court has previously rejected. *See* (Dkt. No. 267 at 4-6 (rejecting Defendants' argument that Mr. Weinstein's proffered royalty rate of $0.92 per unit "lacks a proper apportionment analysis" on the basis that it "includes only seven patents (now five), whereas Atlas Global has offered that same rate to license its entire standard essential patent portfolio of at least 133 U.S. patents outside of the litigation context")). As Defendants simply re-raise the same arguments they brought in their *Daubert* motion against Mr. Weinstein, the Court rejects those arguments again here on the same basis. *See* (*id.*).[5] As the Court stated the first time Defendants raised this dispute, "[w]hile Defendants frame their arguments as identifying unreliable methodology, their arguments instead focus on the *correctness* of Mr. Weinstein's opinion that the $0.92 royalty rate is reasonable." (Dkt. No. 267 at 5). That Defendants may "believe that further apportionment [would have been] proper" is immaterial, as that was a "question[] for [the] jury to decide." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, 2021 WL 662238, at *6 (E.D. Tex. Feb. 20, 2021). The jury decided that question in Plaintiff's favor, and the Court has no basis to disturb the jury's finding.

### F. Whether the Damages Verdict Was Contrary to the Weight of the Evidence

Defendants argue that "[t]he damages verdict was contrary to the weight of the evidence as Defendants qualified for discounts during the hypothetical negotiation not reflected in the jury

---

[5] As the Court noted above with respect to Dr. Shoemake, "it is improper to use a JMOL motion—or a motion for new trial—as a renewed *Daubert* challenge" as Defendants do here. *Optis Wireless Tech.*, No. 2:19-cv-00066-JRG, Dkt. No. 740; *Rembrandt Wireless Techs.*, 2016 WL 362540, at *3–4; *see also Versata*, 717 F.3d at 1264.

verdict." (Dkt. No. 330 at 14). In response, Plaintiff notes that Defendants' argument "relies on the arguments they make in their Rule 50(b) motion." (Dkt. No. 340 at 14). The Court agrees that this is essentially the same argument raised by Defendants in their JMOL Motion. *See* (Dkt. No. 331 at 16-24). As discussed below in detail (*see infra* §§ III.H–I), the Court finds that Defendants' arguments are without merit and that they do not warrant either the entry of judgment as a matter of law or a new trial.

### G. Whether the Jury Was Improperly Instructed Regarding the Meaning of the Disputed Terms of the Asserted Claims

Defendants "renew their prior objections to the Magistrate Judge's Report and Recommendation on Claim Construction as to the claims ultimately asserted at trial, specifically claims 1 and 15 of the '513 Patent, claim 1 of the '738 Patent, and claims 1 and 6 of the '679 Patent." (Dkt. No. 330 at 15 (citing Dkt. No. 126)). Specifically, Defendants contend that "the jury was improperly instructed as to the meaning of 'uplink set-up information' as used in claim 1 of the '738 Patent," and that "the jury considered infringement of claims 1 and 15 of the '513 Patent, claim 1 of the '739 Patent, and claims 1 and 6 of the '679 Patent even though each of those claims should have been found indefinite." (*Id.* (citing Dkt. Nos. 90, 126)). Defendants contend that their renewed objections warrant a new trial. (*Id.*)

In response, Plaintiff argues that "Defendants simply cite their prior objections to Judge Payne's Claim Construction Order without offering anything new," and that "[t]he Court has already considered and correctly overruled those objections." (Dkt. No. 340 at 15 (citing Dkt. Nos. 126, 130)). Plaintiff concludes that "[s]ince Defendants have no new arguments, the Court should simply reaffirm the existing constructions." (*Id.*)

The Court rejects Defendants' arguments—a "renewal" of their previously-rejected Objections (Dkt. No. 126) to Judge Payne's Claim Construction Order (Dkt. No. 117)—for the

same reasons it previously considered. (Dkt. No. 130). As Defendants provide no further explanation or argument on this issue outside of a re-urging of their prior objections, nothing more need be said.

## II.     DISCUSSION: JMOL MOTION (DKT. NO. 331)

In the JMOL Motion, Defendants argue that the Court should enter judgment as a matter of law in favor of Defendants on the following seven issues: *First*, that Defendants do not directly infringe the sole asserted apparatus claim, claim 1 of the '513 Patent. (Dkt. No. 331 at 1-6). *Second*, that Defendants do not infringe the '259 Patent. (*Id.* at 6-11). *Third*, that Defendants do not infringe claim 1 of the '738 Patent and claim 18 of the '259 Patent. (*Id.* at 11-12). *Fourth*, that Defendants do not infringe claims 1 and 6 of the '676 Patent. (*Id.* at 12-13). *Fifth*, that Defendants did not induce infringement of the Asserted Patents. (*Id.* at 13-16). *Sixth*, that "the jury's damages protocol contravenes the mandatory hypothetical negotiation from *Georgia-Pacific*." (*Id.* at 16-22). *Seventh*, that Mr. Weinstein's (Plaintiff's damages expert) 79-cent royalty rate was not supported by evidence and violated apportionment requirements. (*Id.* at 22-24). The Court addresses each argument in turn and finds that no basis compels setting aside the jury's verdict and granting Defendants judgment as a matter of law on any issue.

### A.  Applicable Law

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting FED. R. CIV. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

**Appx29**

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Diag. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

Rule 50(a)(2) requires the moving party, when moving for JMOL before the case is submitted to the jury, to "specify the judgment sought and the law and the facts that entitle the movant to the judgment." Generally, a party who fails to present a Rule 50(a) motion on an issue at the close of evidence waives both its right to present a Rule 50(b) motion after judgment and its right to challenge the sufficiency of the evidence on appeal. FED. R. CIV. P. 50(b); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007) (citing *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001)). Furthermore, "it is improper to use a JMOL motion as a renewed *Daubert* challenge" and "[t]he same is true of claim construction and summary judgment arguments previously rejected by the Court." *U.S. Silica Co. v. Amberger Kaolinwerke Eduard Kick GMBH & Co. KG*, No. 2:20-CV-00298-JRG, 2023 WL 2542600, at *4 (E.D. Tex. Mar. 15, 2023), *appeal dismissed*, No. 2023-1813, 2023 WL 4985730 (Fed. Cir. Aug. 3, 2023).

### B. Whether Defendants Are Entitled to JMOL of No Infringement of Claim 1 of the '513 Patent

Defendants argue that "[n]o reasonable juror could have found that Defendants directly infringed claim 1 of the '513 Patent based on the evidence presented at trial" for two reasons: (1) "shipping invoices do not provide evidence that Defendants imported accused products into the

United States," and (2) "Defendant TP-Link Corporation does not control the tp-link.com/us website and does not use the website to make sales in the United States." (Dkt. No. 331 at 2-6).[6] Plaintiff contends that "[t]he jury was presented with ample evidence to conclude that Defendants directly infringe claim 1 of the '513 Patent by both offering to sell and importing the infringing Wi-Fi 6 products." (Dkt. No. 339 at 1-2). The Court takes Defendants' arguments in turn but finds neither convincing.

### 1. Shipping Invoices and Proof of Importation

Defendants contend that "the evidence showed that only non-party TP-Link USA Corporation ('TP-Link USA'), not either Defendant, has imported accused products into the United States." (*Id.* at 2). Specifically, Defendants argue that "Ms. Zhang [] testified that finished products from Defendant TP-Link Technologies are sold to non-party distributor TP-Link USA overseas, and that the entire sales transaction takes place in Asia." (*Id.* (citing Dkt. No. 317 at 583:5-16)). Defendants further contend that Plaintiff's expert, Dr. Shoemake, "admitted that the invoice evidence presented to the jury . . . showed that the 'goods change[d] hands' in Hong Kong, and that TP-Link USA takes possession of and responsibility for the products in Hong Kong." (*Id.* at 2-3 (citing Dkt. No. 317 at 568:25-569:11; JX022)). Defendants further contend that "Atlas [did not] present at trial any evidence that any 'contracting and performance' took place in the United States with respect to the accused products." (*Id.* at 3). As such, Defendants conclude that "no reasonable juror could have found that either Defendant is responsible for importing the accused products into the United States." (*Id.* at 3).

---

[6] Defendants also generally aver that Dr. Shoemake is not qualified to discuss website terms of service or shipping terms as proof of direct infringement. (Dkt. No. 343 at 1). For the reasons discussed above with respect to Defendants' Motion for New Trial (*see supra* § II.E.1), the Court once again rejects these arguments.

**Appx31**

In response, Plaintiff argues that "[s]ubstantial evidence shows Defendants [] import the infringing products into the United States," for example, "Dr. Shoemake explained how [an] invoice [(JX22)] proves that Defendant TP-Link Corp. (f/k/a TP-Link International Limited) ships the accused AX6000 Wi-Fi 6 routers to California and imports them there." (Dkt. No. 339 at 4). Specifically, Plaintiff notes, quoting Dr. Shoemake's testimony at trial, that "the invoice shows the 'products are being shipped to Fontana, California' and 'they're being shipped from [] Hong Kong…. So this is evidence of importation.'" (*Id.* (quoting Dkt. No. 315 at 431:10-432:7 (Dr. Shoemake's testimony))). Plaintiff refutes that Dr. Shoemake ever "admitted that the invoices prove TP-Link USA imports the infringing products," noting that he instead simply explained that the "FCA Hong Kong" term on the invoice "means the buyer 'would be responsible from Hong Kong if any products were damaged.'" (*Id.* at 5 (quoting Dkt. No. 317 at 569:6-11)). In sum, Plaintiff contends that "[a]t best, Defendants do nothing more than highlight a factual dispute regarding importation that the jury decided in Atlas's favor based on the evidence presented." (*Id.*)

In reply, Defendants argue that "Dr. Shoemake's testimony contradicted Atlas' infringement theory, as Dr. Shoemake admitted that the 'goods change[d] hands' in Hong Kong and that non-party TP-Link USA takes possession of and responsibility for the products in Hong Kong before importation into the United States." (*Id.* at 1 (citing Dkt No. 317 at 568:25-569:11)).

In sur-reply, Plaintiff contends that, despite Defendants' characterizations to the contrary, "Dr. Shoemake only stated that: (1) the generic incoterm free carrier 'has to do with who pays for shipping and where goods change hands;' and (2) FCA Hong Kong means TP-Link USA 'pays for shipping from Hong Kong, and they would be responsible from Hong Kong if any products were damaged.'" (Dkt. No. 346 at 2 (citing Dkt. No. 317 at 568:20-569:11)). Indeed, Plaintiff argues, "Dr. Shoemake was unequivocal that Defendants are the ones who import the accused

products into the United States." (*Id.* (citing Dkt. No. 315 at 431:10-432:12; JX22)).

The Court finds that Defendants simply identify a factual dispute that the jury decided in Plaintiff's favor. Defendants argument is premised on the following exchange with Dr. Shoemake at trial:

> Q. And under the guidelines of the International Chamber of Commerce, the incoterm free carrier designates the location where the buyer assumes possession and responsibility for the goods. Correct?
> A. So it has to do with who pays for shipping and where goods change hands.
>
> Q. And in this case the incoterm FCA Hong Kong specifies that the buyer, TP-Link USA, takes possession and responsibility of the named products in Hong Kong. Correct?
> A. That's correct. So they would pay for shipping from Hong Kong, and they would be responsible from Hong Kong if any products were damaged.

(Dkt. No. 317 at 568:25-569:11). Specifically, Defendants point to Dr. Shoemake's acknowledgment that "the incoterm free carrier" relates to "where goods change hands," and conclude that this requires the Court to grant JMOL of non-infringement. However, that the invoice says "FCA HONGKONG" is not dispositive of the issue. *Cf. Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1370 (Fed. Cir. 2008) ("[S]imply because an article is delivered 'free on board' outside of the forum, a sale is not necessarily precluded from occurring in the forum."). Notably, Dr. Shoemake also testified that TP-Link Corporation "import[s] infringing products into the U.S." based on his analysis of the invoices:

> Q. How else besides offering to sell does TP-Link directly infringe the apparatus claims of Atlas' patents?
> A. By importing infringing products into the U.S.
>
> Q. How do you know that?
> A. I know that because during my analysis in this case I gained access to commercial invoices.
>
> Q. And are those invoices at Joint Exhibit 22?
> A. Yes, they are.
>
> Q. And what do those invoices tell you about who imports the product?

**Appx33**

A. So if you look at this invoice, you can see at the top it says TP-Link International Limited. So in about 2020 or 2021, TP-Link International Limited changed its name to TP-Link Corporation, so this means it's the same company that's a Defendant in this case, TP-Link Corporation. So it shows on this commercial invoice from a Defendant in this case that products are being shipped to Fontana, California, so they're being shipped to the United States. And if you look to the left of that 'ship to' line back to the left, you can see where they're being shipped from--Hong Kong. So that necessarily means that these products are being shipped from outside the United States to inside the United States. So this is evidence of importation.

Q. Well, how does this invoice that we see on the screen from Joint Exhibit 22 compare with all of the other invoices that you've seen?
A. It's typical. It's -- all the other invoices are very similar to this.

(Dkt. No. 315 at 431:10-432:12). Joint Exhibit 22 referenced by Dr. Shoemake is excerpted below:



(JX22 at 3326 (highlighting added by Plaintiff)).

The jury was free to weigh the testimony that Dr. Shoemake provided regarding JX22, including that the invoice listed "ship to" and "bill to" addresses in California and a "from" address in Hong Kong, along with the testimony elicited by Defendants regarding the "FCA HONGKONG" incoterm in reaching their decision on infringement via importation. Resolving such factual disputes is uniquely the province of the jury and is not a suitable ground for JMOL. *See Chamberlain Grp. LLC v. Overhead Door Corp.*, 668 F. Supp. 3d 560, 580 (E.D. Tex. 2023), *appeal dismissed*, No. 2023-1794, 2023 WL 4045371 (Fed. Cir. June 16, 2023) ("Where a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to

support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL and does not support granting a new trial.").

### 2. Offers for Sale Through tp-link.com/us

Defendants argue that evidence of offers to sell the accused products through the tp-link.com/us website "is insufficient for any reasonable juror to have found direct infringement by either Defendant." (Dkt. No. 331 at 4). Specifically, Defendants contend that "Defendants' corporate designee, Feiyue Liu, testified that non-party TP-Link USA controls, and is responsible for all content on, the website tp-link.com/us." (*Id.* (citing Dkt. No. 317 at 594:4-18, 596:19-25, 597:13-21). Defendants note that "Mr. Liu also testified that the Defendants do not control the list of retailers authorized to sell the accused products in the United States, nor do they control the price, quantity, or management of any sales of the accused products made through the tp-link.com/us website." (*Id.* (citing Dkt. No. 317 at 589:6-8, 589:20-591:1, 591:9-16, 591:23-592:3, 596:19-25, 597:13-21)). Defendants contend that "all Atlas presented at trial was tangential speculation from its technical expert ostensibly derived from the name 'TP-Link Corporation Limited' being found in terms of service and listed on a copyright notice at the bottom of the website." (*Id.* at 5).

In response, Plaintiff argues that "[s]ubstantial evidence shows Defendants offer for sale the infringing Wi-Fi 6 products via their U.S. website," for example, Dr. Shoemake "explained how the TP-Link website shows Defendants offer to sell the Deco X60 Wi-Fi 6 system for $199.99." (Dkt. No. 339 at 2 (citing Dkt. No. 315 at 428:19–429:7)). As for whether Defendants control the website, Plaintiff argues that "Dr. Shoemake showed that the Terms of Use for the TP-Link website explicitly say it is 'provided by TP-Link Corporation Limited,' a Defendant in this case," and that "the jury saw that Defendant TP-Link Corporation Limited owns the copyright to the TP-Link U.S. website," meaning that "Defendant TP-Link Corporation Limited—not its TP-

32

**Appx35**

Link USA affiliate—claims to be the original author of the TP-Link U.S. website." (*Id.* at 3 (citing Dkt. No. 315 at 429:15–431:9; Dkt. No. 319 at 812:1–11; PX19 at 9; PX10 at 800)).

Finally, as to the testimony of Defendants' witnesses to the contrary, Plaintiff argue that this "self-serving testimony from [Defendants'] own employees" fails to justify JMOL because (1) "[t]he jury was not required to believe any of TP-Link's witnesses, particularly given their interests in the case and substantial credibility problems," and (2) "even if the jury credited Defendants' evidence, where (as here) 'a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL.'" (*Id.* at 3-4 (quoting *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 2016 WL 4440255, at *7 (E.D. Tex. Aug. 23, 2016))).

In reply, Defendants argues that "Atlas provided zero evidence showing what happens if a consumer actually presses 'Shop Now,' assuming that this would allow for a direct purchase when, to the contrary, the evidence established that TP-Link USA distributes its products to retail partners." (Dkt. No. 343 at 1 (citing Dkt. No. 317 at 597:1- 598:1)). Defendants repeat their argument that Dr. Shoemake's testimony regarding TP-Link Corporation Limited's control of the website is "based on such scant evidence" and was "directly refuted by the only percipient witnesses to address the issue at trial, who explained that TP-Link USA is solely responsible for the contents of the website." (*Id.* at 2 (citing Dkt. No. 317 at 721:15-723:15)).

In sur-reply, Plaintiff argues that it "presented substantial evidence that Defendants offer to sell the accused products on the TP-Link U.S. website via 'a button that says "shop now" that allows you to purchase the product.'" (Dkt. No. 346 at 1 (quoting Dkt. No. 315 at 428:19–429:12; PX10)). As to control of the website, Plaintiff reiterates that it "walked the jury through the website's Terms of Use several times and showed that the website admits that '[t]he Services

defined here'—defined to include the website—are provided by TP-Link Corporation Limited, which 'means the U.S. website is being provided by TP-Link Corporation Limited, one of the Defendants in this case.'" (*Id.* (quoting Dkt. No. 315 at 429:23–431:9 (Shoemake direct); PX19; Dkt. No. 319 at 809:10–811:23 (Hansen cross))).

The Court agrees with Plaintiff. Defendants raise two issues: (1) whether Defendants control the tp-link.com/us website, and (2) whether the evidence presented regarding that website constituted an "offer to sell." Factual disputes existed for both of these issues, which the jury resolved in Plaintiff's favor. Arguments re-litigating the facts of the case cannot justify overturning the jury's verdict and granting JMOL in Defendants' favor. In short, "[t]he jury was entitled to credit Plaintiff's evidence, and apparently did." *Finesse Wireless LLC v. AT&T Mobility LLC*, 689 F. Supp. 3d 332, 352 (E.D. Tex. 2023) (denying request for JMOL).

As to Defendants' first argument, there is a clear factual dispute as to whether Defendants control the tp-link.com/us website. Defendants argue that their "corporate designee, Feiyue Liu, testified that non-party TP-Link USA controls, and is responsible for all content on, the website tp-link.com/us." (Dkt. No. 331 at 4). However, Plaintiff points to testimony of Dr. Shoemake that "showed that the Terms of Use for the TP-Link website explicitly say it is 'provided by TP-Link Corporation Limited,' a Defendant in this case," and that "the jury saw that Defendant TP-Link Corporation Limited owns the copyright to the TP-Link U.S. website," meaning that "Defendant TP-Link Corporation Limited—not its TP-Link USA affiliate—claims to be the original author of the TP-Link U.S. website." (Dkt. No. 339 at 3 (citing Dkt. No. 315 at 429:3-7; PX10 at 800)). Though Defendants may believe their own witnesses, that does not mean the jury must. *See Finesse Wireless*, 2023 WL 5613209, at *15 (jury may reject testimony from witnesses who have been impeached); *Hearing Components v. Shure, Inc.*, 2009 WL 593836, at *1 (E.D. Tex. Mar. 6, 2009)

**Appx37**

(jury may reject testimony of "interested witness"). As the Supreme Court has instructed, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). In so doing, the Court finds no basis to grant Defendants judgment as a matter of law on this issue.

As to the second issue, there is also a clear factual dispute between the parties. Plaintiff points to the testimony of Dr. Shoemake regarding Defendants' "Deco X60 Wi-Fi 6 system" listed on the tp-link.com/us website, concluding that this is sufficient evidence of an "offer to sell" in the United States. An excerpt of the referenced webpage included in Plaintiff's Response is shown below:



(*Id.* (excerpting PX10 at 800 (emphasis added by Plaintiff))). Plaintiff contends that the above webpage "is a commercial offer for sale under the law of contracts because it is sufficiently definite to show 'the manifestation of willingness to enter into a bargain' by Defendants." (*Id.* (quoting *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001))). Specifically, Plaintiff notes that "[t]he website includes key terms, including the product (Deco X60), the price

($199.99), and quantity (3-pack)" as well as "a 'Shop Now' button through which a customer can accept Defendants' offer to sell the Deco X60 for the offered price." (*Id.* at 3 (citing Dkt. No. 315 at 429:3-7; PX10 at 800)). Defendants only rebuttal to the evidence of the Deco X60 Wi-Fi 6 system on the tp-link.com/us website is that "Atlas provided zero evidence showing what happens if a consumer actually presses 'Shop Now'" and that Defendants' corporate representative testified that no sales to consumers occur through the website. (Dkt. No. 343 at 1). As previously discussed, disputed factual questions, including underlying "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150. As the jury was entitled to credit Plaintiff's evidence over Defendants', the Court sees no basis to disturb the jury's conclusion regarding infringement of claim 1 of the '513 Patent.

### C. Whether Defendants Waived Their Non-Infringement JMOL Arguments

In response to all of Defendants' non-infringement JMOL arguments except pre-filing induced infringement[7], Plaintiff argues that Defendants failed to raise these arguments under Rule 50(a) with sufficient specificity and they cannot now be raised on a Rule 50(b) motion. (Dkt. No. 339 at 5-6, 9, 11-12). Defendants' argument for JMOL of non-infringement under Rule 50(a) was the following:

> THE COURT: Let's go to the fourth ground raised by the Defendants which, as I understand it, is that Plaintiffs failed to put on a prima facie case of infringement.
> MR. SAUL: Yes, Your Honor.
> No reasonable jury could find that Defendants have directly or indirectly infringed the asserted claims for the additional reason that Plaintiff has failed to meet its burden of proving that all limitations of any asserted claim are met by any accused product. This is for two reasons.
> First, Plaintiff's expert Doctor Shoemake's purported product testing and discussion of the WiFi 6 standard, WiFi chip data sheets, and TP-Link marketing

---

[7] Defendants' waiver of post-suit induced infringement Rule 50(b) arguments is addressed below. *See infra* at 53 n.10.

> materials are insufficient for a reasonable jury to conclude that all limitations of any asserted claim are met by any accused product.
>
> For the vast majority of the claim limitations at issue, Plaintiff and its expert provided only expert testimony that the limitations cover certain functionality of the WiFi 6 standard. However, inclusion in the standard does not mean that a claim is practiced by Defendants' products, and for at least one element of every asserted claim, Plaintiff's expert provided no evidence to show that such functionality is in any event implemented in the accused products.
>
> Second, Plaintiff has failed to show that any accused product is representative of other accused products in this case. Thus, assuming for argument's sake that Plaintiff showed that any product infringes, that, of course, does not mean that any other product infringes based on the failure of proof as to representativeness. In sum, Plaintiff does not -- did not submit sufficient evidence to show that any of the 69 accused products meet each and every claim limitation of any asserted claim.

(Dkt. No. 319 at 962:2 – 963:8). Plaintiff contends that "[w]hile Defendants argued at an exceedingly high level that Dr. Shoemake failed to establish that at least one claim limitation in each of the Asserted Patents was practiced by Defendants' products, Defendants never identified any specific limitation or explained why any unidentified limitation was not met." (Dkt. No. 339 at 5-6); *see also* (*id.* at 9, 11-12). The Court finds that Defendants sufficiently preserved their Rule 50(b) non-infringement arguments by raising the issues in their Rule 50(a) motion. Preservation of the issues does not require the level of specificity in the Rule 50(a) motion that Plaintiff desires.

### D. Whether Defendants Are Entitled to JMOL that They Do Not Infringe the '259 Patent

Defendants argue that Plaintiff's expert relied upon the 802.11ax standard but "ignored the fact that 802.11ax includes multiple 'sounding methods' that indisputably do not infringe these claims," and that he "do[es] not show that the optional sounding method Atlas relied on must be implemented to perform sounding in all (much less any) of Defendants' products." (Dkt. No. 331 at 6-7). Defendants conclude that Plaintiff's "reliance on an optional feature of the 802.11ax standard is 'not sufficient' to show infringement of these method claims." (*Id.*).

**Appx40**

In response to Defendants' "optional" argument, Plaintiff argues that "Defendants' contention that these infringing methods are 'optional,' and Atlas thus failed to prove infringement, fails to address the actual testimony and evidence presented at trial." (Dkt. No. 339 at 6). Plaintiff contends that "Dr. Shoemake provided an element-by-element analysis showing how the method illustrated in Figure 26-8 [(the "HE Sounding" method)] infringes the '259 Patent." (*Id.*). Plaintiff further notes that "Dr. Shoemake also testified that implementing this method is mandatory." (*Id.* (citing Dkt. No. 315 at 447:21–448:8 (Dr. Shoemake discussing the mandatory nature of BFRP trigger frames used in Figure 26-8))). Plaintiff argues that the jury was free to believe Dr. Shoemake's testimony over Defendants' experts' (Dr. Hansen) testimony, especially here where Dr. Hansen testified that "he had not performed an analysis to determine if any TP-Link products infringe any asserted claims." (*Id.* at 7 (citing Dkt. No. 319 at 794:24–795:7)). Finally, Plaintiff contends that Defendants' citation in their JMOL Motion to a page from the 802.11ax that "suggests using the infringing method is optional," is irrelevant as "the jury was never directed to this page and one cherry-picked page of the 802.11ax standard with no context and no supporting testimony (even from Dr. Hansen) cannot overcome extensive evidence to the contrary, especially when the jury had no basis to look to that page." (*Id.*).

In response to Defendants' implementation argument, Plaintiff contends that "the jury saw evidence that TP-Link products are designed to practice the infringing method" and that "TP-Link's products and customers use the claimed methods" through both expert testimony and circumstantial evidence. (Dkt. No. 339 at 7). With respect to expert testimony, Plaintiff contends that "Dr. Shoemake pointed to several types of evidence, including testing, datasheets, and source code, showing the accused Wi-Fi 6 products actually perform the claimed methods." (*Id.* at 8 (citing Dkt. No. 315 at 404:13–405:5 ("my own testing also shows that the method is performed"),

404:19–405:21, 449:2–14, 449:15-450:5, 450:17–454:4), PX9 (product testing results), PX11). With respect to circumstantial evidence, Plaintiff contends that "Dr. Shoemake showed the '259 claims are critical to Wi-Fi 6 improvements, including improvements that Defendants advertise." (*Id.* (citing Dkt. No. 315 at 422:23–423:7, 424:2–16, 425:13–16, 444:18–445:3, 445:10–17)). Plaintiff further notes that "[t]he jury additionally heard evidence from Defendants' own representative that TP-Link products might infringe." (*Id.* at 9 (citing Dkt. No. 317 at 694:19–25)). As such, Plaintiff concludes that substantial evidence supports the verdict. (*Id.*).

In reply, Defendants argue that "Dr. Shoemake's testimony that '***BRFP trigger frames*** … are mandatory' does not establish that ***the specific method of Figure 26-8*** is mandatory," and that "Atlas's own quotations of Dr. Shoemake's source code analysis shows that he did not address each claim limitation." (Dkt. No. 343 at 4 (emphasis in original)).

In sur-reply, Plaintiff contends that "although the Wi-Fi 6 standard describes two HE sounding sequences (shown in Figs. 26-7 and 26-8, respectively), only the Fig. 26-8 sequence uses BFRP trigger frames," and "because BFRP trigger frames are 'mandatory,' the jury reasonably inferred that Defendants' Wi-Fi 6 products must also implement the Fig. 26-8 sequence." (Dkt. No. 346 at 4 (citing JX17 at 1446-47, 1775; Dkt. No. 315 at 447:21–448:8)). Finally, Plaintiff argues that "Shoemake showed how the source code for Defendants' Wi-Fi 6 products practiced each of the steps in Figure 26-8, including BFRP trigger frames." (*Id.* (citing Dkt. No. 315 at 450:25–453:24)).

The Court finds that substantial evidence supported the jury's verdict of infringement. As an initial matter, the Court notes that "the Rule 50(b) motion standard is not whether there was substantial evidence to support a finding contrary to the jury's verdict." *KAIST IP US LLC v. Samsung Elecs. Co.*, 439 F. Supp. 3d 860, 879 (E.D. Tex. 2020). Nor does the Rule 50(b) standard

replace the jury with the Court and ask "whether the Court sitting in place of the jury would have found the contrary evidence adequate to outweigh the evidence supporting the jury's verdict." *Id.* That is, in essence, what Defendants ask the Court to undertake. Such a request attempts to elevate the Court's judgment over that of the jury in contravention to Seventh Amendment principles. The correct standard requires the Court to "determine whether there is substantial evidence to support the jury's verdict as those citizens returned it." *KAIST IP*, 439 F. Supp. 3d at 879. Here, Plaintiff and its expert, Dr. Shoemake, provided substantial evidence to support the jury's finding of infringement. While the Court recognizes that Defendants, and their expert Dr. Hansen, disagree with Dr. Shoemake's testimony, that is irrelevant for the purposes of the present motion. Here, the jury was presented with conflicting evidence and "was free to credit whichever experts and their testimony it found to be credible." *Id.* at 881.

### E. Whether Defendants Are Entitled to JMOL that They Do Not Infringe Claim 1 of the '738 Patent and Claim 18 of the '259 Patent

Defendants argue that "[t]he Court should grant JMOL of non-infringement of Claim 1 of the '738 Patent and claim 18 of the '259 Patent because Atlas failed to show that feedback frames were received at the access point at the same time (or simultaneously) as required by those claims." (Dkt. No. 331 at 11). Specifically, Defendants contend that "Atlas's only argument that this claim requirement is met is Dr. Shoemake's conclusory and unsupported assumption that simultaneous transmission by transmitting devices would somehow result in simultaneous receipt of those transmissions by the access point," which "is insufficient as a matter of law to support a finding of infringement." (*Id.*).

In response, Plaintiff argues that substantial evidence supports the jury verdict of infringement of the '738 and '259 Patents. (Dkt. No. 339 at 9). Specifically, Plaintiff argues that "Dr. Shoemake explained in detail the multi-user transmissions from stations to an access point

that occur using uplink (UL) OFDMA and UL MU-MIMO" and that "during UL OFDMA operations, multiple station devices transmit at the same time to an access point, and those simultaneous transmissions are received by the access point at the same time." (*Id.* at 9-10 (citing Dkt. No. 315 at 413:13–421:17)). Dr. Shoemake further explained that "[t]he access point coordinates the UL OFDMA operation of the multiple stations through the use of a trigger frame, which is 'a packet that goes from the access point to trigger the stations to send their uplink transmissions at the same time, thereby having synchronization so those packets [*sic*] going to the access point arrive at the same time.' (*Id.* at 10 (Dkt. No. 315 at 417:25–418:7)).

Specifically with respect to the '738 Patent, Plaintiff notes that Dr. Shoemake further testified that "the Wi-Fi 6 standard requires that the Wi-Fi 6 access points will simultaneously receive multiple uplink frames from multiple stations in response to a trigger frame," as shown in "Figure 10-14c of the Wi-Fi 6 standard." (*Id.* (citing Dkt. No. 317 at 505:3–506:16; JX17 at 1309)). Plaintiff contends that Dr. Shoemake "explained that the datasheets for the chipsets used in the TP-Link products 'confirm that trigger frames are being used to initiate the simultaneous uplink transmission from those stations,' and that they "show that TP-Link Wi-Fi 6 chipsets 'support[] UL-OFDMA to allocate resource units to multiple users transmitting traffic simultaneously to the AP.'" (*Id.* (citing Dkt. No. 317 at 501:25–502:22; PX11 at 6317)).

With respect to the '259 Patent, Plaintiff contends that "[r]eferring to Figure 26-8 of the 802.11ax standard, Dr. Shoemake testified that each of the High Efficiency stations (i.e., Wi-Fi 6 stations) respond after a SIFs (short inter-frame spacing) period, simultaneously transmitting their compressed beamforming report which 'shows that since those are transmitted simultaneously, that means they'll be received simultaneously at the access point.'" (*Id.* at 10-11 (citing Dkt. No. 315 at 459:2–18; JX17 at 1447 (Fig. 26-8))).

Plaintiff argues that "[o]ther evidence also supports the jury's verdict regarding simultaneous uplink transmission and reception," including that "the Wi-Fi Alliance mandatory tests 4.41.1 and 4.41.2 require an access point to receive uplink multi-user transmissions" and "Dr. Shoemake's own independent testing also confirmed the TP-Link products transmitted data to the TP-Link access point simultaneously." (*Id.* at 10-11 (citing Dkt. No. 315 at 467:19–468:20; PX12 at 7827, 7842 (test results))). Finally, Plaintiff contends that "[s]imultaneous transmission of the multi-user uplink transmissions by the stations [(admitted by Defendants to occur)] provides circumstantial evidence that these transmissions are received simultaneously at the access point." (*Id.* at 11 (citing Dkt. No. 331 at 11)).

In reply, Defendants simply argue that "the only evidence Atlas identifies of simultaneous reception—as opposed to transmission—of frames is Dr. Shoemake's unfounded and conclusory testimony." (Dkt. No. 343 at 4).

In sur-reply, Plaintiff argues that "Dr. Shoemake's testimony about simultaneous reception was not Atlas's 'only evidence,' and it was not 'unfounded and conclusory.'" (Dkt. No. 346 at 4). For example, Plaintiff provides, "Dr. Shoemake showed the jury Figure 10-14c ('738) and Figure 26-8 ('259) of the Wi-Fi 6 standard, which depict multiple frames being simultaneously received:



(*Id.* (citing JX17 at 1309, 1447 (emphasis added by Plaintiffs))).

**Appx45**

The Court finds that substantial evidence supports the jury's finding of infringement. Once again, Defendants essentially move for judgment as a matter of law because they disagree with Dr. Shoemake, not because substantial evidence does not exist to support the jury's verdict of infringement. As noted above, enough evidence in the record exists in the form of expert testimony and circumstantial evidence for a reasonable juror to conclude that feedback frames were received simultaneously at the access point. Defendants do not substantively address the expert testimony and circumstantial evidence cited by Plaintiff, opting instead to simply characterize Dr. Shoemake's testimony as "unfounded and conclusory." Such a critique, without more, cannot suffice to overturn a jury's verdict.

### F.  Whether Defendants Are Entitled to JMOL that They Do Not Infringe Claims 1 and 6 of the '679 Patent

Defendants argue that "[t]he Court should grant JMOL that claims 1 and 6 of the '679 Patent are not infringed because Atlas failed to set forth evidence that the 'downlink frame . . . including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format' is met." (Dkt. No. 331 at 12). Defendants contend that at trial "Atlas, through Dr. Shoemake, pointed to the Ack Policy Indicator field as constituting the 'acknowledgement information'," and that "Dr. Shoemake claimed that when the Ack policy is 'normal Ack,' it is a single user format, and when Ack policy is 'HE TP Ack' or 'HE [TB] PPDU', then multiuser format is used." (*Id.* at 12-13). However, Defendants argue, Dr. Shoemake's testimony "is contradicted by the Wi-Fi 6 (802.11ax) standard upon which he purports to rely," which, "as confirmed by Dr. Hansen, indicates the HE PB PPDU can be used for ***both*** single-user and multi-user responses." (*Id.* at 13 (citing JX17 at 107-115 (Section 9.3.1.22), Table 9-13, 78; Dkt. No. 319 at 767:7-768:10)).

Defendants further argue that "the Ack Policy Indicator field within the QoS control field in the Wi-Fi 6 standard does not indicate at all whether a single-user format or multi-user format should be used when the STA sends the acknowledgement frame," as such, "the Wi-Fi 6 (802.11ax) standard does not provide sufficient information to show this claim element is met." (*Id.*).

In response, Plaintiff argues that "Dr. Shoemake provided ample evidence that the Ack Policy Indicator field in the accused TP-Link products is the claimed 'acknowledgment information' indicating whether the subsequent acknowledgment will be in single-user format or multi-user format." (Dkt. No. 339 at 12). Specifically, Plaintiff contends that Dr. Shoemake "testified that the 'Ack policy subfield indicates exactly how [] the station should respond with acknowledgments,'" and that he "explained how Table 9-13 of the 802.11ax standard shows 'the rules for how these Ack policy bits are set…[:] if the Ack policy is normal Ack, the bits are set to 00 and you use a single user format. But if the Ack policy is set to HETP Ack, the bits are set to 01, and that means a multiuser format is used, specifically the HE trigger-based PPDU.'" (*Id.* (citing Dkt. No. 317 at 524:13–17, 528:17–529:4; JX18 at 2607 (Table 9-13); JX17 at 1146 (same))). Plaintiff notes that Dr. Shoemake "showed the jury two figures from the standard proving the Ack Policy Indicator is the claimed 'acknowledgment information,'" with "Figure 10-14a from §10.3.2.13.2 show[ing] that 'when the Ack policy is set to HETP Ack, then you will use uplink OFDMA to send the acknowledgment, and that is a multiuser format,'" and "Figure 10-13 and §26.4.4.3 show[ing] that 'when the access point sets the Ack policy indicator to normal Ack, what will happen is a single user PPDU will be sent [] and that's in a single user format.'" (*Id.* (citing Dkt. No. 317 at 532:25–533:16, 534:1–6, 534:17–535:2)). As such, Plaintiff contends that "Defendants' repeated reliance on the testimony of their own expert is misplaced" because "Dr.

**Appx47**

Shoemake's testimony provides substantial evidence from which the jury could reasonably find infringement." (*Id.* at 13-14).

In reply, Defendants simply argues that "Atlas does not refute Defendants' key point—that the HE trigger-based PPDU can be used in both single-user and multi-user contexts." (Dkt. No. 343 at 4).

In sur-reply, Plaintiff contends that "Defendants' key point regarding single-user and multi-user 'contexts' is irrelevant," as the "'679 claims recite single-user and multi-user 'formats' and "Dr. Shoemake explained how the Wi-Fi 6 ack policy indicator in Defendants' Wi-Fi 6 products represents whether the subsequent acknowledgment will use single-user or multi-user 'format.'" (Dkt. No. 346 at 4 (citing Dkt. No. 317 at 528:17–529:4, 532:25–533:16, 534:1–6, 534:17–535:2)).

The Court finds that substantial evidence supports the jury's verdict. Notably, here, as in their previous arguments, Defendants argue that their expert should be believed over Dr. Shoemake. *See, e.g.*, (Dkt. No. 331 at 13 ("The Wi-Fi 6 standard, *as confirmed by Dr. Hansen*, indicates the HE PB PPDU can be used for both single-user and multi-user responses."). The Court reiterates that re-arguing disputed factual positions and urging the Court to usurp the jury's role as fact finder and judge of credibility is not proper in a motion for judgment as a matter of law under Rule 50(b). *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). That Defendants presented conflicting evidence to Dr. Shoemake at trial placed the question as to who to believe in the hands of the jury. The jury sided with Dr. Shoemake and Plaintiff, and the Court will not overturn that result based on a re-litigation of the issue presented to the jury.

**Appx48**

### G. Whether Defendants Are Entitled to JMOL that They Did Not Induce Infringement of the Asserted Patents

Defendants contend that "[a]t trial, Atlas argued that Defendants induced infringement of the asserted patents beginning on June 8, 2021, the date Atlas sent letters to three individuals at the offices of non-party TP-Link USA in the United States," but "those letters failed to provide notice of alleged infringement of any asserted patent." (Dkt. No. 331 at 13-14). Defendants contend that these letters fail to provide sufficient notice as they (1) "do not list any specific patent numbers, but merely reference a 'portfolio'"; (2) "do not identify any specific product that allegedly infringes; instead, the letters vaguely reference a 'range of networking, mobile computing, and internet of things (IOT) applications'"; (3) "the letters provide no analysis of how Defendants' products allegedly infringe any patent"; (4) "the letters provide no information about what features of the 802.11ax standard purportedly are covered by the 'portfolio,' or whether any such features are mandatory in the standard." (*Id.* at 14). Defendants further argue that "Atlas failed to show that either of the Defendants even received the letters Atlas sent to non-party TP-Link USA, or otherwise had knowledge of the asserted patents or their infringement, prior to the filing of the lawsuit." (*Id.* at 15).[8] Finally, Defendants argue that "none of the supposed inducing acts is directed to any feature of the Wi-Fi 6 standard alleged to be covered by any asserted claims" as "[t]he only supposed evidence of inducement set forth at trial by Atlas was benign marketing and support materials for Wi-Fi 6 generally . . . and nothing specific to any specific feature allegedly covered by the asserted claims." (*Id.*). As such, Defendants contend that "Atlas's purported

---

[8] Plaintiff notes that "Defendants failed to present evidence proving the letters were never received" as "Ms. Sun testified that she *personally* did not receive the letters and that TP-Link USA's CEO told her that he *did not recall* receiving the letters, but she never testified that no one affiliated with Defendants ever received the letters," nor could she as "Ms. Sun never asked the recipients of two letters what they did after receiving them." (Dkt. No. 339 at 16 (citing Dkt. No. 317 at 704:20–24 (testifying "I did not receive this letter"), 704:25–705:11 ("[Mr. Liu] said that he did not recall such a letter."), 705:14-16). As such, "Ms. Sun's testimony, then, does not show that TP-Link Corporation and TP-Link Technologies never received the letters," as Defendants now claim. (*Id.*).

**Appx49**

evidence of inducement is insufficient to meet Atlas's burden, either before or after the complaint was filed." (*Id.* at 16).

In response, Plaintiff argues that "[a] reasonable jury could have found induced infringement as of June 8, 2021, the date Atlas sent three notice letters to three TP-Link employees," as those letters "notified Defendants about Atlas's Wi-Fi 6 Standard Essential Patents, acquired from Newracom" and "[b]ecause Atlas told Defendants the patents were 802.11ax Standard Essential, Defendants knew its Wi-Fi 6 products necessarily infringed." (Dkt. No. 339 at 14). As such, Plaintiff argues that "[a]t a minimum, a reasonable jury could have found Defendants willfully blind by ignoring the letters." (*Id.*).

As to Defendants' argument that there can be no induced infringement because the letters do not specify patent numbers, Plaintiff argues that "notifying a party of a patent portfolio can provide the requisite knowledge of patents within that portfolio" and that this Court has "specifically rejected the argument that 'the absence of identifying patent numbers' in a pre-suit notice letter was fatal to establishing pre-suit inducement." (*Id.* at 14-15 (*citing Mobile Equity Corp. v. Walmart Inc.*, 2022 WL 4587554, at *2 (E.D. Tex. Sep. 8, 2022))).

As to Defendants' argument that Plaintiff failed to prove that TP-Link Corporation and TP-Link Technologies ever received the notice letters, Plaintiff contends "[t]hat argument requires drawing all reasonable inferences *against* Atlas, which is improper." (*Id.* at 15). Plaintiff notes that (1) "TP-Link USA and TP-Link Corporation share common ownership"; (2) "TP-Link USA is TP-Link Corporation's sole U.S. distributer;" and (3) "the Distribution Agreement (JX21) contains an indemnity provision whereby TP-Link Corporation must indemnify TP-Link USA for allegations of patent infringement" but that obligation is "conditioned on being promptly notified by TP-Link USA of any allegations of infringement." (*Id.* at 15 (citing Dkt. No. 317 at 705:17–19, 709:19–21,

710:4–7; 713:17–714:8; JX21 (Article 6))). As such, Plaintiff concludes that "[i]t is entirely reasonable for the jury to conclude that letters transmitted to TP-Link USA's leadership would be shared with TP-Link Corporation and TP-Link Technologies." (*Id.*).

Finally, as to Defendants' argument that none of the supposed inducing acts is directed to any feature of the Wi-Fi 6 standard alleged to be covered by any asserted claims, Plaintiff argues that "Dr. Shoemake provided several different categories of evidence," including the following:

- Defendants' website advertises and encourages customers to purchase Wi-Fi 6 products. (Dkt. No. 315 at 432:18–433:5; PX10 (website printouts));
- Defendants issue press releases touting the benefits of Wi-Fi 6. (Dkt. No. 315 at 433:6–12; JX60 (press release)).
- Defendants release marketing and instructional videos showing how to use Wi-Fi 6. (Dkt. No. 315 at 433:13–25; JX61 (videos)).
- Defendants encourage customers to "upgrade to Wi-Fi 6." (Dkt. No. 315 at 434:1–10);
- Defendants provide product user guides and manuals explaining how to set up and use the accused products in an infringing manner. (Dkt. No. 315 at 434:11–19, 435:13–18; Dkt. No. 317 at 581:1– 582:2; PX8 (user manual));
- Defendants hire social media influencers to promote the brand. (Dkt. No. 315 at 434:20–435:5; PX20 (website printout of TP-Link Brand Ambassador Program));
- Defendants' product packaging emphasizes the benefits of Wi-Fi 6. (Dkt. No. 315 at 435:6–12; PX8 (product packaging)); and
- Defendants provide customer support on how to use the accused products in an infringing manner. (Dkt. No. 315 at 435:22–436:6; Dkt. No. 317 at 582:3–17; PX18 (printout of customer support page)).

(*Id.* at 16-17). As such, Plaintiff contends that there is more than sufficient evidence to establish inducement. (*Id.* at 17).[9]

The Court agrees with Plaintiff. First, more than enough evidence existed for a reasonable juror to conclude that Defendants received the letters sent by Plaintiff, including at least that (1) Defendants and TP-Link USA are related entities and share a close business relationship, (2) TP-Link USA receives indemnification only if it promptly notifies Defendants of infringement

---

[9] Defendants and Plaintiff reiterate their positions in reply and sur-reply. (Dkt. No. 343 at 4-5); (Dkt. No. 346 at 5).

allegations, giving it strong incentives to do so, and (3) Defendants failed to offer evidence disproving they received the letters. Second, as to the specificity of the letters, this Court has previously found that an identification of a portfolio of patents can be sufficient to plead knowledge of the asserted patents. *See Ziilabs, Inc. v. Samsung Elecs. Co.*, 2015 U.S. Dist. LEXIS 42361, at \*9–10 (E.D. Tex. Feb. 26, 2015) (holding that "[plaintiff's] representations regarding continuing communications between it and [defendant] as they relate to [plaintiff's] patent portfolio, the Court concludes [plaintiff's] willfulness claims [are sufficiently plead]"). Furthermore, this Court has specifically rejected the argument that failing to identify specific patent numbers in a notice letter is fatal to establishing pre-suit inducement. *See Mobile Equity Corp.*, 2022 WL 4587554, at \*2, *report and recommendation adopted*, No. 2:21-CV-00126-JRG-RSP, 2022 WL 4587499 (E.D. Tex. Sept. 27, 2022) (noting that defendant "does not offer any case law supporting the necessary conclusion that the absence of identifying patent numbers, offers to license, and accusations of infringement in pre-suit materials is fatal to a claim of pre-suit indirect infringement").

The two cases that Defendants cite in support of their position that Plaintiff's reference to the "portfolio" of patents essential to the Wi-Fi 6 standard (802.11ax) dooms Plaintiff's claim for pre-suit induced infringement are both distinguishable. First, in *Bench Walk*, the notice letter did not mention any standard or portfolio, and the patentee in that case conceded its pre-suit notice letter was insufficient. *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 492 (D. Del. 2021). In *Textile Computer*, the notice letter specifically identified two patents, which led the court to hold that the letter failed to provide notice regarding other patents that were not specifically mentioned. *Textile Comp. Sys. v. Broadway Nat'l Bank*, 620 F. Supp. 3d 557, 565 (W.D. Tex. 2022). Neither case is analogous to the present facts where Plaintiff identified "Newracom's

substantial Wi-Fi 6 (802.11ax) SEP portfolio of over 75 granted patent families, consisting of approximately 365+ worldwide patents and applications with over 15 years of life remaining, and cover[ing] key improvements adopted in the IEEE 802.11ax standard." *See, e.g.*, (Dkt. No. 331-9 at 2 (JX019.00002)). This is not a circumstance where Plaintiff identified some patents in a letter and now seeks to support a claim for pre-filing induced infringement for entirely different patents based on said letter. Defendants do not dispute that "Newracom's substantial Wi-Fi 6 (802.11ax) SEP portfolio" includes the asserted patents in this case. As such, and upon a review of the case law cited by the parties, the Court finds that sufficient evidence existed to support the jury's finding that Defendants knew of, or were at least willfully blind to, the asserted patents as of the June 8, 2021 date of the letters.

Furthermore, because the letters identify the portfolio of patents (including the asserted patents) as "Standard Essential Patents" for the "Wi-Fi 6 standard (802.11ax)," a reasonable juror could have found that Defendants knew that their Wi-Fi 6 products infringed the asserted patents, as products practicing the Wi-Fi 6 standard (802.11ax) would necessarily infringe patents *essential* to that standard. (Dkt. No. 331-9 at 2 (JX019.00001)). As such, Defendants' remaining arguments regarding the specificity of the notice letter also fail.

Finally, the Court rejects Defendants' argument that sufficient evidence does not exist to support the jury's finding that Defendants induced end users to directly infringe the asserted patents because that evidence of inducement "was benign marketing and support materials for Wi-Fi 6 generally." (Dkt. No. 331 at 15). The Federal Circuit's decision in *Ericsson, Inc. v. D-Link Systems, Inc.* is instructive on this point. In that case, plaintiff "presented evidence that [defendant] knew about the patents and knew that the patents potentially were essential to the 802.11(n) standard—a standard with which [defendant] intentionally complied." *Ericsson, Inc. v. D-Link*

**Appx53**

*Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014). The Federal Circuit held that "the jury had substantial evidence to find that [defendant] induced infringement of the claims." *Id.* The same result is applicable here. Plaintiff presented evidence that Defendants' products not only comply with the 802.11ax Wi-Fi 6 standard, but that Defendants provided customers with advertising and marketing materials regarding the benefits of "Wi-Fi 6" as well as customer support, product guides, and instructional videos relating to the use of Defendants' Wi-Fi 6 products in an infringing manner. *See* (Dkt. No. 339 at 16-17 (collecting evidence adduced at trial regarding such material)). As the Federal Circuit in *Ericsson* noted, "[q]uestions of intent are quintessential jury questions." *Ericsson, Inc.*, 773 F.3d at 1222; *see also Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed.Cir.1988) ("Intent is a factual determination particularly within the province of the trier of fact."). As such, and like the Federal Circuit in *Ericsson*, this Court "cannot say that the jury did not have substantial evidence to find induced infringement and [the Court] decline[s] to supplant the jury's factual findings with [its] own." *Id.*[10]

---

[10] The Court notes that while Defendants moved for judgment as a matter of law of no induced infringement "either before or after the complaint was filed" in this present JMOL Motion (Dkt. No. 331 at 16), they only moved for judgment as a matter of law of no *pre-suit* induced infringement in their Rule 50(a) motion:

> THE COURT: All right. Let's move to the third ground identified by Defendants, which I believe was *no pre-suit induced infringement*?
> MR. SAUL: Yes, Your Honor.
> THE COURT: Let me hear from Defendant on that.
> MR. SAUL: Your Honor, no reasonable jury could find based on the evidence presented at trial that Defendants have induced infringement of any asserted claim *prior to the date this lawsuit was filed*. Specifically, there was no evidence presented at trial that the three pre-suit notice letters Plaintiff sent to TP-Link USA Corporation were received by either of the Defendants such that they might confer pre-suit notice, or that Defendants were willfully blind to the asserted patents. Again, this is Plaintiff's burden. There was no evidence presented that the two Defendants in this case, TP-Link Technologies and TP-Link Corporation, were aware of those letters.

(Dkt. No. 319 at 959:21 – 960:13 (emphasis added)). Defendants did not a make Rule 50(a) motion regarding post-suit induced infringement. As such, even though Defendants' arguments fail on the merits, the Court notes that Defendants also waived any argument specific to *post-suit* induced infringement by failing to raise it in a Rule 50(a) motion.

### H. Whether the Defendants Are Entitled to JMOL of No Damages

Defendants argue that "[n]o reasonable jury could find that the damages amount proffered by Atlas's expert at trial was supported by evidence and consistent with the Court's instructions." (Dkt. No. 331 at 16). Specifically, Defendants explain that "Atlas's purported FRAND damages model is based on four discounts Atlas allegedly applies when licensing its entire Wi-Fi 6 patent portfolio: litigation stage discount, early adopter discount, fully paid-up discount and volume discount," however, "Atlas's damages expert Mr. Weinstein at trial . . . opined that Defendants were not entitled to three of the discounts at the time of hypothetical negotiation in 2019 because Defendants elected to defend themselves at a trial conducted many years later." (*Id.* at 16-17). Defendants conclude that "Atlas's argument contravenes long-standing Federal Circuit law that (1) the hypothetical negotiation occurs before infringement begins (not during the middle of trial as Mr. Weinstein's opinion supposes); and (2) the real-world willingness of the parties to license cannot be considered in the hypothetical negotiation." (*Id.* at 17).

In response, Plaintiff argues that "Defendants' assertion that Mr. Weinstein's opinions are inconsistent with the assumptions of the hypothetical negotiation framework are quintessential challenges to his methodology," and that such methodological challenges "are not appropriate for JMOL." (Dkt. No. 339 at 18 (citing *Finesse Wireless LLC v. AT&T Mobility LLC*, 2023 WL 5612448, at *6 (E.D. Tex. Aug. 30, 2023))).

The Court agrees with Plaintiff. In *Versata*, the Federal Circuit addressed two arguments on appeal "relate[d] to the methodology used by Versata's expert," including that it was "inconsistent with sound economic principles . . . [and] should have been excluded from evidence" and that the expert "did not adhere to the *Panduit* framework because he used multiple markets thereby rendering his analysis legally defective." *Versata*, 717 F.3d at 1264. The Federal Circuit "reject[ed] these two arguments as improperly raised," stating the following:

Under the guise of sufficiency of the evidence, SAP questions the admissibility of Versata's expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Id.* The Federal Circuit noted that appellant's "briefs and statements at oral argument confirm that its arguments should have been resolved under the framework of *Daubert* and the Federal Rules of Evidence," including that appellant argued that "[the expert's] analysis is 'legally defective.'" (*Id.* (citing appellant's brief)). As a result, the Federal Circuit held:

Whether evidence is inadmissible is a question clearly within the scope of the rules of evidence and *Daubert.* However, SAP has not appealed a *Daubert* ruling. Instead, it argues that the jury could have not had sufficient evidence to award lost profits because the expert's testimony was fatally flawed and should not have been admitted. This is the improper context for deciding questions that, by SAP's own admissions, boil down to the admissibility of evidence.

(*Id.*)

Like the appellant in *Versata*, Defendants make a belated and improper *Daubert* challenge to Mr. Weinstein's methodology "[u]nder the guise of sufficiency of the evidence." (*Id.*). As in *Versata*, Defendants' challenge is principally to Mr. Weinstein's methodology, not to the sufficiency of the evidence. *See, e.g.*, (Dkt. No. 331 at 17 (arguing that "Atlas's [damages model] contravenes long-standing Federal Circuit law" and that "Atlas's expert cannot use such evidence to viate the central premises of the Georgia-Pacific hypothetical negotiation"), 19 (arguing that "Atlas's damages model assumes without justification that its late-arising discounts would have been part of the hypothetical negotiation"), 20 (arguing that "in contravention of the hypothetical negotiation construct mandated under Georgia-Pacific, Atlas's damages expert Mr. Weinstein did not assume that Defendants were willing licensees in 2019," and referring to "***Mr. Weinstein's erroneous theory***") (emphasis added). Indeed, that Defendants present challenge rests on the

argument that Mr. Weinstein's damages model is legally defective is best summed up by Defendants' own conclusion:

> In sum, allowing the jury verdict to stand here would upend the basic premises of the hypothetical negotiation, as Atlas's and ***Mr. Weinstein's damages model*** (adopted by the jury) expressly charges Defendants a higher royalty because there was no settlement before trial. ***Such a model*** (and jury award) ***cannot be reconciled with the requirements under Georgia-Pacific*** that in January 2019 (1) the Parties were a "willing licensor" and a "willing licensee," and (2) an agreement is "successfully negotiated . . . just before infringement began."

(*Id.* at 22).

As in *Versata*, Defendants' arguments are premised on the notion that Mr. Weinstein's damages model is "legally defective." *Versata*, 717 F.3d at 1264. Such arguments are properly considered at the *Daubert* stage, not for the first time on a motion for JMOL after the jury has returned its verdict. *See Versata*, 717 F.3d at 1264 (stating that questions regarding "whether [the expert's] damages model is properly tied to the facts of the case . . . should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert*"); *Finesse Wireless LLC*, 2023 WL 5612448, at *3 ("[C]hallenges to [] methodology and are not appropriately addressed at the JMOL stage."). To allow Defendants to raise this argument after the trial would throw a wrench into the orderly, timely, and ideally final resolution of parties' disputes. The time to raise an issue with an expert's methodology is *before* that testimony is presented to the jury, not after the jury has returned an unfavorable verdict. This timeline helps ensure that the parties', the jury's, and the Court's time and effort are not expended assessing testimony that one side believes should be excluded as counter to the law. Given that Defendants raise their issues with Mr. Weinstein's methodology (and his application of the same) for the first time in their Rule

50(b) motion, the Court finds that such arguments are waived.[11]

## I. Whether Mr. Weinstein's 79-Cent Royalty Was Supported by the Evidence or Violated Apportionment Requirements

Defendants argue that "Mr. Weinstein's cursory apportionment testimony is insufficient to support the enormously high royalty rate he presented to the jury." (Dkt. No. 331 at 22). Specifically, Defendants contend that (1) "Mr. Weinstein gave no explanation of how he arrived at his apportioned 79-cent royalty from his starting point of 92 cents per unit"; and (2) "Mr. Weinstein admitted that he failed to apportion for certain unpatented benefits, contrary to Supreme Court and Federal Circuit precedent." (*Id.* at 23).

Plaintiff disputes each of Defendants' apportionment arguments and additionally contends that said arguments were waived by Defendants as "[i]n their lone Rule 50(a) motion on damages, Defendants never argued—as they do now— that Mr. Weinstein failed to sufficiently explain his math or that he failed to apportion for certain unpatented features." (Dkt. No. 339 at 27 (citing Dkt. No. 319 at 966:22-24)). Rather, Plaintiff contends, Defendants "argued there was 'no basis *not* to apportion'—i.e., that Mr. Weinstein allegedly failed to perform any apportionment," which "is a

---

[11] The Court further notes that **Defendants** themselves presented testimony through **their own damages expert** that it was "up to the jury" to determine which discounts should be considered at the hypothetical negotiation:

> Q. And when the jury is evaluating the hypothetical negotiation, are they required to accept all the evidence that might be available during the hypothetical negotiation as relevant to that particular dispute?
> A. My understanding is it's up to them.
>
> Q. Would that include **whether the discounts should even be considered as part of the hypothetical negotiation**?
> A. Yes. That would fall -- *my understanding is that would be up to the jury*.
>
> Q. *If the jury decides they don't want to follow those discounts, they don't have to do so*. Is that correct?
> A. *That's my understanding*.

(Dkt. No. 319 at 939:12-23 (emphasis added)). Defendants' position now that "[n]o reasonable juror could have found that, at the time of the hypothetical negotiation in January 2019, Defendants would not have received Atlas's so-called pre-litigation and early-adopter discounts" (Dkt. No. 331 at 17) is difficult to square with what they themselves told the jury at trial.

different argument from the one they assert in their current Rule 50(b) motion," meaning "Defendants have therefore waived their current arguments." (*Id.* at 27-28).

The Court finds that Defendants' challenge regarding whether Mr. Weinstein properly apportioned the royalty rate was raised in their Rule 50(a) motion, preserving the issue. Having concluded that the issue is properly before the Court, the Court addresses each of Defendants' arguments in turn.

### 1. Whether the 79-Cent Royalty Rate Was Supported by the Evidence

Defendants contend that "Mr. Weinstein testified that he identified a 92-cent starting point of his apportionment analysis" but then "stated that he "subtract[ed] out for benefits in the portfolio that are not part of this case. And that's how we got from the 92 cents down to the 79 cents." (Dkt. No. 331 at 22 (citing Dkt. No. 317 at 635:4-10)). Defendants argue that Mr. Weinstein "did not explain which benefits allegedly were taken out, the valuation of those benefits, or how they impacted the royalty rate," and that such a "conclusory claim" of apportionment "does not constitute substantial evidence from which the jury could have adopted Mr. Weinstein's royalty model and resulting damages number." (*Id.*)

In response, Plaintiff argues that "Mr. Weinstein testified that he started with the $0.92 undiscounted rate from Atlas's portfolio-wide licenses to limit the rate to the value of Atlas's patents," and "[t]hen, because the 'the five patents in this case do not provide a hundred percent of the functionality and the benefits that are contained in the entire patent portfolio,' Mr. Weinstein 'subtracted out for that functionality that's not part of this case' to limit the rate to the value of the asserted patents, yielding a rate of $0.79." (Dkt. No. 339 at 28 (citing Dkt. No. 317 at 633:11–17, 634:3–6. 632:17–633:10, 633:11–17, 634:3–6, 634:7–635:10)). Plaintiff notes that "[t]he benefits and values of the same that Mr. Weinstein used for his apportionment are set out in JX30":

| Benefit of Wi-Fi 6 Relative to Wi-Fi 5 | Quantitative Multiplier |
|---|---|
| **OFDMA** | |
| 1. Speed: Measured by downlink throughput gains | 1.40 |
| 2. Speed: Measured by uplink throughput gains | 2.20 - 3.00 |
| 3. Speed: Measured by improvement in goodput for outdoor coverage from OFDMA | 4.60 |
| 4. Speed: Theoretical improvement in throughput | 6.00 |
| 5. Coverage: Measured by increased outdoor linear coverage range from OFDMA | 1.67 |
| 6. Coverage: Measured by increased outdoor coverage area from ODFMA | 2.79 |
| 7. Efficiency: Measured by reduced average upload time from scheduling efficiency | 1.80 - 2.70 |
| **Beamforming** | |
| 8. Coverage: Measured by increased coverage range from beamforming | 2.00 |
| 9. Coverage: Measured by increased coverage area from beamforming | 4.00 |
| **BSS Coloring** | |
| 10. Efficiency: Measured by improvement in BSS throughput during color filtering | 1.49 |
| **Midamble** | |
| 11. Speed: Measured by improvement in goodput for outdoor coverage from use of midamble | 7.00 - 9.00 |

(*Id.* (excerpting JX30 at 5346)). Plaintiff further notes that "Dr. Shoemake [(Plaintiff's technical expert)] [] testified that three of the eleven multipliers, relating to BSS coloring (at line 10) and midambles (at line 11 and line 3), are not enabled by the Asserted Patents—a point he conveyed to Mr. Weinstein for purposes of Mr. Weinstein's analysis," and that it "is the value of those benefits that Mr. Weinstein 'subtract[ed] out' to arrive at his apportioned rate." (*Id.* at 29 (Dkt. No. 315 at 421:4–427:15; Dkt. No. 317 at 633:11–17, 634:14–635:10)). As such, Plaintiff concludes that substantial evidence supports the damages verdict and JMOL is inappropriate. (*Id.*).

In reply, Defendants argue that (1) "there was no testimony from Dr. Shoemake that he analyzed the more than one hundred additional patents in Atlas's portfolio and weighed the relative contribution of the five patents at issue"; and (2) "Mr. Weinstein failed to explain how JX30 (or any other evidence) justified such a tiny apportionment (from 92 to 79 cents), despite Dr. Shoemake's admission that less than 5% of the portfolio patents were being asserted in the litigation." (Dkt. No. 343 at 10 (citing Dkt. No. 317 at 560:3-8)).

In sur-reply, Plaintiff argues that Dr. Shoemake "unequivocally testified he had reviewed other patents, that other patents 'enable [] benefits' that are not covered here, and the Asserted Patents are key drivers of certain benefits compared to other patents in the portfolio." (Dkt. No. 346 at 10 (citing Dkt. No. 315 at 427:9–11, 427:12–15, 423:21–424:4)). Plaintiff contends that Defendants ignore all of the evidence cited and simply "ask the Court to adopt their expert's apportionment methodology—counting patents," but "expert disputes are for the jury." (*Id.*)

The Court agrees with Plaintiff. Defendants essentially take issue with Mr. Weinstein's apportionment analysis because he did not assume that all patents in Atlas's patent portfolio were of equal (or similar) value—a position taken by Defendants' expert at trial and already raised in Defendants' *Daubert* motion against Mr. Weinstein (Dkt. No. 201) and rejected by Court (Dkt. Nos. 267, 291). It is for the jury to decide which expert to believe when competing apportionment methods are applied, and in this instance, the jury believed Mr. Weinstein. That Mr. Weinstein did not follow the same apportionment methodology as Defendants' expert does not provide a basis to disturb the jury's verdict where it is otherwise supported by substantial evidence.

### 2. Whether Mr. Weinstein Failed to Properly Apportion for Unpatented Features

Defendants first contend that "Mr. Weinstein conceded that [] purported Wi-Fi 6 benefits are at least partially attributable to features not covered by any asserted patent claim, including BSS color, TWT, and 1024 QAM," and that "Mr. Weinstein did not assign any deductions for 1024 QAM or TWT, and he did not apportion them at all from his royalty rate." (*Id.* at 24 (citing Dkt. No. 317 at 682:11-21, 683:10–685:22)). Defendants further argue that "Mr. Weinstein did not seek to identify whether any other patents in the portfolio, beyond those asserted, contributed to the features he asserted were valuable," and "[t]herefore, there can be no dispute that Mr. Weinstein's damages model . . . was overstated and inadequately apportioned." (*Id.*)

In response, Plaintiff first argues that Defendants' arguments go to Mr. Weinstein's methodology, which are not appropriate for JMOL. (Dkt. No. 339 at 29-30). Further, Plaintiff contends that "Mr. Weinstein did not make any deductions for the other Wi-Fi 6 features Defendants now highlight (1024 QAM and target wake time) for a simple reason: the Atlas portfolio does not have any patents that relate to these technologies," and "Defendants' damages expert admitted as much." (*Id.* at 30 (citing Dkt. No. 319 at 934:3-20)). As such, Plaintiff notes that "[b]ecause the $0.92 undiscounted rate from Atlas's portfolio-wide licenses does not include the value of these technologies, no deduction needs to be made." (*Id.*). As to Defendants' second argument, Plaintiff notes that "Mr. Weinstein—relying on Dr. Shoemake—testified that the Asserted Patents are the 'key drivers' of such features, compared to the other patents in portfolio, which is why further apportionment was not necessary," and that "Defendants never impeached this testimony or presented any contrary testimony." (*Id.* (citing Dkt. No. 317 at 633:18–634:2 (Weinstein testimony); Dkt. No. 315 at 423:21–424:4 (Shoemake testimony))).

In reply, Defendants argue that Plaintiff's response underscores the issue, namely that "[t]he purported Wi-Fi 6 standard benefits that Mr. Weinstein attributes to Atlas's portfolio and uses to determine his starting rate of 92 cents for the entire portfolio—faster speed, more convenience, and higher efficiency—are also attributable to a host of unpatented features in the 802.11ax standard such as 1024 QAM and target wake time." (Dkt. No. 343 at 10). As such, conclude Defendants, "Mr. Weinstein's failure to apportion out the contribution of those unpatented features renders the jury's adoption of Mr. Weinstein's damages opinion unsustainable as a matter of law." (*Id.*).

In sur-reply, Plaintiff argues that Defendants "continues [*sic*] to misunderstand Mr. Weinstein's methodology," as "Mr. Weinstein's royalty rate starts with the $0.92 undiscounted

**Appx62**

rate <u>from Atlas licenses</u>, which limits the rate to the value of Atlas's patents." (Dkt. No. 346 at 10). As such, Plaintiff concludes that "[b]ecause the $0.92 starting point comes from licenses to Atlas's patents and is limited to the value of those patents, there was zero reason to apportion for features that were not valued in the rate in the first place." (*Id.*).

The Court agrees with Plaintiff. As an initial matter, Defendants bring a belated challenge to Mr. Weinstein's methodology, which is an issue suitable to *Daubert* but not JMOL. *See Finesse Wireless LLC*, 2023 WL 5612448, at *3 ("[C]hallenges to [] methodology and are not appropriately addressed at the JMOL stage."). Moreover, as discussed in the preceding section, Defendants previously sought to exclude Mr. Weinstein's opinions on the basis that he failed to apportion the $0.92 rate lower because only a subset of Atlas's patent portfolio is at issue in this case. *See* (Dkt. No. 201 at 4-7 (section titled, "The $0.92 Portfolio Rate Should Be Excluded as Mr. Weinstein Fails To Properly Apportion the Rate To Account for the Fact that Just Seven Patents from the 133+ Patent Portfolio Are Asserted."). The Court has already rejected that argument (Dkt. Nos. Dkt. Nos. 267, 291), and a request for JMOL after the jury's verdict is not an appropriate time to re-urge *Daubert* arguments. *See Optis Wireless Tech.*, No. 2:19-cv-00066-JRG, Dkt. No. 740 ("[I]t is improper to use a JMOL motion . . . as a renewed *Daubert* challenge."); *Rembrandt Wireless Techs.*, 2016 WL 362540, at *3–4; *see also Versata*, 717 F.3d at 1264 (stating that raising *Daubert*-type issues in the context of post-trial rulings "is the improper context for deciding questions that . . . boil down to the admissibility of evidence"). As such, the Court once again rejects Defendants' *Daubert* argument on the same basis.

As to Defendants' argument that "Mr. Weinstein did not assign any deductions for 1024 QAM or TWT, and he did not apportion them at all from his royalty rate," Defendants' own expert (in addition to Mr. Weinstein) testified that those features were not included in the $0.92 royalty

rate in the first place:

> Q. [Mr. Weinstein's] damages analysis starts with Atlas' licenses. Right?
> A. That's fair.
>
> Q. And those licenses are licensees only paying for Atlas' portfolio. Right?
> A. Yes, that's fair. It's very close.
>
> Q. There is -- the other features that we've been hearing about in WiFi 6 that Atlas admits are not part of its portfolio are not being paid for in those licenses. Right?
> A. That's accurate, yes.
>
> Q. So **1024 QAM is not part of the basis of those licenses**, is it?
> A. **Not of the licenses, no**.
>
> Q. And Atlas admits that. Right?
> A. Oh, I think so. I'd defer to them, but that sounds right.
>
> Q. And **TWT, target wake time**, **that's not part of the licenses** and Atlas isn't trying to claim that. Right?
> A. Atlas does not claim to have invented TWT is right, **yes**.

(Dkt. No. 319 at 934:3-20 (emphasis added)). It is undisputed that the $0.92 undiscounted royalty rate comes from licenses to Plaintiff's patents and is limited to the value of those patents, which do not include the 1024 QAM or TWT features. As such, the Court sees no error in Mr. Weinstein not apportioning the $0.92 royalty rate for those features. Indeed, it makes no sense to apportion for features that make up no part of the royalty rate in the first place. Accordingly, the Court finds that substantial evidence supports the jury's damages findings.

### III.     DISCUSSION: JOINT MOTION TO AMEND (DKT. NO. 328)

In the Joint Motion to Amend, the parties make two requests. First, "Atlas moves the Court to amend the judgment to state the amount of pre-judgment interest is $3,851,202." (Dkt. No. 328 at 1). The parties explain that "[a]fter the Court entered judgment [including an award of pre-judgment interest to Plaintiff], Atlas provided TP-Link a calculation of pre-judgment interest

applying the Court's instructions" and "TP-Link has agreed to that calculation of interest and does not oppose the relief requested." (*Id.* at 2). Second, Defendants request that "the judgment should be amended to state that the jury found that Defendants 'infringed one or more' of the Asserted Claims" instead of "infringed <u>all</u> of the Asserted claims" to match the jury's response on the verdict form. (*Id.*). Plaintiff does not oppose the relief requested. (*Id.*).

Having considered the Joint Motion to Amend, and noting its joint nature and for good cause shown, the Court finds that it should be and hereby is **GRANTED**. The Court shall enter an amended final judgment reflecting these agreed amendments.

## IV.    CONCLUSION

Having considered the Motion for New Trial and the JMOL Motion, and for the reasons stated herein, the Court finds that they should be and hereby are **DENIED**. Having considered the Joint Motion to Amend, the Court finds that it should be and hereby is **GRANTED**. The parties are directed to jointly prepare a redacted version of this Memorandum Opinion and Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days.

**So ORDERED and SIGNED this 3rd day of September, 2024.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ATLAS GLOBAL TECHNOLOGIES LLC,　§
　　　　　　　　　　　　　　　　　§
　　　　　*Plaintiff,*　　　　　　　§
　　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　§　CIVIL ACTION NO. 2:21-CV-00430-JRG-RSP
TP-LINK TECHNOLOGIES CO., LTD. and §
TP-LINK CORPORATION LTD.,　　　　§
　　　　　　　　　　　　　　　　　§
　　　　　*Defendants.*　　　　　　§

## **VERDICT FORM**

In answering the following questions and completing this Verdict Form, you are to follow all the instructions that I have given you in the Court's Final Jury Instructions. Your answers to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Final Jury Instructions. You should refer to and consider the Final Jury Instructions as you answer the questions in this Verdict Form.

As used herein, the following terms have the following meanings:

- "**Plaintiff**" or "**Atlas**" refers to Atlas Global Technologies Co., Ltd.

- "**Defendants**" or "**TP-Link**" refers to TP-Link Technologies Co., Ltd. and TP-Link Corporation Ltd.

- The "'**187 Patent**" refers to U.S. Patent No. 9,532,187.

- The "'**259 Patent**" refers to U.S. Patent No. 9,763,259.

- The "'**738 Patent**" refers to U.S. Patent No. 9,825,738.

- The "'**513 Patent**" refers to U.S. Patent No. 9,912,513.

- The "'**679 Patent**" refers to U.S. Patent No. 9,917,679.

- The "**Patents-in-Suit**" refers collectively to the '187 Patent, the '259 Patent, the '738 Patent, the '513 Patent, and the '679 Patent.

- The "**Asserted Claims**" refers collectively to Claims 4 and 12 of the '187 Patent, Claims 1 and 18 of the '259 Patent, Claim 1 of the '738 Patent, Claims 1 and 15 of the '513 Patent, and Claims 1 and 6 of the '679 Patent.

2

**Appx67**

## IT IS VERY IMPORTANT THAT YOU FOLLOW THE INSTRUCTIONS PROVIDED IN THIS VERDICT FORM

## READ THEM CAREFULLY AND ENSURE THAT YOUR VERDICT COMPLIES WITH THEM

3

**Appx68**

**QUESTION NO. 1**

Did Atlas, the Plaintiff, prove by a preponderance of the evidence that TP-Link, the Defendants, infringed ANY of the Asserted Claims?

Yes:____✓____     OR          No: _____

If you answered "NO" to Question No. 1, proceed directly to the Final Page of this Verdict Form and DO NOT answer the remaining questions.

**Appx69**

**QUESTION NO. 2a:**

**ANSWER THE REMAINING QUESTIONS ONLY IF YOU FOUND ONE OR MORE OF THE ASSERTED CLAIMS TO BE INFRINGED IN QUESTION 1.**

What sum of money, if now paid in cash, has Atlas, the Plaintiff, proven by a preponderance of the evidence, would **compensate** it as a fair, reasonable, and non-discriminatory ("FRAND") royalty for the Defendants' infringement of the Asserted Claims that you have found to be infringed?

Answer in United States Dollars and Cents, if any:

$ _37, 481 , 264_____

**QUESTION NO. 2b:**

Is the total amount of the reasonable royalty that you found in Question No. 2a a one-time lump sum for past and future sales, or a running royalty for past sales only?

Check **ONLY** one of the following:

✓_____ Lump Sum            OR            _____ Running Royalty

**Appx70**

## FINAL PAGE OF THE JURY VERDICT FORM

You have now reached the end of the Verdict Form and should review it to ensure that it accurately reflects your unanimous determinations.  The Jury Foreperson should then sign and date the Verdict Form in the spaces below.  Once this is done, notify the Court Security Officer that you have reached a verdict. The Jury Foreperson should keep the Verdict Form and bring it when the jury is brought back into the courtroom.

Signed this ___14___ day of September, 2023.

<br/>

_____
Jury Foreperson

**Appx71**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | § CIVIL ACTION NO.  2:21-CV-00430-JRG-RSP |
| TP-LINK TECHNOLOGIES CO., LTD., | § |
| TP-LINK CORPORATION LIMITED, | § |
| TP-LINK INTERNATIONAL LTD., | § |
| | § |
| *Defendants*. | § |

## MEMORANDUM ORDER

Before the Court is Plaintiff Atlas Global Technologies LLC's Motion that Certain Facts

be Considered Established. **Dkt. No. 175**. Atlas Global requests that the Court sanction

Defendants[1] under Rule 37 because Defendants allegedly failed to comply with their discovery

obligations and Court orders. Specifically, Atlas Global requests that the Court either (1)

establish independent third-party International Data Corporation's ("IDC") unit sales attributable

to Defendants, or alternatively, (2) find the IDC unit sales admissible for trial and reliable so

Atlas Global can argue it is a true reflection of Defendants' sales before the jury. Defendants

filed a Response (Dkt. No. 184), and the parties filed supplemental briefs (Dkt. Nos. 255, 259) in

response to the Court's Order (Dkt. No. 248). For the following reasons, the Court **GRANTS** the

motion.

## I.      BACKGROUND

Atlas Global alleges that Defendants infringe U.S. Patent Nos. 9,532,187 (the "'187

Patent"), 9,763,259 (the "'259 Patent"), 9,825,738 (the "'738 Patent"), 9,912,513 (the "'513

---

[1] TP-Link Technologies Co., Ltd. (now renamed TP-Link Lianzhou Co., Ltd. and sometimes referred to as TP-Link China) and TP Link International Ltd. (now renamed TP-Link Corporation Limited and sometimes referred to as TP-Link Hong Kong) (collectively, "Defendants")

**Appx72**

Patent"), 9,917,679 (the "'679 Patent") (collectively, the "Asserted Patents")).[2] According to Atlas Global, the Asserted Patents cover various aspects of Wi-Fi 6, the current and most advanced version of Wi-Fi based on the Institute of Electrical and Electronics Engineers (IEEE) 802.11ax standard. *See* Dkt. No. 88 at 6–7 ("The Asserted Patents enable numerous features of Wi-Fi 6, including OFDMA and MU-MIMO" (*e.g.*, '679 Patent), "multi-user triggering frames and/or acknowledgement frames" (*e.g.*, '738 Patent, '513 Patent), "channel sounding, estimation, and feedback in multi-user communication" (*e.g.*, '259 Patent), "and interleaving in multi-user systems" (*e.g.*, '187 Patent)).

TP-Link USA was formerly a subsidiary of TP-Link Technologies Co., Ltd. Xu Decl., Dkt. No. 20-2. TP-Link USA Corporation has been Defendants' sole U.S. distributor except during a two-month window in late 2020, in which a separate entity that no longer exists, Trend Success Technology Limited ("TSTL"), fulfilled most of Defendants' orders. Response, Dkt. No. 184 at 3, 8; *see also* Defendants' Supp. Interrog. No. 10, Dkt. No. 184-2 at 3. In their response to the motion, Defendants maintained that TP-Link USA was no longer a related entity.

During discovery, Atlas Global sought sales information from Defendants, TP-Link USA, and independent third-party IDC. Motion, Dkt. No. 175 at 2. Defendants initially produced publicly available sales information. At a discovery hearing, Defendants also stated that TP-Link USA became owned by TP-Link UK Limited in the 2016–2017 timeframe, and that TP-Link UK is owned by Big Field International Limited, which is owned by Ivy Grove Limited. Hearing Transcript (3/1/23), Dkt. No. 141 at 22:13–23:20. After being ordered by the Court, Defendants produced their own financial information and separately served a subpoena on TP-Link USA to obtain Defendants' sales information attributable to TP-Link USA. At another hearing, the Court

---

[2] Atlas Global's initial complaint, filed November 22, 2021, also asserted U.S. Patent Nos. 9,531,520 (the "'520 Patent"), 10,020,919 (the "'919 Patent"), and 10,756,851 (the "'851 Patent"), which have since been dropped from the case. *See* Complaint, Dkt. No. 1 at ¶ 1; *see also* Joint Pretrial Order, Dkt. No. 241 at 5.

**Appx73**

heard arguments about the discrepancies in Defendants' sales information between the different sources. Defendants maintained they were unable to get detailed sales and financial information regarding their U.S. sales. After the hearing, the Court found that Defendants' denial that they had access to the records of their U.S. sales was not plausible, and warned Defendants that consequences based on their apparent misrepresentations would be determined after depositions. Order, Dkt. No. 157 at 1.

Atlas Global deposed Defendants' 30(b)(6) witness and asked about Defendants' relationship with TP-Link USA and the reasons for the discrepancies in the sales information between the different sources. Motion, Dkt. No. 175 at 5–6 (listing deposition Topics 15, 16, 17). During the deposition, Defendants' corporate representative testified that TP-Link USA "is an independent third-party distributor" and that he had "never heard" of Ivy Grove Limited, the entity in the British Virgin Islands. *See* Liu Feiyue Dep. (3/21/23), Dkt. No. 175-4 at 35:16–43:6.

On May 1, 2023, after Atlas Global filed this motion and after the close of fact discovery, Defendants produced an updated spreadsheet showing unit sales and revenue by month per Atlas Global's request. Response, Dkt. No. 184 at 3. In addition, Defendants indicated that their sales information from the two months TSTL filled orders was inadvertently omitted from its previous production. *Id.*

On July 20, 2023, months after the close of fact discovery, Defendants quietly filed a supplemental corporate disclosure statement. Notice, Dkt. No. 243. That document represents that Defendant TP-Link Corporation Limited is a subsidiary of Big Field Pte. Limited, which is a subsidiary of both Ivy Grove Limited and Diamond Creek Global Limited. In sum, Defendants now acknowledge common ownership of both Defendants and TP-Link USA.

**Appx74**

## II.    LAW

Fed. R. Civ. P. 37 sets the consequences of untimely or insufficient disclosure by a party: "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). When determining substantial justification or harm, courts consider "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 564 (5th Cir. 2004) (quoting *Tex. A & M Research Found. v. Magna Transp., Inc.,* 338 F.3d 394, 402 (5th Cir. 2003)).

In addition to or instead of this sanction, "the court, on motion and after giving an opportunity to be heard … (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi)." FED. R. CIV. P. 37(c)(1)(C). One contemplated form of relief is to issue an order "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." FED. R. CIV. P. 37(b)(2)(A)(i); *see also Hernandez v. Rush Enterprises, Inc.*, 2020 WL 7041822, at *1 (E.D. Tex. Dec. 1, 2020) ("Federal Rule of Civil Procedure 37 authorizes sanctions for failure to comply with discovery orders. Courts have the option to bar the disobedient party from introducing evidence or direct that certain facts shall be 'taken to be established for purposes of the action.'"). Subject to certain limitations, a district court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990).

**Appx75**

### III.    ANALYSIS

At the first discovery hearing, the Court did "not find credible the evidence" that the Defendants "produced about their relationship with TP-Link USA." Hearing Transcript (3/1/23), Dkt. No. 141 at 30:15–17. At the second discovery hearing, Defendants maintained that the lack of any relationship between Defendants and TP-Link USA meant that either party would have to obtain sales data from TP-Link USA by subpoena. The Court stated Defendants' inability to obtain financial information about products sold from its sole U.S. distributor—TP-Link USA— to be "an inherently incredible statement." Hearing Transcript (3/27/23), Dkt. No. 255-2 at 7:14– 17; *see also id.* at 23:8–24:1.

The Court reiterated that it "finds it implausible that a major manufacturer of sophisticated electronic equipment, like TP-Link Corporation, has no knowledge of the current owner of its sole U.S. distributor, TP-Link USA, and is unable is unable to get any detailed sales and financial information regarding sales of TP-Link products in the U.S." Order, Dkt. No. 157 at 1. The Court warned that "[t]he consequences of these apparent misrepresentations will be left for further determination after any light the upcoming depositions may shed." *Id.* During the deposition, Defendants' Rule 30(b)(6) corporate representative testified as to having "never heard" of Ivy Grove Limited—the entity in the British Virgin Islands that we now know commonly owns Defendants and TP-Link USA. *See* Liu Feiyue Dep. (3/21/23), Dkt. No. 175-4 at 35:16–43:6.

At the July 24, 2023, Pretrial Conference, the parties presented oral arguments regarding the motion (Dkt. No. 175) and had additional opportunities to present arguments in supplemental briefing. In their brief, Defendants first provide a rationale for the discrepancies between Defendants' and TP-Link USA's sales data. Supp. Response, Dkt. No. 259 at 2–3. Second,

**Appx76**

Defendants assert that any questions left unanswered from the depositions should have been resolved before Atlas Global stipulated to factual issues regarding the witness. *Id.* at 3–4. Finally, Defendants contend that there is nothing improper about Defendants' corporate restructuring, they assert they complied with their discovery obligations, and the relatively similar unit counts between the TP-Link sales data and the IDC sales data supports the reliability of sales data TP-Link produced. *Id.* at 4–8.

The Court finds that Defendants' representations in the 30(b)(6) deposition that, among other things, Defendants had "never heard" of Ivy Grove Limited and that TP-Link USA was an independent third party, constitute a failure to disclose that has had a prejudicial effect sufficient to warrant additional relief beyond allowing the IDC unit counts to be merely admissible. Defendants' assertion they complied with their disclosure obligations is belied by the fact that their corporate disclosure statement—confirming that Defendants and TP-Link USA are commonly owned entities—surfaced a mere one month before trial, and after a year of representations that TP-Link USA was an unrelated entity.

Deeming the IDC unit counts as established facts in this action is an appropriate remedy to cure the prejudice to Atlas Global that occurred during discovery. The added complexity in presenting two separate sets of Defendants' sales data and explaining Defendants' discovery conduct to the jury would distract from addressing the cause of action in the case. In addition, the remedy is necessary because Defendants would otherwise undercut the reliability of the IDC sales data. Without having the information regarding the recurring dispute about Defendants' relationship with TP-Link USA revealed through discovery hearings, the jury would not be able to fully evaluate the lessened reliability of the sales data obtained and produced from the TP-Link Defendants and TP-Link USA, as well as the need for Plaintiff's expert to use the IDC data.

6

**Appx77**

## IV.    CONCLUSION

Defendants' conduct regarding its relationship with TP-Link USA is nothing short of exceptional. *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014).  For the reasons previously discussed, the Court **GRANTS** the motion such that the sales figures in the IDC reports relied upon by Plaintiff's expert shall be deemed established and may not be attacked by Defendants.  Plaintiffs will not be permitted to offer argument or testimony about the discovery disputes and misrepresentations referred to above, but may offer testimony and argument about the common ownership of the Defendants and TP-Link USA (as established through the Supplemental Notice, Dkt. No. 243) as it bears upon infringement.

    **SIGNED this 2nd day of August, 2023.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**Appx78**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ATLAS GLOBAL TECHNOLOGIES LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO.  2:21-CV-00430-JRG-RSP |
| TP-LINK TECHNOLOGIES CO., LTD., | § | |
| TP-LINK CORPORATION LIMITED, | § | |
| TP-LINK INTERNATIONAL LTD., | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

Plaintiff Atlas Global Technologies LLC previously filed a Motion that Certain Facts be Considered Established ("Motion") (Dkt. No. 175.) Magistrate Judge Payne entered a Memorandum Order (Dkt. No. 261), granting Atlas Global's Motion. TP-Link Technologies Co., Ltd. and TP-Link Corporation, Ltd., f/k/a TP-Link International, Ltd.'s (collectively, "Defendants") have now filed Objections (Dkt. No. 282.)

After reviewing the briefing on the Motion, Judge Payne's Memorandum Order, and Defendants' Objections, the Court agrees with the reasoning provided within the Memorandum Order and concludes that the Objections fail to show that the Memorandum Order was clearly erroneous or contrary to law.

Consequently, the Court **OVERRULES** Defendants' Objections (Dkt. No. 282) and **ADOPTS** Judge Payne's Memorandum Order (Dkt. No. 261).

**So Ordered this**

**Aug 17, 2023**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

## Appx79

JX002.00001



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 13, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *9,532,187*
ISSUE DATE: *December 27, 2016*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

John Burson
Certifying Officer


ATLAS-00004262

**Appx80**

JX002.00002



US009532187B2

(12) **United States Patent**
Seok

(10) Patent No.: **US 9,532,187 B2**
(45) Date of Patent: **Dec. 27, 2016**

(54) **INTERLEAVER FOR PHYSICAL LAYER PROTOCOL DATA UNIT IN A HIGH EFFICIENCY WIRELESS LAN**

(71) Applicant: **NEWRACOM, INC.**, Irvine, CA (US)

(72) Inventor: **Yongho Seok**, Irvine, CA (US)

(73) Assignee: **NEWRACOM, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/823,524**

(22) Filed: **Aug. 11, 2015**

(65) **Prior Publication Data**

US 2016/0044635 A1    Feb. 11, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/135,094, filed on Mar. 18, 2015.

(30) **Foreign Application Priority Data**

Aug. 11, 2014    (KR) ...................... 10-2014-0103275

(51) **Int. Cl.**
| | |
|---|---|
| *H04H 20/71* | (2008.01) |
| *H04W 4/06* | (2009.01) |
| *H04L 29/08* | (2006.01) |
| *H04L 1/00* | (2006.01) |
| *H04W 84/12* | (2009.01) |
| *H04L 1/06* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *H04W 4/06* (2013.01); *H04L 1/0071* (2013.01); *H04L 69/324* (2013.01); *H04L 1/0643* (2013.01); *H04W 84/12* (2013.01)

(58) **Field of Classification Search**
CPC ..... H04W 72/044; H04L 5/003; H04L 1/0071; H03M 13/271
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,281,924 B2 * | 3/2016 | Abraham | H04L 5/0023 |
| 2012/0230448 A1 * | 9/2012 | Kang | H03M 13/6527 375/295 |
| 2013/0177090 A1 * | 7/2013 | Yang | H04L 41/16 375/260 |
| 2013/0229996 A1 * | 9/2013 | Wang | H04W 72/0413 370/329 |
| 2015/0139248 A1 * | 5/2015 | Katar | H04L 1/1607 370/470 |
| 2016/0072654 A1 * | 3/2016 | Choi | H04L 27/2602 370/329 |

* cited by examiner

*Primary Examiner* — Shaq Taha

(57) **ABSTRACT**

The present invention provides a method and apparatus for transmitting using an interleaver applied to a PPDU in a HE WLAN. In an aspect of the present invention, a method for transmitting data to a plurality of STAs through transmission channel by an AP in a WLAN system, wherein the transmission channel is divided into a plurality of subchannels which are allocated to the plurality of STAs respectively, the method may include interleaving a plurality of data units for the plurality of STAs based on characteristics of the plurality of subchannels allocated to the plurality of STAs to generate a plurality of interleaved data units; and transmitting, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including the plurality of interleaved data units respectively on the plurality of subchannels to the plurality of STAs.

**14 Claims, 14 Drawing Sheets**



ATLAS-00004263

JX002.00003

**FIG. 1**



FIG. 2



JX002.0000!

FIG. 3

Case: 25-1039    Document: 20    Page: 170    Filed: 02/07/2025

ATLAS-00004266

JX002.00006

Case: 25-1039   Document: 20   Page: 171   Filed: 02/07/2025



FIG. 4

ATLAS-00004267

**Appx85**

JX002.00007



FIG. 5

**Appx86**

Case: 25-1039    Document: 20    Page: 173    Filed: 02/07/2025



FIG. 6

ATLAS-00004269

Appx87

FIG. 7



ATLAS-00004270

Case: 25-1039    Document: 20    Page: 174    Filed: 02/07/2025

JX002.00010

Case: 25-1039  Document: 20  Page: 175  Filed: 02/07/2025

FIG. 8



ATLAS-00004271

JX002.00011

FIG. 9

JX002.00012

FIG. 10

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA6) |
|-------|-------|-------|----------|--------|--------|--------|--------|--------|----------|------------------|
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA5) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA3, STA4) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA1, STA2) |

ATLAS-00004273

**Appx91**

JX002.00013

FIG. 11

| L-STF | L-LTF | L-SIG | HE-SIG-A | | | | | | | | | | | |
|-------|-------|-------|----------|--|--|--|--|--|--|--|--|--|--|--|
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA6) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA5) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA3, STA4) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA1, STA2) |

JX002.00014

Case: 25-1039    Document: 20    Page: 179    Filed: 02/07/2025

FIG. 12

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU (STA4 to AP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU (STA3 to AP) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU (STA2 to AP) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU (STA1 to AP) |

ATLAS-00004275

**Appx93**

JX002.00015

Case: 25-1039 Document: 20 Page: 180 Filed: 02/07/2025

## FIG. 13

write

| k0 | k1 | k2 | k3 | k4 | k5 | k6 | k7 |
|---|---|---|---|---|---|---|---|
| k8 | k9 | k10 | k11 | k12 | k13 | k14 | k15 |
| k16 | k17 | k18 | k19 | k20 | k21 | k22 | k23 |

read

| k0 | k1 | k2 | k3 | k4 | k5 | k6 | k7 |
|---|---|---|---|---|---|---|---|
| k8 | k9 | k10 | k11 | k12 | k13 | k14 | k15 |
| k16 | k17 | k18 | k19 | k20 | k21 | k22 | k23 |

| input | k0 | k1 | k2 | k3 | k4 | k5 | k6 | k7 | k8 | k9 | k10 | k11 | k12 | k13 | k14 | k15 | k16 | k17 | k18 | k19 | k20 | k21 | k22 | k23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| output | k0 | k8 | k16 | k1 | k9 | k17 | k2 | k10 | k18 | k3 | k11 | k19 | k4 | k12 | k20 | k5 | k13 | k21 | k6 | k14 | k22 | k7 | k15 | k23 |

ATLAS-00004276

**FIG. 14**

AP

first STA

interleave data units for STAs
based on characteristics of subchannels
allocated to the STAs
to generate interleaved data units  — S1405

generate a HE PPDU frame including
interleaved data units
on the subchannels  — S1410

transmit the HE PPDU frame
to the plurality of STAs
through the transmission channel  — S1420

receive data unit directed to the first STA
from a subchannel for the first STA
in the HE PPDU including
data units for the plurality of STAs
respectively on the subchannels  — S1430

deinterleave the received data unit
based on the characteristic of
the subchannel allocated to the first STA  — S1440

ATLAS-00004277

JX002.00017

US 9,532,187 B2

1

# INTERLEAVER FOR PHYSICAL LAYER PROTOCOL DATA UNIT IN A HIGH EFFICIENCY WIRELESS LAN

This application claims the benefit of Korean Patent Application No. 10-2014-0103275, filed on Aug. 11, 2014, which is hereby incorporated by reference as if fully set forth herein. This application claims the benefit of U.S. Provisional Application No. 62/135,094, filed on Mar. 18, 2015, which is hereby incorporated by reference as if fully set forth herein.

## BACKGROUND OF THE INVENTION

Field of the Invention

The present invention relates to a Wireless Local Area Network (WLAN), and more particularly, to an interleaver, an interleaving procedure, a deinterleaver, a deinterleaving procedure applied to a Physical layer Protocol Data Unit (PPDU) in a High Efficiency WLAN (HEW), a transmission method, reception method, transmission apparatus, reception apparatus, and software using the interleaver, the interleaving procedure, the deinterleaver, the deinterleaving procedure, and a recording medium that stores the software.

Discussion of the Related Art

Along with the recent development of information and telecommunication technology, various wireless communication techniques have been developed. Among them, the WLAN enables a user to wirelessly access the Internet based on radio frequency technology in a home, an office, or a specific service area using a portable terminal such as a Personal Digital Assistant (PDA), a laptop computer, a Portable Multimedia Player (PMP), a smartphone, etc.

To overcome limitations in communication speed that the WLAN faces, the recent technical standards have introduced a system that increases the speed, reliability, and coverage of a wireless network. For example, the Institute of Electrical and Electronics Engineers (IEEE) 802.11n standard has introduced Multiple Input Multiple Output (MIMO) that is implemented using multiple antennas at both a transmitter and a receiver in order to support High Throughput (HT) at a data processing rate of up to 540 Mbps, minimize transmission errors, and optimize data rates.

## SUMMARY OF THE INVENTION

Objects of the present invention is to provide a new interleaver, an interleaving procedure, a deinterleaver, and a deinterleaving procedure, for application to a High Efficiency WLAN Physical layer Protocol Data Unit (HE PPDU), and to efficiently support Multi-User Multiple Input Multiple Output (MU-MIMO) and Orthogonal Frequency Division Multiple Access (OFDMA) with the HE PPDU.

The objects of the present invention are not limited to the foregoing descriptions, and additional objects will become apparent to those having ordinary skill in the pertinent art to the present invention based upon the following descriptions.

In an aspect of the present invention, a method for transmitting data to a plurality of Stations (STAs) through transmission channel by an Access Point (AP) in a Wireless Local Area Network (WLAN) may be provided. The transmission channel may be divided into a plurality of subchannels which are allocated to the plurality of STAs respectively. The method may include interleaving a plurality of data units for the plurality of STAs based on characteristics of the plurality of subchannels allocated to the plurality of STAs to generate a plurality of interleaved data units; and

2

transmitting, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including the plurality of interleaved data units respectively on the plurality of subchannels to the plurality of STAs.

In another aspect of the present invention, a method for receiving data from an AP through a transmission channel by a first STA among a plurality of STAs in a WLAN may be provided. The transmission channel may be divided into a plurality of subchannels which are allocated to the plurality of STAs respectively. The method may include receiving, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including a plurality of data units for the plurality of STAs respectively on the plurality of subchannels to acquire a data unit for the first STA from a subchannel allocated to the first STA; and deinterleaving the data unit for the first STA based on a characteristic of the subchannel allocated to the first STA.

In another aspect of the present invention, an AP apparatus for transmitting data to a plurality of STAs through transmission channel in a WLAN may be provided. The transmission channel may be divided into a plurality of subchannels which are allocated to the plurality of STAs respectively. The AP apparatus may include a baseband processor, a Radio Frequency (RF) transceiver, and a memory. The baseband processor may be configured to interleave a plurality of data units for the plurality of STAs based on characteristics of the plurality of subchannels allocated to the plurality of STAs to generate a plurality of interleaved data units; and to transmit, through the transmission channel, using the transceiver, a PPDU frame including the plurality of interleaved data units respectively on the plurality of subchannels to the plurality of STAs.

In another aspect of the present invention, a first STA apparatus for receiving data from an AP through a transmission channel among a plurality of STAs in a WLAN may be provided. The transmission channel may be divided into a plurality of subchannels which are allocated to the plurality of STAs respectively. The first STA apparatus may include a baseband processor, an RF transceiver, and a memory. The baseband processor may be configured to receive, through the transmission channel, using the transceiver, a PPDU frame including a plurality of data units for the plurality of STAs respectively on the plurality of subchannels to acquire a data unit for the first STA from a subchannel allocated to the first STA; and to deinterleave the data unit for the first STA based on a characteristic of the subchannel allocated to the first STA.

In an aspect of the present invention, a software or computer-readable medium having instructions executable for an AP to transmit data to a plurality of STAs through transmission channel in a WLAN may be provided. The transmission channel may be divided into a plurality of subchannels which are allocated to the plurality of STAs respectively. The executable instructions may operate the AP to interleave a plurality of data units for the plurality of STAs based on characteristics of the plurality of subchannels allocated to the plurality of STAs to generate a plurality of interleaved data units; and to transmit, through the transmission channel, a PPDU frame including the plurality of interleaved data units respectively on the plurality of subchannels to the plurality of STAs.

In another aspect of the present invention, a software or computer-readable medium having instructions executable for a first STA to receive data from an AP through a transmission channel among a plurality of STAs in a WLAN may be provided. The transmission channel may be divided into a plurality of subchannels which are allocated to the

ATLAS–00004278

**Appx96**

US 9,532,187 B2

3

plurality of STAs respectively. The executable instructions may operate the STA to receive, through the transmission channel, a PPDU frame including a plurality of data units for the plurality of STAs respectively on the plurality of subchannels to acquire a data unit for the first STA from a subchannel allocated to the first STA; and to deinterleave the data unit for the first STA based on a characteristic of the subchannel allocated to the first STA.

It is to be understood that both the foregoing summarized features are exemplary aspects of the following detailed description of the present invention without limiting the scope of the present invention.

According to the present invention, a new interleaver, an interleaving procedure, a deinterleaver, and a deinterleaving procedure can be provided, for application to a High Efficiency WLAN Physical layer Protocol Data Unit (HE PPDU), and Multi-User Multiple Input Multiple Output (MU-MIMO) and Orthogonal Frequency Division Multiple Access (OFDMA) can be efficiently supported with the HE PPDU.

The advantages of the present invention are not limited to the foregoing descriptions, and additional advantages will become apparent to those having ordinary skill in the pertinent art to the present invention based upon the following descriptions.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention and are incorporated in and constitute a part of this application, illustrate embodiment(s) of the invention and together with the description serve to explain the principle of the invention. In the drawings:

FIG. 1 is a block diagram of a Wireless Local Area Network (WLAN) device;

FIG. 2 is a schematic block diagram of an exemplary transmission signal processing unit in a WLAN;

FIG. 3 is a schematic block diagram of an exemplary reception signal processing unit in a WLAN;

FIG. 4 depicts a relationship between InterFrame Spaces (IFSs);

FIG. 5 is a conceptual diagram illustrating a procedure for transmitting a frame in Carrier Sense Multiple Access with Collision Avoidance (CSMA/CA) to avoid collision between frames on a channel;

FIG. 6 depicts an exemplary frame structure in a WLAN system;

FIG. 7 depicts an exemplary High Efficiency (HE) Physical layer Protocol Data Unit (PPDU) frame format according to the present invention;

FIG. 8 depicts subchannel allocation in a HE PPDU frame format according to the present invention;

FIG. 9 depicts a subchannel allocation method according to the present invention;

FIG. 10 depicts the starting and ending points of an High Efficiency Long Training Field (HE-LTF) field in a HE PPDU frame format according to the present invention;

FIG. 11 depicts a High Efficiency SIGnal B (HE-SIG-B) field and a High Efficiency SIGnal C (HE-SIG-C) field in the HE PPDU frame format according to the present invention;

FIG. 12 depicts another exemplary HE PPDU frame format according to the present invention;

FIG. 13 depicts exemplary interleaving of a HE PPDU OFDM symbol according to the present invention; and

4

FIG. 14 is a flowchart illustrating an exemplary method according to the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

In the following detailed description, only certain embodiments of the present invention have been shown and described, simply by way of illustration. As those skilled in the art would realize, the described embodiments may be modified in various different ways, all without departing from the spirit or scope of the present invention. Accordingly, the drawings and description are to be regarded as illustrative in nature and not restrictive. Like reference numerals designate like elements throughout the specification.

In a Wireless Local Area network (WLAN), a Basic Service Set (BSS) includes a plurality of WLAN devices. A WLAN device may include a Medium Access Control (MAC) layer and a PHYsical (PHY) layer in conformance to Institute of Electrical and Electronics Engineers (IEEE) 802.11 series standards. At least one of the WLAN devices may be an Access Point (AP) and the other WLAN devices may be non-AP Stations (non-AP STAs). Alternatively, all of the WLAN devices may be non-AP STAs in an ad-hoc network. Generally, the term STA covers AP STA and non-AP STA. However, only a non-AP STA may be referred to as a STA, for the convenience's sake.

FIG. 1 is a block diagram of a WLAN device.

Referring to FIG. 1, a WLAN device 1 includes a baseband processor 10, a Radio Frequency (RF) transceiver 20, an antenna unit 30, a memory 40, an input interface unit 50, an output interface unit 60, and a bus 70.

The baseband processor 10 may be simply referred to as a processor, performs baseband signal processing described in the present specification, and includes a MAC processor (or MAC entity) 11 and a PHY processor (or PHY entity) 15.

In an embodiment of the present invention, the MAC processor 11 may include a MAC software processing unit 12 and a MAC hardware processing unit 13. The memory 40 may store software (hereinafter referred to as 'MAC software') including at least some functions of the MAC layer. The MAC software processing unit 12 may execute the MAC software to implement some functions of the MAC layer, and the MAC hardware processing unit 13 may implement the remaining functions of the MAC layer as hardware (hereinafter referred to as 'MAC hardware'). However, the MAC processor 11 is not limited to the foregoing implementation examples.

The PHY processor 15 includes a transmission signal processing unit 100 and a reception signal processing unit 200.

The baseband processor 10, the memory 40, the input interface unit 50, and the output interface unit 60 may communicate with one another via the bus 70.

The RF transceiver 20 includes an RF transmitter 21 and an RF receiver 22.

The memory 40 may further store an Operating System (OS) and applications. The input interface unit 50 receives information from a user, and the output interface unit 60 outputs information to the user.

The antenna unit 30 includes one or more antennas. When Multiple Input Multiple Output (MIMO) or Multi-User MIMO (MU-MIMO) is used, the antenna unit 30 may include a plurality of antennas.

FIG. 2 is a schematic block diagram of an exemplary transmission signal processor in a WLAN.

ATLAS-00004279

**Appx97**

JX002.00019

US 9,532,187 B2

5
6

Referring to FIG. 2, the transmission signal processing unit 100 includes an encoder 110, an interleaver 120, a mapper 130, an Inverse Fourier Transform (IFT) processor 140, and a Guard Interval (GI) inserter 150.

The encoder 110 encodes input data. For example, the encoder 100 may be a Forward Error Correction (FEC) encoder. The FEC encoder may include a Binary Convolutional Code (BCC) encoder followed by a puncturing device, or the FEC encoder may include a Low-Density Parity-Check (LDPC) encoder.

The transmission signal processing unit 100 may further include a scrambler for scrambling input data before encoding to reduce the probability of long sequences of 0s or 1s. If a BCC encoding scheme is used in the encoder 110, the transmission signal processing unit 100 may further include an encoder parser for demultiplexing the scrambled bits among a plurality of BCC encoders. If an LDPC encoding scheme is used in the encoder 110, the transmission signal processing unit 100 may not use the encoder parser.

The interleaver 120 interleaves the bits of each stream output from the encoder 110 to change orders of bits. Interleaving may be applied only when a BCC encoding scheme is used in the encoder 110. The mapper 130 maps a sequence of bits output from the interleaver 120 to constellation points. If an LDPC encoding scheme is used in the encoder 110, the mapper 130 may further perform LDPC tone mapping besides the constellation point mapping.

In MIMO or MU-MIMO, the transmission signal processing unit 100 may use as many interleavers 120 as and as many mappers 130 as the number $N_{SS}$ of spatial streams. In this case, the transmission signal processing unit 100 may further include a stream parser for dividing the outputs of the BCC encoders or the output of the LDPC encoder into a plurality of blocks to be provided to the different interleavers 120 or mappers 130. The transmission signal processing unit 100 may further include a Space-Time Block Code (STBC) encoder for spreading the constellation points from $N_{SS}$ spatial streams into $N_{STS}$ space-time streams and a spatial mapper for mapping the space-time streams to transmit chains. The spatial mapper may use direct mapping, spatial expansion, or beamforming.

The IFT processor 140 converts a block of constellation points output from the mapper 130 or the spatial mapper to a time-domain block (i.e., a symbol) by Inverse Discrete Fourier Transform (IDFT) or Inverse Fast Fourier Transform (IFFT). If the STBC encoder and the spatial mapper are used, the IFT processor 140 may be provided for each transmit chain.

In MIMO or MU-MIMO, the transmission signal processing unit 100 may optionally insert Cyclic Shift Diversities (CSDs) in order to prevent unintended beamforming A CSD insertion may applied before or after IFT. A CSD may be specified for each transmit chain or for each space-time stream. Alternatively, the CSD may be applied as a part of the spatial mapper.

In MU-MIMO, some blocks before the spatial mapper may be provided for each stream.

The GI inserter 150 prepends a GI to a symbol. The transmission signal processing unit 100 may additionally perform windowing to smooth edges of each symbol after inserting the GI. The RF transmitter 21 converts the symbols into an RF signal and transmits the RF signal via the antenna unit 30. In MIMO or MU-MIMO, the GI inserter 150 and the RF transmitter 21 may be provided for each transmit chain.

FIG. 3 is a schematic block diagram of an exemplary a reception signal processor in a WLAN

Referring to FIG. 3, the reception signal processing unit 200 includes a GI remover 220, a Fourier Transform (FT) processor 230, a demapper 240, a deinterleaver 250, and a decoder 260.

The RF receiver 22 receives an RF signal via the antenna unit 30 and converts the RF signal into symbols. The GI remover 220 removes a GI from the symbols. In MIMO or MU-MIMO, the RF receiver 22 and the GI remover 220 may be provided for each receive chain.

The FT 230 converts the symbol (i.e., the time-domain block) into a block of constellation points by Discrete Fourier Transform (DFT) or Fast Fourier Transform (FFT). The FT processor 230 may be provided for each receive chain.

In MIMO or MU-MIMO, the reception signal processing unit 200 may include a spatial demapper for converting Fourier Transformed receiver chains to constellation points of space-time streams, and an STBC decoder for despreading the constellation points from the space-time streams into the spatial streams.

The demapper 240 demaps constellation points output from the FT processor 230 or the STBC decoder to bit streams. If an LDPC encoding scheme has been applied to the received signal, the demapper 240 may further perform LDPC tone demapping before the constellation demapping. The deinterleaver 250 deinterleaves the bits of each of the streams output from the demapper 240. Deinterleaving may be applied only when a BCC encoding scheme has been applied to the received signal.

In MIMO or MU-MIMO, the reception signal processing unit 200 may use as many demappers 240 as and as many deinterleavers 250 as the number of spatial streams. In this case, the reception signal processing unit 200 may further include a stream deparser for combining streams output from the deinterleavers 250.

The decoder 260 decodes streams output from the deinterleaver 250 or the stream deparser. For example, the decoder 100 may be an FEC decoder. The FEC decoder may include a BCC decoder or an LDPC decoder. The reception signal processing unit 200 may further include a descrambler for descrambling the decoded data. If a BCC decoding scheme is used in the decoder 260, the reception signal processing unit 200 may further include an encoder deparser for multiplexing data decoded by a plurality of BCC decoders. If an LDPC decoding scheme is used in the decoder 260, the reception signal processing unit 200 may not use the encoder deparser.

In a WLAN system, Carrier Sense Multiple Access with Collision Avoidance (CSMA/CA) is a basic MAC access mechanism. The CSMA/CA mechanism is referred to as Distributed Coordination Function (DCF) of IEEE 802.11 MAC, shortly as a 'listen before talk' access mechanism. According to the CSMA/CA mechanism, an AP and/or a STA may sense a medium or a channel for a predetermined time before starting transmission, that is, may perform Clear Channel Assessment (CCA). If the AP or the STA determines that the medium or channel is idle, it may start to transmit a frame on the medium or channel. On the other hand, if the AP and/or the STA determines that the medium or channel is occupied or busy, it may set a delay period (e.g., a random backoff period), wait for the delay period without starting transmission, and then attempt to transmit a frame. By applying a random backoff period, a plurality of STAs are expected to attempt frame transmission after waiting for different time periods, resulting in minimizing collisions.

ATLAS-00004280

US 9,532,187 B2

7

FIG. 4 depicts a relationship between InterFrame Spaces (IFSs).

WLAN devices may exchange data frames, control frames, and management frames with each other.

A data frame is used for transmission of data to be forwarded to a higher layer. After a Distributed Coordination Function IFS (DIFS) from a time when a medium gets idle, a WLAN device performs a backoff and then transmits a data frame. A management frame is used for exchanging management information which is not forwarded to the higher layer. After an IFS such as the DIFS or a Point Coordination Function IFS (PIFS), the WLAN device transmits the management frame. Subtype frames of the management frame include a beacon frame, an association request/response frame, a probe request/response frame, and an authentication request/response frame. A control frame is used for controlling access to the medium. Subtype frames of the control frame include a Request-To-Send (RTS) frame, a Clear-To-Send (CTS) frame, and an ACKnowledgement (ACK) frame. If the control frame is not a response frame to another frame, the WLAN device performs a backoff after the DIFS and then transmits the control frame; or if the control frame is a response frame to another frame, the WLAN device transmits the control frame after a Short IFS (SIFS) without a backoff. The type and subtype of a frame may be identified by a type field and a subtype field in a Frame Control (FC) field.

On the other hand, a Quality of Service (QoS) STA may perform a backoff after an Arbitration IFS (AIFS) for Access Category (AC), i.e., AIFS[i] (i is determined based on AC) and then transmit a frame. In this case, the AIFC[i] may be used for a data frame, a management frame, or a control frame that is not a response frame.

In the example illustrated in FIG. 4, upon generation of a frame to be transmitted, a STA may transmit the frame immediately, if it determines that the medium is idle for the DIFS or AIFS[i] or longer. The medium is busy for a time period during which the STA transmits the frame. During the time period, upon generation of a frame to be transmitted, another STA may defer access by confirming that the medium is busy. If the medium gets idle, the STA that intends to transmit the frame may perform a backoff operation after a predetermined IFS in order to minimize collision with any other STA. Specifically, the STA that intends to transmit the frame selects a random backoff count, waits for a slot time corresponding to the selected random backoff count, and then attempt transmission. The random backoff count is determined based on a Contention Window (CW) parameter and the medium is monitored continuously during count-down of backoff slots (i.e. decrement a backoff count-down) according to the determined backoff count. If the STA monitors the medium as busy, the STA discontinues the count-down and waits, and then, if the medium gets idle, the STA resumes the count-down. If the backoff slot count reaches 0, the STA may transmit the next frame.

FIG. 5 is a conceptual diagram illustrating a CSMA/CA-based frame transmission procedure to avoid collision between frames on a channel.

Referring FIG. 5, a first STA (STA1) is a transmitting WLAN device having data to be transmitted, a second STA (STA2) is a receiving WLAN device to receive the data from STA1, and a third STA (STA3) is a WLAN device located in an area where STA3 may receive a frame from STA1 and/or STA2.

STA1 may determine whether a channel is busy by carrier sensing. STA1 may determine channel occupancy based on

8

an energy level of the channel or a correlation between signals on the channel, or using a Network Allocation Vector (NAV) timer.

If STA1 determines that the channel is not used by other devices during a DIFS (that is, the channel is idle), STA1 may transmit an RTS frame to STA2 after performing a backoff. Upon receipt of the RTS frame, STA2 may transmit a CTS frame as a response to the CTS frame after a SIFS.

Upon receipt of the RTS frame, STA3 may set a NAV timer for a transmission duration of following frames (e.g., a SIFS time+a CTS frame duration+a SIFS time+a data frame duration+a SIFS time+an ACK frame duration), based on duration information included in the RTS frame. Upon receipt of the CTS frame, STA3 may set the NAV timer for a transmission duration of following frames (e.g., a SIFS time+a data frame duration+a SIFS time+an ACK frame duration), based on duration information included in the CTS frame. Upon receipt of a new frame before the NAV timer expires, STA3 may update the NAV timer based on duration information included in the new frame. STA3 does not attempt to access the channel until the NAV timer expires.

Upon receipt of the CTS frame from STA2, STA1 may transmit a data frame to STA2 a SIFS after the CTS frame has been completely received. Upon successful receipt of the data frame from STA1, STA2 may transmit an ACK frame as a response to the data frame after a SIFS.

Upon expiration of the NAV timer, STA3 may determine whether the channel is busy by carrier sensing. If STA3 determines that the channel is not in use by the other devices during a DIFS after expiration of the NAV timer, STA3 may attempt channel access after a convention window according a random backoff-based CW.

FIG. 6 depicts an exemplary frame structure in a WLAN system.

PHY layer may prepare a transmission MAC PDU (MPDU) in response to an instruction (or a primitive, which is a set of instructions or a set of parameters) by the MAC layer. For example, upon receipt of an instruction requesting transmission start from the MAC layer, the PHY layer may switch to a transmission mode, construct a frame with information (e.g., data) received from the MAC layer, and transmit the frame.

Upon detection of a valid preamble in a received frame, the PHY layer monitors a header of the preamble and transmits an instruction indicating reception start of the PHY layer to the MAC layer.

Information is transmitted and received in frames in the WLAN system. For this purpose, a Physical layer Protocol Data Unit (PPDU) frame format is defined.

A PPDU frame may include a Short Training Field (STF) field, a Long Training Field (LTF) field, a SIGNAL (SIG) field, and a Data field. The most basic (e.g., a non-High Throughput (non-HT)) PPDU frame may include only a Legacy-STF (L-STF) field, a Legacy-LTF (L-LTF) field, a SIG field, and a Data field. Additional (or other types of) STF, LTF, and SIG fields may be included between the SIG field and the Data field according to the type of a PPDU frame format (e.g., an HT-mixed format PPDU, an HT-greenfield format PPDU, a Very High Throughput (VHT) PPDU, etc.).

The STF is used for signal detection, Automatic Gain Control (AGC), diversity selection, fine time synchronization, etc. The LTF field is used for channel estimation, frequency error estimation, etc. The STF and the LTF fields may be referred to as signals for OFDM PHY layer synchronization and channel estimation.

ATLAS-00004281

US 9,532,187 B2

9    10

The SIG field may include a RATE field and a LENGTH field. The RATE field may include information about a modulation scheme and coding rate of data. The LENGTH field may include information about the length of the data. The SIG field may further include parity bits, SIG TAIL bits, etc.

The Data field may include a SERVICE field, a Physical layer Service Data Unit (PSDU), and PPDU TAIL bits. When needed, the Data field may further include padding bits. A part of the bits of the SERVICE field may be used for synchronization at a descrambler of a receiver. The PSDU corresponds to a MAC PDU defined at the MAC layer and may include data generated/used in a higher layer. The PPDU TAIL bits may be used to return an encoder to a zero state. The padding bits may be used to match the length of the Data filed in predetermined units.

A MAC PDU is defined according to various MAC frame formats. A basic MAC frame includes a MAC header, a frame body, and a Frame Check Sequence (FCS). The MAC frame includes a MAC PDU and may be transmitted and received in the PSDU of the data part in the PPDU frame format.

The MAC header includes a Frame Control field, a Duration/Identifier (ID) field, an Address field, etc. The Frame Control field may include control information required for frame transmission/reception. The Duration/ID field may be set to a time for transmitting the frame. For details of Sequence Control, QoS Control, and HT Control subfields of the MAC header, refer to the IEEE 802.11-2012 technical specification.

The Frame Control field of the MAC header may include Protocol Version, Type, Subtype, To DS, From DS, More Fragment, Retry, Power Management, More Data, Protected Frame, and Order subfields. For the contents of each subfield in the Frame Control field, refer to the IEEE 802.11-2012 technical specification.

A Null-Data Packet (NDP) frame format is a frame format that does not include a data packet. In other words, the NDP frame format includes only a Physical Layer Convergence Protocol (PLCP) header part (i.e., the STF, LTF, and SIG fields) of the general PPDU frame format, without the remaining part (i.e., the Data field) of the general PPDU frame format. The NDP frame format may be referred to as a short frame format.

The IEEE 802.11ax task group is discussing a WLAN system, called a High Efficiency WLAN (HEW) system, that operates in 2.4 GHz or 5 GHz and supports a channel bandwidth (or channel width) of 20 MHz, 40 MHz, 80 MHz, or 160 MHz. The present invention defines a new PPDU frame format for the IEEE 802.11ax HEW system. The new PPDU frame format may support MU-MIMO or OFDMA. A PPDU of the new format may be referred to as a 'HEW PPDU' or 'HE PPDU' (similarly, HEW xyz may be referred to as 'HE xyz' or 'HE-xyz' in the following descriptions).

In present specification, the term 'MU-MIMO or OFDMA mode' includes MU-MIMO without using OFDMA, or OFDMA mode without using MU-MIMO in an orthogonal frequency resource, or OFDMA mode using MU-MIMO in an orthogonal frequency resource.

FIG. 7 depicts an exemplary HE PPDU frame format according to the present invention.

Referring to FIG. 7, the vertical axis represents frequency and the horizontal axis represents time. It is assumed that frequency and time increase in the upward direction and the right direction, respectively.

In the example of FIG. 7, one channel includes four subchannels. An L-STF, an L-LTF, an L-SIG, and an HE-

SIG-A may be transmitted per channel (e.g., 20 MHz), a HE-STF and a HE-LTF may be transmitted on each subchannel being a basic subchannel unit (e.g., 5 MHz), and a HE-SIG-B and a PSDU may be transmitted on each of subchannels allocated to a STA. A subchannel allocated to a STA may have a size required for PSDU transmission to the STA. The size of the subchannel allocated to the STA may be N (N=1, 2, 3, . . . ) times as large as the size of basic subchannel unit (i.e., a subchannel having a minimum size). In the example of FIG. 7, the size of a subchannel allocated to each STA is equal to the size of the basic subchannel unit. For example, a first subchannel may be allocated for PSDU transmission from an AP to STA1 and STA2, a second subchannel may be allocated for PSDU transmission from the AP to STA3 and STA4, a third subchannel may be allocated for PSDU transmission from the AP to STA5, and a fourth subchannel may be allocated for PSDU transmission from the AP to STA6.

While the term subchannel is used in the present disclosure, the term subchannel may be referred to as Resource Unit (RU) or subband. In particular, the terms like OFDMA subchannel, OFDMA RU, OFDMA subband can be used in embodiments for OFDMA in the present disclosure. Terms like a bandwidth of a subchannel, a number of tones (or subcarriers) allocated to a subchannel, a number of data tones (or data subcarriers) allocated to a subchannel can be used to express a size of a subchannel. A subchannel refers to a frequency band allocated to a STA and a basic subchannel unit refers to a basic unit used to represent the size of a subchannel. While the size of the basic subchannel unit is 5 MHz in the above example, this is purely exemplary. Thus, the basic subchannel unit may have a size of 2.5 MHz.

In FIG. 7, a plurality of HE-LTF elements are distinguished in the time and frequency domains. One HE-LTF element may correspond to one OFDM symbol in time domain and one subchannel unit (i.e., a subchannel bandwidth allocated to a STA) in frequency domain. The HE-LTF elements should be understood as logical units and the PHY layer does not necessarily operate in units of an HE-LTF element. In the following description, an HE-LTF element may be referred to shortly as a HE-LTF.

A HE-LTF symbol may correspond to a set of HE-LTF elements in one OFDM symbol in time domain and in one channel unit (e.g., 20 MHz) in frequency domain.

A HE-LTF section may correspond to a set of HE-LTF elements in one or more OFDM symbols in time domain and in one subchannel unit (i.e., a subchannel bandwidth allocated to a STA) in frequency domain.

A HE-LTF field may be a set of HE-LTF elements, HE-LTF symbols, or HE-LTF sections for a plurality of stations.

The L-STF field is used for frequency offset estimation and phase offset estimation, for preamble decoding at a legacy STA (i.e., a STA operating in a system such as IEEE 802.11a/b/g/n/ac). The L-LTF field is used for channel estimation, for the preamble decoding at the legacy STA. The L-SIG field is used for the preamble decoding at the legacy STA and provides a protection function for PPDU transmission of a third-party STA (e.g., setting a NAV based on the value of a LENGTH field included in the L-SIG field).

HE-SIG-A (or HEW SIG-A) represents High Efficiency Signal A (or High Efficiency WLAN Signal A), and includes HE PPDU (or HEW PPDU) modulation parameters, etc. for HE preamble (or HEW preamble) decoding at a HE STA (or HEW STA). The parameters set included in the HEW SIG-A field may include one or more of Very High Throughput (VHT) PPDU modulation parameters transmitted by IEEE 802.11ac stations, as listed in [Table 1] below, to ensure backward compatibility with legacy STAs (e.g., IEEE 802.11ac stations).

ATLAS-00004282

JX002.00022

US 9,532,187 B2

11  12

TABLE 1

| Two parts of VHT-SIG-A | Bit | Field | Number of bits | Description |
|---|---|---|---|---|
| VHT-SIG-A1 | B0-B1 | BW | 2 | Set to 0 for 20 MHz, 1 for 40 MHz, 2 for 80 MHz, and 3 for 160 MHz and 80 + 80 MHz |
| | B2 | Reserved | 1 | Reserved. Set to 1. |
| | B3 | STBC | 1 | For a VHT SU PPDU: Set to 1 if space time block coding is used and set to 0 otherwise. For a VHT MU PPDU: Set to 0. |
| | B4-B9 | Group ID | 6 | Set to the value of the TXVECTOR parameter GROUP_ID. A value of 0 or 63 indicates a VHT SU PPDU; otherwise, indicates a VHT MU PPDU. |
| | B10-B21 | NSTS/Partial AID | 12 | For a VHT MU PPDU: NSTS is divided into 4 user positions of 3 bits each. User position p, where 0 ≤ p ≤ 3, uses bits B(10 + 3p) to B(12 + 3p). The number of space-time streams for user u are indicated at user position p = USER_POSITION[u] where u = 0, 1, ..., NUM_USERS − 1 and the notation A[b] denotes the value of array A at index b. Zero space-time streams are indicated at positions not listed in the USER_POSITION array. Each user position is set as follows: Set to 0 for 0 space-time streams Set to 1 for 1 space-time streams Set to 2 for 2 space-time streams Set to 3 for 3 space-time streams Set to 4 for 4 space-time streams Values 5-7 are reserved For a VHT SU PPDU: B10-B12 Set to 0 for 1 space-time stream Set to 1 for 2 space-time streams Set to 2 for 3 space-time streams Set to 3 for 4 space-time streams Set to 4 for 5 space-time streams Set to 5 for 6 space-time streams Set to 6 for 7 space-time streams Set to 7 for 8 space-time streams B13-B21 Partial AID: Set to the value of the TXVECTOR parameter PARTIAL_AID. Partial AID provides an abbreviated indication of the intended recipient(s) of the PSDU (see 9.17a). |
| | B22 | TXOP_PS_NOT_ALLOWED | 1 | Set to 0 by VHT AP if it allows non-AP VHT STAs in TXOP power save mode to enter Doze state during a TXOP. Set to 1 otherwise. The bit is reserved and set to 1 in VHT PPDUs transmitted by a non-AP VHT STA. |
| VHT-SIG-A2 | B23 | Reserved | 1 | Set to 1 |
| | B0 | Short GI | 1 | Set to 0 if short guard interval is not used in the Data field. Set to 1 if short guard interval is used in the Data field. |
| | B1 | Short GI $N_{SYM}$ Disambiguation | 1 | Set to 1 if short guard interval is used and $N_{SYM}$ mod 10 = 9; otherwise, set to 0. $N_{SYM}$ is defined in 22.4.3. |
| | B2 | SU/MU[0] Coding | 1 | For a VHT SU PPDU, B2 is set to 0 for BCC, 1 for LDPC For a VHT MU PPDU, if the MU[0] NSTS field is nonzero, then B2 indicates the coding used for user u with USER_POSITION[u] = 0; set to 0 for BCC and 1 for LDPC. If the MU[0] NSTS field is 0, then this field is reserved and set to 1. |
| | B3 | LDPC Extra OFDM Symbol | 1 | Set to 1 if the LDPC PPDU encoding process (if an SU PPDU), or at least one LDPC user's PPDU encoding process (if a VHT MU PPDU), results in an extra OFDM symbol (or symbols) as described in 22.3.10.5.4 and 22.3.10.5.5. Set to 0 otherwise. |
| | B4-B7 | SU VHT-MCS/MU[1-1] Coding | 4 | For a VHT SU PPDU: VHT-MCS index For a VHT MU PPDU: If the MU[1] NSTS field is nonzero, then B4 indicates coding for user u with USER_POSITION[u] = 1; set to 0 for BCC, 1 for LDPC. If the MU[1] NSTS field is 0, then B4 is reserved and set to 1. If the MU[2] NSTS field is nonzero, then B5 indicates coding for user u with USER_POSITION[u] = 2; set to 0 for BCC, 1 for LDPC. If the MU[2] NSTS field is 0, then B5 is reserved and set to 1. If the MU[3] NSTS field is nonzero, then B6 indicates coding for user u with USER_POSITION[u] = 3; set to 0 for BCC, 1 for LDPC. If the MU[3] NSTS field is 0, then |

ATLAS-00004283

**Appx101**

US 9,532,187 B2

13                                                           14

TABLE 1-continued

| Two parts of VHT-SIG-A | Bit | Field | Number of bits | Description |
|---|---|---|---|---|
| | | | | B6 is reserved and set to 1. |
| | | | | B7 is reserved and set to 1 |
| | B8 | Beamformed | 1 | For a VHT SU PPDU: |
| | | | | Set to 1 if a Beamforming steering matrix is applied to the waveform in an SU transmission as described in 20.3.11.11.2, set to 0 otherwise. |
| | | | | For a VHT MU PPDU: |
| | | | | Reserved and set to 1 |
| | | | | NOTE-If equal to 1 smoothing is not recommended. |
| | B9 | Reserved | 1 | Reserved and set to 1 |
| | B10-B17 | CRC | 8 | CRC calculated as in 20.3.9.4.4 with c7 in B10. Bits 0-23 of HT-SIG1 and bits 0-9 of HT-SIG2 are replaced by bits 0-23 of VHT-SIG-A1 and bits 0-9 of VHT-SIG-A2, respectively. |
| | B18-B23 | Tail | 6 | Used to terminate the trellis of the convolutional decoder. Set to 0. |

[Table 1] illustrates fields, bit positions, numbers of bits, and descriptions included in each of two parts, VHT-SIG-A1 and VHT-SIG-A2, of the VHT-SIG-A field defined by the IEEE 802.11ac standard. For example, a BW (BandWidth) field occupies two Least Significant Bits (LSBs), B0 and B1 of the VHT-SIG-A1 field and has a size of 2 bits. If the 2 bits are set to 0, 1, 2, or 3, the BW field indicates 20 MHz, 40 MHz, 80 MHz, or 160 and 80+80 MHz. For details of the fields included in the VHT-SIG-A field, refer to the IEEE 802.11ac-2013 technical specification. In the HE PPDU frame format of the present invention, the HE-SIG-A field may include one or more of the fields included in the VHT-SIG-A field, and it may provide backward compatibility with IEEE 802.11ac stations.

FIG. 8 depicts subchannel allocation in the HE PPDU frame format according to the present invention.

In the example of FIG. 8, it is assumed that information indicating subchannels to which STAs are allocated in HE PPDU indicates that a subchannel of 0 MHz is allocated to STA1 (i.e., no subchannel is allocated), a subchannel of 5 MHz is allocated to each of STA2 and STA3, and a subchannel of 10 MHz is allocated to STA4.

In the example of FIG. 8, an L-STF, an L-LTF, an L-SIG, and a HE-SIG-A may be transmitted per channel (e.g., 20 MHz), a HE-STF and a HE-LTF may be transmitted on each of subchannels being basic subchannel units (e.g., 5 MHz), and a HE-SIG-B and a PSDU may be transmitted on each of subchannels allocated to STAs. A subchannel allocated to a STA has a size required for PSDU transmission to the STA. The size of the subchannel allocated to the STA may be an N (N=1, 2, 3, . . . ) multiple of the size of the basic subchannel unit (i.e., a minimum-size subchannel unit). In the example of FIG. 8, the size of a subchannel allocated to STA2 is equal to that of the basic subchannel unit, the size of a subchannel allocated to STA3 is equal to that of the basic subchannel unit, and the size of a subchannel allocated to STA4 is twice larger than that of the basic subchannel unit.

FIG. 8 illustrates a plurality of HE-LTF elements and a plurality of HE-LTF subelements which are distinguished in the time and frequency domains. One HE-LTF element may correspond to one OFDM symbol in the time domain and one subchannel unit (i.e., the bandwidth of a subchannel allocated to a STA) in the frequency domain. One HE-LTF subelement may correspond to one OFDM symbol in the time domain and one basic subchannel unit (e.g. 5 MHz) in the frequency domain. In the example of FIG. 8, one HE-LTF element includes one HE-LTF subelement in the

5-MHz subchannel allocated to STA2 or STA3. On the other hand, one HE-LTF element includes two HE-LTF subelements in the third subchannel, i.e., 10-MHz subchannel, allocated to STA4. It is to be understood that a HE-LTF element and a HE-LTF subelement are logical units and the PHY layer does not always operate in units of a HE-LTF element or HE-LTF subelement.

A HE-LTF symbol may correspond to a set of HE-LTF elements in one OFDM symbol in the time domain and one channel unit (e.g. 20 MHz) in the frequency domain. That is, one HE-LTF symbol may be divided into HE-LTF elements by a subchannel width allocated to a STA and into HE-LTF subelements by the width of the basic subchannel unit in the frequency domain.

A HE-LTF section may correspond to a set of HE-LTF elements in one or more OFDM symbols in the time domain and one subchannel unit (i.e. the bandwidth of a subchannel allocated to a STA) in the frequency domain. A HE-LTF subsection may correspond to a set of HE-LTF elements in one or more OFDM symbols in the time domain and one basic subchannel unit (e.g., 5 MHz) in the frequency domain. In the example of FIG. 8, one HE-LTF section includes one HE-LTF subsection in the 5-MHz subchannel allocated to STA2 or STA3. On the other hand, one HE-LTF section includes two HE-LTF subsections in the third subchannel, i.e., 10-MHz subchannel, allocated to STA4.

A HE-LTF field may correspond to a set of HE-LTF elements (or subelements), HE-LTF symbols, or HE-LTF sections (or subsections) for a plurality of stations.

For the afore-described HE PPDU transmission, subchannels allocated to a plurality of the HE STAs may be contiguous in the frequency domain. In other words, for HE PPDU transmission, the subchannels allocated to the HE STAs may be sequential and any intermediate one of the subchannels of one channel (e.g., 20 MHz) may not be allowed to be unallocated or empty. Referring to FIG. 7, if one channel includes four subchannels, it may not be allowed to keep the third subchannel unallocated and empty, while the first, second, and fourth subchannels are allocated to STAs. However, the present invention does not exclude non-allocation of an intermediate subchannel of one channel to a STA.

FIG. 9 depicts a subchannel allocation method according to the present invention.

In the example of FIG. 9, a plurality of contiguous channels (e.g., 20-MHz-bandwidth channels) and boundaries of the plurality of contiguous channels are shown. In

US 9,532,187 B2

15

FIG. 9, a preamble may correspond to an L-STF, an L-LTF, an L-SIG, and a HE-SIG-A as illustrated in the examples of FIGS. 7 and 8.

A subchannel for each HE STA may be allocated only within one channel, and may not be allocated with partially overlapping between a plurality of channels. That is, if there are two contiguous 20-MHz channels CH1 and CH2, subchannels for STAs paired for MU-MIMO-mode or OFDMA-mode transmission may be allocated either within CH1 or within CH2, and it may be prohibited that one part of a subchannel exists in CH1 and another part of the subchannel exists in CH2. This means that one subchannel may not be allocated with crossing a channel boundary. From the perspective of RUs supporting the MU-MIMO or OFDMA mode, a bandwidth of 20 MHz may be divided into one or more RUs, and a bandwidth of 40 MHz may be divided into one or more RUs in each of two contiguous 20-MHz bandwidths, and no RU is allocated with crossing the boundary between two contiguous 20-MHz bandwidths.

As described above, it is allowed that one subchannel belongs to two or more 20-MHz channels. Particularly, a 2.4-GHz OFDMA mode may support a 20-MHz OFDMA mode and a 40-MHz OFDMA mode. In the 2.4-GHz OFDMA mode, it may not be allowed that one subchannel belongs to two or more 20-MHz channels.

FIG. 9 is based on the assumption that subchannels each having the size of a basic subchannel unit (e.g., 5 MHz) in CH1 and CH2 are allocated to STA1 to STA7, and subchannels each having double the size (e.g., 10 MHz) of the basic subchannel unit in CH4 and CH5 are allocated to STA8, STA9, and STA10.

As illustrated in the lower part of FIG. 9, although a subchannel allocated to STA1, STA2, STA3, STA5, STA6, or STA7 is fully overlapped only with one channel (i.e., without crossing the channel boundary, or belonging only to one channel), a subchannel allocated to STA4 is partially overlapped with the two channels (i.e., crossing the channel boundary, or belonging to the two channels). In the forgoing example of the present invention, the subchannel allocation to STA4 is not allowed.

As illustrated in the upper part of FIG. 9, although a subchannel allocated to STA8 or STA10 is fully overlapped only with one channel (i.e., crossing the channel boundary, or belonging only to one channel), a subchannel allocated to STA9 is partially overlapped with two channels (i.e., crossing the channel boundary, or belonging to the two channels). In the forgoing example of the present invention, the subchannel allocation to STA9 is not allowed.

On the other hand, it may be allowed to allocate a subchannel partially overlapped between a plurality of channels (i.e., crossing the channel boundary, or belonging to two channels). For example, in SU-MIMO mode transmission, a plurality of contiguous channels may be allocated to a STA and any of one or more subchannels allocated to the STA may cross the boundary between two contiguous channels.

While the following description is given with an assumption that one subchannel has a channel bandwidth of 5 MHz in one channel having a channel bandwidth of 20 MHz, this is provided to simplify the description of the principle of the present invention and thus should not be construed as limiting the present invention. For example, the bandwidths of a channel and a subchannel may be defined or allocated as values other than the above examples. In addition, a plurality of subchannels in one channel may have the same or different channel widths.

16

FIG. 10 depicts the starting and ending points of a HE-LTF field in the HE PPDU frame format according to the present invention.

To support the MU-MIMO mode and the OFDMA mode, the HE PPDU frame format according to the present invention may include, in the HE-SIG-A field, information about the number of spatial streams to be transmitted to a HE STA allocated to each subchannel.

If MU-MIMO-mode or OFDMA-mode transmission is performed to a plurality of HE STAs on one subchannel, the number of spatial streams to be transmitted to each of the HE STAs may be provided in the HE-SIG-A or HE-SIG-B field, which will be described later in detail.

FIG. 10 is based on the assumption that a first 5-MHz subchannel is allocated to STA1 and STA2 and two spatial streams are transmitted to each STA in a DL MU-MIMO or OFDMA mode (i.e., a total of four spatial streams are transmitted on one subchannel). For this purpose, a HE-STF, a HE-LTF, a HE-LTF, a HE-LTF, a HE-LTF, and a HE-SIG-B follow the HE-SIG-A field on the subchannel. The HE-STF is used for frequency offset estimation and phase offset estimation for the 5-MHz subchannel. The HE-LTFs are used for channel estimation for the 5-MHz subchannel. Since the subchannel carries four spatial streams, as many HE-LTFs (i.e., HE-LTF symbols or HE-LTF elements in a HE-LTF section) as the number of the spatial streams, that is, four HE-LTFs are required to support MU-MIMO transmission.

According to an example of the present invention, a relationship between a number of total spatial streams transmitted in one subchannel and a number of HE-LTF are listed in [Table 2].

TABLE 2

| Total number of spatial streams transmitted on one subchannel | Number of HE-LTFs |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 4 |
| 4 | 4 |
| 5 | 6 |
| 6 | 6 |
| 7 | 8 |
| 8 | 8 |

Referring to [Table 2], if one spatial stream is transmitted on one subchannel, at least one HE-LTF needs to be transmitted on the subchannel. If an even number of spatial streams are transmitted on one subchannel, at least as many HE-LTFs as the number of the spatial streams need to be transmitted. If an odd number of spatial streams greater than one are transmitted on one subchannel, at least as many HE-LTFs as a number of adding 1 to the number of the spatial streams need to be transmitted.

Referring to FIG. 10 again, it is assumed that the second 5-MHz subchannel is allocated to STA3 and STA4 and one spatial streams per STA is transmitted in the DL MU-MIMO or OFDMA mode (i.e., a total of two spatial streams are transmitted on one subchannel). In this case, two HE-LTFs need to be transmitted on the second subchannel, however, in the example of FIG. 10, a HE-STF, a HE-LTF, a HE-LTF, a HE-LTF, a HE-LTF, and a HE-SIG-B follow the HE-SIG-A field on the subchannel (i.e., four HE-LTFs are transmitted). This is for setting the same starting time of PSDU transmission for subchannels allocated to other STAs paired with STA3 and STA4 for MU-MIMO transmission. If only two HE-LTFs are transmitted on the second subchan

US 9,532,187 B2

17                                                                                          18

nel, PSDUs are transmitted at different time points on the first and second subchannels. PSDU transmission on each subchannel at a different time point results in discrepancy between OFDM symbol timings of subchannels, thereby no orthogonality is maintained. To overcome this problem, an additional constraint need to be imposed for HE-LTF transmission.

Basically, transmission of as many HE-LTFs as required is sufficient in an SU-MIMO or non-OFDMA mode. However, timing synchronization (or alignment) with fields transmitted on subchannels for other paired STAs is required in the MU-MIMO or OFDMA mode. Accordingly, the numbers of HE-LTFs may be determined for all other subchannels based on a subchannel having the maximum number of streams in MU-MIMO-mode or OFDMA-mode transmission.

Specifically, the numbers of HE-LTFs may be determined for all subchannels according to the maximum of the numbers of HE-LTFs (HE-LTF symbols or HE-LTF elements in a HE-LTF section) required according to the total numbers of spatial streams transmitted on each subchannel, for a set of HE STAs allocated to each subchannel. A "set of HE STAs allocated to each subchannel" is one HE STA in the SU-MIMO mode, and a set of HE STAs paired across a plurality of subchannels in the MU-MIMO mode. The 'number of spatial streams transmitted on each subchannel" is the number of spatial streams transmitted to one HE STA in the SU-MIMO mode, and the number of spatial streams transmitted to a plurality of HE STAs paired on the subchannel in the MU-MIMO mode.

That is, it may be said that a HE-LTF field starts at the same time point and ends at the same time point in a HE PPDU for all users (i.e. HE STAs) in MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that the lengths of HE-LTF sections are equal on a plurality of subchannels for all users (i.e. HE STAs) in MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that the number of HE-LTF elements included in each HE-LTF section is equal on a plurality of subchannels for all users (i.e. HE STAs) in MU-MIMO-mode or OFDMA-mode transmission. Accordingly, PSDU transmission timings may be synchronized among a plurality of subchannels for all HE STAs in MU-MIMO-mode or OFDMA-mode transmission.

As described above, the number of HE-LTF symbols (refer to FIG. 7) may be 1, 2, 4, 6, or 8 in HE PPDU transmission in the MU-MIMO or OFDMA mode, determined according to the maximum of the numbers of spatial streams on each of a plurality of subchannels. A different number of spatial streams may be allocated to each of a plurality of subchannels, and the number of spatial streams allocated to one subchannel is the number of total spatial streams for all users allocated to the subchannel. That is, the number of HE-LTF symbols may be determined according to the number of spatial streams allocated to a subchannel having a maximum number of spatial streams by comparing the number of total spatial streams for all users allocated to one of a plurality of subchannels with the number of total spatial streams for all users allocated to another subchannel.

Specifically, in HE PPDU transmission in the OFDMA mode, the number of HE-LTF symbols may be 1, 2, 4, 6, or 8, determined based on the number of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels. Further, in HE PPDU transmission in the OFDMA mode, the number of HE-LTF symbols may be determined based on whether the number of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality

of subchannels is odd or even (refer to [Table 3]). That is, in HE PPDU transmission in the OFDMA mode, when the number (e.g., K) of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels is an even number, the number of HE-LTF symbols may be equal to K. In HE PPDU transmission in the OFDMA mode, when the number, K, of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels is an odd number greater than one, the number of HE-LTF symbols may be equal to K+1.

When only one STA is allocated to one subchannel in OFDMA mode (i.e., OFDMA mode without using MU-MIMO), a subchannel having a maximum number of spatial streams across a plurality of subchannels may be determined by the number of spatial streams for a STA allocated to each subchannel. When more than one STA is allocated to one subchannel in OFDMA mode (i.e., OFDMA mode using MU-MIMO), a subchannel having a maximum number of spatial streams across a plurality of subchannels may be determined by the number of STAs allocated to each subchannel and the number of spatial streams for each STA allocated to each subchannel (e.g., if STA1 and STA2 are allocated to one subchannel, sum of the number of spatial streams for STA1 and the number of spatial streams for STA2).

When transmitting a HE PPDU frame in the MU-MIMO or OFDMA mode, a transmitter may generate P (P is an integer equal to or larger than 1) HE-LTF symbols (refer to FIG. 7) and transmit a HE PPDU frame including at least the P HE-LTF symbols and a Data field to a receiver. The HE PPDU frame may be divided into Q subchannels in the frequency domain (Q is an integer equal to or larger than 2). Each of the P HE-LTF symbols may be divided into Q HE-LTF elements corresponding to the Q subchannels in the frequency domain. That is, the HE PPDU may include P HE-LTF elements on one subchannel (herein, the P HE-LTF elements may belong to one HE-LTF section on the subchannel).

As described above, the number of HE-LTF elements (i.e., P) in one of the Q subchannels may be equal to the number of HE-LTF elements (i.e. P) of another subchannel. Also, the number of HE-LTF elements (i.e., P) included in a HE-LTF section in one of the Q subchannels may be equal to the number of HE-LTF elements (i.e. P) included in a HE-LTF section in another subchannel. The HE-LTF section of one of the Q subchannels may start and end at the same time points as the HE-LTF section of another subchannel. Also, the HE-LTF sections may start and end at the same time points across the Q subchannels (i.e., across all users or stations).

Referring to FIG. 10 again, the third 5-MHz subchannel is allocated to STA5 and one spatial stream is transmitted on the subchannel in SU-MIMO (considering all subchannels, a plurality of spatial streams are transmitted to STA1 to STA6 in MU-MIMO or OFDMA mode). In this case, although transmission of one HE-LTF is sufficient for the subchannel, as many HE-LTFs as the maximum of the numbers of HE-LTFs on the other subchannels, that is, four HE-LTFs are transmitted on the subchannel in order to align the starting points and ending points of the HE-LTF fields of the subchannels.

The fourth 5-MHz subchannel is allocated to STA6 and one spatial stream is transmitted on the subchannel in SU-MIMO (considering all other subchannels, a plurality of spatial streams are transmitted to STA1 to STA6 in MU-MIMO or OFDMA mode). In this case, although transmis-

US 9,532,187 B2

19

20

sion of one HE-LTF is sufficient for the subchannel, as many HE-LTFs as the maximum of the numbers of HE-LTFs on the other subchannels, that is, four HE-LTFs are transmitted on the subchannel in order to align the starting points and ending points of the HE-LTF fields of the subchannels.

In the example of FIG. 10, the remaining two HE-LTFs except two HE-LTFs required for channel estimation of STA3 and STA4 on the second subchannel, the remaining three HE-LTFs except one HE-LTF required for channel estimation of STA5 on the third subchannel, and the remaining three HE-LTFs except one HE-LTF required for channel estimation of STAG on the fourth subchannel may be said to be placeholders that are actually not used for channel estimation at the STAs.

FIG. 11 depicts a HE-SIG-B field and a HE-SIG-C field in the HE PPDU frame format according to the present invention.

To effectively support MU-MIMO-mode or OFDMA-mode transmission in the HE PPDU frame format according to the present invention, independent signaling information may be transmitted on each subchannel. Specifically, a different number of spatial streams may be transmitted to each of a plurality of HE STAs that receive an MU-MIMO-mode or OFDMA-mode transmission simultaneously. Therefore, information about the number of spatial streams to be transmitted should be indicated to each HE STA.

Information about the number of spatial streams on one channel may be included in, for example, a HE-SIG-A field. A HE-SIG-B field may include spatial stream allocation information about one subchannel. Also, a HE-SIG-C field may be transmitted after transmission of HE-LTFs, including MCS information about a PSDU and information about the length of the PSDU, etc.

With reference to the foregoing examples of the present invention, mainly the features of a HE PPDU frame structure applicable to a DL MU-MIMO-mode or OFDMA-mode transmission that an AP transmits simultaneously to a plurality of STAs have been described. Now, a description will be given of the features of a HE PPDU frame structure applicable to a UL MU-MIMO-mode or OFDMA-mode transmission that a plurality of STAs transmits simultaneously to an AP.

The above-described various examples of structures of the HE PPDU frame format supporting MU-MIMO-mode or OFDMA-mode transmission should not be understood as applicable only to DL without applicable UL. Rather, the examples should be understood as also applicable to UL. For example, the above-described exemplary HE PPDU frame formats may also be used for a UL HE PPDU transmission that a plurality of STAs simultaneously transmits to a single AP.

However, in the case of a DL MU-MIMO-mode or OFDMA-mode HE PPDU transmission that an AP simultaneously transmits to a plurality of STAs, the transmission entity, AP has knowledge of the number of spatial streams transmitted to a HE STA allocated to each of a plurality of subchannels. Therefore, the AP may include, in a HE-SIG-A field or a HE-SIG-B field, information about the total number of spatial streams transmitted across a channel, a maximum number of spatial streams (i.e., information being a basis of the number of HE-LTF elements (or the starting point and ending point of a HE-LTF section) on each subchannel), and the number of spatial streams transmitted on each subchannel. In contrast, in the case of a UL MU-MIMO-mode or OFDMA-mode HE PPDU transmission that a plurality of STAs simultaneously transmits to an AP, each STA being a transmission entity may be aware only

of the number of spatial streams in a HE PSDU that it will transmit, without knowledge of the number of spatial streams in a HE PSDU transmitted by another STA paired with the STA. Accordingly, the STA may determine neither the total number of spatial streams transmitted across a channel nor a maximum number of spatial streams.

To solve this problem, a common parameter (i.e., a parameter applied commonly to STAs) and an individual parameter (a separate parameter applied to an individual STA) may be configured as follows in relation to a UL HE PPDU transmission.

For simultaneous UL HE PPDU transmissions from a plurality of STAs to an AP, control may be designed in such a manner that the AP sets a common parameter or individual parameters (common/individual parameters) for the STAs for the UL HE PPDU transmissions and each STA operates according to the common/individual parameters. For example, the AP may transmit a trigger frame (or polling frame) for a UL MU-MIMO-mode or OFDMA-mode transmission to a plurality of STAs. The trigger frame may include a common parameter (e.g., the number of spatial streams across a channel or a maximum number of spatial streams) and individual parameters (e.g., the number of spatial streams allocated to each subchannel) for the UL MU-MIMO-mode or OFDMA-mode transmission. As a consequence, a HE PPDU frame format applicable to a UL MU-MIMO or OFDMA mode may be configured without a modification to an exemplary HE PPDU frame format applied to a DL MU-MIMO or OFDMA mode. For example, each STA may configure a HE PPDU frame format by including information about the number of spatial streams across a channel in a HE-SIG-A field, determining the number of HE-LTF elements (or the starting point and ending point of a HE-LTF section) on each subchannel according to the maximum number of spatial streams, and including information about the number of spatial streams for the individual STA in a HE-SIG-B field.

Alternatively, if the STAs operate always according to the common/individual parameters received in the trigger frame from the AP, each STA does not need to indicate the common/individual parameters to the AP during a HE PPDU transmission. Therefore, this information may not be included in a HE PPDU. For example, each STA may have only to determine the total number of spatial streams, the maximum number of spatial streams, and the number of spatial streams allocated to individual STA, as indicated by the AP, and configure a HE PPDU according to the determined numbers, without including information about the total number of spatial streams or the number of spatial streams allocated to the STA in the HE PPDU.

On the other hand, if the AP does not provide common/individual parameters in a trigger frame, for a UL MIMO-mode or OFDMA-mode HE PPDU transmission, the following operation may be performed.

Common transmission parameters (e.g., channel Band-Width (BW) information, etc.) for simultaneously transmitted HE PSDUs may be included in HE-SIG-A field, but parameters that may be different for individual STAs (e.g., the number of spatial streams, an MCS, and whether STBC is used or not, for each individual STA) may not be included in HE-SIG-A field. Although the individual parameters may be included in HE-SIG-B field, information about the number of spatial streams and information indicating whether STBC is used or not, need to be transmitted before a HE-LTF field because the number of spatial streams and the information indicating whether STBC is used or not are significant to determination of configuration information

ATLAS-00004287

Appx105

US 9,532,187 B2

21

about a preamble and a PSDU in a HE PPDU frame format (e.g., the number of HE-LTF elements is determined according to a combination of the number of spatial streams and the information indicating whether STBC is used or not). For this purpose, a HE PPDU frame format as illustrated in FIG. 12 may be used for a UL HE PPDU transmission.

FIG. 12 depicts another exemplary HE PPDU frame format according to the present invention. The HE PPDU frame format illustrated in FIG. 12 is characterized in that a structure of HE-SIG-A, HE-SIG-B, and HE-SIG-C fields similar to FIG. 10 is used for a UL PPDU transmission.

As described before, if a UL MU-MIMO-mode or OFDMA-mode transmission is performed by triggering of an AP (according to common/individual parameters provided by the AP), an individual STA may not need to report an individual parameter to the AP. In this case, one or more of a HE-SIG-B field, a HE-SIG-C field, and a first HE-LTF element (i.e., a HE-LTF between a HE-STF field and a HE-SIG-B field) illustrated in FIG. 12 may not exist. In this case, a description of each field given below may be understood that it is applied only in the presence of this field.

In the example of FIG. 12, a HE-SIG-A field is transmitted per channel (i.e., per 20-MHz channel) and may include transmission parameters common to simultaneously transmitted HE PSDUs. Since the same information is transmitted in up to HE-SIG-A fields in UL PPDUs transmitted by HE STAs allocated to subchannels, the AP may receive the same signals from the plurality of STAs successfully.

A HE-SIG-B field is transmitted per subchannel in one channel. The HE-SIG-B field may have an independent parameter value according to the transmission characteristics of a HE PSDU transmitted on each subchannel. The HE-SIG-B field may include spatial stream allocation information and information indicating whether STBC is used or not, for each subchannel. If MU-MIMO is applied to a subchannel (i.e., if a plurality of STAs perform transmission on a subchannel), the HE-SIG-B field may include a common parameter for the plurality of STAs paired on the subchannel.

A HE-SIG-C field is transmitted on the same subchannel as the HE-SIG-B field and may include information about an MCS and a packet length. If MU-MIMO is applied to a subchannel (i.e., if a plurality of STAs perform transmission on a subchannel), the HE-SIG-C field may include respective individual parameters for each of the plurality of STAs paired on the subchannel.

Similarly to DL MU-MIMO-mode or OFDMA-mode HE PPDU transmission, transmissions of PSDUs may start at different time points on subchannels in UL MU-MIMO-mode or OFDMA-mode HE PPDU transmission, and if OFDM symbols are not aligned accordingly, then the implementation complexity of an AP that receives a plurality of PSDUs increased. To solve this problem, 'the number of HE-LTFs may be determined for all subchannels according to the maximum of the numbers of HE LTFs required according to the total numbers of spatial streams transmitted on each subchannel for a set of HE STAs allocated to each of subchannels' as described with reference to the example of FIG. 10.

This feature may mean that the HE-LTF field start at the same time point and end at the same time point across all users (i.e., HE STAs) in UL MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that the HE-LTF sections of a plurality of subchannels have the same length across all HE STAs in UL MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that each of the HE-LTF sections of a plurality of subchannels includes the

22

same number of HE-LTF elements across all HE STAs in UL MU-MIMO-mode or OFDMA-mode transmission. Therefore, PSDU transmission timings are synchronized between a plurality of subchannels across all HE STAs in UL MU-MIMO-mode or OFDMA-mode transmission.

As described before with reference to FIG. 2, a block interleaver may interleave coded data bits. The interleaver performs 3-stage permutation. Adjacent coded bits are mapped to non-adjacent subcarriers by the first permutation. Adjacent coded bits are mapped alternately between less significant bits and more significant bits by the second permutation. Thus, long continuation of less reliable bits may be avoided. The third permutation corresponds to frequency rotation.

Now, a description will be given of an interleaving scheme or an interleaver which is applied to OFDM symbols in a HE PPDU frame format supporting MU-MIMO or OFDMA (i.e., MU transmission).

In the HE PPDU frame format, a DATA field (or a PSDU) may be transmitted independently on a subchannel. In this case, processes for PSDU transmission (e.g., encoding, interleaving, padding, modulation, etc. of a PSDU) may be performed independently on a subchannel basis. For example, if interleaving is independently applied to each subchannel, this means that a first interleaver may be used for a first subchannel, a second interleaver may be used for a second subchannel, the first and second subchannels may be different, and the first and second interleavers may be same or different. Independent PSDU processing on a subchannel basis means that PSDU processing for each subchannel is logically independent, which is said to facilitate description of PSDU processing from the viewpoint of one subchannel. This does not mean that a PSDU is not necessary processed individually or separately for each subchannel.

For example, in the case where the size of FFT applied to a PSDU of a HE PPDU frame transmitted on one channel (e.g., a 20-MHz channel bandwidth) is 256 (i.e., if 256-FFT is used for the PSDU), if a PSDU is transmitted on each of 16 subchannels of the channel, it may be said that 16-FFT is applied to a PSDU on one subchannel (i.e., one subchannel has up to 16 subcarrier or up to 16 tones). In other words, in the case where 256-FFT is used for a PSDU in a HE PPDU frame transmitted on one channel (e.g., a 20-MHz channel bandwidth), if a PSDU is transmitted on each of X subchannels having the same bandwidth in the channel, it may be said that 256/X-FFT is applied to a PSDU on one subchannel (i.e., one subchannel has up to 256/X subcarriers or up to 256/X tones). On the other hand, if 256-FFT is used for PSDU transmission for one destination STA on one channel which is not divided into subchannels, it may be said that the PSDU transmission has 256 subcarriers (or 256 tones) in one OFDM symbol.

First, parameters are defined, which are used in the following description of an interleaver applied to HE PPDU OFDM symbols supporting MU-MIMO or OFDMA according to the present invention.

$N_{CBPS}$ is the number of coded blocks per symbol.

$N_{SS}$ is the number of spatial streams.

$N_{CBPSS}$ is the number of coded bits per symbol per spatial stream.

$N_{CBPSSI}$ is the number of coded bits per symbol per spatial stream per interleaver block.

$N_{ROW}$ is the number of rows in a block interleaver.

$N_{COL}$ is the number of columns in the block interleaver.

$N_{SD}$ is the number of complex data per frequency segment.

ATLAS-00004288

**Appx106**

US 9,532,187 B2

**23**

$N_{ROT}$ is a parameter for frequency rotation.

$N_{BPSCS}$ is the number of coded bits per subcarrier per spatial stream.

Herein, a frequency segment may correspond to a sub-channel, a suband, or a frequency unit, as described in the present disclosure. While the following description is given mainly in the context of subchannel, the term subchannel may be replaced with subband, resource unit, or frequency segment.

While the following description is given on the assumption that one channel has a channel bandwidth of 20 MHz and uses 256-FFT and X subchannels of the channel have the same bandwidth (i.e., each subchannel has a bandwidth of 20/X MHz and uses 256/X FFT), this is purely exemplary, not limiting the scope of the present invention.

A Case with X=4

A description is given below of an embodiment of configurations of data, pilots, and guard subcarriers in regard to 64 subcarriers corresponding to one subchannel and an interleaver for data subcarriers according to the present

**24**

selected in such a manner that the capability of error recovery may be optimized when a specific bandwidth and frequency are used.

In the embodiment of the present invention, 5-MHz OFDM-MIMO transmission may be used. 64 orthogonal subcarriers are available within 5 MHz. In one aspect, 52 or more subcarriers (i.e., tones) out of the 64 available subcarriers may be used for data transmission, and the remaining tones may be used as pilot tones, a DC tone, and guard tones. In this manner, the value of $N_{COL}$ corresponding to the interleaver depth may be optimized for 52 or more data tones according to various implementation schemes. For example, the interleaver depth, $N_{COL}$ may be selected, which is a factor of the number of data tones (i.e. 52 or larger). The interleaver depth $N_{COL}$ may be selected, which enables a receiver to recover a message on the 52 or more data tones with a highest frequency diversity.

[Table 3] below lists exemplary interleaver depths $N_{COL}$ and numbers of rows $N_{ROW}$ as exemplary parameters of the present invention.

TABLE 3

| Parameter | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 | Option 6 |
|---|---|---|---|---|---|---|
| $N_{SD}$ | 52 | 54 | 55 | 56 | 56 | 57 |
| $N_{COL}$ | 13 | 9 | 11 | 8 | 14 | 19 |
| $N_{ROW}$ | $4 \times N_{BPSCS}$ ($i_{rs}$) | $6 \times N_{BPSCS}$ ($i_{rs}$) | $5 \times N_{BPSCS}$ ($i_{rs}$) | $7 \times N_{BPSCS}$ ($i_{rs}$) | $4 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) |
| $N_{ROT}$ ($N_{ss} \leq 4$) | 11 | 11 | 11 | 11 | 11 | 11 |
| $N_{ROT}$ ($N_{ss} > 4$) | 6 | 6 | 6 | 6 | 6 | 6 |

| Parameter | Option 7 | Option 8 | Option 9 | Option 10 | Option 11 | Option 12 |
|---|---|---|---|---|---|---|
| $N_{SD}$ | 58 | 60 | 60 | 60 | 60 | 60 |
| $N_{COL}$ | 29 | 30 | 20 | 15 | 12 | 11 |
| $N_{ROW}$ | $2 \times N_{BPSCS}$ ($i_{rs}$) | $2 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) | $4 \times N_{BPSCS}$ ($i_{rs}$) | $5 \times N_{BPSCS}$ ($i_{rs}$) | $6 \times N_{BPSCS}$ ($i_{rs}$) |
| $N_{ROT}$ ($N_{ss} \leq 4$) | 11 | 11 | 11 | 11 | 11 | 11 |
| $N_{ROT}$ ($N_{ss} > 4$) | 6 | 6 | 6 | 6 | 6 | 6 |

| Parameter | Option 13 | Option 14 | Option 15 | Option 16 | Option 17 | Option 18 |
|---|---|---|---|---|---|---|
| $N_{SD}$ | 62 | 48 | 48 | 48 | 48 | 48 |
| $N_{COL}$ | 31 | 16 | 16 | 16 | 16 | 16 |
| $N_{ROW}$ | $2 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) | $3 \times N_{BPSCS}$ ($i_{rs}$) |
| $N_{ROT}$ ($N_{ss} \leq 4$) | 11 | 10 | 11 | 12 | 13 | 14 |
| $N_{ROT}$ ($N_{ss} > 4$) | 6 | 4, 5, 6, 7, or 8 | 4, 5, 6, 7, or 8 | 4, 5, 6, 7, or 8 | 4, 5, 6, 7, or 8 | 4, 5, 6, 7, or 8 |

invention, when PSDU transmission is performed independently on four subchannels of one channel.

In a 5-MHz HE PPDU transmission on one subchannel, bits output from a stream parser may be processed on a group basis and each group includes $N_{CBPS}$ bits. Each group may be divided into $N_{SS}$ blocks ($N_{SS}$ may be set to separate values for subchannels, and values of $N_{SS}$ may be equal or different in subchannels) each including $N_{CBPSS}$ bits. Each block may be interleaved in the following manner.

An interleaver may be configured to perform frequency interleaving. The stream parser may output blocks each including $N_{CBPSSI}$ bits. Each block may be interleaved by writing the block by rows and reading out the block by columns (i.e., $N_{CBPSSI}$ bits are written row by row in a block interleaver (i.e., if all elements of one row are filled with bits, the next row is taken) and read out column by column in the block interleaver (i.e., if all elements of one column are read out, the next column is taken)). The depth of the interleaver, that is, the number of columns, $N_{COL}$ may be

Although Option 2, Option 5, and Option 10 are preferred among the candidate options listed in [Table 3], other options may also be used as alternatives in consideration of implementation complexity or a propagation property.

According to the present invention, interleaving may be defined by three permutations.

The first permutation of the interleaver may be expressed as the following [Equation 1].

$$i = N_{ROW}(k \bmod N_{COL}) + \left\lfloor \frac{k}{N_{COL}} \right\rfloor, \qquad \text{[Equation 1]}$$
$$k = 0, 1, \dots, N_{CBPSSI} - 1$$

In [Equation 1], k is the index of a coded bit before the first permutation, and i is the index of the coded bit after the first permutation before the second permutation. In addition, mod represents a modulo operation of calculating the

US 9,532,187 B2

**25**

remainder of dividing A by B. ⌊ ⌋ is a floor operation and ⌊x⌋ represents a largest integer that does not exceed x (i.e., a largest integer equal to or less than x).

The second permutation of the interleaver is given by the following [Equation 2].

$$j = s \left\lfloor \frac{i}{s} \right\rfloor + \left( i + N_{CBPSSI} - \left\lfloor \frac{N_{COL} \cdot i}{N_{CBPSSI}} \right\rfloor \right) \text{mod} s \qquad \text{[Equation 2]}$$

$$i = 0, 1, \ldots, N_{CBPSSI} - 1$$

$$s = \max\left\{ 1, \frac{N_{BPSCS}}{2} \right\}$$

In [Equation 2], j is the index of the coded bit after the second permutation, s is the number of bits allocated to a constellation point of a spatial stream on one axis (i.e., a real number axis or an imaginary number axis), and max {A,B} represents the larger between A and B.

Frequency rotation may be applied to the output of the second permutation (i.e., j). The frequency rotation may be referred to as the third permutation of the interleaver. After the third permutation, the coded bit may be indexed with r.

If $N_{SS}=1$, $r=j$.

If $2 \leq N_{SS} \leq 4$, the output of the second permutation may be subjected to frequency rotation given by [Equation 3]

$$r = \left\{ j - \left[ (2i_{SS} - 1)\text{mod}4 + 3 \left\lfloor \frac{i_{SS} - 1}{3} \right\rfloor \right] \cdot N_{ROT} \cdot N_{BPSCS} \right\} \qquad \text{[Equation 3]}$$

$$\text{mod} N_{CBPSSI}.$$

$$j = 0, 1, \ldots, N_{CBPSSI} - 1$$

$$i_{SS} = 1, 2, \ldots, N_{SS}$$

In [Equation 3], $i_{SS}$ is the index of a spatial stream on which the interleaver operates.

If $N_{SS}>4$, frequency rotation described by [Equation 4] may be performed on the output of the second permutation.

$$r = [j - J(i_{SS}) \cdot N_{ROT} \cdot N_{BPSCS}] \mod N_{CBPSSI}, \quad j=0, 1, \ldots, N_{CBPSSI}-1 \; i_{SS}=1, 2, \ldots, N_{SS} \qquad \text{[Equation 4]}$$

In [Equation 4], $J(i_{SS})$ is an integer defined in [Table 4].

TABLE 4

| $i_{ss}$ | $J(i_{ss})$ |
|---|---|
| 1 | 0 |
| 2 | 5 |
| 3 | 2 |
| 4 | 7 |
| 5 | 3 |
| 6 | 6 |
| 7 | 1 |
| 8 | 4 |

Meanwhile, a deinterleaver performs inverse permutation by the following three operations. The characteristics (or parameters) of the interleaver may be applied as the characteristics (or parameters) of the deinterleaver. To describe a deinterleaving operation, it is assumed that the index of a bit of a received block (per spatial stream) is r.

The first operation of the deinterleaver corresponds to the reverse operation of the third permutation (i.e., frequency rotation) performed in the interleaver.

**26**

If $N_{SS}=1$, the reverse operation may be performed as described by [Equation 5].

$$j = r \; (r=0, 1, \ldots, N_{CBPSSI}-1) \qquad \text{[Equation 5]}$$

If $2 \leq N_{SS} \leq 4$, the reverse operation may be performed as described by [Equation 6].

$$j = \left\{ r + \left[ (2i_{SS} - 1)\text{mod}3 + 3 \left\lfloor \frac{i_{SS} - 1}{3} \right\rfloor \right] \cdot N_{ROT} \cdot N_{BPSCS} \right\} \qquad \text{[Equation 6]}$$

$$\text{mod} N_{CBPSSI}.$$

$$r = 0, 1, \ldots, N_{CBPSSI} - 1$$

If $N_{SS}>4$, the reverse operation may be performed as described by [Equation 7].

$$j = \{r + J(i_{SS}) \cdot N_{ROT} \cdot N_{BPSCS}\} \mod N_{CBPSSI}, \quad r=0, 1, \ldots, N_{CBPSSI}-1 \qquad \text{[Equation 7]}$$

In [Equation 7], $J(i_{SS})$ is an integer as defined in [Table 4].

In this manner, the output of the first operation in the deinterleaver may be indexed with j.

The second operation of the deinterleaver may be expressed as [Equation 8].

$$i = s \left\lfloor \frac{j}{s} \right\rfloor + \left( j + \left\lfloor \frac{N_{COL} \cdot j}{N_{CBPSSI}} \right\rfloor \right) \text{mod} s \qquad \text{[Equation 8]}$$

$$j = 0, 1, \ldots, N_{CBPSSI} - 1$$

$$s = \max\left\{ 1, \frac{N_{BPSCS}}{2} \right\}$$

The output of the second operation in the deinterleaver may be indexed with i in this manner.

The third operation of the deinterleaver may be expressed as [Equation 9].

$$k = N_{COL} \cdot i - (N_{CBPSSI} - 1) \left\lfloor \frac{i}{N_{ROW}} \right\rfloor. \qquad \text{[Equation 9]}$$

$$i = 0, 1, \ldots, N_{CBPSSI} - 1$$

The output of the third operation in the deinterleaver may be indexed with k in this manner, corresponding to the index k of the coded bit before the first permutation in the interleaver.

A Case with X=8

A description is given below of an embodiment of configurations of data, pilots, and guard subcarriers in regard to 32 subcarriers corresponding to one subchannel and an interleaver for data subcarriers according to the present invention, when PSDU transmission is performed independently on eight subchannels of one channel.

In a 2.5-MHz HE PPDU transmission on one subchannel, bits output from the stream parser may be processed on a group basis and each group includes $N_{CBPS}$ bits. Each group may be divided into $N_{SS}$ blocks ($N_{SS}$ may be set to separate values for subchannels, and values of $N_{SS}$ may be equal or different in subchannels) each including $N_{CBPSS}$ bits. Each block may be interleaved in the following manner.

The interleaver may be configured to perform frequency interleaving. The stream parser may output blocks each including $N_{CBPSSI}$ bits. Each block may be interleaved by writing the block row by row and reading out the block column by column. The depth of the interleaver, that is, the

ATLAS-00004290

US 9,532,187 B2

27 28

number of columns, $N_{COL}$ may be selected in such a manner that the capability of error recovery may be optimized when a specific bandwidth and frequency are used.

In the embodiment of the present invention, 2.5-MHz OFDM-MIMO transmission may be used. 32 orthogonal subcarriers are available within 2.5 MHz. In one aspect, 24 or more subcarriers (i.e., tones) out of the 32 available subcarriers may be used for data transmission, and the remaining tones may be used as pilot tones, a DC tone, and guard tones. In this manner, the value of $N_{COL}$ corresponding to the interleaver depth may be optimized for 24 or more data tones according to various implementation schemes. For example, the interleaver depth, $N_{COL}$ may be selected, which is a factor of the number of data tones (i.e. 24 or larger). The interleaver depth $N_{COL}$ may be selected, which enables a receiver to recover a message on the 24 or more data tones with a highest frequency diversity.

[Table 5] below lists exemplary interleaver depths $N_{COL}$ and numbers of rows $N_{ROW}$ as exemplary parameters of the present invention.

Under the above assumption, the block interleaver illustrated in FIG. 13 may perform the first interleaving on $N_{CBPSSI}$ bits output from the stream parser. For example, index i corresponding to index k may be achieved as listed in [Table 6] below on the assumption that $N_{CBPSSI}$=24, $N_{ROW}$=3, and $N_{COL}$=8 in [Equation 1].

TABLE 6

| k | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|----|----|
| i | 0 | 3 | 6 | 9 | 12 | 15 | 18 | 21 | 1 | 4 | 7 | 10 |
| k | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| i | 13 | 16 | 19 | 22 | 2 | 5 | 8 | 11 | 14 | 17 | 20 | 23 |

The value of j resulting from the second interleaving of the value of i calculated by [Equation 1] may be calculated by [Equation 2]. In [Equation 2], $N_{BPSCS}$ is 1 in the case of BPSK. Accordingly, index j corresponding to index i may be obtained as listed in [Table 7].

TABLE 5

| Parameter | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 | Option 6 |
|---|---|---|---|---|---|---|
| $N_{SD}$ | 24 | 25 | 26 | 27 | 28 | 28 |
| $N_{COL}$ | 8 | 5 | 13 | 9 | 7 | 14 |
| $N_{ROW}$ | 3 × $N_{BPSCS}$ ($i_{ss}$) | 5 × $N_{BPSCS}$ ($i_{ss}$) | 2 × $N_{BPSCS}$ ($i_{ss}$) | 3 × $N_{BPSCS}$ ($i_{ss}$) | 4 × $N_{BPSCS}$ ($i_{ss}$) | 2 × $N_{BPSCS}$ ($i_{ss}$) |
| $N_{ROT}$ ($N_{ss}$ <= 4) | 4 or 5 | 4 or 5 | 4 or 5 | 4 or 5 | 4 or 5 | 4 or 5 |
| $N_{ROT}$ ($N_{ss}$ > 4) | 2 | 2 | 2 | 2 | 2 | 2 |

| Parameter | Option 7 | Option 8 | Option 9 | Option 10 |
|---|---|---|---|---|
| $N_{SD}$ | 24 | 24 | 24 | 24 |
| $N_{COL}$ | 8 | 8 | 8 | 8 |
| $N_{ROW}$ | 3 × $N_{BPSCS}$ ($i_{ss}$) | 3 × $N_{BPSCS}$ ($i_{ss}$) | 3 × $N_{BPSCS}$ ($i_{ss}$) | 3 × $N_{BPSCS}$ ($i_{ss}$) |
| $N_{ROT}$ ($N_{ss}$ <= 4) | 5 | 6 | 7 | 8 |
| $N_{ROT}$ ($N_{ss}$ > 4) | 3 or 4 | 2, 3, 4 | 2, 3, 4 | 2, 3, or 4 |

Although Option 3, Option 5, and Option 6 are preferred among the candidate options listed in [Table 5], other options may also be used as alternatives in consideration of implementation complexity or a propagation property. A transmitter may perform interleaving by [Equation 1] to [Equation 4] and a receiver may deinterleave a received interleaved signal by [Equation 5] to [Equation 9], based on the parameter values of one of the candidate options listed in [Table 5].

FIG. 13 depicts exemplary interleaving of a HE PPDU OFDM symbol according to the present invention.

For example, $N_{SD}$=24 in Option 1 of [Table 5] means that 24 out of 32 available subcarriers are used for complex data. Therefore, the remaining eight subcarriers may be used as pilot tones, a DC tone, and guard tones. For example, there may be two pilot tones. In this case, a resource unit has 26 tones with two pilots.

$N_{BPSCS}$($i_{ss}$) may be determined according to an MCS and may be 1, 2, 4, 6, and 8, respectively for Binary Phase Shift Keying (BPSK), Quadrature PSK (QPSK), 16-ary Quadrature Amplitude Modulation (16 QAM), 64 QAM, and 256 QAM. If BPSK is used, $N_{BPSCS}$($i_{ss}$) is 1. Then the number of rows in the block interleaver is 3 ($N_{ROW}$=3×1). Therefore, the block interleaver may have 8 columns ($N_{COL}$=8) and 3 rows. If the number of spatial streams is 1, $N_{ROT}$ may be, for example, 4.

TABLE 7

| i | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|----|----|
| j | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| i | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| j | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |

The value of r resulting from the third interleaving (permutation) of the value of j calculated by [Equation 2] may be calculated by [Equation 3]. For $N_{ROT}$=4 and $i_{ss}$=1 In [Equation 3], index r corresponding to index j may be obtained as listed in [Table 8].

TABLE 8

| i | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|----|----|
| r | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| j | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| r | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |

Referring to [Table 6], [Table 7], and [Table 8], for example, a k value of 17 is mapped to an i value of 5, the i value of 5 is mapped to a j value of 5, and the j value of 5 is mapped to an r value of 5. Eventually, the k value of 17 is mapped to the r value of 5. An 18th input bit (i.e., k17) is output as 6th output bit by sequence permutation in FIG. 1.

JX002.00031

US 9,532,187 B2

29

A Case with X=16

A description is given below of an embodiment of configurations of data, pilots, and guard subcarriers in regard to 16 subcarriers corresponding to one subchannel and an interleaver for data subcarriers according to the present invention, when PSDU transmission is performed independently on 16 subchannels of one channel.

In a 1.25-MHz HE PPDU transmission on one subchannel, bits output from the stream parser may be processed on a group basis and each group includes $N_{CBPS}$ bits. Each group may be divided into $N_{SS}$ blocks ($N_{SS}$ may be set to separate values for subchannels, and values of $N_{SS}$ may be equal or different in subchannels) each including $N_{CBPSS}$ bits. Each block may be interleaved in the following manner.

The interleaver may be configured to perform frequency interleaving. The stream parser may output blocks each including $N_{CBPSS}$ bits. Each block may be interleaved by writing the block row by row and reading out the block column by column. The depth of the interleaver, that is, the number of columns, $N_{COL}$ may be selected in such a manner that the capability of error recovery may be optimized when a specific bandwidth and frequency are used.

In the embodiment of the present invention, 1.25-MHz OFDM-MIMO transmission may be used. 16 orthogonal subcarriers are available within 1.25 MHz. In one aspect, 10 or more subcarriers (i.e., tones) out of the 16 available subcarriers may be used for data transmission, and the remaining tones may be used as pilot tones, a DC tone, and guard tones. In this manner, the value of $N_{COL}$ corresponding to the interleaver depth may be optimized for 10 or more data tones according to various implementation schemes. For example, the interleaver depth, $N_{COL}$ may be selected, which is a factor of the number of data tones (i.e. 10 or larger). The interleaver depth $N_{COL}$ may be selected, which enables a receiver to recover a message on the 10 or more data tones with a highest frequency diversity.

[Table 9] below lists exemplary interleaver depths $N_{COL}$ and numbers of rows $N_{ROW}$ as exemplary parameters of the present invention.

TABLE 9

| Parameter | Option 1 | Option 2 | Option 3 |
|---|---|---|---|
| $N_{SD}$ | 10 | 12 | 12 |
| $N_{COL}$ | 5 | 4 | 6 |
| $N_{ROW}$ | $2 \times N_{BPSCS}$ ($i_{ss}$) | $3 \times N_{BPSCS}$ ($i_{ss}$) | $2 \times N_{BPSCS}$ ($i_{ss}$) |
| $(N_{ss} \leq 4)$ | 2 or 3 | 2 or 3 | 2 or 3 |
| $N_{ROT}$ | 1 | 1 | 1 |
| $(N_{ss} > 4)$ | | | |

Although Option 2 and Option 3 are preferred among the candidate options listed in [Table 9], other options may also be used as alternatives in consideration of implementation complexity or a propagation property. A transmitter may perform interleaving by [Equation 1] to [Equation 4] and a receiver may deinterleave a received interleaved signal by [Equation 5] to [Equation 9], based on the parameter values of one of the candidate options listed in [Table 9].

A Case with X=1

A description is given below of an embodiment of configurations of data, pilots, and guard subcarriers in regard to 256 subcarriers corresponding to one subchannel and an interleaver for data subcarriers according to the present invention, when PSDU transmission is performed independently on one subchannel of one channel.

30

In a 20-MHz HE PPDU transmission on one subchannel, bits output from the stream parser may be processed on a group basis and each group includes $N_{CBPS}$ bits. Each group may be divided into $N_{SS}$ blocks ($N_{SS}$ may be set to separate values for subchannels, and values of $N_{SS}$ may be equal or different in subchannels) each including $N_{CBPSS}$ bits. Each block may be interleaved in the following manner.

The interleaver may be configured to perform frequency interleaving. The stream parser may output blocks each including $N_{CBPSS}$ bits. Each block may be interleaved by writing the block row by row and reading out the block column by column. The depth of the interleaver, that is, the number of columns, $N_{COL}$ may be selected in such a manner that the capability of error recovery may be optimized when a specific bandwidth and frequency are used.

In the embodiment of the present invention, 20-MHz OFDM-MIMO transmission may be used. 256 orthogonal subcarriers are available within 20 MHz. In one aspect, 234 or more subcarriers (i.e., tones) out of the 256 available subcarriers may be used for data transmission, and the remaining tones may be used as pilot tones, a DC tone, and guard tones. In this manner, the value of $N_{COL}$ corresponding to the interleaver depth may be optimized for 234 or more data tones according to various implementation schemes. For example, the interleaver depth, $N_{COL}$ may be selected, which is a factor of the number of data tones (i.e. 234 or larger). The interleaver depth $N_{COL}$ may be selected, which enables a receiver to recover a message on the 234 or more data tones with a highest frequency diversity.

[Table 10] below lists exemplary interleaver depths $N_{COL}$ and numbers of rows $N_{ROW}$ as exemplary parameters of the present invention.

TABLE 10

| Parameter | |
|---|---|
| $N_{SD}$ | 234 |
| $N_{COL}$ | 26 |
| $N_{ROW}$ | $9 \times N_{BPSCS}$ ($i_{ss}$) |
| $N_{ROT}$ ($N_{ss} \leq 4$) | 58 |
| $N_{ROT}$ ($N_{ss} > 4$) | 28 |

A transmitter may perform interleaving by [Equation 1] to [Equation 4] and a receiver may deinterleave a received interleaved signal by [Equation 5] to [Equation 9], based on the parameter values of one of the candidate option in [Table 10].

A Case with X=2

A description is given below of an embodiment of configurations of data, pilots, and guard subcarriers in regard to 128 subcarriers corresponding to one subchannel and an interleaver for data subcarriers according to the present invention, when PSDU transmission is performed independently on two subchannels of one channel.

In a 10-MHz HE PPDU transmission on one subchannel, bits output from the stream parser may be processed on a group basis and each group includes $N_{CBPS}$ bits. Each group may be divided into $N_{SS}$ blocks ($N_{SS}$ may be set to separate values for subchannels, and values of $N_{SS}$ may be equal or different in subchannels) each including $N_{CBPSS}$ bits. Each block may be interleaved in the following manner.

The interleaver may be configured to perform frequency interleaving. The stream parser may output blocks each including $N_{CBPSS}$ bits. Each block may be interleaved by writing the block row by row and reading out the block

ATLAS-00004292

Appx110

US 9,532,187 B2

31                                                          32

column by column. The depth of the interleaver, that is, the number of columns, $N_{COL}$ may be selected in such a manner that the capability of error recovery may be optimized when a specific bandwidth and frequency are used.

In the embodiment of the present invention, 10-MHz OFDM-MIMO transmission may be used. 128 orthogonal subcarriers are available within 10 MHz. In one aspect, 102 or more subcarriers (i.e., tones) out of the 128 available subcarriers may be used for data transmission, and the remaining tones may be used as pilot tones, a DC tone, and guard tones. In this manner, the value of $N_{COL}$ corresponding to the interleaver depth may be optimized for 102 or more data tones according to various implementation schemes. For example, the interleaver depth, $N_{COL}$ may be selected, which is a factor of the number of data tones (i.e. 102 or larger). The interleaver depth $N_{COL}$ may be selected, which enables a receiver to recover a message on the 102 or more data tones with a highest frequency diversity.

[Table 11] below lists exemplary interleaver depths $N_{COL}$ and numbers of rows $N_{ROW}$ as exemplary parameters of the present invention.

TABLE 11

| Parameter | |
|---|---|
| $N_{SD}$ | 102 |
| $N_{COL}$ | 17 |
| $N_{ROW}$ | $6 \times N_{BPSCS} (i_{ss})$ |
| $N_{ROT}$ ($N_{ss} \leq 4$) | 23, 24, 25, 26, or 27 |
| $N_{ROT}$ ($N_{ss} > 4$) | 10, 11, 12, 13, or 14 |

A transmitter may perform interleaving by [Equation 1] to [Equation 4] and a receiver may deinterleave a received interleaved signal by [Equation 5] to [Equation 9], based on one of the parameters of the candidate option listed in [Table 11].

While the foregoing examples have been described on the assumption that one channel has a channel bandwidth of 20 MHz and uses 256-FFT and X subchannels of one channel have the same bandwidth, the channel bandwidth of one channel may not be limited to 20 MHz and the subchannels may have different bandwidths. For example, a subchannel may have one of 1.25 MHz, 2.5 MHz, 5 MHz, 10 MHz, 20 MHz, 40 MHz, and 80 MHz. For example, a plurality of subchannels allocated within one transmission channel (e.g., having a 20-MHz channel bandwidth) may have a first bandwidth (narrower than the bandwidth of the transmission channel), a second bandwidth (narrower than the first bandwidth), and a third bandwidth (narrower than the second bandwidth).

For example, if subchannels are allocated to 4 STAs using 256-FFT on a channel having a channel bandwidth of 20 MHz (i.e., if an AP transmits a DL PSDU to each of four STAs on a subchannel allocated to the STA or each of four STAs transmits a UL PSDU to the AP on a subchannel allocated to the STA), the subchannels allocated to the four respective STAs may have different bandwidths, for example, 2.5 MHz, 2.5 MHz, 5 MHz, ad 10 MHz. In this manner, a PSDU may be transmitted on a subchannel having a different bandwidth in a HE PPDU. To support this, different interleaver depths $N_{COL}$ and different values of $N_{ROW}$ (or interleavers) may be used independently) may be used for PSDUs on the respective channels.

For example, an interleaver defined according to the parameter characteristics of Option 1 in [Table 5] may be

used for a PSDU transmitted on a 2.5-MHz subchannel and an interleaver defined according to the parameter characteristics listed in [Table 11] may be used for a PSDU transmitted on a 10-MHz subchannel in the example of the present invention.

According to the present invention, different interleaver characteristics may be applied to different subchannels on which a plurality of PSDUs are transmitted simultaneously (or to different PSDUs), as described above. Particularly, if different subchannels carrying different PSDUs at the same time have different bandwidths, interleavers defined for transmission or reception of PSDUs on the subchannels may have different characteristics. That is, independent interleaving for each subchannel means that a first interleaver may be used for a first subchannel, a second interleaver may be used for a second subchannel, the first and second subchannels may be different, and the first and second interleavers may be same or different. If the first and second subchannels have the same bandwidth, the first and second interleavers may have the same characteristics (or the same parameters (e.g., the first and second interleavers may have the same interleaver depth $N_{COL}$ and the same value of $N_{ROW}$). If the first and second subchannels have different bandwidths, the first and second interleavers may have different characteristics (or different parameters (e.g., the first and second interleavers may have different interleaver depths $N_{COL}$ and different values of $N_{ROW}$).

In a DL MU-MIMO or OFDMA transmission based on a HE PPDU frame format, subchannels carrying PSDUs to a plurality of STAs may have different bandwidths, and interleaver characteristics (e.g., combinations of parameters related to interleaving schemes) that the AP applies to the PSDUs (or PSDU OFDM symbols) on the respective subchannels may be determined the characteristics of the subchannels (e.g., the bandwidths or sizes of the subchannels or $N_{SD}$ values of the subchannels (i.e., the numbers of complex data per frequency segment (or subchannel)). Upon receipt of this DL MU-MIMO or OFDMA data, each STA may deinterleave the received data in an interleaver scheme determined according to the characteristics of a subchannel allocated to the STA.

In a UL MU-MIMO or OFDMA transmission based on a HE PPDU frame format, subchannels carrying PSDUs from a plurality of STAs may have different bandwidths, and interleaver characteristics (e.g., combinations of parameters related to interleaving schemes) that each STA applies to a PSDU (or PSDU OFDM symbols) on a subchannel allocated to the STA may be determined the characteristics of the subchannel (e.g., the bandwidth or size of the subchannel, or an $N_{SD}$ value of the subchannel (i.e., the number of complex data per frequency segment)). Upon receipt of this UL MU-MIMO or OFDMA data, the AP may deinterleave the received data in an interleaver scheme determined according to the characteristics of the subchannel carrying a PSDU from each STA.

FIG. 14 is a flowchart illustrating an exemplary method according to the present invention.

In FIG. 14, AP may transmit a PPDU to a plurality of STAs through a transmission channel, the PPDU including a plurality of data units for the plurality of STAs, the transmission channel being divided into a plurality of subchannels which are allocated to the plurality of STAs respectively. The plurality of subchannels may correspond to a plurality of OFDMA RUs. The transmission channel may be a 20 MHz channel, a 40 MHz channel, a 80 MHz channel, or a 160 MHz channel.

US 9,532,187 B2

33

In step S1405, an AP may interleave data units for STAs based on characteristics of subchannels allocated to the STAs to generate interleaved data units. The AP may interleave the plurality of data units based on a plurality of subchannel sizes respectively corresponding to the plurality of subchannels. The AP may interleave the plurality of data units based on a plurality of interleaving parameter value combinations respectively depending on the plurality of subchannel sizes.

[Table 12] below lists below lists exemplary interleaving parameter value combinations depending on subchannel sizes.

TABLE 12

| RU size (tones) | 26 | 52 | 106 | 242 |
|---|---|---|---|---|
| $N_{COL}$ | 8 | 16 | 17 | 58 ($N_{SS} \le 4$) |
| $N_{ROT}$ | 2 ($N_{SS} \le 4$) | 11 ($N_{SS} \le 4$) | 29 ($N_{SS} \le 4$) | 58 ($N_{SS} \le 4$) |

In [Table 12], a subchannel size is expressed as an RU size, and the RU size is expressed as a number of tone allocated to the RU. The number of tones includes a number of data tones and a number of pilot tones.

As shown in [Table 12], for a subchannel size corresponding to 26 tones, an interleaving parameter value combination of $N_{COL}=8$ and $N_{ROT}=2$ ($N_{SS} \le 4$) may be used. For a subchannel size corresponding to 52 tones, an interleaving parameter value combination of $N_{COL}=16$ and $N_{ROT}=11$ ($N_{SS} \le 4$) may be used. For a subchannel size corresponding to 106 tones, an interleaving parameter value combination of $N_{COL}=17$ and $N_{ROT}=29$ ($N_{SS} \le 4$) may be used. For a subchannel size corresponding to 242 tones, an interleaving parameter value combination of $N_{COL}=26$ and $N_{ROT}=58$ ($N_{SS} \le 4$) may be used.

As described above, when a first subchannel size differs from a second subchannel size, an interleaving parameter value combination for the first subchannel size differs from an interleaving parameter value combination for the second subchannel size. Specifically, when a first subchannel size differs from a second subchannel size. $N_{COL}$ for the first subchannel size differs from $N_{COL}$ for the second subchannel, and $N_{ROT}$ for the first subchannel differs from $N_{ROT}$ for the first subchannel.

A subchannel size for a STA may be 26 tones, 52 tones, 106 tones, or 242 tones, and an interleaving parameter value combination for 26 tones, an interleaving parameter value combination for 52 tones, an interleaving parameter value combination for 106 tones and an interleaving parameter value combination 242 tones differ from one another.

In step S1410, the AP may generate a HE PPDU frame including interleaved data units (e.g., PSDUs) to be transmitted to a plurality of STAs on the subchannels. Data for the plurality of STAs may be transmitted on different subchannels, and different interleavers may be applied to the data on the respective subchannels (e.g., a first interleaver may be applied to a first subchannel and second interleaver may be applied to a second subchannel).

In step S1420, the AP may transmit the HE PPDU frame to the plurality of STAs through the transmission channel.

In step S1430, a first STA may receive a data unit directed to the first STA from a subchannel for the first STA in the HE PPDU including data units for the plurality of STAs on the subchannels.

In step S1440, the first STA may deinterleave the received data unit based on the characteristic of the subchannel allocated to the first STA. The first STA deinterleaves the

34

data unit for the first STA based on a subchannel size corresponding to the subchannel allocated to the first STA. The first STA deinterleaves the data unit for the first STA based on an interleaving parameter value combination depending on the subchannel size.

While an interleaver used for a DL HE PPDU by an AP and a deinterleaver used by an STA receiving the DL HE PPDU have been described in the example of FIG. 14, the scope of the present invention is not limited thereto. Rather, the present invention also includes an interleaver used for data transmitted on a subchannel allocated to each STA by the STA and a deinterleaver used for data received on each subchannel by an AP, in the case where a plurality of STAs transmit a HE PPDU including PSDUs transmitted from the STAs on a plurality of subchannels in UL MU-MIMO or OFDMA.

While the exemplary method has been described with reference to FIG. 14 as a series of operations for simplicity of description, this does not limit the sequence of steps. When needed, steps may be performed at the same time or in a different sequence. All of the exemplary steps are not always necessary to implement the method according to the present invention.

The foregoing embodiments of the present invention may be implemented independently or one or more of the embodiments may be implemented simultaneously, for the method of FIG. 14.

The present invention includes an apparatus for processing or performing the method according to the present invention (e.g., the wireless device and its components described with reference to FIGS. 1, 2, and 3).

The present invention includes software (an operating system (OS), an application, firmware, a program, etc.) for executing the method according to the present invention in a device or a computer, and a medium storing the software that can be executed in a device or a computer.

While various embodiments of the present invention have been described in the context of an IEEE 802.11 system, they are applicable to various mobile communication systems.

What is claimed is:

1. A method for transmitting data to a plurality of Stations (STAs) through a transmission channel by an Access Point (AP) in a Wireless Local Area Network (WLAN) system, wherein the transmission channel is divided into a plurality of resource units which are allocated to the plurality of STAs respectively, the method comprising:

interleaving a plurality of data units for the plurality of STAs based on sizes of the plurality of resource units allocated to the plurality of STAs to generate a plurality of interleaved data units; and

transmitting, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including the plurality of interleaved data units respectively on the plurality of resource units to the plurality of STAs,

wherein a set of sizes available to a resource unit allocated to a first STA among the plurality of STAs includes a first size and a second size,

wherein the interleaving of the plurality of data units for the plurality of STAs comprises:

when the size of the resource unit allocated to the first STA is the first size, interleaving a data unit for the first STA using a first set of interleaving parameter values; and

US 9,532,187 B2

35

when the size of the resource unit allocated to the first STA is the second size, interleaving the data unit for the first STA using a second set of interleaving parameter values, and

wherein the first size is smaller than a size of the transmission channel, the second size is smaller than the first size, and the second set of interleaving parameter values is different from the first set of interleaving parameter value.

2. The method according to claim 1, wherein a size of each of the plurality of resource units corresponds to a number of tones allocated to said each of the plurality of resource units.

3. The method according to claim 2, wherein the number of tones allocated to said each of the plurality of resource units includes a number of tones used for complex data and a number of tones used for pilot in said each of the plurality of resource units.

4. The method according to claim 1, wherein the set of sizes available to the resource unit allocated to the first STA among the plurality of STAs further includes a third size,

wherein the interleaving of the plurality of data units for the plurality of STAs further comprises:

when the size of the resource unit allocated to the first STA is the third size, interleaving the data unit for the first STA using a third set of interleaving parameter values, and

wherein the third size is smaller than the second size, and the third set of interleaving parameter values is different from the second set of interleaving parameter values.

5. The method according to claim 1, wherein an interleaver depth for the first set of interleaving parameter values is different from an interleaver depth for the second set of interleaving parameter values.

6. The method according to claim 1, wherein each of the first set of interleaving parameter values and the second set of interleaving parameter values includes the number $N_{COL}$ of columns in a block interleaver, the number $N_{ROW}$ of rows in the block interleaver, and a frequency rotation parameter $N_{ROT}$.

7. The method according to claim 1, wherein the interleaving of the plurality of data units for the plurality of STAs comprises:

when the size of the resource unit allocated to the first STA is 24 data tones, interleaving the data unit for the first STA using a block interleaver having 8 columns.

8. The method according to claim 1, wherein:

when an index of a bit input for interleaving is k, an index i and an index j are calculated by the following equations,

$$i = N_{ROW}(k \bmod N_{COL}) + \left\lfloor \frac{k}{N_{COL}} \right\rfloor, k = 0, 1, \dots, N_{CBPSSI} - 1$$

$$j = s \left\lfloor \frac{i}{s} \right\rfloor + \left( i + N_{CBPSSI} - \left\lfloor \frac{N_{COL} \cdot i}{N_{CBPSSI}} \right\rfloor \right) \bmod s,$$

$$i = 0, 1, \dots, N_{CBPSSI} - 1$$

$$s = \max \left\{ 1, \frac{N_{BPSCS}}{2} \right\}$$

i is an index obtained by applying a first permutation to the index k,

j is an index obtained by applying a second permutation to the index i,

36

when a number of spatial streams $N_{SS}$ is 1, an index r obtained by frequency rotation is calculated by r=j, and when $2 \leq N_{SS} \leq 4$, the index r is calculated by

$$r = \left\{ j - \left[ (2(i_{SS} - 1) \bmod 3 + 3 \left\lfloor \frac{i_{SS} - 1}{3} \right\rfloor \right] \cdot N_{ROT} \cdot N_{BPSCS} \right\} \bmod N_{CBPSSI}.$$

$$j = 0, 1, \dots, N_{CBPSSI} - 1$$

$$i_{SS} = 1, 2, \dots, N_{SS}$$

where:

mod represents a modulo operation,

$\lfloor \ \rfloor$ is a floor operation,

$N_{COL}$ is a number of columns in a block interleaver,

$N_{ROW}$ is a number of rows in the block interleaver,

$N_{ROT}$ is a frequency rotation parameter, and

$N_{CBPSSI}$ is the number of coded bits per symbol per spatial stream per interleaver block.

9. The method according to claim 8, wherein $N_{SS}$ is set to separate values for the plurality of resource units.

10. A method for receiving data from an Access Point (AP) through a transmission channel by a first Station (STA) among a plurality of STAs in a Wireless Local Area Network (WLAN) system, wherein the transmission channel is divided into a plurality of resource units which are allocated to the plurality of STAs respectively, the method comprising:

receiving, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including a plurality of data units for the plurality of STAs respectively on the plurality of resource units to acquire a data unit for the first STA from a resource units allocated to the first STA; and

deinterleaving the data unit for the first STA based on a size corresponding to the resource unit allocated to the first STA,

wherein a set of sizes available to the resource unit allocated to the first STA includes a first size and a second size,

wherein the deinterleaving of the data unit for the STA comprises:

when the size of resource unit allocated to the first STA is the first size, deinterleaving the data unit for the first STA using a first set of interleaving parameter values; and

when the size of resource unit allocated to the first STA is the second size, deinterleaving the data unit for the first STA using a second set of interleaving parameter values; and

wherein the first size is smaller than a size of the transmission channel, the second size is smaller than the first size, and the second set of interleaving parameter values is different from the first set of interleaving parameter values.

11. The method according to claim 10, wherein the size of the resource unit corresponds to a number of tones allocated to the resource unit allocated to the first STA.

12. The method according to claim 10, wherein the set of sizes available to the resource unit allocated to the first STA further includes a third size,

wherein the deinterleaving of the data unit for the first STA further comprises:

when the size of the resource unit allocated to the first STA is the third size, deinterleaving the data unit for the first STA using a third set of interleaving parameter values, and

US 9,532,187 B2

37

wherein the third size is smaller than the second size, and the third set of interleaving parameter values is different from the second set of interleaving parameter values.

13. The method according to claim 10, wherein the size of the transmission channel is 20 MHz.

14. A method for receiving data from an Access Point (AP) through a transmission channel by a first Station (STA) among a plurality of STAs in a Wireless Local Area Network (WLAN) system, wherein the transmission channel is divided into a plurality of OFDMA resource units which are allocated to the plurality of STAs respectively, the method comprising:

receiving, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including a plurality of data units for the plurality of STAs respectively on the plurality of OFDMA resource units to acquire a data unit for the first STA from an OFDMA resource unit allocated to the first STA; and

deinterleaving the data unit for the first STA based on a size of the OFDMA resource unit allocated to the first STA,

38

wherein a set of sizes available to the OFDMA resource unit allocated to the first STA includes a first size and a second size,

wherein deinterleaving of the data for the first STA comprises:

when the size of the OFDMA resource unit allocated to the first STA is the first size, deinterleaving the data unit for the first STA using a first set of interleaving parameter values; and

when the size of the OFDMA resource unit allocated to the first STA is the second size, deinterleaving the data unit for the first STA using a second set of interleaving parameter values, and

wherein the first size is smaller than a size of the transmission channel, the second size is smaller than the first size, and the second set of interleaving parameter values is different from the first set of interleaving parameter values.

* * * * *

ATLAS-00004296

JX003.00001



U 8146575

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**August 27, 2021**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

**U.S. PATENT:** *9,763,259*
**ISSUE DATE:** *September 12, 2017*

By Authority of the
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**

SYLVIA HOLLEY
Certifying Officer

JOINT
TRIAL EXHIBIT
JX003

ATLAS-00004620

JX003.00002

||||| |||||||| || |||| ||||| |||| ||||| ||||| |||| |||| ||||| ||| ||| |||
US009763259B2

(12) **United States Patent**
    Kwon et al.

(10) **Patent No.:** **US 9,763,259 B2**
(45) **Date of Patent:** **Sep. 12, 2017**

(54) **SOUNDING METHOD**

(71) Applicant: **NEWRACOM, INC.**, Irvine, CA (US)

(72) Inventors: **Yongjin Kwon**, Daejeon (KR); **Hyungu Park**, Daejeon (KR); **Jongee Oh**, Irvine, CA (US); **Inkyeong Choi**, Daejeon (KR)

(73) Assignee: **NEWRACOM, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 65 days.

(21) Appl. No.: **14/862,078**

(22) Filed: **Sep. 22, 2015**

(65) **Prior Publication Data**
    US 2016/0088641 A1    Mar. 24, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/054,270, filed on Sep. 23, 2014.

(30) **Foreign Application Priority Data**

Aug. 19, 2015    (KR) ...................... 10-2015-0116576

(51) **Int. Cl.**
    **H04B 7/02**        (2017.01)
    **H04W 72/08**       (2009.01)
    (Continued)

(52) **U.S. Cl.**
    CPC ............. **H04W 72/085** (2013.01); **H04L 1/00** (2013.01); **H04L 5/006** (2013.01); **H04L 5/0044** (2013.01);
    (Continued)

(58) **Field of Classification Search**
    None
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2013/0107916 A1 * | 5/2013 | Liu ...................... | H04B 7/0452 375/219 |
| 2014/0334420 A1 * | 11/2014 | You ...................... | H04L 25/0204 370/329 |

(Continued)

OTHER PUBLICATIONS

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE P802.11ah™/D5.0 Draft Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 2: Sub 1 GHz License Exempt Operation," Mar. 2015.

(Continued)

*Primary Examiner* — Chi H Pham
*Assistant Examiner* — Shick Hom
(74) *Attorney, Agent, or Firm* — McDermott, Will & Emery LLP

(57) **ABSTRACT**

A sounding method by a receiving device is provided. The receiving device receives an NDPA frame from a transmitting device, and then receives an NDP frame from the transmitting device. After receiving the NDP frame, the receiving device transmits to the transmitting device a feedback frame including subchannel information measured on a subchannel that is allocated to the first receiving device among a plurality of subchannels into which a predetermined band is divided.

**18 Claims, 24 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004621

**Appx116**

**US 9,763,259 B2**

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *H04W 16/28* | (2009.01) |
| *H04L 1/00* | (2006.01) |
| *H04W 24/00* | (2009.01) |
| *H04L 5/00* | (2006.01) |
| *H04W 72/04* | (2009.01) |
| *H04W 84/12* | (2009.01) |

(52) **U.S. Cl.**
CPC .......... *H04W 16/28* (2013.01); *H04W 24/00* (2013.01); *H04W 72/046* (2013.01); *H04W 84/12* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2014/0348097 A1* 11/2014 Park ................... H04L 25/0226
370/329

2016/0043783 A1* 2/2016 Xia ...................... H04B 7/0417
370/329

OTHER PUBLICATIONS

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 4: Enhancements for Very High Throughput for Operation in Bands below 6 GHz," 2013.
LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications," 2012.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039 Document: 20 Page: 204 Filed: 02/07/2025

FIG. 1



JX003.00005



FIG. 2

FIG. 3

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004624

Appx119



FIG. 4

JX003.00007

FIG. 5



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004626

**Appx121**

JX003.00008

**U.S. Patent**      Sep. 12, 2017      Sheet 5 of 24      US 9,763,259 B2

FIG. 6



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004627

**Appx122**

JX003.00009



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX003.00010

Case: 25-1039 Document: 20 Page: 210 Filed: 02/07/2025

FIG. 8



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004629

**Appx124**

JX003.00011

FIG. 9



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS−00004630

**Appx125**

FIG. 10




Copy provided by USPTO from the PIRS Image Database on 08-13-2021

FIG. 11



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00004632

**Appx127**

# FIG. 12



# FIG. 13



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

FIG. 14



Copy provided by USPTO from the PIRS Image Database on 08-13-2021



FIG. 15



FIG. 16

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00004636



FIG. 17

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039   Document: 20   Page: 219   Filed: 02/07/2025

**FIG. 18**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00004638

**Appx133**



FIG. 19

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00004639

**Appx134**



FIG. 20

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039    Document: 20    Page: 222    Filed: 02/07/2025



FIG. 21

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00004641

**Appx136**

JX003.00023

Case: 25-1039    Document: 20    Page: 223    Filed: 02/07/2025



FIG. 22

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004642

**Appx137**

JX003.00024



FIG. 23

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004643

**Appx138**

JX003.00025

# FIG. 24



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00004644

**Appx139**

JX003.0002

## FIG. 25

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF1 | HE-LTF2 | HE-SIG-B |
|-------|-------|-------|----------|--------|---------|---------|----------|

$$\begin{bmatrix} 1 & -1 \\ 1 & 1 \end{bmatrix}$$

## FIG. 26

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF1 | HE-LTF2 | HE-LTF3 | HE-SIG-B |
|-------|-------|-------|----------|--------|---------|---------|---------|----------|

$$\begin{bmatrix} 1 & -1 & 1 \\ 1 & -w^1 & w^2 \\ 1 & -w^2 & w^4 \end{bmatrix}, w=\exp(-\frac{j2\pi}{3})$$

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Appx140

ATLAS-00004645

JX003.00027

FIG. 27

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF1 | HE-LTF2 | HE-LTF3 | HE-LTF4 | HE-SIG-B |
|-------|-------|-------|----------|--------|---------|---------|---------|---------|----------|

$$\begin{bmatrix} 1 & -1 & 1 & 1 \\ 1 & 1 & -1 & 1 \\ 1 & 1 & 1 & -1 \\ -1 & 1 & 1 & 1 \end{bmatrix}$$

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004646

**Appx141**

US 9,763,259 B2

**1**

## SOUNDING METHOD

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority to and the benefit of U.S. Provisional Application No. 62/054,270, filed on Sep. 23, 2014, in the U.S. Patent and Trademark Office and priority to and the benefit of Korean Patent Application No. 10-2015-0116576, filed on Aug. 19, 2015, in the Korean Intellectual Property Office, the entire contents of which are incorporated herein by reference.

### BACKGROUND

(a) Field

The described technology relates generally to a sounding method. More particularly, the described technology relates generally to a sounding method in a wireless local area network (WLAN).

(b) Description of the Related Art

A WLAN transmits or receives data using an unlicensed band of 2.4 GHz or 5 GHz and is being standardized by the IEEE (Institute of Electrical and Electronics Engineers) Part 11 under the name of "Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications."

After an original standard was published in 1999, new version standards are continuously published by amendments. The IEEE standard 802.11a (IEEE Std 802.11a-1999) supporting 2.4 GHz band was published in 1999, the IEEE standard 802.11b (IEEE Std 802.11b-1999) supporting 5 GHz band was published in 1999, and the IEEE standard 802.11g (IEEE Std 802.11g-2003) supporting 5 GHz band was published in 2003. These standards are called legacy. Subsequently, the IEEE standard 802.11n (IEEE Std 802.11n-2009) for enhancements for higher throughput (HT) was published in 2009, and the IEEE standard 802.11 ac (IEEE 802.11 ac-2013) for enhancements for very high throughput (VHT) was published in 2013. Recently, a high efficiency (HE) WLAN for enhancing the system throughput in high density scenarios is being developed by the IEEE 802.11ax task group.

The HE WLAN or a subsequent WLAN may use a multi-user transmission. For example, a device may simultaneously transmit data to a plurality of devices or the plurality of devices may simultaneously transmit data by using a scheme such as orthogonal frequency division multiple access (OFDMA).

For the multi-user transmission, a given bandwidth may be divided into a plurality of subchannels and the plurality of subchannels may be allocated to multi users. In this case, a scheme such as beamforming may be applied to the plurality of subchannels to improve the transmission gain. For this, a sounding procedure is required for the plurality of subchannels.

### SUMMARY

An embodiment of the present disclosure provides a sounding method for multi users.

According to an embodiment, a sounding method by a first receiving device is provided. The method includes receiving a null data packet announcement (NDPA) frame from a transmitting device, receiving a null data packet (NDP) frame from the transmitting device after receiving the NPDA frame, and transmitting to the transmitting device a feedback frame including subchannel information measured

**2**

on a first subchannel after receiving the NDP frame. The first subchannel is a subchannel that is allocated to the first receiving device among a plurality of subchannels into which a predetermined band is divided.

The subchannel information may include an average signal-to-noise ratio (SNR) of the first subchannel.

The subchannel information may include average SNRs of the first subchannel for a plurality of space-time streams.

The feedback frame may further include subchannel information measured on other subchannels excluding the first subchannel.

Transmitting the feedback frame may include transmitting the feedback frame to the transmitting device before a second feedback frame including subchannel information measured on a second subchannel is transmitted to the transmitting device by a second receiving device or after the second feedback frame is transmitted to the transmitting device by the second receiving device, the second subchannel being a subchannel that is allocated to the second receiving device among the plurality of subchannels.

Transmitting the feedback frame may include transmitting the feedback frame to the transmitting device while a second feedback frame including subchannel information measured on the second subchannel is transmitted to the transmitting device by a second receiving device, the second subchannel being a subchannel that is allocated to the second receiving device among the plurality of subchannels.

Transmitting the feedback frame may include adding pad bits to a data field of the feedback frame when a length of data to be transmitted by the feedback frame is shorter than a predetermined length, or partitioning the data into a plurality of fragments and inserting any one of the fragments to the data field of the feedback frame when the length of the data is longer than the predetermined legacy.

The NDPA frame or the NDP frame may indicate information corresponding to the predetermined length.

The NDPA frame or the NDP frame may include allocation information of the first subchannel.

The subchannel information may be measured on each of a predetermined number of subchannels including the first subchannel, and the first subchannel may be allocated based on the subchannel information.

The NDPA frame may include information on the predetermined number.

The method may further include receiving a frame including selected subchannel information from the transmitting device, the selected subchannel information indicating a subchannel that is selected by other receiving device among the plurality of subchannels. The predetermined number of subchannels may not include the subchannel that that is selected by the other receiving device.

The selected subchannel information may be represented by a bitmap having a plurality of bits that correspond to the plurality of subchannels respectively, and a predetermined value in each of the plurality of bits may indicate that a corresponding subchannel is selected by the other device.

Transmitting the feedback frame may include transmitting a subchannel information frame to the transmitting device after receiving the NDP frame, the subchannel information frame including measurement information that is measured on each of the plurality of subchannels by the first receiving device. Transmitting the feedback frame may further include receiving from the transmitting device a channel feedback trigger frame including allocation information of the plurality of subchannels and transmitting the feedback frame to the transmitting device after receiving the channel feedback trigger frame.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004647

US 9,763,259 B2

3

Transmitting the subchannel information frame may include transmitting the subchannel information frame to the transmitting device before a second subchannel information frame is transmitted to the transmitting device by a second receiving device or after the second subchannel information frame is transmitted to the transmitting device by the second receiving device, the second subchannel information frame including measurement information that is measured on each of plurality of subchannels by the second receiving device.

Transmitting the subchannel information frame may include transmitting the subchannel information frame to the transmitting device while a second subchannel information frame is transmitted to the transmitting device by a second receiving device, the second subchannel information frame including measurement information that is measured on each of plurality of subchannels by the second receiving device.

The method may further include receiving a trigger frame from a transmitting device and transmitting a frame including a plurality of long training fields to the transmitting device after receiving the trigger frame. The plurality of long training fields may be multiplied by a predetermined identification code allocated to the first receiving device among a plurality of receiving devices.

A number of the plurality of long training fields may be equal to a number of the plurality of receiving devices.

The trigger frame may include information on a predetermined identification code allocated to each of the plurality of receiving devices.

According to another embodiment, a sounding method by a transmitting device is provided. The method includes transmitting an NDPA frame to a plurality of receiving devices, transmitting an NDP frame to the plurality of receiving devices after transmitting the NPDA frame, and receiving from each receiving device a feedback frame including subchannel information measured on a subchannel that is allocated to each receiving device among a plurality of subchannels into which a band is divided, after transmitting the NDP frame.

According to yet another embodiment, a sounding apparatus of a receiving device is provided. The sounding apparatus includes a processor and a transceiver. The transceiver receives an NDPA frame from a transmitting device and receives an NDP frame from the transmitting device after receiving the NPDA frame. The processor generates a feedback frame including subchannel information measured on a first subchannel after receiving the NDP frame. The first subchannel is a subchannel that is allocated to the first receiving device among a plurality of subchannels into which a predetermined band is divided. The transceiver transmits the feedback frame to the transmitting device.

According to still another embodiment, a sounding apparatus of a transmitting device is provided. The sounding apparatus includes a processor and a transceiver. The processor generates an NDPA frame and an NDP frame. The transceiver transmits the NDPA frame to a plurality of receiving devices, transmits the NDP frame to the plurality of receiving devices after transmitting the NPDA frame, and receives from each receiving device a feedback frame including subchannel information measured on a subchannel that is allocated to each receiving device among a plurality of subchannels into which a band is divided, after transmitting the NDP frame.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic block diagram of a WLAN device according to an embodiment.

4

FIG. 2 is a schematic block diagram of a transmitting signal processor in an embodiment suitable for use in a WLAN.

FIG. 3 is a schematic block diagram of a receiving signal processing unit in an embodiment suitable for use in the WLAN.

FIG. 4 exemplifies illustrates Inter-Frame Space (IFS) relationships.

FIG. 5 is a schematic diagram illustrating a CSMA/CA based frame transmission procedure for avoiding collision between frames in a channel.

FIG. 6 shows an example of a wireless communication network according to an embodiment.

FIG. 7 shows a sounding procedure in a wireless communication network according to an embodiment.

FIG. 8, FIG. 9, FIG. 10 and FIG. 11 show CB frames according to various embodiments.

FIG. 12 and FIG. 13 each shows a subchannel allocation notification method in a wireless communication network according to various embodiments.

FIG. 14, FIG. 15, FIG. 16, and FIG. 17 each shows a parallel transmission method of a CB frame in a wireless communication network according to various embodiments.

FIG. 18, FIG. 19, FIG. 20, FIG. 21, FIG. 22, FIG. 23, and FIG. 24 each shows a subchannel allocation method in a wireless communication network according to various embodiments.

FIG. 25, FIG. 26, and FIG. 27 each shows an LTF frame in a wireless communication network according to various embodiments.

DETAILED DESCRIPTION OF EMBODIMENTS

In the following detailed description, only certain embodiments have been shown and described, simply by way of illustration. As those skilled in the art would realize, the described embodiments may be modified in various different ways, all without departing from the spirit or scope of the present disclosure. Accordingly, the drawings and description are to be regarded as illustrative in nature and not restrictive. Like reference numerals designate like elements throughout the specification.

In a wireless local area network (WLAN), a basic service set (BSS) includes a plurality of WLAN devices. The WLAN device may include a medium access control (MAC) layer and a physical (PHY) layer according to the IEEE (Institute of Electrical and Electronics Engineers) standard 802.11. The plurality of WLAN devices may include a WLAN device that is an access point and the other WLAN devices that are non-AP stations (non-AP STAs). Alternatively, all of the plurality of WLAN devices may be non-AP STAs in ad-hoc networking. In general, the AP STA and the non-AP STA may be collectively called the STAs. However, for ease of description, herein, only the non-AP STA are referred to as the STAs.

FIG. 1 is a schematic block diagram exemplifying a WLAN device according to an embodiment.

Referring to FIG. 1, the WLAN device 1 includes a baseband processor 10, a radio frequency (RF) transceiver 20, an antenna unit 30, a memory 40 including non-transitory computer-readable media, an input interface unit 50, an output interface unit 60, and a bus 70.

The baseband processor 10 performs baseband signal processing, and includes a MAC processor 11 and a PHY processor 15.

In one embodiment, the MAC processor 11 may include a MAC software processing unit 12 and a MAC hardware

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,763,259 B2

5

6

processing unit 13. The memory 40 may store software (hereinafter referred to as "MAC software") including at least some functions of the MAC layer. The MAC software processing unit 12 executes the MAC software to implement the some functions of the MAC layer, and the MAC hardware processing unit 13 may implement remaining functions of the MAC layer as hardware (hereinafter referred to "MAC hardware"). However, the MAC processor 11 is not limited to this.

The PHY processor 15 includes a transmitting (Tx) signal processing unit 100 and a receiving (Rx) signal processing unit 200.

The baseband processor 10, the memory 40, the input interface unit 50, and the output interface unit 60 may communicate with each other via the bus 70.

The RF transceiver 20 includes an RF transmitter 21 and an RF receiver 22.

The memory 40 may further store an operating system and applications. The input interface unit 50 receives information from a user, and the output interface unit 60 outputs information to the user.

The antenna unit 30 includes one or more antennas. When multiple-input multiple-output (MIMO) or multi-user MIMO (MU-MIMO) is used, the antenna unit 30 may include a plurality of antennas.

FIG. 2 is a schematic block diagram of a transmitting signal processor 100 in an embodiment suitable for use in a WLAN.

Referring to FIG. 2, a transmitting signal processing unit 100 includes an encoder 110, an interleaver 120, a mapper 130, an inverse Fourier transformer (IFT) 140, and a guard interval (GI) inserter 150.

The encoder 110 encodes input data. For example, the encoder 100 may be a forward error correction (FEC) encoder. The FEC encoder may include a binary convolutional code (BCC) encoder followed by a puncturing device, or may include a low-density parity-check (LDPC) encoder.

The transmitting signal processing unit 100 may further include a scrambler for scrambling the input data before the encoding to reduce the probability of long sequences of 0s or 1s. If BCC encoding is used in the encoder, the transmitting signal processing unit 100 may further include an encoder parser for demultiplexing the scrambled bits among a plurality of BCC encoders. If LDPC encoding is used in the encoder, the transmitting signal processing unit 100 may not use the encoder parser.

The interleaver 120 interleaves the bits of each stream output from the encoder to change an order of bits. Interleaving may be applied only when BCC encoding is used. The mapper 130 maps the sequence of bits output from the interleaver to constellation points. If the LDPC encoding is used in the encoder, the mapper 130 may further perform LDPC tone mapping besides the constellation mapping.

When the MIMO or the MU-MIMO is used, the transmitting signal processing unit 100 may use a plurality of interleavers 120 and a plurality of mappers 130 corresponding to a number of spatial streams $N_{SS}$. In this case, the transmitting signal processing unit 100 may further include a stream parser for dividing outputs of the BCC encoders or the LDPC encoder into blocks that are sent to different interleavers 120 or mappers 130. The transmitting signal processing unit 100 may further include a space-time block code (STBC) encoder for spreading the constellation points from the $N_{SS}$ spatial streams into $N_{STS}$ space-time streams and a spatial mapper for mapping the space-time streams to $N_{TX}$ transmit chains. The spatial mapper may use direct mapping, spatial expansion, or beamforming.

The IFT 140 converts a block of the constellation points output from the mapper 130 or the spatial mapper to a time domain block (i.e., a symbol) by using an inverse discrete Fourier transform (IDFT) or an inverse fast Fourier transform (IFFT). If the STBC encoder and the spatial mapper are used, the inverse Fourier transformer 140 may be provided for each transmit chain.

When the MIMO or the MU-MIMO is used, the transmitting signal processing unit 100 may insert cyclic shift diversities (CSDs) to prevent unintentional beamforming. The CSD insertion may occur before or after the inverse Fourier transform. The CSD may be specified per transmit chain or may be specified per space-time stream. Alternatively, the CSD may be applied as a part of the spatial mapper.

When the MU-MIMO is used, some blocks before the spatial mapper may be provided for each user.

The GI inserter 150 prepends a guard interval (GI) to the symbol. The transmitting signal processing unit 100 may optionally perform windowing to smooth edges of each symbol after inserting the GI. The RF transmitter 21 converts the symbols into an RF signal and transmits the RF signal via the antenna unit 30. When the MIMO or the MU-MIMO is used, the GI inserter 150 and the RF transmitter 21 may be provided for each transmit chain.

FIG. 3 is a schematic block diagram of a receiving signal processing unit according to an embodiment suitable for use in the WLAN.

Referring to FIG. 3, a receiving signal processing unit 200 includes a GI remover 220, a Fourier transformer (FT) 230, a demapper 240, a deinterleaver 250, and a decoder 260.

An RF receiver 22 receives an RF signal via the antenna unit 30 and converts the RF signal into a symbol. The GI remover 220 removes the GI from the symbol. When the MIMO or the MU-MIMO is used, the RF receiver 22 and the GI remover 220 may be provided for each receive chain.

The FT 230 converts the symbol (i.e., the time domain block) into a block of the constellation points by using a discrete Fourier transform (DFT) or a fast Fourier transform (FFT). The Fourier transformer 230 may be provided for each receive chain.

When the MIMO or the MU-MIMO is used, the receiving signal processing unit 200 may include a spatial demapper for converting the Fourier transformed received symbols to constellation points of the space-time streams, and an STBC decoder for despreading the constellation points from the space-time streams into the spatial streams.

The demapper 240 demaps the constellation points output from the Fourier transformer 230 or the STBC decoder to the bit streams. If the LDPC encoding is used, the demapper 240 may further perform LDPC tone demapping before the constellation demapping. The deinterleaver 250 deinterleaves the bits of each stream output from the demapper 240. Deinterleaving may be applied only when BCC encoding is used.

When the MIMO or the MU-MIMO is used, the receiving signal processing unit 200 may use a plurality of demappers 240 and a plurality of deinterleavers 250 corresponding to the number of spatial streams. In this case, the receiving signal processing unit 200 may further include a stream deparser for combining the streams output from the deinterleavers 250.

The decoder 260 decodes the streams output from the deinterleaver 250 or the stream deparser. For example, the decoder 100 may be an FEC decoder. The FEC decoder may include a BCC decoder or an LDPC decoder. The receiving signal processing unit 200 may further include a descram-

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,763,259 B2

7
8

bler for descrambling the decoded data. If BCC decoding is used in the decoder, the receiving signal processing unit 200 may further include an encoder deparser for multiplexing the data decoded by a plurality of BCC decoders. If LDPC decoding is used in the decoder, the receiving signal processing unit 100 may not use the encoder deparser.

FIG. 4 illustrates interframe space (IFS).

A data frame, a control frame, or a management frame may be exchanged between WLAN devices.

The data frame is used for transmission of data forwarded to a higher layer. The WLAN device transmits the data frame after performing backoff if a distributed coordination function IFS (DIFS) has elapsed from a time when the medium has been idle. The management frame is used for exchanging management information which is not forwarded to the higher layer. Subtype frames of the management frame include a beacon frame, an association request/response frame, a probe request/response frame, and an authentication request/response frame. The control frame is used for controlling access to the medium. Subtype frames of the control frame include a request to send (RTS) frame, a clear to send (CTS) frame, and an acknowledgement (ACK) frame. When the control frame is not a response frame of a previous frame, the WLAN device transmits the control frame after performing backoff when the DIFS has elapsed. When the control frame is the response frame of a previous frame, the WLAN device transmits the control frame without performing backoff when a short IFS (SIFS) has elapsed. The type and subtype of a frame may be identified by a type field and a subtype field in a frame control field.

On the other hand, a Quality of Service (QoS) STA may transmit the frame after performing backoff when an arbitration IFS (AIFS) for access category (AC), i.e., AIFS[AC], has elapsed. In this case, the data frame, the management frame, or the control frame which is not the response frame may use the AIFS[AC].

FIG. 5 is a schematic diagram illustrating a CSMA (carrier sense multiple access)/CA (collision avoidance) based frame transmission procedure for avoiding collision between frames in a channel.

Referring to FIG. 5, STA1 is a transmit WLAN device for transmitting data, STA2 is a receive WLAN device for receiving the data, and STA3 is a third WLAN device which may be located at an area where a frame transmitted from the STA1 and/or a frame transmitted from the STA2 can be received by the third WLAN device.

The STA1 may determine whether the channel is busy by carrier sensing. The STA1 may determine the channel occupation based on an energy level on the channel or correlation of signals in the channel, or may determine the channel occupation by using a network allocation vector (NAV) timer.

When it is determined that the channel is not in use by other devices during DIFS (that is, that the channel is idle), the STA1 may transmit an RTS frame to the STA2 after performing backoff. Upon receiving the RTS frame, the STA2 may transmit a CTS frame as a response of the CTS frame after a SIFS.

When the STA3 receives the RTS frame, it may set the NAV timer for a transmission duration of subsequently transmitted frames (for example, a duration of SIFS+CTS frame duration+SIFS+data frame duration+SIFS+ACK frame duration) by using duration information included in the RTS frame. For example, the NAV timer may be set for

a duration of SIFS+CTS frame duration+SIFS+data frame duration+SIFS+ACK frame duration. When the STA3 receives the CTS frame, it may set the NAV timer for a transmission duration of subsequently transmitted frames (for example, a duration of SIFS+data frame duration+SIFS+ACK frame duration) by using duration information included in the RTS CTS frame. For example, the NAV timer may be set for a duration of SIFS+data frame duration+SIFS+SIFS+ACK frame duration. Upon receiving a new frame before the NAV timer expires, the STA3 may update the NAV timer by using duration information included in the new frame. The STA3 does not attempt to access the channel until the NAV timer expires.

When the STA1 receives the CTS frame from the STA2, it may transmit a data frame to the STA2 after SIFS elapses from a time when the CTS frame has been completely received. Upon successfully receiving the data frame, the STA2 may transmit an ACK frame as a response of the data frame after a SIFS elapses.

When the NAV timer expires, the STA3 may determine whether the channel is busy by the carrier sensing. Upon determining that the channel is not in use by the other devices during DIFS after the NAV timer has expired, the STA3 may attempt the channel access after a contention window according to random backoff elapses.

Now, a sounding method in a wireless communication network according to an embodiment is described with reference to the drawings.

FIG. 6 shows an example of a wireless communication network according to an embodiment.

Referring to FIG. 6, a basic service set (BSS) 600 includes a plurality of WLAN devices. The plurality of WLAN devices include a beamformer device 610 and beamformee devices 621, 622, 623, and 624. The beamformer device 610 may be a device for transmitting a PHY protocol data unit (PPDU) by using a beamforming steering matrix. The beamformee devices 621, 622, 623, and 624 may be devices for receiving the PPDU that is transmitted by using the beamforming steering matrix. The four beamformee devices 621, 622, 623, and 624 are exemplified in FIG. 6 for convenience, but the number of beamformee devices is not limited thereto.

In some embodiments, the beamformer device may be an AP and the beamformee devices may be stations.

The beamformer device 610 and the beamformee devices 621, 622, 623, and 624 support a wireless communication network according to an embodiment. For example, the wireless communication network according to an embodiment may be a high efficiency (HE) WLAN developed by the IEEE 802.11 ax task group. Hereinafter, it is assumed for convenience that the wireless communication network according to an embodiment is the HE WLAN.

In the wireless communication network according to an embodiment, a predetermined band is divided into a plurality of subbands (i.e., subchannels) and the plurality of subchannels are allocated to the plurality of beamformer devices. In one embodiment, one subchannel may be allocated to one beamformer device. In another embodiment, two or more subchannels may be allocated to one beamformer device, or one subchannel may be allocated to two or more beamformer devices. In some embodiments, an OFDMA scheme may be used for transmissions on the plurality of subchannels.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004650

US 9,763,259 B2

9

The BSS 600 may further include a previous version device. The previous version device may be, for example, a device (hereinafter referred to as a "legacy device") supporting the IEEE standard 802.11a, 802.11b or 802.11g (IEEE Std 802.11a-1999, IEEE Std 802.11b-1999 or IEEE Std 802.11g-2003), a device (hereinafter referred to as an "HT device") supporting the IEEE standard 802.11n (IEEE Std 802.11n-2009) for enhancements for higher throughput (HT), or a device (hereinafter referred to as a "VHT device") supporting the IEEE standard 802.11ac (IEEE Std 802.11 ac-2013) for enhancements for very high throughput (VHT).

FIG. 7 shows a sounding procedure in a wireless communication network according to an embodiment.

Referring to FIG. 7, a beamformer device transmits a null data packet announcement (NDPA) frame to beamformee devices, and then transmits a null data packet (NDP) frame to the beamformee devices after a SIFS interval. The first beamformee device (e.g., beamformee device 1) among the plurality of beamformee devices receiving the NDP frame feeds a feedback frame back to the beamformer device as a response of the NDP frame after a SIFS interval. For example, the feedback frame may be a compressed beamforming (CB) frame. The beamformer device receiving the CB frame from the beamformee device 1 transmits a beamforming report poll (BR-poll) frame to the second beamformee device (e.g., beamformee device 2) after the SIFS interval. The beamformee device 2 receiving the BR-poll frame feeds a CB frame back to the beamformer device as a response of the BR-poll frame after the SIFS interval. The beamformer device receiving the CB frame from the beamformee device 2 transmits a BR-poll frame to the third beamformee device (e.g., beamformee device 3) after the SIFS interval. The beamformee device 3 receiving the BR-poll frame feeds a CB frame back to the beamformer device as a response of the BR-poll frame after the SIFS interval. The beamformer device receiving the CB frame from the beamformee device 3 transmits a BR-poll frame to the fourth beamformee device (e.g., beamformee device 4) after the SIFS interval. The beamformee device 4 receiving the BR-poll frame feeds a CB frame back to the beamformer device as a response of the BR-poll frame after the SIFS interval.

In some embodiments, the CB frame transmitted by each beamformer device includes beamforming report information as feedback information. In one embodiment, the beamforming report information may be compressed beamforming report information.

FIG. 8, FIG. 9, FIG. 10 and FIG. 11 show CB frames according to various embodiments.

Referring to FIG. 8, in an embodiment, compressed beamforming report information of each CB frame includes subchannel information that is measured on each of a plurality of subchannels. The beamformee device may measure the subchannel information based on an NDP frame. In one embodiment, the subchannel information for a subchannel may include an average signal-to-noise ratio (SNR). When the number of subchannels is Ns, the compressed beamforming report information includes an average SNR of subchannel 1, an average SNR of subchannel 2, . . . , an average SNR of subchannel Ns.

The average SNR of subchannel i may be obtained by calculating SNRs per subcarrier for a plurality of subcarriers of subchannel i and calculating an arithmetic mean of the SNRs per subcarrier. In some embodiments, when a plurality of space-time streams are used, the average SNR of sub-

10

channel i may be calculated by averaging arithmetic means of the SNRs per subcarrier for the plurality of space-time streams.

Referring to FIG. 9, in another embodiment, compressed beamforming report information of each CB frame includes subchannel information that is measured on each of a plurality of space-time streams. The beamformee device may measure the subchannel information based on an NDP frame. In some embodiments, the subchannel information of a space-time stream may include average SNR information of the space-time stream.

In some embodiments, when an STBC encoder spreads input data into Nc space-time streams, the compressed beamforming report information includes average SNR information of space-time stream 1, average SNR information of space-time stream 2, . . . , average SNR information of space-time stream Nc. The average SNR information of each space-time stream includes average SNRs for the plurality of subchannels. That is, the average SNR information of space-time stream j includes the average SNR of subchannel 1, the average SNR of subchannel 2, . . . , the average SNR of subchannel Ns.

The average SNR of subchannel i in space-time stream j may be obtained by calculating SNRs per subcarrier for a plurality of subcarriers of subchannel i in space-time stream j and calculating an arithmetic mean of the SNRs per subcarrier.

Since each of the plurality of beamformee devices is allocated a corresponding subchannel in an embodiment, each beamformee device may not provide the feedback information for the entire subchannels. As shown in FIG. 10 and FIG. 11, in some embodiments, each beamformee device may provide the feedback information for the allocated subchannel.

Referring to FIG. 10, in yet another embodiment, compressed beamforming report information of a CB frame that is fed back by each beamformee device includes subchannel information of a subchannel allocated to the beamformee device. In some embodiments, the subchannel information may include an average SNR of the subchannel. The compressed beamforming report information of the CB frame that is fed back by beamformee device 1 includes the average SNR of subchannel 1, the compressed beamforming report information of the CB frame that is fed back by beamformee device 2 includes the average SNR of subchannel 2, the compressed beamforming report information of the CB frame that is fed back by beamformee device 3 includes the average SNR of subchannel 3, and the compressed beamforming report information of the CB frame that is fed back by beamformee device 4 includes the average SNR of subchannel 4.

Referring to FIG. 11, in still another embodiment, compressed beamforming report information of a CB frame that is fed back by each beamformee device includes subchannel information of a subchannel allocated to the beamformee device for a plurality of space-time streams. In some embodiments, the subchannel information may include an average SNR of the subchannel in the plurality of space-time streams. The compressed beamforming report information of the CB frame that is fed back by beamformee device 1 includes the average SNRs of subchannel 1 in the plurality of space-time streams. The compressed beamforming report information of the CB frame that is fed back by beamformee device 2 includes the average SNRs of subchannel 2 in the

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,763,259 B2

11

plurality of space-time streams, the compressed beamforming report information of the CB frame that is fed back by beamformee device 3 includes the average SNRs of subchannel 3 in the plurality of space-time streams, and the compressed beamforming report information of the CB frame that is fed back by beamformee device 4 includes the average SNRs of subchannel 4 in the plurality of space-time streams.

According to embodiments shown in FIG. 10 and FIG. 11, because each beamformee device provides the feedback information for the allocated subchannel, the overhead of the CB frame can be reduced.

As described with reference to FIG. 8 to FIG. 11, when the beamformer device receives the average SNR information of each subchannel through the CB frames from the plurality of beamformee devices, the beamformer device may determine a coding and modulation scheme (MCS) of a frame to be transmitted by beamforming based on the average SNR information.

Referring to FIG. 8 to FIG. 11 again, in some embodiments, the compressed beamforming report information may further include beamforming feedback matrix information. The beamforming feedback matrix information may be compressed beamforming feedback matrix information. The compressed beamforming feedback matrix information may be provided in the form of angles representing compressed beamforming feedback matrix for use by the beamformer device to determine steering matrices.

In some embodiments, the CB frame may be a management frame including a MAC header, a frame body field, and a frame check sequence (FCS) field. The frame body field may further include an action/category field, a MIMO control field and an MU (multi-user) exclusive beamforming report field in addition to the compressed beamforming report information.

The action/category field provides a mechanism for specifying extended management actions, and may include a category field and an action details field. The category field is set as any one of predefined values. For example, the category field may be set as a value corresponding to a category of the CB frame described in FIG. 8 to FIG. 11. The action details field includes the details of the actions.

The MIMO control field carries control values necessary for a MIMO transmission when the MIMO transmission is used. For example, the MIMO control field may carry a control value of the compressed beamforming feedback matrix. The MU exclusive beamforming report field may be used to determine the steering matrices.

Hereinafter, a method of notifying beamformee devices of allocated subchannels by a beamformer device is described with reference to FIG. 12 and FIG. 13.

FIG. 12 and FIG. 13 each shows a subchannel allocation notification method in a wireless communication network according to various embodiments.

Referring to FIG. 12, an NDPA frame includes subchannel information of a subchannel allocated to each beamformee device.

In some embodiments, the NDPA frame may have a legacy frame format. The NDPA frame includes a legacy short training field (L-STF), a legacy long training field (L-LTF), a legacy signal field (L-SIG), and a data field. A MAC frame is inserted to the data field, and the MAC frame includes a MAC header and a frame body field. The frame body field includes a station information field (STA Info). When a plurality of beamformee devices (e.g., station), the frame body field includes a plurality of station information

12

field (STA Info 1, . . . , STA Info n) corresponding to the plurality of beamformee devices respectively.

Each station information field (STA Info i) includes information of a corresponding beamformee device and allocation information of a subchannel allocated to the corresponding beamformee device. The information of the beamformee device may include some LSBs (least significant bits) of a association identifier (AID) of the beamformee device. The subchannel allocation information may include information indicating a position of the allocated subchannel. For example, when a band with a 20 MHz bandwidth is divided into four 5 MHz subchannels, the four 5 MHz subchannels (subchannel 1, subchannel 2, subchannel 3, and subchannel 4) may correspond to four values defined two bits, i.e., '00', '01', '10', and '11' respectively. Accordingly, the subchannel allocation information may have any one of the four values '00', '01', '10', and '11' according to the allocated subchannel.

Each of the plurality of beamformee devices receiving the NDPA frame can identify its allocated subchannel.

Referring to FIG. 13, an NDP frame includes allocation information of a subchannel allocated to each beamformee device.

In some embodiments, the NDP frame may have a frame format defined by a wireless communication network (i.e., HE WLAN) according to an embodiment. Such the frame format is referred to as an "HE frame format."

The NDP frame includes a legacy compatible part and an HE compatible part.

The legacy compatible part can be decoded based on a legacy preamble, and the HE compatible part can be decoded based on an HE preamble. The legacy compatible part includes a legacy short training field (L-STF), a legacy long training field (L-LTF), a legacy signal field (L-SIG), and an HE signal field (HE-SIG-A). The L-STF, the L-LTF, and the L-SIG correspond to the legacy preamble. The HE-SIG-A carries signaling information for a device supporting the HE WLAN and may include the subchannel allocation information as the signaling information. The subchannel allocation information includes information on a subchannel allocated to each beamformee device.

The HE compatible part includes the HE preamble and may further include an additional HE signal field (HE-SIG-B). HE preamble may include a HE short training field (HE-STF) and a HE long training field (HE-LTF). The HE-STF may be used for automatic gain control of the HE compatible part, and the HE-LTF may be used for channel estimation of the HE compatible part. In the NDP frame, the HE compatible part does not include a data field.

Each of the beamformee devices receiving the NDP frame can identify its allocated subchannel through the subchannel allocation information carried by the HE signal field.

In some embodiments, the HE-LTF may be transmitted for each subband as shown in FIG. 13 such that the channel estimation can be performed for each subchannel.

In some embodiments, a bandwidth unit of the subchannel may be 2.5 MHz, 5 MHz, 10 MHz, 20 MHz, 40 MHz, or 80 MHz when hardware supporting previous WLANs, for example a VHT WLAN and a WLAN according to the IEEE standard 802.11ah is reused. Accordingly, each subchannel may be allocated a bandwidth as shown in Table 1, in accordance with the number of divided subchannels.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,763,259 B2

**13**                   **14**

TABLE 1

| | Number of subchannels | Bit index | Sub-channel allocation for OFDMA | | | |
|---|---|---|---|---|---|---|
| | | | 20 MHz | 40 MHz | 80 MHz | 160 MHz |
| OFDM | 1 | N/A | 20 | 40 | 80 | 160 |
| OFDMA | 2 | 0 | (10, 10) | (20, 20) | (40, 40) | (80, 80) |
| | 3 | 1 | (10, 5, 5) | (20, 10, 10) | (40, 20, 20) | (80, 40, 40) |
| | | 2 | (5, 10, 5) | (10, 20, 10) | (20, 40, 20) | (40, 80, 40) |
| | | 3 | (5, 5, 10) | (10, 10, 20) | (20, 20, 40) | (40, 40, 80) |
| | 4 | 4 | (10, 5, 2.5, 2.5) | (20, 10, 5, 5) | (40, 20, 10, 10) | (80, 40, 20, 20) |
| | | 5 | (10, 2.5, 5, 2.5) | (20, 5, 10, 5) | (40, 10, 20, 10) | (80, 20, 40, 20) |
| | | 6 | (10, 2.5, 2.5, 5) | (20, 5, 5, 10) | (40, 10, 10, 20) | (80, 20, 20, 40) |
| | | 7 | (5, 10, 2.5, 2.5) | (10, 20, 5, 5) | (20, 40, 10, 10) | (40, 80, 20, 20) |
| | | 8 | (2.5, 10, 5, 2.5) | (5, 20, 10, 5) | (10, 40, 20, 10) | (20, 80, 40, 20) |
| | | 9 | (2.5, 10, 2.5, 5) | (5, 20, 5, 10) | (10, 40, 10, 20) | (20, 80, 20, 40) |
| | | 10 | (5, 2.5, 10, 2.5) | (10, 5, 20, 5) | (20, 10, 40, 10) | (40, 20, 80, 20) |
| | | 11 | (2.5, 5, 10, 2.5) | (5, 10, 20, 5) | (10, 20, 40, 10) | (20, 40, 80, 20) |
| | | 12 | (2.5, 2.5, 10, 5) | (5, 5, 20, 10) | (10, 10, 40, 20) | (20, 20, 80, 40) |
| | | 13 | (5, 2.5, 2.5, 10) | (10, 5, 5, 20) | (20, 10, 10, 40) | (40, 20, 20, 80) |
| | | 14 | (2.5, 5, 2.5, 10) | (5, 10, 5, 20) | (10, 20, 10, 40) | (20, 40, 20, 80) |
| | | 15 | (2.5, 2.5, 5, 10) | (5, 5, 10, 20) | (10, 10, 20, 40) | (20, 20, 40, 80) |
| | | 16 | (5, 5, 5, 5) | (10, 10, 10, 10) | (20, 20, 20, 20) | (40, 40, 40, 40) |

In Table 1, (a,b) represents a case that bandwidths with a and b are allocated to two subchannel respectively, (a,b,c) represents a case that bandwidths with a, b, and c are allocated to three subchannel respectively, and (a,b,c,d) represents a case that bandwidths with a, b, c, and d are allocated to four subchannel respectively.

Referring to Table 1, when a 20 MHz bandwidth is allocated to two users, the 20 MHz bandwidth may be divided into two 10 MHz subchannels. When the 20 MHz bandwidth is allocated to three users, the 20 MHz bandwidth may be divided into 10 MHz, 5 MHz, and 5 MHz subchannels; 5 MHz, 10 MHz, and 5 MHz subchannels; or 5 MHz, 5 MHz, and 10 MHz subchannels. When the 20 MHz bandwidth is allocated to four users, the 20 MHz bandwidth may be divided into 10 MHz, 5 MHz, 2.5 MHz, and 2.5 MHz subchannels; 10 MHz, 2.5 MHz, 5 MHz, and 2.5 MHz subchannels; 10 MHz, 2.5 MHz, 2.5 MHz, and 5 MHz subchannels; 5 MHz, 10 MHz, 2.5 MHz, and 2.5 MHz subchannels; 2.5 MHz, 10 MHz, 5 MHz, and 2.5 MHz subchannels; 2.5 MHz, 10 MHz, 2.5 MHz, and 5 MHz subchannels; 5 MHz, 2.5 MHz, 10 MHz, and 2.5 MHz subchannels; 2.5 MHz, 5 MHz, 10 MHz, and 2.5 MHz subchannels; 2.5 MHz, 2.5 MHz, 10 MHz, and 5 MHz subchannels; 5 MHz, 2.5 MHz, 2.5 MHz, and 10 MHz subchannels; 2.5 MHz, 5 MHz, 2.5 MHz, and 10 MHz subchannel; 2.5 MHz, 2.5 MHz, 5 MHz, and 10 MHz subchannels; or 5 MHz, 5 MHz, 5 MHz, and 5 MHz.

As shown in Table 1, a 40 MHz bandwidth, an 80 MHz bandwidth, and a 160 MHz bandwidth may be divided in the same way.

In one embodiment, since seventeen subchannel division schemes are provided for each bandwidth in an example shown in Table 1, the subchannel allocation information may have five bits in order to differentiate the subchannel division schemes. The seventeen subchannel division schemes may correspond to values of 0 to 16 among values of 0 to 31 represented by 5 bits.

In another embodiment, when only one user exists, an orthogonal frequency division multiplexing (OFDM) transmission may be used. Accordingly, the subchannel allocation information may further have one bit for differentiating the OFDM transmission and the OFDMA transmission. That is, the subchannel allocation information may have sixth bits.

In yet another embodiment, the OFDM transmission may be indicated by any one of values (for example, values of 17 to 31) that do not correspond to the seventeen subchannel division schemes among the values of 0 to 31 represented by the subchannel allocation information with five bits.

It is shown in FIG. 7 that the beamformee devices sequentially transmit the CB frames. However, the beamformee devices may transmit the CB frames in parallel. Such embodiments are described with reference to FIG. 14 to FIG. 17.

FIG. 14, FIG. 15, FIG. 16, and FIG. 17 each shows a parallel transmission method of a CB frame in a wireless communication network according to various embodiments. FIG. 14 shows an example of transmitting a CB frame in parallel in a wireless communication network according to an embodiment. FIG. 15 shows another example of transmitting a CB frame in parallel in a wireless communication network according to an embodiment, and FIG. 16 and FIG. 17 show examples of transmitting remaining fragments of a CB frame in a wireless communication network according to an embodiment.

Referring to FIG. 14, in an embodiment, a plurality of beamformee devices transmit CB frames in parallel. In some embodiments, the beamformee device may transmit the CB frames in an uplink OFDMA scheme.

The CB frame transmitted by each beamformee device includes beamforming report information of its allocated subchannel at a data field. In some embodiments, each beamformee device may transmit the CB frame on its allocated subchannel. For example, beamformee device 1 may transmit the CB frame on subchannel 1, beamformee device 2 may transmit the CB frame on subchannel 2, beamformee device 3 may transmit the CB frame on subchannel 3, and beamformee device 4 may transmit the CB frame on subchannel 4.

In some embodiments, the CB frame may have a HE frame format. In one embodiment, each beamformee device may transmit a legacy compatible part of the CB frame on entire subchannels and may transmit a HE compatible part on its allocated subchannel.

The legacy compatible part includes a legacy short training field (L-STF), a legacy long training field (L-LTF), a legacy signal field (L-SIG), and an HE signal field (HE-SIG-A). The HE compatible part includes a HE preamble and a data field, and may further include an additional HE signal field (HE-SIG-B). The HE preamble may include a HE short training field (HE-STF) and a HE long training field (HE-LTF).

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004653

US 9,763,259 B2

15

As such, the beamformee devices transmit the CB frames in parallel, thereby reducing a time necessary for transmitting the CB frames compared with a case that the CB frames are sequentially transmitted. Further, since each beamformee device can transmit the beamforming report information of its allocated subchannel, the overhead of the CB frame can be reduced.

As shown in FIG. 14, lengths of the CB frames (i.e., lengths of data fields in the CB frames) transmitted by the beamformee devices may be different from each other. When receiving the CB frames having different lengths in parallel, the beamformee device may not decode the received CB frames. Because the length of the data field in the CB frame is determined by each beamformee device, each beamformee device cannot know the length of the data field to be transmitted by the other beamformee device such that padding for adjusting the length of the data field cannot be performed.

Referring to FIG. 15, in another embodiment, each beamformee device may transmit a CB frame by adjusting a length of the CB frame to a maximum CB length. Therefore, when the length of data to be transmitted through the data field of the CB frame is shorter than the maximum CB length, the beamformee device may perform the padding for adding pad bits to remaining portion of the data field. When the length of data to be transmitted through the data field of the CB frame is longer than the maximum CB length, the beamformee device may partition the beamforming report information into two or more fragments and transmit two or more CB frames.

In some embodiments, the beamformee device may partition a MAC service data unit (MSDU) or a MAC management protocol data unit (MMPDU) including the beamforming report information into two or more smaller MAC protocol data units (MPDUs). The beamformee device may transmit the two or more CB frames that include the two or more MPDUs respectively.

In some embodiments, the beamformer device may indicate the maximum CB length to the beamformee devices. The maximum CB length may be a maximum length of the data field in the CB frame or a maximum length of the CB frame.

In one embodiment, the beamformer device may indicate the maximum CB length using the NDPA frame. For example, a data field of the NDPA frame, i.e., a frame body field of a MAC frame inserted to the NDPA frame may include information on the maximum CB length.

In another embodiment, the beamformer device may indicate the maximum CB length using the NDP frame. For example, a HE signal field (HE-SIG-A or HE-SIG-B) of the NDP frame may include the maximum CB length as the signaling information.

As such, when the beamformer device indicates the maximum CB length using the NDPA frame or the NDP frame, the beamformer device and the beamformee devices may change the maximum CB length each time performing a sounding procedure.

On the other hand, the MAC efficiency may be deteriorated because the beamformee device may perform unnecessary padding or fragmentation due to the maximum CB length. Accordingly, in yet another embodiment, the beamformer device may select the maximum CB length based on other information. For example, the beamformee device may determine the maximum CB length based on a previous CB frame length or the number of antennas.

Referring to FIG. 16, in some embodiments, when beamforming report information is partitioned, a beamformer

16

device may receive the first CB frames from a plurality of beamformee devices and then transmit a BR-poll frame to a beamformee device having a remaining fragment to allow the beamformee device to transmit the remaining fragment. The beamformee device receiving the BR-poll frame transmits a next CB frame including the remaining fragment to the beamformer device.

In some embodiments, a MAC header of the CB frame may indicate whether the remaining fragment exists. In one embodiment, a more fragments field of the MAC header may indicate whether the remaining fragment exists. Therefore, the beamformer device can determine which beamformee device has the remaining fragment based on the MAC header of the received CB frame.

In some embodiments, when a plurality of beamformee devices have the remaining fragment, the beamformee devices may transmit CB frames including the remaining fragment in parallel. In one embodiment, when the beamformee devices transmit the next CB frames in parallel, each beamformee device may transmit the next CB frame on its allocated subchannel.

In another embodiment, the feedback of the CB frame may terminate in a part of a plurality of beamformee devices joining in beamforming. In this case, when the next CB frames are transmitted, remaining beamformee devices may use subchannels different from subchannels used for transmitting the first CB frames. For example, as shown in FIG. 17, the feedback of the CB frame may terminate in beamformee device 1 and beamformee device 2, and beamformee device 3 and beamformee device 4 may have remaining fragments. Then, beamformee device 3 may transmit the CB frame through subchannels 1 and 2, and beamformee device 4 may transmit the CB frame through subchannels 3 and 4. The beamformer device may include changed subchannel allocation information to the BR-poll frame. Since the maximum CB length may be changed when the subchannel allocation is changed, the BR-poll frame may further include information on the maximum CB length.

In some embodiments, the BR-poll frame may include information on the fragment that has not been successfully received. Accordingly, the beamformee device may retransmit a CB frame including the fragment which the beamformer device has not successfully received.

Hereinafter, embodiments for allocating subchannels in a sounding procedure are described with reference to FIG. 18 to FIG. 24.

FIG. 18, FIG. 19, FIG. 20, FIG. 21, FIG. 22, FIG. 23, and FIG. 24 each shows a subchannel allocation method in a wireless communication network according to various embodiments.

Referring to FIG. 18, in an embodiment, a beamformer device transmits an NDPA frame to beamformee devices. The NDPA frame includes information on the number of best subchannels to be fed back by the beamformee device through a CB frame. In some embodiments, the NDPA frame may include information requesting to transmit feedback information on the best N subchannels, i.e., information indicating N. Herein, N is an integer greater than or equal to 1, and may be determined by the beamformer device. The beamformer device transmits the NDPA frame and then transmits an NDP frame to the beamformee device after a SIFS interval.

The beamformee devices receiving the NDP frame sequentially transmit CB frames. The CB frame may include the feedback information on the best N subchannels.

In some embodiments, beamformee device 1 among the beamformee devices receiving the NDP frame feeds the CB

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004654

JX003.00036

US 9,763,259 B2

**17**                                                                                                              **18**

frame back to the beamformer device as a response of the NDPA frame after the SIFS interval. The CB frame transmitted by beamformee device 1 includes the feedback information on the best N subchannels for beamformee device 1 among a plurality of subchannels.

The beamformer device receiving the CB frame from beamformee device 1 transmits a BR-poll frame to beamformee device 2 after the SIFS interval. In one embodiment, the beamformer device may select a subchannel for beamformee device 1 based on the feedback information on the best N subchannels that is provided by beamformee device 1. The BR-poll frame may include selected subchannel information indicating the selected subchannel for a previous beamformee device, i.e., beamformee device 1. In one embodiment, the selected subchannel information may be transferred by a selected subchannel bitmap field that is represented in the form of bitmap. The selected subchannel bitmap has a plurality of bits that correspond to the plurality of subchannels respectively. When a bit has a predetermined value (for example, '1'), it is indicated that a subchannel corresponding to the bit is selected for the previous beamformee device.

Beamformee device 2 receiving the BR-poll frame selects its best N subchannels from among the plurality of subchannels based on the selected subchannel information and transmits the CB frame including the feedback information on the selected best N subchannels. In one embodiment, beamformee device 2 may select the N subchannels from among subchannels excluding the subchannel selected for the previous beamformee device (i.e., beamformee device 1) based on the selected subchannel information.

The beamformer device receiving the CB frame from beamformee device 2 transmits a BR-poll frame to beamformee device 3 after the SIFS interval. In one embodiment, the beamformer device may select a subchannel for beamformee device 2 based on the feedback information on the best N subchannels that is provided by beamformee device 2. The BR-poll frame may include selected subchannel information indicating the selected subchannel for the previous beamformee devices, i.e., beamformee devices 1 and 2. In one embodiment, the selected subchannel information may be the selected subchannel bitmap where bits corresponding to the subchannels selected for the previous beamformee devices (i.e., beamformee devices 1 and 2) have the predetermined value.

As described above, beamformee device 3 receiving the BR-poll frame selects its best N subchannels from among the plurality of subchannels based on the selected subchannel information and transmits the CB frame including the feedback information on the selected best N subchannels. The beamformer device receiving the CB frame from beamformee device 3 may select a subchannel for beamformee device 3 based on the feedback information on the best N subchannels, and transmits to beamformee device 4 a BR-poll frame including selected subchannel information for the previous beamformee devices. Beamformee device 4 receiving the BR-poll frame selects its best N subchannels based on the selected subchannel information and transmits the CB frame including the feedback information on the selected best N subchannels. The beamformer device receiving the CB frame from beamformee device 4 may select a subchannel for beamformee device 4 based on the feedback information on the best N subchannels.

Accordingly, the beamformer device can allocate the subchannels to the beamformee devices. Further, the beamformer device may provide the beamformee device with subchannel allocation information on the subchannel selected for the beamformee device. in some embodiments, the beamformer device may provide the subchannel allocation information using a HE signal field.

According to the above embodiment, the subchannels can be allocated to the beamformee devices by using the sounding procedure described with reference to FIG. 7.

Referring to FIG. 19, in another embodiment, a beamformer device transmits an NDPA frame to beamformee devices and then transmits an NDP frame to the beamformee devices after a SIFS interval.

Each beamformee device measures a plurality of subchannels based on the NDP frame and transmits a subchannel information frame including measured information for each of the plurality of subchannels. In some embodiment, the measured information may include an average SNR of each subchannel. In some embodiments, the beamformee devices may transmit the subchannel information frames in parallel.

The beamformer device receiving the subchannel information frames from the beamformee devices allocates a subchannel to each beamformee device based on the measured information. The beamformer device transmits to the beamformee devices a channel feedback trigger frame including allocation information of the subchannels. In some embodiments, the channel feedback trigger frame may have a frame format that is similar to a frame format of the NDPA frame or the NDP frame. When the channel feedback trigger frame has the similar frame format to the NDPA frame, a frame body field of a MAC frame inserted to a data field of the channel feedback trigger frame may include the subchannel allocation information. When the channel feedback trigger frame has the similar frame format to the NDP frame, a HE signal field (HE-SIG-A or HE-SIG-B) of the channel feedback trigger frame may include the subchannel allocation information.

Beamformee device 1 among the beamformee devices receiving the channel feedback trigger frame transmits a CB frame to the beamformer device as a response of the channel feedback trigger frame after a SIFS interval. The beamformer device receiving the CB frame from beamformee device 1 transmits a BR-poll frame to beamformee device 2. Beamformee device 2 receiving the BR-poll frame feeds a CB frame back to the beamformer device, and the beamformer device receiving the CB frame from beamformee device 2 transmits a BR-poll frame to beamformee device 3. Beamformee device 4 receiving the BR-poll frame feeds a CB frame back to the beamformer device, and the beamformer device receiving the CB frame from beamformee device 3 transmits a BR-poll frame to beamformee device 4. Beamformee device 4 receiving the BR-poll frame feeds a CB frame back to the beamformer device.

In some embodiments, the CB frame transmitted by each beamformee device includes subchannel information of its allocated subchannel as described with reference to FIG. 8 to FIG. 11.

Referring to FIG. 20, in another embodiment, a plurality of beamformee devices transmits CB frames in parallel after receiving a channel feedback trigger frame. In some embodiments, the beamformee devices may transmit the CB frames using an uplink OFDMA scheme.

Since each beamformee device can identify its allocated subchannel using the channel feedback trigger frame, it can transmit the CB frame through the allocated subchannel. For example, beamformee device 1 may transmit the CB frame on subchannel 1, beamformee device 2 may transmit the CB frame on subchannel 2, beamformee device 3 may transmit the CB frame on subchannel 3, and beamformee device 4 may transmit the CB frame on subchannel 4.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx150**

ATLAS-00004655

US 9,763,259 B2

**19**

Referring to FIG. 21 and FIG. 22, in yet another embodiment, a plurality of beamformee devices sequentially transmits subchannel information frames.

Each beamformee device measure subchannel information of a plurality of subchannels based on an NDP frame, and beamformee device **1** first transmits the subchannel information frame including the measured information to a beamformer device. The beamformer device receiving the subchannel information frame from beamformee device **1** transmits a subchannel information trigger frame to beamformee device **2**. The beamformee device **2** receiving the subchannel information trigger frame feeds the subchannel information frame including the measured information back to the beamformer device, and the beamformer device receiving the subchannel information frame from beamformee device **2** transmits a subchannel information trigger frame to beamformee device **3**. The beamformee device **3** receiving the subchannel information trigger frame feeds the subchannel information frame including the measured information back to the beamformer device, and the beamformer device receiving the subchannel information frame from beamformee device **3** transmits a subchannel information trigger frame to beamformee device **4**. The beamformee device **4** receiving the subchannel information trigger frame feeds the subchannel information frame including the measured information back to the beamformer device.

Accordingly, the beamformer device can receive the measured information of the subchannels from the beamformee devices, allocate the subchannels to the beamformee devices based on the measured information, and provide the beamformee devices with a channel feedback trigger frame including the subchannel allocation information.

In one embodiment, the beamformee devices receiving the channel feedback trigger frame may sequentially transmit CB frames as shown in FIG. 21.

In another embodiment, the beamformee devices receiving the channel feedback trigger frame may transmit CB frames in parallel as shown in FIG. 22.

According to the above embodiments, after a subchannel allocation procedure is performed, the feedback on the allocated subchannel can be provided. Therefore, the sounding procedure can be divided into the subchannel allocation procedure and the channel feedback procedure.

Referring to FIG. 23, in some embodiments, a beamformer device may directly measure subchannels and allocate the subchannels.

The beamformer device transmits a trigger frame to a plurality of beamformee devices, and the beamformee devices transmit channel measurement frames to the beamformer device in parallel.

The beamformer device measures subchannels for each beamformee device based on the channel measurement frame and allocates the subchannels to the beamformee devices based on the measured information of the subchannels. In some embodiments, the beamformer device may measure an average SNR of each of the subchannels for each beamformee device and allocated the subchannels based on the average SNRs.

Subsequently, the beamformer device performs a sounding procedure in a similar way to the above embodiments. For example, as described with reference to FIG. 7, the beamformer device transmits an NDPA frame and an NDP frame to the beamformee devices, and the beamformee devices sequentially feed CB frames back to the beamformer device. In one embodiment, as shown in FIG. 23, the NDPA frame may include the subchannel allocation information. In

**20**

another embodiment, a HE signal field (HE-SIG-A or HE-SIG-B) of the NDP frame may include the subchannel allocation information.

Referring to FIG. 24, in another embodiment, a plurality of beamformee devices may transmit CB frames in parallel.

In some embodiments, since a long training field (LTF) can be used for channel estimation, the channel measurement frame transmitted by the beamformee device may be an LTF frame including the LTF. In this case, the beamformee devices may transmit the LTF frames in a code division multiple access (CDMA) scheme in order to differentiate the LTF frames transmitted by the beamformee devices. That is, the beamformee devices may be differentiated by applying predetermined identification codes (for example, Hadamard orthogonal codes) to the LTFs. The trigger frame transmitted by the beamformer device may include information on the LTFs to be used by the beamformee devices. In one embodiment, the information of the LTFs may include information indicating the number of beamformee devices (i.e., users) for transmitting the LTF frames and a code (i.e., the identification code) to be used by each beamformee device.

FIG. 25, FIG. 26, and FIG. 27 each shows an LTF frame in a wireless communication network according to various embodiments.

Referring to FIG. 25, FIG. 26, and FIG. 27, an LTF frame includes a legacy compatible part and a HE compatible part. The legacy compatible part includes a legacy short training field (L-STF), a legacy long training field (L-LTF), a legacy signal field (L-SIG), and an HE signal field (HE-SIG-A). The beamformee devices transmit common information through the legacy compatible part.

The HE compatible part includes a plurality of HE LTFs to be used for subchannel measurement. The HE compatible part may further include a HE short training field (HE-STF) to used for automatic gain control of the HE compatible part. The HE compatible part may further include an additional HE signal field (HE-SIG-B).

As shown in FIG. 25, when two beamformee devices transmit LTF frames, the beamformer device may provide information on two identification codes. The LTF frame may include two HE-LTFs (HE-LTF1 and HE-LTF2). For example, a code matrix defined in Equation 1 may be used. An identification code [1 −1] corresponding to the first row of the code matrix may be allocated to beamformee device **1**, and an identification code [1 1] corresponding to the second row of the code matrix may be allocated to beamformee device **2**. Then, beamformee device **1** may transmit the LTF frame by multiplying the HE-LTF by 1 and multiplying HE-LTF2 by −1, and beamformee device **2** may transmit the LTF frame by multiplying the HE-LTF1 by 1 and multiplying the HE-LTF2 by 1. The trigger frame may include information on the code matrix and information on a row to be used by each beamformee device. Alternatively, when the code matrix is predefined between the beamformer device and the beamformee devices, the trigger frame may include the number of beamformee devices and information on a row to be used by each beamformee device.

$$\begin{vmatrix} 1 & -1 \\ 1 & 1 \end{vmatrix}$$ Equation 1

As shown in FIG. 26, when three beamformee devices transmit LTF frames, the beamformer device may provide information on three identification codes. The LTF frame

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,763,259 B2

**21**

may include three HE-LTFs (HE-LTF1, HE-LTF2, and HE-LTF3). For example, a code matrix defined in Equation 2 may be used. An identification code [1 −1 1] corresponding to the first row of the code matrix may be allocated to beamformee device **1**, an identification code [1 −w¹ w²] corresponding to the second row of the code matrix may be allocated to beamformee device **2**, and an identification code [1 −w² w⁴] corresponding to the second row of the code matrix may be allocated to beamformee device **3**. Then, beamformee device **1** may transmit the LTF frame by multiplying the HE-LTF by 1, multiplying HE-LTF2 by −1, and multiplying HE-LTF3 by 1. Beamformee device **2** may transmit the LTF frame by multiplying the HE-LTF1 by 1, multiplying the HE-LTF2 by −w¹, and multiplying the HE-LTF3 by w². Beamformee device **3** may transmit the LTF frame by multiplying the HE-LTF1 by 1, multiplying the HE-LTF2 by −w², and multiplying the HE-LTF3 by w⁴.

$$\begin{vmatrix} 1 & -1 & 1 \\ 1 & -w^1 & w^2 \\ 1 & -w^2 & w^4 \end{vmatrix},$$  Equation 2

$$w = \exp\!\left(-\frac{j2\pi}{3}\right)$$

As shown in FIG. 26, when four beamformee devices transmit LTF frames, the beamformer device may provide information on four identification codes. The LTF frame may include four HE-LTFs (HE-LTF1, HE-LTF2, HE-LTF3, and HE-LTF4). For example, a code matrix defined in Equation 3 may be used. An identification code [1 −1 1 1] corresponding to the first row of the code matrix may be allocated to beamformee device **1**, an identification code [1 1 −1 1] corresponding to the second row of the code matrix may be allocated to beamformee device **2**, an identification code [1 1 1 −1] may be allocated to beamformee device **4**, and an identification code [−1 1 1 1] corresponding to the second row of the code matrix may be allocated to beamformee device **4**. Then, beamformee device **1** may transmit the LTF frame by multiplying the HE-LTF1 by 1, multiplying the HE-LTF2 by −1, multiplying the HE-LTF3 by 1, and multiplying the HE-LTF4 by 1. Beamformee device **2** may transmit the LTF frame by multiplying the HE-LTF1 by 1, multiplying the HE-LTF2 by 1, multiplying the HE-LTF3 by −1, and multiplying the HE-LTF4 by 1. Beamformee device **3** may transmit the LTF frame by multiplying the HE-LTF1 by 1, multiplying the HE-LTF2 by 1, multiplying the HE-LTF3 by 1, multiplying the HE-LTF4 by −1. Beamformee device **4** may transmit the LTF frame by multiplying the HE-LTF1 by −1, multiplying the HE-LTF2 by 1, multiplying the HE-LTF3 by 1, and multiplying the HE-LTF4 by 1.

$$\begin{vmatrix} 1 & -1 & 1 & 1 \\ 1 & 1 & -1 & 1 \\ 1 & 1 & 1 & -1 \\ -1 & 1 & 1 & 1 \end{vmatrix}$$  Equation 3

In one embodiment, when the LTF frame includes the additional HE signal field (HE-SIG-B), the beamformee devices may transmit common information by multiplying the HE-SIG-Bs by the same sequence. In another embodiment, the beamformee devices may transmit different infor-

**22**

mation by multiplying the HE-SIG-Bs by different sequences. The sequence for HE-SIG-B may be the same as the identification code for the HE-LTFs.

While a 20 MHz bandwidth has been used for description in FIG. 25, FIG. 26, and FIG. 27, the same code matrix may be used in the different bandwidth such that each beamformee device may use a corresponding identification code of the code matrix.

As such, when the beamformee devices transmit the LTF frames using the different identification codes, the beamformer device may despread the received HE-LTFs and then measure an average SNR per subchannel for each beamformee device.

A sounding method according to above embodiments may be executed by a baseband processor **10** shown in FIG. 1 to FIG. 3. In one embodiment, instructions for executing the frame transmitting method and the frame receiving method according to above embodiments may be stored in a non-transitory computer-readable recording medium such as a memory **40**. In another embodiment, at least some of the instructions may be MAC software. In yet another embodiment, at least some of the instructions may be transmitted from a non-transitory computer-readable recording medium of a certain server and may be stored in the memory **40**.

While this invention has been described in connection with what is presently considered to be practical embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims. Further, two or more embodiments may be combined.

What is claimed is:

**1**. A sounding method by a first receiving device, the method comprising:
  receiving a null data packet announcement (NDPA) frame from a transmitting device;
  receiving a null data packet (NDP) frame from the transmitting device after receiving the NPDA frame; and
  transmitting to the transmitting device a feedback frame including subchannel information measured on a first subchannel after receiving the NDP frame, the first subchannel being a subchannel that is allocated to the first receiving device among a plurality of subchannels into which a predetermined band is divided,
  wherein transmitting the feedback frame includes:
    transmitting the feedback frame to the transmitting device while a second feedback frame including subchannel information measured on the second subchannel is transmitted to the transmitting device by a second receiving device, the second subchannel being a subchannel that is allocated to the second receiving device among the plurality of subchannels.

**2**. The method of claim **1**, wherein the subchannel information includes an average signal-to-noise ratio (SNR) of the first subchannel.

**3**. The method of claim **1**, wherein the subchannel information includes average signal-to-noise ratios (SNRs) of the first subchannel for a plurality of space-time streams.

**4**. The method of claim **1**, wherein the feedback frame further includes subchannel information measured on other subchannels excluding the first subchannel.

**5**. The method of claim **1**, wherein transmitting the feedback frame includes
  adding pad bits to a data field of the feedback frame when a length of data to be transmitted by the feedback frame is shorter than a predetermined length, or partitioning

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,763,259 B2

23

the data into a plurality of fragments and inserting any one of the fragments to the data field of the feedback frame when the length of the data is longer than the predetermined length.

6. The method of claim 5, wherein the NDPA frame indicates information corresponding to the predetermined length.

7. The method of claim 1, wherein the NDPA frame includes allocation information of the first subchannel.

8. The method of claim 1, wherein the subchannel information is measured on each of a predetermined number of subchannels including the first subchannel, and

wherein the first subchannel is allocated based on the subchannel information.

9. The method of claim 8, wherein the NDPA frame includes information on the predetermined number.

10. The method of claim 8, further comprising receiving a frame including selected subchannel information from the transmitting device, the selected subchannel information indicating a subchannel that is selected by other receiving device among the plurality of subchannels,

wherein the predetermined number of subchannels do not include the subchannel that that is selected by the other receiving device.

11. The method of claim 10, wherein the selected subchannel information is represented by a bitmap having a plurality of bits that correspond to the plurality of subchannels respectively, and

wherein a predetermined value in each of the plurality of bits indicates that a corresponding subchannel is selected by the other receiving device.

12. The method of claim 1, wherein transmitting the feedback frame includes:

transmitting a subchannel information frame to the transmitting device after receiving the NDP frame, the subchannel information frame including measurement information that is measured on each of the plurality of subchannels by the first receiving device;

receiving from the transmitting device a channel feedback trigger frame including allocation information of the plurality of subchannels; and

transmitting the feedback frame to the transmitting device after receiving the channel feedback trigger frame.

13. The method of claim 12, wherein transmitting the subchannel information frame includes

transmitting the subchannel information frame to the transmitting device before a second subchannel information frame is transmitted to the transmitting device

24

by the second receiving device or after the second subchannel information frame is transmitted to the transmitting device by the second receiving device, the second subchannel information frame including measurement information that is measured on each of the plurality of subchannels by the second receiving device.

14. The method of claim 12, wherein transmitting the subchannel information frame includes

transmitting the subchannel information frame to the transmitting device while a second subchannel information frame is transmitted to the transmitting device by the second receiving device, the second subchannel information frame including measurement information that is measured on each of the plurality of subchannels by the second receiving device.

15. The method of claim 1, further comprising:

receiving a trigger frame from a transmitting device; and

transmitting a frame including a plurality of long training fields to the transmitting device after receiving the trigger frame,

wherein the plurality of long training fields are multiplied by a predetermined identification code allocated to the first receiving device among a plurality of receiving devices.

16. The method of claim 15, wherein a number of the plurality of long training fields is equal to a number of the plurality of receiving devices.

17. The method of claim 15, wherein the trigger frame includes information on a predetermined identification code allocated to each of the plurality of receiving devices.

18. A sounding method by a transmitting device, the method comprising:

transmitting a null data packet announcement (NDPA) frame to a plurality of receiving devices;

transmitting a null data packet (NDP) frame to the plurality of receiving devices after transmitting the NPDA frame; and

receiving from each receiving device a feedback frame including subchannel information measured on a subchannel that is allocated to each receiving device among a plurality of subchannels into which a band is divided, after transmitting the NDP frame,

wherein the plurality of feedback frames from the plurality of receiving devices are received at a same time, and the NDPA frame includes allocation information of the plurality of subchannels.

＊　＊　＊　＊　＊

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00004658

JX004.00001



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**August 23, 2021**

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

**U.S. PATENT:** *9,825,738*
**ISSUE DATE:** *November 21, 2017*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



**SYLVIA HOLLEY**
Certifying Officer

JOINT
TRIAL EXHIBIT
**JX004**

ATLAS-00008981

**Appx154**

JX004.00002



US009825738B2

(12) **United States Patent**
Kwon et al.

(10) **Patent No.:** **US 9,825,738 B2**
(45) **Date of Patent:** **Nov. 21, 2017**

(54) **ACKNOWLEDGEMENT METHOD AND MULTI USER TRANSMISSION METHOD**

(71) Applicant: **NEWRACOM, INC.**, Irvine, CA (US)

(72) Inventors: **Yongjin Kwon**, Daejeon (KR); **Jong-Ee Oh**, Irvine, CA (US); **Hyungu Park**, Daejeon (KR); **Je-Hun Lee**, Irvine, CA (US); **Hong Soog Kim**, Daejeon (KR); **Heejung Yu**, Daegu (KR); **Minho Cheong**, Irvine, CA (US); **Hyoung Jin Kwon**, Daejeon (KR)

(73) Assignee: **NEWRACOM, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 112 days.

(21) Appl. No.: **14/678,724**

(22) Filed: **Apr. 3, 2015**

(65) **Prior Publication Data**

US 2015/0288501 A1 · Oct. 8, 2015

**Related U.S. Application Data**

(60) Provisional application No. 61/981,427, filed on Apr. 18, 2014, provisional application No. 61/975,622, filed on Apr. 4, 2014.

(51) **Int. Cl.**
**H04L 1/00** (2006.01)
**H04L 1/06** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... **H04L 5/0007** (2013.01); **H04L 1/1614** (2013.01); **H04L 1/0057** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... H04B 7/024; H04B 7/0404; H04B 7/0413; H04B 7/0452; H04B 7/0613; H04B 7/04;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,331,310 B2 * 12/2012 Wang ................... H04B 7/0413
370/330
8,483,742 B2 * 7/2013 Kim ....................... H04W 52/12
370/252

(Continued)

OTHER PUBLICATIONS

Zhang et al., Preamble Structure for 11 ax system, doc.:IEEE 802.11-15/0101r1, Jan. 2015, IEEE.*
Stacey, IEEE P802.11 Wireless LANs, Specification Framework for TGax, doc.:IEEE 802.11-15/0132r4, Mar. 27, 2015, IEEE.*
Son et al., HE Trigger Frame Format, doc.: IEEE 802.11-15/0851r0, Jul. 13, 2015, IEEE.*
Merlin et al., Trigger Frame Format, doc.:IEEE 802.11-15/0877r1, Jul. 13, 2015, IEEE.*

(Continued)

*Primary Examiner* — Benjamin H Elliott, IV
*Assistant Examiner* — Eric Nowlin

(57) **ABSTRACT**

An Acknowledgment (ACK) method is provided by a receiving device in a Wireless Local Area Network (WLAN). The receiving device receives a plurality of data units having a plurality of Traffic Identifiers (TIDs) and transmits an ACK frame including a plurality of ACK information fields for at least part of the plurality of data units. An ACK information field for a data unit satisfying a first condition among the plurality of ACK information fields includes a Traffic Identifier (TID) and a block ACK bitmap indicating whether the data unit has been successfully received. An ACK information field for a data unit satisfying a second condition and having been successfully received among the plurality of ACK information fields includes the first TID and does not include a block ACK bitmap.

**16 Claims, 25 Drawing Sheets**



ULT is piggybacked
UL setup is piggybacked

| AP | NDPA | NDP | | Poll | | DL PPDU | | | ACK |
| STA1 | | | CB | | | | ACK | UL PPDU | |
| STA2 | | | | CB | | | ACK | UL PPDU | |

UL req is piggybacked

**Appx155**

# US 9,825,738 B2
Page 2

(51) **Int. Cl.**
    *H04L 1/16*     (2006.01)
    *H04L 5/00*     (2006.01)
    *H04W 84/12*     (2009.01)
(52) **U.S. Cl.**
    CPC .......... *H04L 1/0059* (2013.01); *H04L 1/0071*
    (2013.01); *H04L 1/0643* (2013.01); *H04W*
    *84/12* (2013.01)
(58) **Field of Classification Search**
    CPC .. H04B 7/0617; H04B 7/0626; H04B 7/0697;
        H04W 72/0413; H04W 72/042; H04W
        72/12; H04W 74/06; H04W 84/12; H04W
        88/08; H04W 72/04; H04W 74/08; H04L
        1/0031; H04L 1/0057; H04L 1/0059;
        H04L 1/0071; H04L 1/0643; H04L
        1/1621; H04L 1/1887; H04L 5/0007;
        H04L 5/0037; H04L 25/0204; H04L
        2001/0093; H04L 2025/03426; H04L
        5/0023; H04L 5/0044; H04L 5/0053
    See application file for complete search history.

(56)           **References Cited**

          U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,571,010 B1 * | 10/2013 | Zhang | H04W 56/0005 |
| | | | 370/230 |
| 8,737,329 B2 * | 5/2014 | Ogawa | H04L 5/0064 |
| | | | 370/329 |
| 8,824,403 B2 * | 9/2014 | Oh | H04L 5/0092 |
| | | | 370/252 |
| 8,903,441 B2 * | 12/2014 | Kim | H04B 7/0413 |
| | | | 370/329 |
| 8,976,741 B2 * | 3/2015 | Wentink | H04W 72/1289 |
| | | | 370/329 |
| 9,042,331 B2 * | 5/2015 | Lee | H04B 7/0452 |
| | | | 370/329 |
| 9,065,502 B2 * | 6/2015 | Lee | H04L 5/0023 |
| 9,155,070 B2 * | 10/2015 | Yuk | H04W 72/04 |
| 9,232,502 B2 * | 1/2016 | Zhu | H04W 72/0406 |
| 9,325,463 B2 * | 4/2016 | Azizi | H04L 5/003 |
| 9,344,238 B2 * | 5/2016 | Vermani | H04L 5/0044 |
| 9,397,805 B2 * | 7/2016 | Vermani | H04L 5/0044 |
| 9,398,570 B2 * | 7/2016 | Lee | H04B 7/0452 |
| 9,439,192 B2 * | 9/2016 | Reznik | H04L 1/0025 |
| 9,467,994 B2 * | 10/2016 | Ogawa | H04L 5/0064 |
| 9,497,744 B2 * | 11/2016 | Husen | H04W 72/042 |
| 9,503,931 B2 * | 11/2016 | Vermani | H04L 27/0012 |
| 9,503,932 B2 * | 11/2016 | Vermani | H04L 27/0012 |
| 9,673,943 B2 * | 6/2017 | Seok | H04L 5/0007 |
| 2008/0193518 A1 * | 8/2008 | Zarkadas | A61K 9/1652 |
| | | | 424/451 |
| 2010/0067480 A1 * | 3/2010 | Wang | H04B 7/0413 |
| | | | 370/330 |
| 2010/0165985 A1 * | 7/2010 | Sharma | H04L 47/2425 |
| | | | 370/389 |
| 2011/0002319 A1 * | 1/2011 | Husen | H04W 72/042 |
| | | | 370/338 |
| 2011/0051636 A1 * | 3/2011 | Van Nee | H04B 7/0452 |
| | | | 370/310 |
| 2011/0188482 A1 * | 8/2011 | Vermani | H04L 27/0012 |
| | | | 370/338 |
| 2011/0310901 A1 * | 12/2011 | Uchida | H04L 43/026 |
| | | | 370/392 |
| 2012/0020261 A1 * | 1/2012 | Van Zelst | H04L 5/003 |
| | | | 370/310 |
| 2013/0023296 A1 * | 1/2013 | Kim | H04B 7/0413 |
| | | | 455/509 |
| 2013/0114494 A1 * | 5/2013 | Yuk | H04W 72/04 |
| | | | 370/312 |
| 2013/0250958 A1 * | 9/2013 | Watanabe | H04L 45/54 |
| | | | 370/392 |

| | | | |
|---|---|---|---|
| 2014/0019639 A1 * | 1/2014 | Ueno | H04L 61/103 |
| | | | 709/238 |
| 2014/0112298 A1 * | 4/2014 | Oh | H04L 5/0092 |
| | | | 370/329 |
| 2014/0119288 A1 * | 5/2014 | Zhu | H04W 74/0816 |
| | | | 370/329 |
| 2014/0140312 A1 * | 5/2014 | Lee | H04B 7/0452 |
| | | | 370/329 |
| 2014/0195666 A1 * | 7/2014 | Dumitriu | H04L 12/4625 |
| | | | 709/223 |
| 2014/0211715 A1 * | 7/2014 | Ogawa | H04L 5/0064 |
| | | | 370/329 |
| 2014/0307612 A1 * | 10/2014 | Vermani | H04L 5/0044 |
| | | | 370/312 |
| 2014/0307649 A1 * | 10/2014 | Vermani | H04L 5/0044 |
| | | | 370/329 |
| 2014/0307650 A1 * | 10/2014 | Vermani | H04L 5/0044 |
| | | | 370/329 |
| 2014/0337690 A1 * | 11/2014 | Zhang | H03M 13/2933 |
| | | | 714/776 |
| 2014/0362857 A1 * | 12/2014 | Guichard | H04L 45/566 |
| | | | 370/392 |
| 2015/0029996 A1 * | 1/2015 | Yuan | H04W 72/121 |
| | | | 370/330 |
| 2015/0063258 A1 * | 3/2015 | Merlin | H04L 47/12 |
| | | | 370/329 |
| 2015/0078368 A1 * | 3/2015 | Vermani | H04L 27/0012 |
| | | | 370/338 |
| 2015/0139206 A1 * | 5/2015 | Azizi | H04L 5/003 |
| | | | 370/338 |
| 2015/0215172 A1 * | 7/2015 | Kumar | H04L 43/026 |
| | | | 709/223 |
| 2015/0327276 A1 * | 11/2015 | Rebeiz | H04W 72/0493 |
| | | | 370/329 |
| 2015/0333930 A1 * | 11/2015 | Aysola | H04L 63/0471 |
| | | | 370/392 |
| 2015/0334691 A1 * | 11/2015 | Ogawa | H04L 5/0064 |
| | | | 370/329 |
| 2015/0365923 A1 * | 12/2015 | Vermani | H04W 72/042 |
| | | | 370/329 |
| 2016/0014763 A1 * | 1/2016 | Jauh | H04B 7/0452 |
| | | | 370/329 |
| 2016/0028452 A1 * | 1/2016 | Chu | H04J 11/00 |
| | | | 375/267 |
| 2016/0056930 A1 * | 2/2016 | Seok | H04L 5/0026 |
| | | | 370/330 |
| 2016/0057657 A1 * | 2/2016 | Seok | H04L 69/324 |
| | | | 370/476 |
| 2016/0065467 A1 * | 3/2016 | Wu | H04L 65/60 |
| | | | 370/392 |
| 2016/0088602 A1 * | 3/2016 | Seok | H04L 5/0055 |
| | | | 370/338 |
| 2016/0100396 A1 * | 4/2016 | Seok | H04L 5/003 |
| | | | 370/329 |
| 2016/0100408 A1 * | 4/2016 | Hedayat | H04L 65/4076 |
| | | | 370/329 |
| 2016/0105836 A1 * | 4/2016 | Seok | H04W 36/32 |
| | | | 370/331 |
| 2016/0113009 A1 * | 4/2016 | Seok | H04B 7/0452 |
| | | | 370/329 |
| 2016/0113034 A1 * | 4/2016 | Seok | H04W 74/04 |
| | | | 370/329 |
| 2016/0128057 A1 * | 5/2016 | Seok | H04L 5/0055 |
| | | | 370/329 |
| 2016/0143010 A1 * | 5/2016 | Kenney | H04W 4/008 |
| | | | 370/330 |
| 2016/0143026 A1 * | 5/2016 | Seok | H04W 72/0413 |
| | | | 370/329 |
| 2016/0150505 A1 * | 5/2016 | Hedayat | H04W 72/1289 |
| | | | 370/329 |
| 2016/0164776 A1 * | 6/2016 | Biancaniello | H04L 45/306 |
| | | | 370/392 |
| 2016/0165482 A1 * | 6/2016 | Yang | H04L 27/2613 |
| | | | 370/336 |
| 2016/0174200 A1 * | 6/2016 | Seok | H04W 72/04 |
| | | | 370/329 |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx156**

**US 9,825,738 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2016/0198445 A1* | 7/2016 | Ghosh | H04L 5/00 |
| | | | 370/329 |
| 2016/0212246 A1* | 7/2016 | Seok | H04L 69/323 |
| 2016/0241315 A1* | 8/2016 | Kwon | H04B 7/0452 |
| 2016/0242177 A1* | 8/2016 | Seok | H04W 72/0446 |
| 2016/0249397 A1* | 8/2016 | Seok | H04W 76/023 |
| 2016/0285526 A1* | 9/2016 | Hedayat | H04B 7/0452 |
| 2016/0302185 A1* | 10/2016 | Sun | H04W 74/08 |
| 2016/0309478 A1* | 10/2016 | Nabetani | H04B 7/0697 |
| 2016/0315675 A1* | 10/2016 | Seok | H04B 7/0452 |
| 2016/0330714 A1* | 11/2016 | Hedayat | H04W 72/1289 |
| 2016/0330715 A1* | 11/2016 | Chen | H04L 27/2607 |
| 2016/0330732 A1* | 11/2016 | Moon | H04B 7/0617 |
| 2016/0345328 A1* | 11/2016 | Reznik | H04L 1/0025 |
| 2016/0366254 A1* | 12/2016 | Asterjadhi | H04L 69/324 |
| 2016/0380731 A1* | 12/2016 | Kim | H04L 5/0007 |
| | | | 370/329 |
| 2017/0026952 A1* | 1/2017 | Park | H04W 76/00 |
| 2017/0041945 A1* | 2/2017 | Ogawa | H04L 5/0064 |
| 2017/0048823 A1* | 2/2017 | Bharadwaj | H04W 72/042 |
| 2017/0048844 A1* | 2/2017 | Chen | H04W 72/0413 |
| 2017/0048890 A1* | 2/2017 | Sun | H04W 74/08 |
| 2017/0077999 A1* | 3/2017 | Asterjadhi | H04B 7/024 |
| 2017/0104659 A1* | 4/2017 | Suh | H04B 7/0619 |
| 2017/0127385 A1* | 5/2017 | Vermani | H04B 7/0626 |
| 2017/0170937 A1* | 6/2017 | Chun | H04L 5/0048 |

OTHER PUBLICATIONS

IEEE Std 802.11ac-2013, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 4: Enhancements for Very High Throughput for Operation in Bands below 6 GHz.*

Van Nee et al., "UL MU-MIMO for 11ac," IEEE 802.11-09/0852-00-00ac, Jul. 2009, pp. 1-10.*

"Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications", IEEE Standards 802.11™-2012 (Revision of IEEE Standard 802.11-2007), Mar. 29, 2012, pp. 1-2695, IEEE (The Institute of Electrical and Electronic Engineers, Inc.), New York, NY, USA.

"Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications for Operation in Bands below 6 GHz", IEEE Standards 802.11ac™-2013, 2013, pp. 1-395, IEEE (The Institute of Electrical and Electronic Engineers, Inc.), New York, NY, USA.

"Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 2: Sub 1 GHz License Exempt Operation", IEEE P802.11ah™/D5.0, Mar. 2015, pp. 1-604, IEEE (The Institute of Electrical and Electronic Engineers, Inc.), New York, NY, USA.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX004.00005

Case: 25-1039    Document: 20    Page: 244    Filed: 02/07/2025

## FIG. 1



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00008985

JX004.00006

FIG. 2



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00008986

**Appx159**

FIG. 3



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS−00008987

JX004.00008



FIG. 4

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx161**

ATLAS-00008988

Case: 25-1039    Document: 20    Page: 248    Filed: 02/07/2025



FIG. 5

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00008989

**Appx162**

JX004.00010

# FIG. 6



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00008990

**Appx163**

JX004.00011



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00008991

Appx164

JX004.00012

# FIG. 8



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00008992

**Appx165**

JX004.00013

# FIG. 9



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00008993

**Appx166**

FIG. 10



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx167**

ATLAS–00008994

FIG. 11



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

## FIG. 12



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx169**

ATLAS-00008996

JX004.00017

FIG. 13



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039    Document: 20    Page: 256    Filed: 02/07/2025

FIG. 14



FIG. 15



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00008998

**Appx171**

JX004.00019

# FIG. 16



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX004.00020

# FIG. 17



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009000

JX004.00021

FIG. 18



FIG. 19



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009001

**Appx174**

JX004.00022

FIG. 20



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009002

**Appx175**

JX004.00023

FIG. 21



BASSC : Block Ack Starting Sequence Control
BA Bitmap : Block Ack Bitmap

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009003

**Appx176**

JX004.00024

## FIG. 22



## FIG. 23



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx177**

JX004.00025

FIG. 24

ATLAS-00009005

**Appx178**

JX004.00026



FIG. 25

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009006

**Appx179**

JX004.00027

## FIG. 26



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009007

**Appx180**

JX004.00028



FIG. 27

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS−00009008

**Appx181**

FIG. 28

JX004.00030

US 9,825,738 B2

1

## ACKNOWLEDGEMENT METHOD AND MULTI USER TRANSMISSION METHOD

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority to and the benefit of U.S. Provisional Application Nos. 61/975,622 and 61/981,427, filed on Apr. 4, 2014 and Apr. 18, 2014 in the U.S. Patent and Trademark Office, the entire contents of which are incorporated herein by reference.

### BACKGROUND

(a) Field

The described technology relates generally to an acknowledgement (ACK) method and an uplink multi-user transmission method. More particularly, the described technology relates generally to an acknowledgement (ACK) method and an uplink multi-user transmission method in a wireless local area network (WLAN).

(b) Description of the Related Art

In a WLAN, data are transmitted and received by using unlicensed band such as 2.4 GHz or 5 GHz. The WLAN is being standardized by the IEEE (Institute of Electrical and Electronics Engineers) Part 11 under the name of "Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications."

After an original standard was published on 1999, new version standards are continuously published by amendments. The IEEE standard 802.11a (IEEE Std 802.11a-1999) supporting 2.4 GHz band was published on 1999, and the IEEE standard 802.11g (IEEE Std 802.11g-2003) supporting 5 GHz band was published on 2003. These standards are called legacy. Subsequently, the IEEE standard 802.11n (IEEE Std 802.11n-2009) for enhancements for higher throughput (HT) was published on 2009, and the IEEE standard 802.11ac (IEEE 802.11ac-2013) for enhancements for very high throughput (VHT) was published on 2013. Recently, a high efficiency WLAN (HEW) for enhancing the system throughput in high density scenarios is being developed by the IEEE 802.11 ax task group.

A multiple input multiple output (MIMO) has been introduced by the HT WLAN, and a downlink multi-user MIMO (MU-MIMO) has been introduced by the VHT WLAN. Accordingly, a transmitting device with multiple antennas can simultaneously transmit downlink data to a plurality of receiving devices. However, an uplink MU-MIMO has not been introduced by the previous WLANs, but the HEW or a later WLAN may use the uplink MU-MIMO such that a plurality of transmitting devices can simultaneously transmit data to a single receiving device.

The HEW or later WLAN may use a scheme such as an orthogonal frequency division multiple access (OFDMA) for simultaneously transmitting data to a plurality of devices or for data being simultaneously transmitted by the plurality of devices.

A single physical layer convergence procedure (PLCP) protocol data unit (PPDU) including MAC protocol data units (MPDUs) having a plurality of access categories (ACs) can be transmitted in the VHT WLAN. In this case, an MPDU corresponding to one AC is transmitted to a single receiving device. However, the single device may receive MPDUs having the plurality of ACs in the HEW or later WLAN.

As such, since the single device may simultaneously receive data from the plurality of devices or may receive

2

data with the plurality of ACs in the HEW or later WLAN, an ACK procedure for the received data is required.

### SUMMARY

An embodiment of the present invention provides an ACK method for acknowledging data received from a plurality of devices or data with a plurality of ACs and an uplink multi-user transmission method for transmitting uplink data by a plurality of devices.

According to another embodiment, a method of receiving an ACK is provided by a first transmitting device in a WLAN. The method includes transmitting a first data unit having a first traffic identifier (TID) when a plurality of data units, having a plurality of TIDs respectively, are transmitted by a plurality of transmitting devices including the first transmitting device. The method further includes receiving an ACK frame including a plurality of ACK information fields for at least part of the plurality of data units. When the first data unit satisfies a first condition, an ACK information field for the first data unit among the plurality of ACK information fields includes the first TID and a block ACK bitmap indicating whether the first data unit has been successfully received. When the first data unit satisfies a second condition and has been successfully received, an ACK information field for the first data unit among the plurality of ACK information fields includes the first TID and does not include a block ACK bitmap.

The first condition may be a condition that a data unit includes no single MAC (medium access protocol) protocol data unit (MPDU), and the second condition may be a condition that a data unit includes a single MPDU.

An ACK information field for a data unit satisfying the first condition among the plurality of ACK information fields may further include block ACK starting sequence control information. The block ACK starting sequence control information may indicate a sequence number of the first MPDU among a plurality of MPDUs included in the data unit, and a plurality of bits in the block ACK bitmap may indicate whether the plurality of MPDUs have been successfully received in an order of sequence number.

The ACK frame may further include identification information of the plurality of transmitting devices.

The identification information of each transmitting device may be included in a corresponding ACK information field among the plurality of ACK information fields.

When the first data unit satisfies the second condition and has been not successfully received, the ACK frame may not include the first TID.

According to yet another embodiment, an ACK receiving apparatus of a first transmitting device is provided in a WLAN. The ACK receiving apparatus includes a processor and a transceiver. The processor generates a first data unit having a first TID. The transceiver transmits the first data unit when a plurality of data units, having a plurality of TIDs respectively, are transmitted by a plurality of transmitting devices including the first transmitting device. The transceiver receives an ACK frame including a plurality of ACK information fields for at least part of the plurality of data units. When the first data unit satisfies a first condition, an ACK information field for the first data unit among the plurality of ACK information fields includes the first TID and a block ACK bitmap indicating whether the first data unit has been successfully received. When the first data unit satisfies a second condition and has been successfully received, an ACK information field for the first data unit

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009010

3

among the plurality of ACK information fields includes the first TID and does not include a block ACK bitmap.

According to yet another embodiment of the present invention, an ACK method is provided by a receiving device in a WLAN. The method includes receiving a plurality of data units having a plurality of TIDs respectively, and transmitting an ACK frame including a plurality of ACK information fields for at least part of the plurality of data units. An ACK information field for a data unit satisfying a first condition among the plurality of ACK information fields includes a TID and a block ACK bitmap indicating whether the data unit has been successfully received. An ACK information field for a data unit satisfying a second condition and having been successfully received among the plurality of ACK information fields includes the first TID and does not include a block ACK bitmap.

The first condition may be a condition that a data unit includes no MPDU, and the second condition may be a condition that a data unit includes a single MPDU.

The ACK information field for the data unit satisfying the first condition among the plurality of ACK information fields may further include block ACK starting sequence control information. The block ACK starting sequence control information may indicate a sequence number of the first MPDU among a plurality of MPDUs included in the data unit, and a plurality of bits in the block ACK bitmap may indicate whether the plurality of MPDUs have been successfully received in an order of sequence number.

Receiving the plurality of data units may include receiving the plurality of data units from the plurality of transmitting devices, respectively.

The ACK frame may further include identification information of the plurality of transmitting devices.

The identification information of each transmitting device may be included in a corresponding ACK information field among the plurality of ACK information fields.

The ACK frame may not include a TID of a data unit satisfying the second condition and having been not successfully received.

According to still another embodiment of the present invention, an ACK apparatus of a receiving device is provided in a WLAN. The ACK apparatus includes a processor and a transceiver. The transceiver receives a plurality of data units having a plurality of TIDs respectively, and transmits an ACK frame. The processor generates the ACK frame including a plurality of ACK information fields for at least part of the plurality of data units. An ACK information field for a data unit satisfying a first condition among the plurality of ACK information fields includes a TID and a block ACK bitmap indicating whether the data unit has been successfully received. An ACK information field for a data unit satisfying a second condition and having been successfully received among the plurality of ACK information fields includes the first TID and does not include a block ACK bitmap.

According to further embodiment of the present invention, a method of receiving an ACK is provided by a transmitting device in a WLAN. The method includes transmitting a data unit having a TID and receiving an ACK frame including an ACK information field. When the data unit satisfies a first condition, the ACK information field includes the TID and a block ACK bitmap indicating whether the data unit has been successfully received. When the data unit satisfies a second condition and has been successfully received, the ACK information includes the TID and does not include a block ACK bitmap.

4

The first condition may be a condition that the data unit includes no single MPDU, and the second condition may be a condition that the data unit includes a single MPDU.

When the ACK information field satisfies the first condition, the ACK information field may further include block ACK starting sequence control information. The block ACK starting sequence control information may indicate a sequence number of the first MPDU among a plurality of MPDUs included in the data unit, and a plurality of bits in the block ACK bitmap may indicate whether the plurality of MPDUs have been successfully received in an order of sequence number.

The ACK frame may further include identification information of the transmitting device.

According to further embodiment of the present invention, an ACK receiving apparatus of a transmitting device is provided in a WLAN. The ACK receiving apparatus includes a processor and a transceiver. The processor generates a data unit having a TID. The transceiver transmits the data unit and receives an AKC frame including an ACK information field. When the data unit satisfies a first condition, the ACK information field includes the TID and a block ACK bitmap indicating whether the data unit has been successfully received. When the data unit satisfies a second condition and has been successfully received, the ACK information includes the TID and does not include a block ACK bitmap.

According to further embodiment of the present invention, an ACK method is provided by a receiving device in a WLAN. The method includes receiving a data unit having a TID and transmitting an ACK frame including an ACK information field. When the data unit satisfies a first condition, the ACK information field includes the TID and a block ACK bitmap indicating whether the data unit has been successfully received. When the data unit satisfies a second condition and has been successfully received, the ACK information includes the TID and does not include a block ACK bitmap.

The first condition may be a condition that the data unit includes no MPDU, and the second condition may be a condition that the data unit includes a single MPDU.

When the ACK information field satisfies the first condition, the ACK information field may further include block ACK starting sequence control information. The block ACK starting sequence control information may indicate a sequence number of the first MPDU among a plurality of MPDUs included in the data unit, and a plurality of bits in the block ACK bitmap may indicate whether the plurality of MPDUs have been successfully received in an order of sequence number.

The ACK frame may further include identification information of the transmitting device.

According to further embodiment of the present invention, an ACK apparatus of a receiving device is provided in a WLAN. The ACK apparatus includes a processor and a transceiver. The transceiver receives a data unit having a TID and transmits an ACK frame. The processor generates the ACK frame including an ACK information field. When the data unit satisfies a first condition, the ACK information field includes the TID and a block ACK bitmap indicating whether the data unit has been successfully received. When the data unit satisfies a second condition and has been successfully received, the ACK information includes the TID and does not include a block ACK bitmap.

According to further embodiment of the present invention, a multi-user transmission method is provided by an access point in a WLAN. The method includes transmitting

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,825,738 B2

5

an initiation frame indicating an initiation of uplink multi-user transmission, receiving a plurality of data frames from a plurality of stations, respectively, and transmitting an ACK frame indicating whether the plurality of data frames have been successfully received.

The initiation frame, the data frames, and the ACK frame may be transmitted on an unlicensed band.

An interval between temporally consecutive frames in a plurality of frames including the initiation frame, the data frames, and the ACK frame may be an SIFS (short inter-frame space) interval defined in a WLAN standard.

The ACK frame may include information for identifying each station and a block ACK bitmap for indicating whether the data frame transmitted by each station has been success-fully received, and the block ACK bitmap may be provided for each station.

The ACK frame may further include block ACK starting sequence control information for each station. The block ACK starting sequence control information may indicate a sequence number of the first MPDU among a plurality of MPDUs included in a data frame transmitted by a corresponding station, and each bit in the block ACK bitmap may indicate whether the MPDU has successfully received in an order of sequence number.

The ACK frame may further include information for identifying a station that has transmitted a data frame which has been successfully received from among the plurality of stations.

The method may further include sequentially receiving request frame including feedback information from the plurality of stations as a response of the initiation frame, and transmitting a setup frame including setup information for the uplink multi-user transmission to at least part of the plurality of stations as a response of the request frame.

The feedback information may include transmission power information.

The setup information may include information that is common to the at least part of the plurality of stations and dedicate information that is specific to each of the at least part of the plurality of stations, for the uplink multi-user transmission.

According to further embodiment of the present invention, a multi-user transmission apparatus of an access point is provided in a WLAN. The multi-user transmission apparatus includes a processor and a transceiver. The transceiver received a plurality of data frames and transmits an ACK frame. The transceiver transmits an initiation frame indicating an initiation of uplink multi-user transmission, and receives a plurality of data frames from a plurality of stations, respectively. The processor generates an ACK frame indicating whether the plurality of data frames have been successfully received, and the transceiver transmits the ACK frame.

According to further embodiment of the present invention, a multi-user transmission method is provided by a station in a WLAN. The method includes receiving an initiation frame indicating an initiation of uplink multi-user transmission, transmitting a data frame, and receiving an ACK frame indicating whether a plurality of data frames including the data frame have been successfully received. The plurality of data frames are transmitted by a plurality of stations including the station, respectively.

According to further embodiment of the present invention, an ACK apparatus of a station is provided in a WLAN. The ACK apparatus includes a processor and a transceiver. The transceiver receives an initiation frame indicating an initiation of uplink multi-user transmission, and the proces-

6

sor generates a data frame. The transceiver transmits the data frame, and receives an ACK frame indicating whether a plurality of data frames including the data frame have been successfully received. The plurality of data frames are transmitted by a plurality of stations including the station, respectively.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic block diagram exemplifying a WLAN device.

FIG. 2 is a schematic block diagram exemplifying a transmitting signal processor in a WLAN.

FIG. 3 is a schematic block diagram exemplifying a receiving signal processing unit in the WLAN.

FIG. 4 exemplifies IFS relationships.

FIG. 5 is a schematic diagram explaining CSMA/CA based frame transmission procedure for avoiding collision between frames in a channel.

FIG. 6, FIG. 8, and FIG. 10 exemplify an ACK procedure in a wireless communication network according to embodiments of the present invention.

FIG. 7, FIG. 9, and FIG. 11 exemplify an ACK frame in a wireless communication network according to embodiments of the present invention.

FIG. 12 is a flowchart exemplifying information selection of an ACK frame in a wireless communication network according to an embodiment of the present invention.

FIG. 13 exemplifies an ACK procedure in a wireless communication network according to another embodiment of the present invention.

FIG. 14 shows an example of a wireless communication network according to another embodiment of the present invention.

FIG. 15 exemplifies a UL MU transmission procedure in a wireless communication network according to another embodiment of the present invention.

FIG. 16 and FIG. 17 exemplify an ACK frame in a wireless communication network according to embodiments of the present invention.

FIG. 18 and FIG. 19 exemplify a UL initiation frame in a wireless communication network according to embodiments of the present invention.

FIG. 20 exemplifies a UL MU transmission procedure in a wireless communication network according to yet another embodiment of the present invention.

FIG. 21 exemplifies an ACK frame in a wireless communication network according to yet another embodiment of the present invention.

FIG. 22, FIG. 23, FIG. 24, FIG. 25, FIG. 26, FIG. 27, and FIG. 28 exemplify a UL MU procedure in a wireless communication network according to various embodiments of the present invention.

DETAILED DESCRIPTION OF THE EMBODIMENTS

In the following detailed description, only certain embodiments of the present invention have been shown and described, simply by way of illustration. As those skilled in the art would realize, the described embodiments may be modified in various different ways, all without departing from the spirit or scope of the present invention. Accordingly, the drawings and description are to be regarded as illustrative in nature and not restrictive. Like reference numerals designate like elements throughout the specification.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009012

**Appx185**

US 9,825,738 B2

7

In a wireless local area network (WLAN), a basic service set (BSS) includes a plurality of WLAN devices. The WLAN device may include a medium access control (MAC) layer and a physical (PHY) layer according to the IEEE (Institute of Electrical and Electronics Engineers) standard 802.11. The plurality of WLAN devices may include a WLAN device that is an access point and the other WLAN devices that are non-AP stations (non-AP STAs). Alternatively, all the plurality of WLAN devices may be non-AP STAs in Ad-hoc networking. In general, the AP STA and the non-AP STA may be collectively called the STA. However, for easy description, only the non-AP STA may be called the STA.

FIG. 1 is a schematic block diagram exemplifying a WLAN device.

Referring to FIG. 1, the WLAN device 1 includes a baseband processor 10, a radio frequency (RF) transceiver 20, an antenna unit 30, a memory 40, an input interface unit 50, an output interface unit 60, and a bus 70.

The baseband processor 10 performs baseband signal processing, and includes a MAC processor 11 and a PHY processor 15.

In one embodiment, the MAC processor 11 may include a MAC software processing unit 12 and a MAC hardware processing unit 13. The memory 40 may store software (hereinafter referred to as "MAC software") including at least some functions of the MAC layer. The MAC software processing unit 12 executes the MAC software to implement the some functions of the MAC layer, and the MAC hardware processing unit 13 may implement remaining functions of the MAC layer as hardware (hereinafter referred to "MAC hardware"). However, the MAC processor 11 is not limited to this.

The PHY processor 15 includes a transmitting signal processing unit 100 and a receiving signal processing unit 200.

The baseband processor 10, the memory 40, the input interface unit 50, and the output interface unit 60 may communicate with each other via the bus 70.

The RF transceiver 20 includes an RF transmitter 21 and an RF receiver 22.

The memory 40 may further store an operating system and applications. The input interface unit 50 receives information from a user, and the output interface unit 60 outputs information to the user.

The antenna unit 30 includes one or more antennas. When multiple-input multiple-output (MIMO) or multi-user MIMO (MU-MIMO) is used, the antenna unit 30 may include a plurality of antennas.

FIG. 2 is a schematic block diagram exemplifying a transmitting signal processor in a WLAN.

Referring to FIG. 2, a transmitting signal processing unit 100 includes an encoder 110, an interleaver 120, a mapper 130, an inverse Fourier transformer (IFT) 140, and a guard interval (GI) 150.

The encoder 110 encodes input data. For example, the encoder 100 may be a forward error correction (FEC) encoder. The FEC encoder may include a binary convolutional code (BCC) encoder followed by a puncturing device, or may include a low-density parity-check (LDPC) encoder.

The transmitting signal processing unit 100 may further include a scrambler for scrambling the input data before the encoding to reduce the probability of long sequences of 0s or 1s. If BCC encoding is used in the encoder, the transmitting signal processing unit 100 may further include an encoder parser for demultiplexing the scrambled bits among

8

a plurality of BCC encoders. If LDPC encoding is used in the encoder, the transmitting signal processing unit 100 may not use the encoder parser.

The interleaver 120 interleaves the bits of each stream output from the encoder to change order of bits. Interleaving may be applied only when BCC encoding is used. The mapper 130 maps the sequence of bits output from the interleaver to constellation points. If the LDPC encoding is used in the encoder, the mapper 130 may further perform LDPC tone mapping besides the constellation mapping.

When the MIMO or the MU-MIMO is used, the transmitting signal processing unit 100 may use a plurality of interleavers 120 and a plurality of mappers corresponding to the number of $N_{SS}$ of spatial streams. In this case, the transmitting signal processing unit 100 may further include a stream parser for dividing outputs of the BCC encoders or the LDPC encoder into blocks that are sent to different interleavers 120 or mappers 130. The transmitting signal processing unit 100 may further include a space-time block code (STBC) encoder for spreading the constellation points from the $N_{SS}$ spatial streams into $N_{STS}$ space-time streams and a spatial mapper for mapping the space-time streams to transmit chains. The spatial mapper may use direct mapping, spatial expansion, or beamforming.

The IFT 140 converts a block of the constellation points output from the mapper 130 or the spatial mapper to a time domain block (i.e., a symbol) by using an inverse discrete Fourier transform (IDFT) or an inverse fast Fourier transform (IFFT). If the STBC encoder and the spatial mapper are used, the inverse Fourier transformer 140 may be provided for each transmit chain.

When the MIMO or the MU-MIMO is used, the transmitting signal processing unit 100 may insert cyclic shift diversities (CSDs) to prevent unintentional beamforming. The CSD insertion may occur before or after the inverse Fourier transform. The CSD may be specified per transmit chain or may be specified per space-time stream. Alternatively, the CSD may be applied as a part of the spatial mapper.

When the MU-MIMO is used, some blocks before the spatial mapper may be provided for each user.

The GI inserter 150 prepends a GI to the symbol. The transmitting signal processing unit 100 may optionally perform windowing to smooth edges of each symbol after inserting the GI. The RF transmitter 21 converts the symbols into an RF signal and transmits the RF signal via the antenna unit 30. When the MIMO or the MU-MIMO is used, the GI inserter 150 and the RF transmitter 21 may be provided for each transmit chain.

FIG. 3 is a schematic block diagram exemplifying a receiving signal processing unit in the WLAN.

Referring to FIG. 3, a receiving signal processing unit 200 includes a GI remover 220, a Fourier transformer (FT) 230, a demapper 240, a deinterleaver 250, and a decoder 260.

An RF receiver 22 receives an RF signal via the antenna unit 30 and converts the RF signal into the symbols. The GI remover 220 removes the GI from the symbol. When the MIMO or the MU-MIMO is used, the RF receiver 22 and the GI remover 220 may be provided for each receive chain.

The FT 230 converts the symbol (i.e., the time domain block) into a block of the constellation points by using a discrete Fourier transform (DFT) or a fast Fourier transform (FFT). The Fourier transformer 230 may be provided for each receive chain.

When the MIMO or the MU-MIMO is used, the receiving signal processing unit 200 may a spatial demapper for converting the Fourier transformed receiver chains to con-

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,825,738 B2

**9**

stellation points of the space-time streams, and an STBC decoder for despreading the constellation points from the space-time streams into the spatial streams.

The demapper **240** demaps the constellation points output from the Fourier transformer **230** or the STBC decoder to the bit streams. If the LDPC encoding is used, the demapper **240** may further perform LDPC tone demapping before the constellation demapping. The deinterleaver **250** deinterleaves the bits of each stream output from the demapper **240**. Deinterleaving may be applied only when BCC encoding is used.

When the MIMO or the MU-MIMO is used, the receiving signal processing unit **200** may use a plurality of demappers **240** and a plurality of deinterleavers **250** corresponding to the number of spatial streams. In this case, the receiving signal processing unit **200** may further include a stream deparser for combining the streams output from the deinterleavers **250**.

The decoder **260** decodes the streams output from the deinterleaver **250** or the stream deparser. For example, the decoder **100** may be an FEC decoder. The FEC decoder may include a BCC decoder or an LDPC decoder. The receiving signal processing unit **200** may further include a descrambler for descrambling the decoded data. If BCC decoding is used in the decoder, the receiving signal processing unit **200** may further include an encoder deparser for multiplexing the data decoded by a plurality of BCC decoders. If LDPC decoding is used in the decoder, the receiving signal processing unit **100** may not use the encoder deparser.

FIG. **4** exemplifies interframe space (IFS) relationships. A data frame, a control frame, or a management frame may be exchanged between WLAN devices.

The data frame is used for transmission of data forwarded to a higher layer. The WLAN device transmits the data frame after performing backoff if a distributed coordination function IFS (DIFS) has elapsed from a time when the medium has been idle. The management frame is used for exchanging management information which is not forwarded to the higher layer. Subtype frames of the management frame include a beacon frame, an association request/response frame, a probe request/response frame, and an authentication request/response frame. The control frame is used for controlling access to the medium. Subtype frames of the control frame include a request to send (RTS) frame, a clear to send (CTS) frame, and an acknowledgement (ACK) frame. In the case that the control frame is not a response frame of the other frame, the WLAN device transmits the control frame after performing backoff if the DIFS has elapsed. In the case that the control frame is the response frame of the other frame, the WLAN device transmits the control frame without performing backoff if a short IFS (SIFS) has elapsed. The type and subtype of frame may be identified by a type field and a subtype field in a frame control field.

On the other hand, a Quality of Service (QoS) STA may transmit the frame after performing backoff if an arbitration IFS (AIFS) for access category (AC), i.e., AIFS[AC], has elapsed. In this case, the data frame, the management frame, or the control frame which is not the response frame may use the AIFC[AC].

FIG. **5** is a schematic diagram explaining a CSMA (carrier sense multiple access)/CA (collision avoidance) based frame transmission procedure for avoiding collision between frames in a channel.

Referring to FIG. **5**, STA1 is a transmit WLAN device for transmitting data, STA2 is a receive WLAN device for receiving the data, and STA3 is a WLAN device which may be located at an area where a frame transmitted from the

**10**

STA1 and/or a frame transmitted from the STA2 can be received by the WLAN device.

The STA1 may determine whether the channel is busy by carrier sensing. The STA1 may determine the channel occupation based on an energy level on the channel or correlation of signals in the channel, or may determine the channel occupation by using a network allocation vector (NAV) timer.

When determining that the channel is not used by other devices during DIFS (that is, the channel is idle), the STA1 may transmit an RTS frame to the STA2 after performing backoff. Upon receiving the RTS frame, the STA2 may transmit a CTS frame as a response of the CTS frame after SIFS.

When the STA3 receives the RTS frame, it may set the NAV timer for a transmission duration of subsequently transmitted frames (for example, a duration of SIFS+CTS frame duration+SIFS+data frame duration+SIFS+ACK frame duration) by using duration information included in the RTS frame. When the STA3 receives the CTS frame, it may set the NAV timer for a transmission duration of subsequently transmitted frames (for example, a duration of SIFS+data frame duration+SIFS+ACK frame duration) by using duration information included in the RTS frame. Upon receiving a new frame before the NAV timer expires, the STA3 may update the NAV timer by using duration information included in the new frame. The STA3 does not attempt to access the channel until the NAV timer expires.

When the STA1 receives the CTS frame from the STA2, it may transmit a data frame to the STA2 after SIFS elapses from a time when the CTS frame has been completely received. Upon successfully receiving the data frame, the STA2 may transmit an ACK frame as a response of the data frame after SIFS elapses.

When the NAV timer expires, the STA3 may determine whether the channel is busy by the carrier sensing. Upon determining that the channel is not used by the other devices during DIFS after the NAV timer has expired, the STA3 may attempt the channel access after a contention window according to a random backoff elapses.

Now, a signaling method in a wireless communication network according to various embodiments of the present invention is described with reference to the drawings.

FIG. **6**, FIG. **8**, and FIG. **10** exemplify an ACK procedure in a wireless communication network according to embodiments of the present invention, and FIG. **7**, FIG. **9**, and FIG. **11** exemplify an ACK frame in a wireless communication network according to embodiments of the present invention.

Referring to FIG. **6**, FIG. **8**, and FIG. **10**, a transmitting device transmits a PHY frame, for example a PLCP (physical layer convergence procedure) protocol data unit (PPDU).

The PPDU is a multi-AC PPDU corresponding to a plurality of access categories (ACs). The multi-AC PPDU includes a plurality of aggregate MAC protocol data units (A-MPDUs) that correspond to the plurality of ACs, respectively. Each A-MPDU may include a single MPDU or may include a plurality of MPDUs. One example of the single MPDU may be a VHT single MPDU defined in the IEEE Std 802.11ac. In the IEEE Std 802.11ac, an MPDU that is the only MPDU in an A-MPDU and is carried in an A-MPDU with an end-of-frame (EOF) subfield set to 1 is called a "VHT single MPDU." In one embodiment, the multi-AC PPDU may, as shown in FIG. **6**, include a plurality of A-MPDUs each including no single MPDU. In another embodiment, the multi-AC PPDU may, as shown in FIG. **8**, include a plurality of A-MPDUs each including a single MPDU. In yet another embodiment, the multi-AC PPDU

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx187**

ATLAS-00009014

US 9,825,738 B2

**11**

may, as shown in FIG. 10, include a plurality of A-MPDUs. The plurality of A-MPDUs includes an A-MPDU including a single MPDU and an A-MPDU including no single MPDU.

In some embodiments, the AC corresponds to a traffic identifier (TID). The TID associates the MPDU with an appropriate AC. Hereinafter, the AC is described as the TID for convenience.

Referring to FIG. 6 again, a transmitting device may transmit a PPDU including A-MPDUs for the plurality of ACs. FIG. 6 shows an example where the PPDU includes an A-MPDU to which "TID1" is assigned as the TID and an A-MPDU to which "TID2" is assigned as the TID. A receiving device receiving the PPDU transmits an ACK frame to the transmitting device after a predetermined IFS interval. The predetermined IFS may be an SIFS. Alternatively, the predetermined IFS may be an IFS having the different duration from the SIFS.

As shown in FIG. 7, the ACK frame is defined by using a multi-TID block ACK frame format that is defined for a power save multi-poll operation in the HT WLAN.

Referring to FIG. 7, the ACK frame includes an MAC header, a frame body field, a frame check sequence (FCS) field like the multi-TID block ACK frame defined in the HT WLAN.

The MAC header includes an address field, and the address field may include a transmitter address (TA) field and a receiver address (RA) field. The MAC header may further include a frame control field and a duration/ID field. The FCS field includes a cyclic redundancy check (CRC). Since the MAC header and the FCS field are fields included in a control frame of a previous WLAN, detailed descriptions thereof are omitted.

The frame body field includes a block ACK (BA) information field. The BA information field has a variable length according to the number of TIDs and includes an information per TID (per TID info) subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield, for each TID. The information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield are repeated for each TID.

The information per TID subfield indicates a value of a corresponding TID. The information per TID subfield may have two octets whose first 12 bits B0-B11 are reserved and last 4 bits B12-B15 indicate the TID value.

The block ACK starting sequence control subfield includes a starting sequence number subfield. The starting sequence number subfield indicates a sequence number of the first MPDU, i.e., a MSDU or an aggregate MSDU (A-MSDU) included in the first MPDU, for which the ACK frame is sent. The block ACK starting sequence control subfield may have two octets whose last 12 bits B4-B15 correspond to the starting sequence number subfield. The first 4 bits B0-B3 of the block ACK starting sequence control subfield may correspond to a fragment number subfield set to 0.

The block ACK bitmap subfield includes a block ACK bitmap. Each bit that is equal to 1 in the block ACK bitmap acknowledges successful reception of an MPDU in the order of sequence number. The first bit of the Block ACK bitmap corresponds to the MPDU with the sequence number that matches the starting sequence number of the block ACK starting sequence control subfield. The bit position n of the block ACK bitmap, if equal to 1, indicates the successful reception of the MPDU with the sequence number equal to 5 (a value of the block ACK starting sequence control subfield+n). The bit position n of the block ACK bitmap, if

**12**

equal to 0, indicates that the MPDU with the sequence number equal to (a value of the block ACK starting sequence control subfield+n) has not been successfully received.

The first instance of the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield corresponds to the lowest TID value with subsequent instances ordered by increasing values of the information per TID subfield.

Accordingly, the receiving device receiving the multi-AC PPDU may set each bit of the block ACK bitmap according to whether MPDUs aggregated in the A-MPDU corresponding to the TID with the lowest TID value has been successfully received in the order of sequence number. Subsequently, the receiving device may set each bit of the block ACK bitmap according to whether MPDUs aggregated in the A-MPDU corresponding to the TID with the next TID value has been successfully received in the order of sequence number. Assuming that TID1 is less than TID2 in the example shown in FIG. 6, the receiving device may set the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield for TID1, and then may set the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield for TID2. The transmitting device receiving the multi-TID block ACK frame can identify whether the MPDUs aggregated in the A-MPDU have been successfully received based on the TID value and the block ACK bitmap.

In some embodiments, the frame body field may further include a BA control field for controlling the block ACK.

Referring to FIG. 8 again, the transmitting device may transmit a PPDU including single MPDUs for the plurality of ACs. FIG. 8 shows an example where the PPDU includes a single MPDU to which "TID1" is assigned as the TID and a single MPDU to which "TID2" is assigned as the TID. A receiving device receiving the PPDU transmits an ACK frame to the transmitting device after a predetermined IFS interval.

The ACK frame is a multi-TID ACK frame and uses a normal ACK not the block ACK as shown in FIG. 9.

Referring to FIG. 9, the multi-TID ACK includes an MAC header, a frame body field, and an FCS field.

The MAC header includes an address field. In some embodiments, the address field may not include a TA field and may include an RA field. The MAC header may further include a frame control field and a duration/ID field. The FCS field includes a CRC.

The frame body field includes a BA information field. The BA information field has a variable length according to the number of TIDs and includes information per TID (per TID info) subfield for each TID. The information per TID subfield is repeated for each TID. In some embodiments, the BA information field may include the information per TID subfields for TIDs of single MPDUs that have been successfully received. That is, the ACK may be transmitted for only the single MPDUs that have been successfully received. Differently from an embodiment shown in FIG. 7, the BA information field does not include a block ACK starting sequence control subfield and a block ACK bitmap subfield. Accordingly, the BA information field shown in FIG. 9 may be called an ACK information field. In some embodiments, the ACK frame may use a format that is a multi-TID block ACK frame format defined in the HT WLAN having an ACK information filed excluding a block ACK starting sequence control subfield and a block ACK bitmap subfield.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009015

US 9,825,738 B2

13                                            14

The information per TID subfield indicates information, for example a TID value, on a TID for which an ACK is transmitted

The information per TID subfield may have two octets whose first 12 bits B0-B11 are reserved and last 4 bits B12-B15 indicate the TID value.

The first instance of the information per TID subfield corresponds to the lowest TID value from among TIDs for which the ACK is transmitted, with subsequent instances ordered by increasing values of the information per TID subfield.

Accordingly, the receiving device receiving the multi-AC PPDU may input TID values of single MPDUs, which have been successfully received from among single MPDUs corresponding to a plurality of TIDs, to the ACK information field in the increasing order of TID value. The transmitting device receiving the multi-TID ACK frame can identify whether the single MPDUs have been successfully received based on the TID values input to the ACK information field. If the information per TID subfield is transmitted for the single MPDU that has been successfully received, the overhead of the ACK frame can be reduced.

In one embodiment, a bit of the reserved bits B0-B11 of the information per TID subfield in the ACK frame shown in FIG. 9 may indicate whether the ACK frame includes the block ACK bitmap, i.e., is the block ACK. For example, the last bit B11 of the reserved bits B0-B11 may indicate the block ACK. In another embodiment, a bit of the reserved bits B0-B11 of the information per TID subfield in the ACK frame shown in FIG. 7 may indicate whether the ACK frame is the block ACK.

Referring to FIG. 10, a transmitting device may transmit a PPDU including a plurality of A-MPDUs. In the plurality of A-MPDUs, an A-MPDU for a certain AC includes a single MPDU and an A-MPDU for other AC includes no single MPDU. FIG. 10 shows an example where the PPDU includes an A-MPDU to which "TID1" is assigned as the TID and a single MPDU to which "TID2" is assigned as the TID. A receiving device receiving the PPDU transmits an ACK frame to the transmitting device after a predetermined IFS interval.

The ACK frame is an ACK frame into which a multi-TID block ACK frame and a multi-TID ACK frame are multiplexed, and may use a multi-TID block ACK frame format defined in the HT WLAN.

Referring to FIG. 11, for the TID on which the A-MPDU is transmitted, the BA information field includes an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield as shown in FIG. 7. For the TID on which the single MPDU is transmitted, the BA information field includes an information per TID subfield as shown in FIG. 9. That is, the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield are repeated for each TID on which the A-MPDU is transmitted, and the information per TID subfield is repeated for each TID on which the single MPDU is transmitted. Since the A-MPDU is transmitted for TID1 and the single MPDU is transmitted for TID2 in an example shown in FIG. 10, the ACK frame includes the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield for TID1 and includes the information per TID for TID2.

The transmitting device receiving the ACK frame can identify whether the MPDUs aggregated in the A-MPDU have been successfully received based on the TID value and the block ACK bitmap for the TID on which the A-MPDU is transmitted, and can identify whether the single MPDU has been successfully received based on the TID value for the TID on which the single MPDU is transmitted.

In one embodiment, for each TID, a bit of the reserved bits B0-B11 of the information per TID subfield may indicate whether the ACK frame for a corresponding TID is the block ACK. In another embodiment, for only the TID on which the block ACK is not used, a bit of the reserved bits B0-B11 of the information per TID subfield may indicate that the ACK frame is not the block ACK.

While it has been described in the above embodiments that the ACK frame uses the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield or uses the information per TID subfield in accordance with whether the multi-AC PPDD includes the A-MPDU or the single MPDU, the other conditions may be used.

In some embodiments, when a data unit does not include an A-MPDU and a single MPDU, i.e., includes MPDUs that are not aggregated, an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield may be used as ACK information.

In some embodiments, when a data unit includes one MPDU that is not a single MPDU, an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield may be used as ACK information.

FIG. 12 is a flowchart exemplifying information selection of an ACK frame in a wireless communication network according to an embodiment of the present invention.

As shown in FIG. 12, a device determines a condition (S110). When the determined condition is a first condition, the device inputs ACK information of a first type to an ACK frame (S120). When the determined condition is a second condition, the device inputs ACK information of a second type to the ACK frame (S130). The ACK information of the first type may correspond to an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield as described with reference to FIG. 7. The ACK information of the second type may correspond to an information per TID subfield as described with reference to FIG. 9. As such, the type of the ACK information inputted for a TID may be determined depending on the condition of the TID.

In some embodiments, the first condition may be a condition that an A-MPDU does not include a single MPDU, and the second condition may be a condition that an A-MPDU includes a single MPDU.

In some embodiments, the first condition may be a condition that an A-MPDU is not indicated to a single MPDU by information such as an EOF field, and the second condition may be a condition that an A-MPDU is indicated to a single MPDU by information such as an EOF field.

In some embodiments, the first condition may be a condition that an A-MPDU includes a plurality of MPDUs, and the second condition may be a condition that an A-MPDU includes one MPDU.

In some embodiments, the device may input the ACK information of the second type to the ACK frame when the data unit satisfies the second condition and has been successfully received in the step S130.

In another embodiment of the present invention, a transmitting device may set an ACK policy and a receiving device may transmit an ACK in accordance with the ACK policy. This embodiment is described with reference to Table 1 and FIG. 13.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009016

**Appx189**

US 9,825,738 B2

15

Table 1 shows an ACK policy in a wireless communication network according to another embodiment of the present invention, and FIG. 13 exemplifies an ACK procedure in a wireless communication network according to another embodiment of the present invention.

TABLE 1

| | Single AC transmission | | Multi-AC transmission | |
| | Non A-MPDU or | | | |
| Value | single MPDU | A-MPDU | Single MPDU | Non single MPDU |
|---|---|---|---|---|
| 0 | Normal ACK (ACK) | Implicit Block Ack (block ACK) | Normal ACK (Multi-TID ACK) | Implicit block Ack (Multi-TID block ACK) |
| 1 | No explicit acknowledgement or PSMP Ack | | | |
| 2 | No Ack (No response) | No Ack (No response) | No Ack (No response) | No Ack (No response) |
| 3 | — | Block Ack Wait for receiving BlockAck Request (BAR) | — | Block Ack Wait for receiving Multi-TID BlockAck Request (BAR) |

In some embodiments, the ACK policy may have a setting value of 2 bits, and may be included in, for example, a QoS (quality of service) control field of a data frame.

As shown in Table 1, the ACK policy setting value of 0 indicates to respond as a normal ACK, i.e., a multi-TID ACK frame for a single MPDU and to respond as a block ACK, i.e., a multi-TID block ACK frame for an A-MPDU. The ACK policy setting value of 2 indicates that no ACK needs to be transmitted as a response. The setting value of the ACK policy of 3 indicates to respond as the multi-TID block ACK frame after receiving a multi-TID block ACK request (BAR) for the A-MPDU.

Accordingly, when the multi-AC PPDU is used, the ACK procedure can be performed by setting the ACK policy.

In some embodiments, as shown in Table 1, the ACK policy setting value may be applied to a PPDU using a single AC not a plurality of ACs. The ACK policy setting value of 0 indicates to respond as an ACK frame for a non A-MPDU or an MPDU and to respond as a block ACK frame for an A-MPDU. The setting value of the ACK policy of 1 indicates that no explicit acknowledgement or PSMP ACK is required. The ACK policy setting value of 2 indicates that no ACK needs to be transmitted as a response. The setting value of the ACK policy of 3 indicates to respond as the block ACK frame after receiving a block ACK request (BAR) for the A-MPDU.

Next, referring to FIG. 13, a transmitting device may transmit a PPDU including A-MPDUs. FIG. 13 shows an example where the PPDU include A-MPDUs 121, 122, 123, 124, and 125. The A-MPDU 121 is assigned "TID1" as the TID, is toward a receiving device Rx1, and has an ACK policy set to 0. The A-MPDU 122 is assigned "TID2" as the TID, is toward the receiving device Rx1, and has an ACK policy set to 0. The A-MPDU 123 is assigned "TID1" as the TID, is toward a receiving device Rx2, and has an ACK policy set to 3. The A-MPDU 124 is assigned "TID2" as the TID, is toward a receiving device Rx3, and has an ACK policy set to 3. The A-MPDU 125 is assigned "TID3" as the TID, is toward the receiving device Rx3, and has an ACK policy set to 3.

The receiving device Rx1 receiving the A-MPDUs 121 and 122 with the ACK policy of 0 transmits a multi-TID block ACK frame after the SIFS interval. The receiving device Rx1 sets whether the A-MPDU has been received for

16

each TID as a block ACK bitmap. The receiving device Rx2 or Rx3 receiving the A-MPDU 123, 124, or 125 with the ACK policy of 3 waits without transmitting an ACK.

The transmitting device receives the multi-TID block ACK frame from the receiving device Rx1 and then transmits a BAR frame to the receiving device Rx2 after the SIFS interval. Since the A-MPDU 123 transmitted to the receiving device Rx2 has a single TID (TID1), the transmitting device transmits a normal BAR frame thereby requesting the receiving device Rx2 to transmit a block ACK. The BAR frame uses a BlockAckReq frame format defined in the previous WLAN. The receiving device Rx2 receiving the BAR frame transmits a block ACK frame after the SIFS interval. The block ACK frame sets whether the A-MPDU 123 has been received as a block ACK bitmap.

Next, the transmitting device receives the block ACK frame from the receiving device Rx2 and then transmits a multi-TID BAR frame to the receiving device Rx3 after the SIFS interval. Since the A-MPDUs 124 and 125 transmitted to the receiving device Rx3 have multi TIDs (TID2 and TID3), the transmitting device transmits a multi-TID BAR frame thereby requesting the receiving device Rx3 to transmit a multi-TID block ACK. The receiving device Rx3 receiving the multi-TID BAR frame transmits the block ACK frame after the SIFS interval. The receiving device Rx3 sets whether the A-MPDU has been received for each TID as a block ACK bitmap.

Each receiving device can transmit the ACK in accordance with its ACK policy through the above procedure.

While the ACK for a frame having a plurality of ACs has been described above, an embodiment of the present invention may be applied to an ACK on frames that are simultaneously transmitted to a plurality of receiving devices. In a wireless communication network according to an embodiment of the present invention, a multi-user (MU), i.e., a plurality of stations may simultaneously transmit uplink (UL) frames (for example, PPDUs) using UL MU-MIMO or OFDMA transmission. In this case, a method in which a receiving device, i.e., an AP, receiving the UL PPDUs transmits an ACK is described.

FIG. 14 shows an example of a wireless communication network according to another embodiment of the present invention, FIG. 15 exemplifies a UL MU transmission procedure in a wireless communication network according to another embodiment of the present invention, FIG. 16 and FIG. 17 exemplify an ACK frame in a wireless communication network according to embodiments of the present invention, and FIG. 18 and FIG. 19 exemplify a UL initia-

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009017

JX004.00038

US 9,825,738 B2

**17**

tion frame in a wireless communication network according to embodiments of the present invention.

Referring to FIG. **14**, a basic service set (BSS) includes a plurality of WLAN devices. The WLAN devices include a device that is an AP and a device that is a non-AP station, i.e., a station. In FIG. **14** and FIG. **15**, three stations STA1, STA2, and STA3 are shown for convenience, but the number of stations is not limited thereto.

Referring to FIG. **15**, the AP first transmits a UL initiation (ULI) frame to perform UL MU transmission with a plurality of stations STA1, STA2, and STA3. The AP may transmit the ULI frame whose recipient is a group including the stations STA1, STA2, and STA3. The ULI frame indicates the stations STA1, STA2, and STA3 to initiate the UL MU transmission. In some embodiments, the ULI frame may include setup information to be used for the UL MU transmission by each station.

Each of the stations STA1, STA2, and STA3 receiving the ULI frame transmits a UL data frame, for example a UL PPDU. The AP receiving the UL PPDUs from the stations STA1, STA2, and STA3 transmits an ACK frame on the UL PPDUs to the stations STA1, STA2, and STA3. In one embodiment, the ACK frame may include information of each station and information about whether the UL PPDU from the corresponding station has been received to allow each station to check an acknowledgement on its UL PPDU. In another embodiment, the ACK frame may include information about whose UL PPDU has been successfully received from among the stations.

The stations STA1, STA2, and STA3 can transmit the UL PPDUs to the AP through the above procedure.

In some embodiments, the ACK frame may use a block ACK frame described with reference to FIG. **7**. Referring to FIG. **16**, the ACK frame includes a MAC header, a frame body field, and an FCS field, and the frame body field includes a BA information field, like a multi-TID block ACK frame shown in FIG. **7**.

Differently from an embodiment described with reference to FIG. **7**, since the AP transmits the ACK on the UL PPDUs received from the stations STA1, STA2, and STA3, the BA information field may have a variable length according to the number of stations. Accordingly, the BA information field may include an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield, for each station. The information per TID subfield may include information of a corresponding station, for example identification information of the corresponding station. Therefore, the information per TID subfield may be called an information per station subfield. The information per TID subfield may indicate whether MPDUs aggregated in an A-MPDU included in the UL PPDU of the corresponding station have been received.

In some embodiments, when the multi-TID block ACK frame format is used, a part or whole of reserved bits B0-B11 in the information per TID subfield may indicate the identification information of the station. In this case, some bits of an association identifier (AID) between the station and the AP may be used as the identification information of the station.

In some embodiment, a part of the reserved bits B0-B11 may indicate whether the ACK for the station is a block ACK.

Accordingly, each station can check the ACK on its UL PPDU from bitmap information of the block ACK corresponding to the station.

**18**

In some embodiments, the ACK frame described with reference to FIG. **16** may be applied to a case that the UL PPDU includes no single MPDU.

In another embodiment, the ACK frame may use an ACK frame described with reference to FIG. **9**. Referring to FIG. **17**, the ACK frame includes a MAC header, a frame body field, and an FCS field like a multi-TID ACK frame shown in FIG. **9**.

Differently from an embodiment described with reference to FIG. **9**, since the AP transmits the ACK on the UL PPDUs received from the stations STA1, STA2, and STA3, the BA information field (i.e., an ACK information field) may have a variable length according to the number of stations. Accordingly, the ACK information field may include an information per TID subfield for each station. The information per TID subfield may include information of a corresponding station, for example identification information of the corresponding station. Therefore, the information per TID subfield may be called an information per station subfield. Differently from an embodiment shown in FIG. **16**, a block ACK starting sequence control subfield and a block ACK bitmap subfield are not included in the ACK information field.

In some embodiments, the ACK information may include the information per TID subfield for only a station for which the ACK is transmitted.

In some embodiments, when the multi-TID ACK frame is used, a part or whole of reserved bits B0-B11 of the information per TID subfield may indicate the identification information of the station. In this case, some bits of an AID between the station and the AP may be used as the identification information of the station.

In some embodiment, a part of the reserved bits B0-B11 may indicate whether the ACK for the station is not a block ACK.

Accordingly, each station can check the ACK on its UL PPDU by determining whether its information exists in the ACK information field. In some embodiments, the ACK frame described with reference to FIG. **17** may be applied to a case that the UL PPDU includes a single MPDU.

In some embodiments, an interval between two frames shown in FIG. **15** may be a predetermined IFS interval. The predetermined IFS may be a predetermined SIFS. Alternatively, the predetermined IFS may be a PIFS or an IFS having the different duration from the SIFS and the PIFS. Accordingly, a plurality of devices can transmit frames without a collision in an unlicensed band.

In some embodiments, the ULI frame may include identification information (for example, address information) of each of the stations STA1, STA2, and STA3 for joining in the UL MU transmission. Each station can transmit a UL request (UL req) frame when it corresponds to any one of the plurality of station identification information included in the ULI frame. In another embodiment, the ULI frame may include group information to which candidate stations STA1, STA2, and STA3 belong. The group information may be a group ID. Then, each station can transmit the UL req frame when a group to which it belongs corresponds to the group information included in the ULI frame.

In some embodiments, the ULI frame may be a control frame or a management frame. That is, as shown in FIG. **18** and FIG. **19**, the ULI frame may include a MAC header, a frame body field, and an FCS field. The MAC header includes an address, and the address field may include a TA field indicating an address of the AP.

As shown in FIG. **18**, the frame body field may include information (STA Info 1, STA Info 2, . . . , STA Info n) of

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009018

US 9,825,738 B2

**19**

the stations STA1, STA2, and STA3. The information (STA Info i) of each station may indicate identification information of the station. In this case, some bits of an AID between the station and the AP may be used as the identification information of the station.

In another embodiment, as shown in FIG. 19, the frame body field may include group information to which the stations STA1, STA2, and STA3 belong. The group information may be an identifier (group ID) of the group.

In some embodiments, the UL PPDU transmitted by each device may have a plurality of ACs as described above. These embodiments are described with reference to FIG. 20 and FIG. 21.

FIG. 20 exemplifies a UL MU transmission procedure in a wireless communication network according to yet another embodiment of the present invention, and FIG. 21 exemplifies an ACK frame in a wireless communication network according to yet another embodiment of the present invention.

Referring to FIG. 20, an AP transmits a ULI frame to perform a UL MU transmission with a plurality of stations STA1, STA2, and STA3.

Each of the stations STA1, STA2, and STA3 receiving the ULI frame transmits a UL data frame, for example a UL PPDU. Each UL PPDU includes an A-MPDU corresponding to one or more ACs. The A-MPDU may be an A-MPDU including no single MPDU or an A-MPDU including a single MPDU. FIG. 20 shows an example where a UL PPDU transmitted to the station STA1 includes an A-MPDU to which "TID1" is assigned as the TID and an A-MPDU to which "TID2" is assigned as the TID, a UL PPDU transmitted to the station STA2 includes an A-MPDU to which "TID1" is assigned as the TID and an A-MPDU to which "TID3" is assigned as the TID, and an A-MPDU to which "TID2" is assigned as the TID and a UL PPDU transmitted to the station STA3 includes an A-MPDU to which "TID2" is assigned as the TID. The A-MPDU of the station STA1 to which "TID1" is assigned and the A-MPDU of the station STA3 to which "TID2" is assigned include the single MPDU, and remaining A-MPDUs include no single MPDU.

The AP receiving the UL PPDUs from the stations STA1, STA2, and STA3 transmits an ACK frame on the UL PPDUs to the stations STA1, STA2, and STA3. The ACK frame may include information of each station and information about whether the UL PPDU from the corresponding station has been received to allow each station to check an acknowledgement on its UL PPDU.

The ACK frame may use an ACK frame described with reference to FIG. 11. Referring to FIG. 21, the ACK frame includes a MAC header, a frame body field, and an FCS field, and the frame body field includes a BA information field, like the ACK frame shown in FIG. 11.

Differently from an embodiment described with reference to FIG. 11, since the AP transmits the ACK on the UL PPDUs received from the stations STA1, STA2, and STA3, the BA information field may have a variable length according to the number of stations. Accordingly, the BA information field may include ACK information per TID for each station. For the TID on which the A-MPDU is transmitted, the ACK information per TID may an information per TID subfield, a block ACK starting sequence control subfield, and a block ACK bitmap subfield. For the TID on which the single MPDU is transmitted, the ACK information per TID field may include an information per TID subfield. That is, the ACK information per TID is repeated for each station and for each TID.

**20**

The information per TID subfield may include information (for example, identification information) of the corresponding station and TID information (for example, a TID value).

In the example shown in FIG. 20, the UL PPDU of the station STA1 includes A-MPDUs for TID1 and TID2 each including no single MPDU, the UL PPDU of the station STA2 includes an A-MPDU for TID1 including a single MPDU and an A-MPDU for TID3 including no single MPDU, and the UL PPDU of the station STA3 includes an A-MPDU for TID2 including a single MPDU. Therefore, the ACK frame includes the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield for TID1 of the station STA1 and includes the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield for TID2 of the station STA1. The ACK frame includes the information per TID subfield for TID1 of the station STA2, includes the information per TID subfield, the block ACK starting sequence control subfield, and the block ACK bitmap subfield for TID3 of the station STA2, and includes the information per TID subfield for TID2 of the station STA3.

In some embodiments, when the multi-TID block ACK frame format is used, a part or whole of reserved bits B0-B11 in the information per TID subfield may indicate the identification information of the station. In this case, some bits of an AID between the station and the AP may be used as the identification information of the station.

In some embodiments, a part of the reserved bits B0-B11 may indicate whether the corresponding ACK information per TID is a block ACK. In another embodiment, only when the block ACK is not used, a part of the reserved bits B0-B11 may indicate whether the corresponding ACK information per TID is not the block ACK.

Accordingly, each station can check whether its UL PPDU has been successfully received for each TID.

While it has been described above that the AP transmits one frame, for example one ULI frame, indicating the UL MU transmission for the UL MU transmission, the AP may the frames two or more times to indicate a UL MU-MIMO transmission when the UL MU transmission is the UL MU-MIMO transmission. Such embodiment is described below.

FIG. 22 exemplifies a UL MU procedure in a wireless communication network according to an embodiment of the present invention.

Referring to FIG. 22, an AP transmits a UL MU-MIMO initiation (ULI) frame to perform UL MU-MIMO with a plurality of stations STA1, STA2, and STA3. The ULI frame indicates the stations STA1, STA2, and STA3 to initiate the UL MU-MIMO transmission.

The stations STA1, STA2, and STA3 receiving the ULI frame sequentially transmit UL MU-MIMO request (UL req) frames to the AP. The UL req frame transmitted by each station includes feedback information for the UL MU-MIMO of the corresponding station.

The AP receiving the UL req frame from the stations STA1, STA2, and STA3 selects a station for joining in the UL MU-MIMO from among the stations STA1, STA2, and STA3 based on the feedback information carried by the UL req frame, and transmits a UL MU-MIMO setup (UL setup) frame to the selected stations STA1 and STA2. The UL setup frame includes setup information to be used for the UL MU-MIMO by each station. The setup information may include for example a transmission power, modulation and coding scheme (MCS) information, or a data length to be

JX004.00040

US 9,825,738 B2

**21**

used by each station. The setup information may further include information on a structure of a long training field (LTF) to be used by each station.

Each of the stations STA1 and STA2 receiving the UL setup frame transmits a UL data frame, for example a UL MU PPDU, based on the setup information. The AP receiving the UL MU PPDUs transmits an ACK frame on the UL MU PPDUs to the stations STA1 and STA2.

The stations STA1 and STA2 can transmit the UL data frame to the AP in the MU-MIMO through the above procedure.

In some embodiments, an interval between two frames shown in FIG. 22 may be a predetermined IFS interval. The predetermined IFS may be an SIFS. Alternatively, the predetermined IFS may be a PIFS or an IFS having the different duration from the SIFS and the PIFS.

In some embodiments, the UL req frame may include identification information of each of the candidate stations STA1, STA2, and STA3 for joining in the UL MU transmission. Each station can transmit the UL req frame when it corresponds to any one of the plurality of station identification information included in the ULI frame. In another embodiment, the ULI frame may include group information to which candidate stations STA1, STA2, and STA3 belong. The group information may be a group ID. Then, each station can transmit the UL req frame when a group to which it belongs corresponds to the group information included in the ULI frame.

In yet another embodiment, the ULI frame may further include channel sounding indication information. The channel sounding indication information indicates whether to perform a channel sounding procedure between the AP and the stations STA1, STA2, and STA3. When the channel sounding indication information channel indicates to perform the channel sounding procedure, the AP may select the station for joining in the UL MU-MIMO based on channel information acquired through the channel sounding procedure of each station. When the channel sounding indication information indicates to perform the channel sounding procedure, beamforming may be supported at the data transmission.

In some embodiments, the stations STA1, STA2, and STA3 receiving the ULI frame may sequentially transmit the UL req frames in a predetermined order. The predetermined order may be for example an address order of the stations.

In some embodiments, the feedback information carried by the UL req frame may include transmission power information. The transmission power information may include information on a magnitude of a current transmission power of a corresponding station. The AP can determine a path loss between the AP and the corresponding station based on the information on the magnitude of the transmission power and a magnitude of a received power of the UL req frame. Accordingly, the transmission power information may be used when the AP determines whether to join the corresponding station in the UL MU-MIMO. The transmission power information may further include information on a magnitude of a maximum transmission power that can be used by the corresponding station.

In another embodiment, the feedback information may include information on a current state of a data queue of the corresponding station. The information on the data queue state may include information about whether data to be transmitted exist in the data queue and information on a size of the data if the data to be transmitted exist. Accordingly,

**22**

the information on the data queue state may be used when the AP determines whether to include the corresponding in the UL MU-MIMO.

In yet another embodiment, each station may transmit the UL req frame by correcting a carrier frequency offset after receiving the ULI frame. Then, the AP can determine based on the UL req frame whether each station transmits a frame by correcting the carrier frequency offset to acceptable level. Accordingly, the carrier frequency offset that is corrected at the time of the UL req frame transmission may be used for determining whether to include the corresponding station in the UL MU-MIMO transmission. In this case, the stations STA1 and STA2 selected by the UL setup frame may transmit the UL data frames by applying the carrier frequency offsets that have been used at the time of the UL req frame transmission.

In yet another embodiment, when the ULI frame indicates to perform the channel sounding procedure, the number of long training fields used by the UL req frame may be the number of antennas of the corresponding station. That is, the long training field (LTF) is used for estimating a MIMO channel in a frame. For the MIMO channel estimation, the number of HEW long training fields (HEW-LTFs) may be determined in accordance with the number of antennas to be used for transmission, i.e., the number of space-time streams. For example, when the numbers of space-time streams are 1, 2, 3, 4, 5, 6, 7, and 8, the numbers of long training fields may be determined as 1, 2, 4, 4, 6, 6, 8, and 8, respectively. Accordingly, the AP can estimate the channel in each transmitting antennas from the long training fields.

In some embodiments, the UL setup frame that is transmitted by the AP, after the AP selects the stations for performing the MU-MIMO based on the UL req frames received from the candidate stations, includes setup information. The setup information may include common information that is common to all stations for joining in the UL MU-MIMO and dedicated information that is specific to each station.

In some embodiments, the common information is information to be commonly used for the UL MU-MIMO transmission by the station STA1 and STA2, and includes the total number of data streams, i.e., space-time streams to be transmitted by the stations STA1 and STA2 and a transmission length of the UL data frame. The transmission length of the UL data frame may be the number of symbols or a transmission time. Since the AP provides the transmission length, all of the stations STA1 and STA2 can transmit the data frames in accordance with the transmission length. When the transmission length is longer than a length of data to be actually transmitted, the station may add pad bits. Further, each station may determine the number of long training fields (HEW-LTFs) based on the number of space-time streams.

In some embodiments, the dedicated information is information dedicated to each station and is provided for each station. The dedicated information may include identification information of the corresponding station, the number of data streams (i.e., space-time streams) to be transmitted by the corresponding station, a transmission power of the corresponding station, an MCS of the corresponding station, or beam information for the corresponding station. The beam information may be provided as compressed beamforming information like the HT WLAN or the VHL WLAN. The compressed beamforming information may be provided in, for example, the form of angles representing compressed beamforming matrix. Then, the station may transmit the UL data frame by setting the number of space-

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009020

US 9,825,738 B2

23

time streams, a magnitude of the transmission power, the MCS, or a steering matrix in accordance with the dedicated information.

The dedicated information may further include information on the long training fields (HEW-LTF) to be used by the corresponding station. The information on the long training fields (HEW-LTF) may include an index of a row to be used by the corresponding station in a long training field mapping matrix. Accordingly, the station may set codes of the long training fields (HEW-LTF) in accordance with a row vector of the long training field mapping matrix.

In some embodiments, the ACK frame transmitted by the AP may use the ACK frame described with reference to FIG. 16, FIG. 17 or FIG. 21. The ACK frame may indicate whether there are more DL data to be transmitted by each station.

FIG. 23, FIG. 24, FIG. 25, FIG. 26, FIG. 27, and FIG. 28 exemplify UL MU transmission procedure in a wireless communication network according to various embodiments of the present invention.

Referring to FIG. 23, each station may transmit a UL req frame as a null data packet (NDP) type frame to perform a sounding procedure for beamforming. Then, an AP transmits a UL setup frame including compressed beamforming information to each station based on the received NDP type frame. A backoff contention window (CW) value may be determined based on the received signal-to-noise ratio (SNR) of the UL1 frame. Then, the higher received SNR is, the earlier the stations STA1, STA2, and STA3 may transmit the UL req frames.

As shown in FIG. 24, FIG. 25, FIG. 26, and FIG. 27, downlink (DL) MU transmission may be performed together with the UL MU transmission.

Referring to FIG. 24, an AP first transmits an NDP announcement (NDPA) frame to a plurality of stations STA STA1 and STA2, and then transmits an NDP frame to the stations STA1 and STA2 after the SIFS interval. Among the stations STA1 and STA2 receiving the NDP frame, the first station STA1 feedbacks a compressed beamforming (CB) frame to the AP as a response of the NDPA frame. Then after receiving the CB frame from the station STA1 transmits a beamforming report poll (BR-poll) frame to the second station STA2. The station STA2 receiving the BR-poll frame feedbacks a CB frame to the AP as a response of the BR-poll frame.

Since the CB frame includes compressed beamforming information as feedback information, the AP may determine a steering matrix based on the compressed beamforming information and transmit DL data frame, for example a DL PPDU, to the stations STA1 and STA2 using the steering matrix. The stations STA1 and STA2 receiving the DL PPDU sequentially transmit ACK frames.

Information included in the UL1 frame may be piggybacked on the DL PPDU, and information included in the UL req frame may be piggybacked on the ACK frame. Then, the AP and the stations STA1 and STA2 may omit a procedure for exchanging the UL1 frame and the UL req frame.

Accordingly, the AP receiving the ACK frames transmits a UL setup frame to the stations STA1 and STA2. The subsequent processes are the same as the processes described with reference to FIG. 22.

Referring to FIG. 25, information included in a UL1 frame is piggybacked on an NDPA frame, information included in a UL req frame is piggybacked on a CB frame, and information included in a UL setup frame is piggybacked on a DL PPDU. Then, the AP and the stations STA1 and STA2 may omit a procedure for exchanging the UL1 frame, the UL req frame, and the UL setup frame. Accordingly, the stations

24

STA1 and STA2 may transmit ACK frames on the DL PPDU and then transmit UL MU PPDUs after the predetermined IFS interval.

Referring to FIG. 26, if all setup information to be transmitted by a UL setup frame cannot be piggybacked on a DL PPDU, some setup information may be piggybacked on the DL PPDU and remaining setup information may be transmitted by a separate UL setup frame. After receiving the ACK frames on the DL PPDU from the stations STA1 and STA2, the AP may transmit the UL setup frame including the remaining setup information to the stations STA1 and STA2.

Referring to FIG. 27, while information for UL MU-MIMO transmission is piggybacked on and is transmitted through a frame for DL MU-MIMO transmission, an additional STA STA4 may join in a group for the UL MU-MIMO transmission. In this case, an AP and the added station STA4 may exchange a UL1 frame, a UL req frame, and a UL setup frame independently of the other stations STA1 and STA2.

According to embodiments described with reference to FIG. 24 to FIG. 27, the UL transmission can be performed subsequently to the DL transmission.

Referring to FIG. 28, after stations STA1, STA2, and STA3 perform UL MU-MIMO transmission with an AP as described with reference to FIG. 22, the AP may perform DL MU-MIMO transmission with the stations STA1, STA2, and STA3. A UL PPDU may include compressed beamforming information for the DL MU-MIMO transmission. Then, the AP may transmit an ACK frame on the UL PPDU and then transmit a DL PPDU to the stations STA1, STA2, and STA3 based on the compressed beamforming information after the predetermined IFS interval. The stations STA1, STA2, and STA3 may sequentially transmit ACK frames on the DL PPDU to the AP.

Accordingly, the DL transmission can be performed subsequently to the UL transmission.

A frame transmitting method and a frame receiving method according to above embodiments of the present invention may be executed by a baseband processor 10 shown in FIG. 1 to FIG. 3. In one embodiment, instructions for executing the frame transmitting method and the frame receiving method according to above embodiments of the present invention may be stored in a recording medium such as a memory 40. In another embodiment, at least some of the instructions may be MAC software. In yet another embodiment, at least some of the instructions may be transmitted from a recording medium of a certain server and may be stored in the memory 40.

While this invention has been described in connection with what is presently considered to be practical embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims. Further, two or more embodiments may be combined.

What is claimed is:

1. A method of operating an access point in a wireless communication network, the method comprising:
    generating downlink data;
    generating uplink setup information, the uplink setup information including a first information to be used for uplink multi-user transmission;
    transmitting the downlink data and the uplink setup information in a single physical downlink frame to a plurality of stations;
    simultaneously receiving multiple uplink frames from multiple stations of the plurality of stations; and
    transmitting an acknowledgement frame to the multiple stations after a successful reception of the multiple uplink frames,

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009021

Appx194

US 9,825,738 B2

25

wherein the uplink setup information includes a common information portion and a dedicated information portion, the common information portion includes a second information being common to all of the plurality of stations to receive the uplink setup information, and the dedicated information portion includes respective third information specific to each of the plurality of stations to receive the uplink setup information, and

wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames.

2. The method of claim 1, wherein the common information portion includes a length information associated with a length of the multiple uplink frames.

3. The method of claim 2, wherein respective lengths of the multiple uplink frames are identical to a transmission length.

4. The method of claim 3, wherein one or more of the multiple uplink frames include padding bits when the transmission length is longer than a length of a frame to be actually transmitted.

5. The method of claim 1, wherein the dedicated information portion includes a station identification information, an information associated with a number of data streams, and MCS (Modulation and Coding Scheme).

6. The method of claim 1, wherein the acknowledgement frame includes acknowledgement information for one or more of the plurality of stations.

7. The method of claim 1, wherein an interframe space between the uplink setup frame and the multiple uplink frames is SIFS (short interframe space), and an interframe space between the multiple uplink frames and the acknowledgement frame is SIFS.

8. The method of claim 1, wherein the multiple uplink frames are transmitted by the multiple stations using MU-MIMO (multi-user multiple-input multiple-output).

9. A method of operating a station in a wireless communication network, the method comprising:

receiving, from an access point, a physical downlink frame transmitted to a plurality of stations, the physical downlink frame comprising:

uplink setup information including a first information to be used for uplink multi-user transmission by the station, and

downlink data;

transmitting an uplink frame to the access point, the uplink frame being simultaneously transmitted with one or more uplink frames from one or more other

26

stations of the plurality of stations, the uplink frame being generated based on the uplink setup information; and

receiving an acknowledgement frame from the access point after the uplink frame is successfully received in the access point,

wherein the uplink setup information includes a common information portion and a dedicated information portion, the common information portion includes a second information being common to all of the plurality of stations to receive the uplink setup frame, the dedicated information portion includes respective third information specific to each of the plurality of stations to receive the uplink setup information, and

wherein the second information is a function of a total number of space time streams to be used to perform the simultaneous transmission of the uplink frame and the one or more uplink frames from the one or more other stations.

10. The method of claim 9, wherein the common information portion includes a length information associated with a length of the uplink frame.

11. The method of claim 10, wherein the length of the uplink frame is identical to the length of each of the one or more uplink frames transmitted from the one or more other stations.

12. The method of claim 11, wherein further the uplink frame includes padding bits when the length of the uplink frame is longer than a length of a frame to be actually transmitted to the access point.

13. The method of claim 9, wherein the dedicated information portion includes a station identification information, an information associated with a number of data streams, and MCS (Modulation and Coding Scheme).

14. The method of claim 9, wherein the acknowledgement frame includes acknowledgement information for the station and one or more other stations of the plurality of stations.

15. The method of claim 9, wherein an interframe space between the uplink setup frame and the uplink frame is SIFS (short interframe space), and an interframe space between the multiple frames and the acknowledgement frame is SIFS.

16. The method of claim 9, wherein the uplink frame of the station and the one or more uplink frames of the one or more other stations are simultaneously transmitted using MU-MIMO (multi-user multiple-input multiple-output).

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00009022

**Appx195**

JX005.00001



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**August 23, 2021**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *9,912,513*
ISSUE DATE: *March 06, 2018*

By Authority of the
**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

**SYLVIA HOLLEY**
Certifying Officer

JOINT TRIAL EXHIBIT
JX005

ATLAS-00014189

**Appx196**

JX005.00002



US009912513B2

## (12) United States Patent
### Kwon

(10) **Patent No.:** **US 9,912,513 B2**
(45) **Date of Patent:** *Mar. 6, 2018

(54) **SYSTEM AND METHOD FOR SYNCHRONIZATION FOR OFDMA TRANSMISSION**

(71) Applicant: **NEWRACOM, INC.**, Irvine, CA (US)

(72) Inventor: **Younghoon Kwon**, Laguna Niguel, CA (US)

(73) Assignee: **NEWRACOM, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/203,717**

(22) Filed: **Jul. 6, 2016**

(65) **Prior Publication Data**

US 2016/0315796 A1    Oct. 27, 2016

### Related U.S. Application Data

(63) Continuation of application No. 14/868,303, filed on Sep. 28, 2015, now Pat. No. 9,413,581.
(Continued)

(51) **Int. Cl.**
*H04W 4/00*        (2009.01)
*H04J 3/06*        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... *H04L 27/2665* (2013.01); *H04B 7/0452* (2013.01); *H04L 5/0007* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .................................................. H04L 27/2665
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,031,583 B2 | 10/2011 | Classon | |
| 8,422,577 B1 | 4/2013 | Shetty et al. | |

(Continued)

#### FOREIGN PATENT DOCUMENTS

WO    WO-2010/050731 A2    5/2010

#### OTHER PUBLICATIONS

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE P802.11ah™/D5.0 Draft Standards for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 2: Sub 1 GHz License Exempt Operation,"Mar. 2015.

(Continued)

*Primary Examiner* — Gerald Smarth
(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP

(57)    **ABSTRACT**

In an example of wireless communications, an access point may send a downlink frame to multiple stations. The downlink frame may include information indicative of a cyclic prefix length to be utilized by the stations. In response, some or all of the stations may transmit their respective uplink frames to the access point. A cyclic prefix for a portion of each respective uplink frame may have a cyclic prefix length corresponding to the information included in the downlink frame. The downlink frame may be, for example, a beacon frame or a trigger frame. A trigger frame may allocate resources for uplink orthogonal frequency division multiple access (OFDMA) transmission. Other methods, apparatus, and computer-readable media are also disclosed.

**19 Claims, 10 Drawing Sheets**



ATLAS-00014190

# US 9,912,513 B2
Page 2

## Related U.S. Application Data

(60) Provisional application No. 62/061,503, filed on Oct. 8, 2014.

(51) Int. Cl.

| | |
|---|---|
| *H04L 27/26* | (2006.01) |
| *H04W 56/00* | (2009.01) |
| *H04B 7/0452* | (2017.01) |
| *H04L 5/00* | (2006.01) |
| *H04W 84/12* | (2009.01) |

(52) U.S. Cl.
CPC ......... *H04L 27/2666* (2013.01); *H04W 56/00* (2013.01); *H04W 84/12* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,467,373 B2 * | 6/2013 | Ahn | ................... H04L 27/2655 370/350 |
| 2004/0082356 A1 | 4/2004 | Walton | |
| 2006/0013325 A1 | 1/2006 | Agrawal et al. | |
| 2006/0176966 A1 | 8/2006 | Stewart et al. | |
| 2008/0043613 A1 | 2/2008 | Yang et al. | |
| 2009/0290524 A1 | 11/2009 | Seok | |
| 2010/0054236 A1 * | 3/2010 | Guvenc | ................... H04W 4/20 370/350 |
| 2010/0118806 A1 | 5/2010 | Griot et al. | |
| 2012/0263108 A1 | 10/2012 | Ban et al. | |
| 2013/0022090 A1 | 1/2013 | Weng et al. | |
| 2013/0279614 A1 | 10/2013 | Walton et al. | |
| 2015/0063190 A1 * | 3/2015 | Merlin | ................. H04L 5/0037 370/312 |

### OTHER PUBLICATIONS

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 4: Enhancements for Very High Throughput for Operation in Bands below 6 GHz," 2013.

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications," 2012.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014191

**Appx198**

JX005.00004





FIG. 1

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014192

JX005.00005



FIG. 2

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS−00014193

**Appx200**

JX005.00006



FIG. 3A

FIG. 3B

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014194

JX005.00007



FIG. 4

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014195

JX005.00008



FIG. 5

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014196

**Appx203**

JX005.00009



FIG. 6

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014197

JX005.00010



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 08-13-2021



FIG. 8

JX005.00012



FIG. 9A

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX005.00013



920

DETERMINING A CYCLIC PREFIX LENGTH FOR AN UPLINK MULTI-USER TRANSMISSION BASED ON A FIRST FRAME RECEIVED FROM AN ACCESS POINT, WHEREIN THE FIRST FRAME INCLUDES RESOURCE ALLOCATION INFORMATION FOR THE UPLINK MULTI-USER TRANSMISSION AND THE CYCLIC PREFIX LENGTH

GENERATING A SECOND FRAME USING THE CYCLIC PREFIX LENGTH FOR THE UPLINK MULTI-USER TRANSMISSION

TRANSMITTING THE SECOND FRAME USING THE RESOURCE ALLOCATION INFORMATION

## FIG. 9B

930

GENERATING A FIRST FRAME THAT COMPRISES A PAYLOAD, THE PAYLOAD COMPRISING INFORMATION INDICATIVE OF A CYCLIC PREFIX LENGTH FOR A PLURALITY OF STATIONS

PROVIDING THE FIRST FRAME FOR TRANSMISSION DIRECTED TO THE PLURALITY OF STATIONS

## FIG. 9C

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014201

US 9,912,513 B2

1

# SYSTEM AND METHOD FOR SYNCHRONIZATION FOR OFDMA TRANSMISSION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/868,303, filed on Sep. 28, 2015, entitled "SYSTEM AND METHOD FOR SYNCHRONIZATION FOR OFDMA TRANSMISSION," which in turn claims the benefit of priority from U.S. Provisional Application No. 62/061,503, entitled "SYSTEM AND METHOD FOR SYNCHRONIZATION OF OFDMA TRANSMISSION," filed Oct. 8, 2014, each of which is incorporated herein by reference in its entirety.

## TECHNICAL FIELD

The present description relates in general to wireless communication systems and methods, and more particularly to, for example, without limitation, systems and methods for synchronization for orthogonal frequency division multiple access (OFDMA) transmission.

## BACKGROUND

Wireless local area network (WLAN) devices are deployed in diverse environments. These environments are generally characterized by the existence of access points and non-access point stations. Increased interference from neighboring devices gives rise to performance degradation. Additionally, WLAN devices are increasingly required to support a variety of applications such as video, cloud access, and offloading. In particular, video traffic is expected to be the dominant type of traffic in many high efficiency WLAN deployments. With the real-time requirements of some of these applications, WLAN users demand improved performance in delivering their applications, including improved power consumption for battery-operated devices.

The description provided in the background section should not be assumed to be prior art merely because it is mentioned in or associated with the background section. The background section may include information that describes one or more aspects of the subject technology.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a schematic diagram of an example of a wireless communication network.

FIG. 2 illustrates a schematic diagram of an example of a wireless communication device.

FIG. 3A illustrates a schematic block diagram of an example of a transmitting signal processor in a wireless communication device.

FIG. 3B illustrates a schematic block diagram of an example of a receiving signal processor in a wireless communication device.

FIG. 4 illustrates an example of a high efficiency frame.

FIG. 5 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission.

FIG. 6 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission.

2

FIG. 7 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission.

FIG. 8 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission.

FIGS. 9A through 9C illustrate flow charts of examples of methods for facilitating wireless communication.

In one or more implementations, not all of the depicted components in each figure may be required, and one or more implementations may include additional components not shown in a figure. Variations in the arrangement and type of the components may be made without departing from the scope of the subject disclosure. Additional components, different components, or fewer components may be utilized within the scope of the subject disclosure.

## DETAILED DESCRIPTION

The detailed description set forth below is intended as a description of various implementations and is not intended to represent the only implementations in which the subject technology may be practiced. As those skilled in the art would realize, the described implementations may be modified in various different ways, all without departing from the scope of the present disclosure. Accordingly, the drawings and description are to be regarded as illustrative in nature and not restrictive.

Multi-user (MU) transmission in next-generation WLAN systems include techniques such as downlink/uplink (DL/UL) MU multiple-input/multiple-output (MIMO) and DL/UL orthogonal frequency division multiple access (OFDMA). During the standardization activities of the Institute of Electrical and Electronics Engineers (IEEE) 802.11, Task Group ax, OFDMA technology is introduced to provide a multiple access scheme to improve network efficiency. OFDMA is a technology that allows multiple stations (STAs) to transmit frames simultaneously using non-overlapping frequency-time resources.

In OFDMA transmission, if frames transmitted by different stations are not synchronized at a receiver side (e.g., at an access point), the receiver may have difficulty correctly decoding the frames. In one or more aspects, a trigger frame may be utilized to facilitate maintaining of synchronization among the participating stations for MU simultaneous transmission in OFDMA.

In one or more aspects, a trigger frame may be a frame sent by an access point (AP) that seeks data, control, or management frame response(s) from stations that participate in a subsequent uplink (UL) MU frame. The trigger frame may be utilized to initiate the MU simultaneous transmission in OFDMA. By way of non-limiting example, a trigger frame may include some or all of the following features: (a) a list of STAs that an AP seeks a response from; (b) resource allocation information for each STA (e.g., a sub-band assigned to each STA); and/or (c) attributes of the expected UL MU frame, such as the duration, bandwidth, etc., among other features. The term "resource" may refer to, for example, bandwidth, time/duration that the STAs expect to occupy a transmission medium, and/or possibly a number of spatial streams that the STAs may use. In one or more aspects, a trigger frame may include information for a guard interval (GI) duration and/or the fast Fourier transform (FFT) size to be used for at least some symbols of an UL frame.

In one or more aspects, a data transmission procedure using a trigger frame may be provided as follows. An AP

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,912,513 B2

3

sends a trigger frame to participating STAs, where the trigger frame includes resource allocation information for the participating STAs. Each of the participating STAs may send its respective UL frame in its assigned resource at a predetermined time after receiving the trigger frame. Each of the participating STAs may monitor frames transmitted by the AP, such as beacon frames, and compensate frequency offset before the participating STA transmits its respective UL frame. For example, the participating STAs may perform frequency/time offset compensation by aligning their respective clock to a clock associated with the AP. The alignment of the clocks may also allow for time synchronization between the participating STAs and the AP. Accordingly, the trigger frame for the AP may facilitate time/frequency synchronization, which in turn may facilitate synchronization for OFDMA transmission.

In one or more implementations, in addition to time/frequency synchronization, each participating STA may be configured to use the same orthogonal frequency division multiplexing (OFDM) symbol duration as the other participating STAs to further facilitate synchronization of the OFDMA transmission. The configuring of the participating STAs may be based on information (e.g., from the AP) indicative of guard intervals to be utilized by the participating STAs. The OFDM symbol duration of the participating STAs may be referred to as being aligned when the OFDM symbol duration is the same among the participating STAs. Conversely, if the STAs have different OFDM symbol durations from one another (e.g., the OFDM symbol durations are not aligned between the various STAs), a receiver of the OFDM symbols (e.g., the AP) may have greater difficulty correctly decoding the frames received from the STAs.

In one or more aspects, to maintain the same OFDM symbol duration among the participating STAs, the GI periods, associated with the OFDM symbols of the participating STAs, are aligned. In one or more aspects, mechanisms are provided to enable all participating STAs to use the same GI duration (or the same OFDM symbol duration).

In one or more implementations, a method is provided for aligning the OFDM symbol durations from multiple STAs based on setting a guard interval utilized by the participating STAs. The aligning of the OFDM symbol durations allows synchronization of OFDM symbol boundaries when the multiple STAs transmit frames simultaneously, such as for OFDMA transmission. In some aspects, the aligning of the OFDM symbol durations of multiple STAs may be referred to as aligning the OFDM symbol boundaries of the multiple STAs, synchronizing the OFDM symbols of the multiple STAs, or synchronizing the OFDM symbol boundaries of the multiple STAs.

In one or more implementations, the method may include receiving at a first station a first frame (e.g., a downlink frame), where the first frame includes information on resource allocation that the first station is scheduled to transmit a frame (e.g., an uplink frame). The method may further include sending, by the first station, a second frame (e.g., an uplink frame), where the guard interval of each OFDM symbol of a portion (e.g., a payload portion) of the second frame is the same as that of a portion (e.g., the payload portion) of the first frame.

In one aspect, each of the first and second frames includes a respective first part and a respective second part. A guard interval duration associated with the second part of the second frame may be based on information (e.g., a value) contained in the first frame that is indicative of the guard interval duration.

4

In some aspects, the first part of the first frame is associated with a first FFT size, and the second part of the first frame is associated with a second FFT size different from the first FFT size. In some aspects, the first part of the second frame is associated with a third FFT size, and the second part of the second frame is associated with a fourth FFT size different from the third FFT size. In one aspect, the third FFT size is the same as the first FFT size. In one aspect, the fourth FFT size is the same as the second FFT size.

FIG. 1 illustrates a schematic diagram of an example of a wireless communication network 100. In the wireless communication network 100, such as a wireless local area network (WLAN), a basic service set (BSS) includes a plurality of wireless communication devices (e.g., WLAN devices). In one aspect, a BSS refers to a set of STAs that can communicate in synchronization, rather than a concept indicating a particular area. In the example, the wireless communication network 100 includes wireless communication devices 111-115, which may be referred to as stations (STAs).

Each of the wireless communication devices 111-115 may include a media access control (MAC) layer and a physical (PHY) layer according to an IEEE 802.11 standard. In the example, at least one wireless communication device (e.g., device 111) is an access point (AP). An AP may be referred to as an AP STA or an AP device. The other wireless communication devices (e.g., devices 112-115) may be non-AP STAs. Alternatively, all of the wireless communication devices 111-115 may be non-AP STAs in an Ad-hoc networking environment.

An AP STA and a non-AP STA may be collectively called STAs. However, for simplicity of description, in some aspects, only a non-AP STA may be referred to as a STA. An AP may be, for example, a centralized controller, a base station (BS), a node-B, a base transceiver system (BTS), a site controller, a network adapter, a network interface card (NIC), a router, or the like. An non-AP STA (e.g., a client device operable by a user) may be, for example, a device with wireless communication capability, a terminal, a wireless transmit/receive unit (WTRU), a user equipment (UE), a mobile station (MS), a mobile terminal, a mobile subscriber unit, a laptop, a non-mobile computing device (e.g., a desktop computer with wireless communication capability) or the like. In one or more aspects, a non-AP STA may act as an AP (e.g., a wireless hotspot).

In one aspect, an AP is a functional entity for providing access to a distribution system, by way of a wireless medium, for an associated STA. For example, an AP may provide access to the internet for one or more STAs that are wirelessly and communicatively connected to the AP. In FIG. 1, wireless communications between non-AP STAs are made by way of an AP. However, when a direct link is established between non-AP STAs, the STAs can communicate directly with each other (without using an AP).

In one or more implementations, OFDMA-based 802.11 technologies are utilized, and for the sake of brevity, a STA refers to a non-AP HE STA, and an AP refers to a HE AP. In one or more aspects, a STA may act as an AP.

FIG. 2 illustrates a schematic diagram of an example of a wireless communication device. The wireless communication device 200 includes a baseband processor 210, a radio frequency (RF) transceiver 220, an antenna unit 230, a memory 240, an input interface unit 250, an output interface unit 260, and a bus 270, or subsets and variations thereof. The wireless communication device 200 can be, or can be a part of, any of the wireless communication devices 111-115.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014203

JX005.00016

US 9,912,513 B2

5

In the example, the baseband processor 210 performs baseband signal processing, and includes a medium access control (MAC) processor 211 and a PHY processor 215. The memory 240 may store software (such as MAC software) including at least some functions of the MAC layer. The memory may further store an operating system and applications.

In the illustration, the MAC processor 211 includes a MAC software processing unit 212 and a MAC hardware processing unit 213. The MAC software processing unit 212 executes the MAC software to implement some functions of the MAC layer, and the MAC hardware processing unit 213 may implement remaining functions of the MAC layer as hardware (MAC hardware). However, the MAC processor 211 may vary in functionality depending on implementation. The PHY processor 215 includes a transmitting (TX) signal processing unit 280 and a receiving (RX) signal processing unit 290. The term TX may refer to transmitting, transmit, transmitted, transmitter or the like. The term RX may refer to receiving, receive, received, receiver or the like.

The PHY processor 215 interfaces to the MAC processor 211 through, among others, transmit vector (TXVECTOR) and receive vector (RXVECTOR) parameters. In one or more aspects, the MAC processor 211 generates and provides TXVECTOR parameters to the PHY processor 215 to supply per-packet transmit parameters. In one or more aspects, the PHY processor 215 generates and provides RXVECTOR parameters to the MAC processor 211 to inform the MAC processor 211 of the received packet parameters.

In some aspects, the wireless communication device 200 includes a read-only memory (ROM) (not shown) or registers (not shown) that store instructions that are needed by one or more of the MAC processor 211, the PHY processor 215 and/or other components of the wireless communication device 200.

In one or more implementations, the wireless communication device 200 includes a permanent storage device (not shown) configured as a read-and-write memory device. The permanent storage device may be a non-volatile memory unit that stores instructions even when the wireless communication device 200 is off. The ROM, registers and the permanent storage device may be part of the baseband processor 210 or be a part of the memory 240. Each of the ROM, the permanent storage device, and the memory 240 may be an example of a memory or a computer-readable medium. A memory may be one or more memories.

The memory 240 may be a read-and-write memory, a read-only memory, a volatile memory, a non-volatile memory, or a combination of some or all of the foregoing. The memory 240 may store instructions that are one or more of the MAC processor 211, the PHY processor 215, and/or another component may need at runtime.

The RF transceiver 220 includes an RF transmitter 221 and an RF receiver 222. The input interface unit 250 receives information from a user, and the output interface unit 260 outputs information to the user. The antenna unit 230 includes one or more antennas. When multi-input multi-output (MIMO) or multi-user MIMO (MU-MIMO) is used, the antenna unit 230 may include more than one antenna.

The bus 270 collectively represents all system, peripheral, and chipset buses that communicatively connect the numerous internal components of the wireless communication device 200. In one or more implementations, the bus 270 communicatively connects the baseband processor 210 with the memory 240. From the memory 240, the baseband processor 210 may retrieve instructions to execute and data

6

to process in order to execute the processes of the subject disclosure. The baseband processor 210 can be a single processor, multiple processors, or a multi-core processor in different implementations. The baseband processor 210, the memory 240, the input interface unit 250, and the output interface unit 260 may communicate with each other via the bus 270.

The bus 270 also connects to the input interface unit 250 and the output interface unit 260. The input interface unit 250 enables a user to communicate information and select commands to the wireless communication device 200. Input devices that may be used with the input interface unit 250 may include any acoustic, speech, visual, touch, tactile and/or sensory input device, e.g., a keyboard, a pointing device, a microphone, or a touchscreen. The output interface unit 260 may enable, for example, the display or output of videos, images, audio, and data generated by the wireless communication device 200. Output devices that may be used with the output interface unit 260 may include any visual, auditory, tactile, and/or sensory output device, e.g., printers and display devices or any other device for outputting information. One or more implementations may include devices that function as both input and output devices, such as a touchscreen.

One or more implementations can be realized in part or in whole using a computer-readable medium. In one aspect, a computer-readable medium includes one or more media. In one or more aspects, a computer-readable medium is a tangible computer-readable medium, a computer-readable storage medium, a non-transitory computer-readable medium, a machine-readable medium, a memory, or some combination of the foregoing (e.g., a tangible computer-readable storage medium, or a non-transitory machine-readable storage medium). In one aspect, a computer is a machine. In one aspect, a computer-implemented method is a machine-implemented method.

A computer-readable medium may include storage integrated into a processor and/or storage external to a processor. A computer-readable medium may be a volatile, non-volatile, solid state, optical, magnetic, and/or other suitable storage device, e.g., RAM, ROM, PROM, EPROM, a flash, registers, a hard disk, a removable memory, or a remote storage device.

In one aspect, a computer-readable medium comprises instructions stored therein. In one aspect, a computer-readable medium is encoded with instructions. In one aspect, instructions are executable by one or more processors (e.g., 210, 211, 212, 213, 215, 280, 290) to perform one or more operations or a method. Instructions may include, for example, programs, routines, subroutines, data, data structures, objects, sequences, commands, operations, modules, applications, and/or functions. Those skilled in the art would recognize how to implement the instructions.

A processor (e.g., 210, 211, 212, 213, 215, 280, 290) may be coupled to one or more memories (e.g., one or more external memories such as the memory 240, one or more memories internal to the processor, one or more registers internal or external to the processor, or one or more remote memories outside of the device 200), for example, via one or more wired and/or wireless connections. The coupling may be direct or indirect. In one aspect, a processor includes one or more processors. A processor, including a processing circuitry capable of executing instructions, may read, write, or access a computer-readable medium. A processor may be, for example, an application specific integrated circuit (ASIC), a digital signal processor (DSP), or a field programmable gate array (FPGA).

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014204

**Appx211**

US 9,912,513 B2

7

In one aspect, a processor (e.g., 210, 211, 212, 213, 215, 280, 290) is configured to cause one or more operations of the subject disclosure to occur. In one aspect, a processor is configured to cause an apparatus (e.g., a wireless communication device 200) to perform operations or a method of the subject disclosure. In one or more implementations, a processor configuration involves having a processor coupled to one or more memories. A memory may be internal or external to the processor. Instructions may be in a form of software, hardware or a combination thereof. Software instructions (including data) may be stored in a memory. Hardware instructions may be part of the hardware circuitry components of a processor. When the instructions are executed or processed by one or more processors, (e.g., 210, 211, 212, 213, 215, 280, 290), the one or more processors cause one or more operations of the subject disclosure to occur or cause an apparatus (e.g., a wireless communication device 200) to perform operations or a method of the subject disclosure.

FIG. 3A illustrates a schematic block diagram of an example of a transmitting signal processing unit 280 in a wireless communication device. The transmitting signal processing unit 280 of the PHY processor 215 includes an encoder 281, an interleaver 282, a mapper 283, an inverse Fourier transformer (IFT) 284, and a guard interval (GI) inserter 285.

The encoder 281 encodes input data. For example, the encoder 281 may be a forward error correction (FEC) encoder. The FEC encoder may include a binary convolutional code (BCC) encoder followed by a puncturing device, or may include a low-density parity-check (LDPC) encoder. The interleaver 282 interleaves the bits of each stream output from the encoder 281 to change the order of bits. In one aspect, interleaving may be applied only when BCC encoding is employed. The mapper 283 maps the sequence of bits output from the interleaver 282 into constellation points.

When MIMO or MU-MIMO is employed, the transmitting signal processing unit 280 may use multiple instances of the interleaver 282 and multiple instances of the mapper 283 corresponding to the number of spatial streams ($N_{SS}$). In the example, the transmitting signal processing unit 280 may further include a stream parser for dividing outputs of the BCC encoders or the LDPC encoder into blocks that are sent to different interleavers 282 or mappers 283. The transmitting signal processing unit 280 may further include a space-time block code (STBC) encoder for spreading the constellation points from the number of spatial streams into a number of space-time streams ($N_{STS}$) and a spatial mapper for mapping the space-time streams to transmit chains. The spatial mapper may use direct mapping, spatial expansion, or beamforming depending on implementation. When MU-MIMO is employed, one or more of the blocks before reaching the spatial mapper may be provided for each user.

The IFT 284 converts a block of the constellation points output from the mapper 283 or the spatial mapper into a time domain block (e.g., a symbol) by using an inverse discrete Fourier transform (IDFT) or an inverse fast Fourier transform (IFFT). If the STBC encoder and the spatial mapper are employed, the IFT 284 may be provided for each transmit chain.

When MIMO or MU-MIMO is employed, the transmitting signal processing unit 280 may insert cyclic shift diversities (CSDs) to prevent unintentional beamforming. The CSD insertion may occur before or after the inverse Fourier transform operation. The CSD may be specified per

8

transmit chain or may be specified per space-time stream. Alternatively, the CSD may be applied as a part of the spatial mapper.

The GI inserter 285 prepends a GI to the symbol. The transmitting signal processing unit 280 may optionally perform windowing to smooth edges of each symbol after inserting the GI. The RF transmitter 221 converts the symbols into an RF signal and transmits the RF signal via the antenna unit 230. When MIMO or MU-MIMO is employed, the GI inserter 285 and the RF transmitter 221 may be provided for each transmit chain.

FIG. 3B illustrates a schematic block diagram of an example of a receiving signal processing unit 290 in a wireless communication device. The receiving signal processing unit 290 of the PHY processor 215 includes a GI remover 291, a Fourier transformer (FT) 292, a demapper 293, a deinterleaver 294, and a decoder 295.

The RF receiver 222 receives an RF signal via the antenna unit 230 and converts the RF signal into one or more symbols. In some aspects, the GI remover 291 removes the GI from the symbol. When MIMO or MU-MIMO is employed, the RF receiver 222 and the GI remover 291 may be provided for each receive chain.

The FT 292 converts the symbol (e.g., the time domain block) into a block of the constellation points by using a discrete Fourier transform (DFT) or a fast Fourier transform (FFT) depending on implementation. In one or more implementations, the FT 292 is provided for each receive chain.

When MIMO or MU-MIMO is employed, the receiving signal processing unit 290 may be a spatial demapper for converting the Fourier transformed receiver chains to constellation points of the space-time streams, and a STBC decoder (not shown) for despreading the constellation points from the space-time streams into the spatial streams.

The demapper 293 demaps the constellation points output from the FT 292 or the STBC decoder to the bit streams. If the LDPC encoding is used, the demapper 293 may further perform LDPC tone demapping before the constellation demapping. The deinterleaver 294 deinterleaves the bits of each stream output from the demapper 293. In one or more implementations, deinterleaving may be applied only when BCC encoding is used.

When MIMO or MU-MIMO is employed, the receiving signal processing unit 290 may use multiple instances on the demapper 293 and multiple instances of the deinterleaver 294 corresponding to the number of spatial streams. In the example, the receiving signal processing unit 290 may further include a stream departer for combining the streams output from the deinterleavers 294.

The decoder 295 decodes the streams output from the deinterleaver 294 and/or the stream departer. For example, the decoder 295 may be an FEC decoder. The FEC decoder may include a BCC decoder or an LDPC decoder.

FIG. 4 illustrates an example of a high efficiency (HE) frame 400. The HE frame 400 is a physical layer convergence procedure (PLCP) protocol data unit (or PPDU) format. An HE frame may be referred to as an OFDMA frame, a PPDU, an OFDMA PPDU, an MU PPDU, another similar term, or vice versa. An HE frame may be simply referred to as a frame for convenience.

An AP may transmit a frame for downlink (DL) using a frame format shown in this figure or a variation thereof. A STA may transmit a frame for uplink (UL) using a frame format shown in this figure or a variation thereof (e.g., without any or some portions of an HE header 414). In one or more aspects, the frames shown in FIGS. 5 through 8 may utilize a frame format shown in FIG. 4 or a variation thereof.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014205

JX005.00018

US 9,912,513 B2

9

10

Referring to FIG. 4, the HE frame **400** contains a header **410** and a payload **430**. The header **410** includes a legacy header **412** comprised of a legacy short training field (L-STF), a legacy long training field (L-LTF), and a legacy signal (L-SIG) field. These legacy fields contain symbols based on an early design of an IEEE 802.11 specification. Presence of these symbols would make any new design compatible with the legacy designs and products.

In one or more implementations, the legacy STF, LTF, and SIG symbols are modulated/carried with FFT size of 64 on a 20 MHz sub-channel and are duplicated every 20 MHz if the frame has a channel bandwidth wider than 20 MHz. Therefore, the legacy field (i.e., the STF, LTF, and SIG fields) occupies the entire channel bandwidth of the frame. The L-STF field may be utilized for packet detection, automatic gain control (AGC), and coarse frequency-offset correction. The L-LTF field may be utilized for channel estimation, fine frequency-offset correction, and timing.

The header **410** may include an HE header **414** comprised of an HE-SIG-A field and an HE-SIG-B field. These fields contain symbols that carry control information that may be vital regarding each PLCP service data unit (PSDU) and regarding the radio frequency (RF), PHY, and MAC properties of a PPDU. Several sub-fields may be located either in the HE-SIG-A and/or HE-SIG-B fields. In one aspect, the HE-SIG-A field can be carried/modulated using an FFT size of 64 for 20 MHz channel bandwidth. The HE-SIG-B field can be carried/modulated using an FFT size of e.g., 64 or 256 depending on implementation. The HE-SIG-A and HE-SIG-B fields may occupy the entire channel bandwidth of the frame. In some aspects, the size of the HE-SIG-B field is variable. In other words, the number of symbols contained in the HE-SIG-B field can vary from frame to frame. For example, the number of symbols in the HE-SIG-B field may be one symbol, two symbols, zero symbols, among other possibilities. In this regard, a HE-SIG-B field is not always present in all frames. To facilitate decoding of the HE frame **400** by a receiver, the size (e.g., number of symbols) contained in the HE-SIG-B field may be indicated in the HE-SIG-A field.

For a 20 MHz channel, an FFT size of 64 is associated with a discrete Fourier transform (DFT) period of 3.2 μs and a subcarrier spacing of 312.5 kHz. For a 20 MHz channel, an FFT size of 256 is associated with a DFT period of 12.8 μs and a subcarrier spacing of 78.125 kHz. The DFT period may also be referred to as an inverse DFT period (IDFT) or an IDFT/DFT period. The DFT period may be denoted as $T_{DFT}$. The subcarrier spacing may be referred to as a subcarrier frequency spacing and may be denoted as $\Delta_F$. The subcarrier spacing may be obtained by dividing the channel bandwidth by the FFT size. The DFT period is the reciprocal of the subcarrier spacing.

The HE header **414** may further include HE-STF and HE-LTF fields, which contain symbols used to perform necessary RF and PHY processing for each PSDU and/or for the whole PPDU. The HE-LTF symbols may be modulated/carried with FFT size of 256 per 20 MHz channel bandwidth and modulated over the entire bandwidth of the frame. Thus, the HE-LTF field may occupy the entire channel bandwidth of the frame. The HE-STF symbols may have a fixed pattern and a fixed duration. For example, the HE-STF symbols may have a predetermined repeating pattern. In one aspect, the HE-STF symbols do not require FFT processing.

In one example, the legacy STF, LTF, and SIG symbols and the HE-SIG-A and HE-SIG-B symbols are modulated/carried with FFT size of 64 on a 20 MHz channel (e.g., using

a DFT period of 3.2 μs and a subcarrier spacing of 312.5 kHz), whereas the HE-LTF symbols are modulated/carried with FFT size of 256 on a 20 MHz channel (e.g., using a DFT period of 12.8 μs and a subcarrier spacing of 78.125 kHz). In such implementations, a first part **420** of the HE frame **400** may include the legacy STF, LTF and SIG symbols and the HE-SIG-A and HE-SIG-B symbols. A second part **422** of the HE frame **400** may include HE-LTF symbols. The HE-STF symbols may be a known predetermined pattern that does not require FFT processing. Thus, the HE-STF symbols may be considered separate from the first part **420** and the second part **422** of the HE frame **400**. In one aspect, the payload **430** (containing data) is modulated/carried with FFT size of 256 (e.g., using a DFT period of 12.8 μs and a subcarrier spacing of 78.125 kHz), and the payload **430** may be included in the second part **422** of the HE frame **400**.

In one or more aspects, the first part **420** of the HE frame **400** is associated with a first FFT size, and the second part **422** of the HE frame **400** is associated with a second FFT size that is greater (or larger) than the first FFT size. In one or more aspects, the first part **420** of the HE frame **400** is associated with a first subcarrier spacing (e.g., 312.5 kHz), and the second part **422** of the HE frame **400** is associated with a second subcarrier spacing (e.g., 78.125 kHz) that is less than the first subcarrier spacing. In one aspect, a subcarrier spacing is a spacing between tones (or between subcarriers). In one or more aspects, the boundary of a first part and a second part of an HE frame **400** can be placed at a location other than the location shown in FIG. 4. For example, the second part may start at the beginning of the payload **430**. In one aspect, a first part of an HE frame **400** always includes at least the legacy header (i.e., the L-STF, L-LTF, and L-SIG symbols).

In one or more aspects, additional one or more of the HE-STF and/or HE-LTF fields may be included in the header **410**. For example, an additional HE-STF field and/or an additional HE-LTF field may be included between the HE-SIG-A field and the HE-SIG-B field. The additional HE-STF and HE-LTF fields may be, for example, modulated/carried with FFT size of 64 on a 20 MHz channel and may be included as part of the first part **420** of the HE frame **400**. In one or more implementations, a TX signal processing unit **280** (or an IFFT **284**) illustrated in FIG. 3A may carry out the modulation described in this paragraph as well as the modulations described in other paragraphs above. In one or more implementations, an RX signal processing unit **290** (or an FT **292**) may perform demodulation for a receiver.

The horizontal dimension in FIG. 4 represents the time dimension or number of OFDM symbols. Each of the fields (e.g., L-LTF, HE-SIG-B, etc.) of the HE frame **400** includes one or more guard intervals and one or more OFDM symbols. The guard interval may be utilized to facilitate compensation of multi-path effects, which may cause inter-symbol interference (ISI). In one or more implementations, a guard interval is a cyclic prefix (CP), and a guard interval duration is a CP length. A guard interval associated with the first part **420** of the HE frame may be predetermined to be, and set to, for example, 0.8 μs. In one aspect, a guard interval for each of a legacy OFDM symbol in the legacy header in the first part **420** is set to, for example, 0.8 μs. Each guard interval may be associated with a symbol and may be present between symbols (or between consecutive symbols). In some aspects, each OFDM symbol is preceded by a guard interval.

In one aspect, multiple guard intervals may be represented as one long guard interval, and such long guard interval may

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014206

**Appx213**

US 9,912,513 B2

11                                                    12

precede the OFDM symbols associated with the multiple guard intervals. For example, a guard interval of 1.6 µs (representing two guard intervals, each being 0.8 µs) may be prepended to two consecutive OFDM symbols associated with the two guard intervals.

In one or more implementations of a transmitter, a GI inserter 285 illustrated in FIG. 3A may prepend a guard interval to an OFDM symbol. For a receiver, a GI remover 291 of FIG. 3B may remove the prepended guard interval. As used herein, the term "OFDM symbol duration" or "symbol duration" may refer to a sum of a duration of a guard interval and a duration of an OFDM symbol associated with the guard interval, rather than the duration of the OFDM symbol itself, e.g., without the duration of the guard interval.

In some aspects, a guard interval duration utilized in the first part 420 of the HE frame 400 is predetermined for all UL and DL transmissions associated with OFDMA. In some aspects, information regarding the guard interval duration (e.g., a value of the guard interval duration) utilized for the second part 422 of the HE frame 400 may be stored in an HE-SIG-A field of the HE frame 400. The inclusion of the guard interval duration may facilitate decoding of the HE frame 400 by a receiver of the HE frame 400 by allowing the receiver to determine boundaries between adjacent symbols in the second part 422 of the HE frame 420 based on the guard interval duration. For example, a receiver of the HE frame 400 may decode the first part 420 of the HE frame 400 based on the predetermined guard interval duration to obtain the information indicative of the guard interval duration utilized for the second part 422 of the HE frame 400. With the information, the receiver may decode the second part 422 of the HE frame 400.

FIG. 5 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission. One or more aspects of aligning GI among all participating stations of OFDMA transmission are illustrated. The horizontal dimension in FIG. 5 represents the time dimension or number of OFDM symbols. The wireless communication devices include an AP, a participating station STA1, and a participating station STA2. Although FIG. 5 illustrates an exchange of frames between an AP and two stations participating in OFDMA transmission, the exchange of frames may be between the AP and one participating station (e.g., the non-OFDMA case) or between the AP and more than two participating stations.

In FIG. 5, the AP sends a downlink frame 510 to the participating stations (e.g., STA1 and STA2) during a time period T1. The downlink frame 510 is utilized to initiate OFDMA transmission. For example, the downlink frame 510 may be a trigger frame. The downlink frame 510 may provide, for example, a transmission opportunity to the participating stations and may indicate resource allocation information for the participating stations pertaining to OFDMA transmission. For example, the resource allocation information may include a sub-band assigned to a respective one of the participating stations as well as scheduling information regarding when a respective one of the participating stations may transmit using its assigned sub-band. For instance, when there are four STAs, and the uplink channel bandwidth is, for example, 80 MHz, then the AP may assign a sub-band of the uplink channel bandwidth (e.g., a portion of 80 MHz) to each respective STA so that each STA has its assigned sub-band. The downlink frame 510 may also include other information, such as FFT/IFFT period information.

The downlink frame 510 includes a first part 520 and a second part 522. In one or more implementations, the first part 520 and the second part 522 of the downlink frame 510 may be (or may include, or may be a part of) the first part 420 and the second part 422, respectively, of the frame 400 described with reference to FIG. 4. The downlink frame 510 may include an HE-STF field that is in between the first part 520 and the second part 522 of the downlink frame 510. Each guard interval (GI) of the first part 520 of the downlink frame 510 may be set at a predetermined guard interval duration GI1. The guard interval duration GI1 may be predetermined for all DL and/or UL transmissions. For example, the guard interval duration GI1 may be set to 0.8 µs regardless of using a short guard interval for the second part 522. The AP may utilize a guard interval duration GI2 for the rest of the downlink frame 510. The rest of the downlink frame 510 may include, for example, the HE-STF field and the second part 522 of the downlink frame 510.

For example, a guard interval 521a having the guard interval duration GI1 may be prepended to a symbol 521b of the first part 520 of the downlink frame 510. A symbol duration may be the sum of the duration of the guard interval 521a and the duration of the symbol 521b. For brevity, additional guard intervals and their associated symbols are not shown in the first part 520 are not shown.

Guard interval 523a and 524a, each having the guard interval duration GI2, may be prepended to their respective symbols 523b and 524b of the second part 522 of the downlink frame 510. Additional guard intervals and symbols that are present in the second part 522 are not shown for brevity. Information on the guard interval duration GI2 (e.g., a value representing GI2) may be stored in the first part 520 of the downlink frame 510, such as in an HE-SIG-A field, and may be utilized by a receiver of the downlink frame 510 to determine, e.g., for decoding purposes, that the second part 522 of the downlink frame 510 utilizes guard intervals of the guard interval duration GI2.

When the participating stations receive the downlink frame 510 transmitted by the AP, the participating stations may decode the downlink frame 510 and identify that the participating stations are supposed to transmit their respective frames to the AP after a specified time period (e.g., T2) after the participating stations received the frame 510. From the perspective of the AP, the predetermined time period T2 may be from the end of the transmission of the frame 510 (e.g., the end of the time period T1). After the predetermined time period T2, the participating stations send their respective uplink frames 530 and 550 to the AP during a time period T3 in response to the downlink frame 510. The time period T2 may be around 6 µs to around 60 µs for example. In some aspects, the time period T2 may be a short interface space (SIFS). In FIG. 5, the uplink frames 530 and 550 have a time duration equal to the time period T3. In other words, in one aspect, every UL OFDMA participating STA has the same frame length. In some cases, one or both of the uplink frames 530 and 550 may be of a time duration less than or greater than the time period T3. The uplink frame 530 may include a different number of symbols from the uplink frame 550. In one aspect, an uplink frame may include additional guard intervals and symbols beyond those shown in this figure (e.g., additional guard intervals and symbols after the symbol 564b).

When the participating stations transmit the uplink frames 530 and 550 as part of OFDMA transmission, the participating stations use the predetermined guard interval duration GI1 for the first parts 540 and 560 of their respective frames 530 and 550 and use the same guard interval duration GI2,

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014207

US 9,912,513 B2

13                                                                14

which is used in the second part 522 of the downlink frame 510, for the second parts 542 and 562 of their respective uplink frames 530 and 550. The uplink frames 530 and 550 may include a respective HE-STF field that is in between the first parts 540 and 560 and the second parts 542 and 562 of the respective uplink frames frame 530 and 550. In one aspect, the HE-STF field does not utilize any guard interval. As the guard interval duration GI2 is included in the downlink frame 510 for decoding purposes, no additional overhead is used in the downlink frame 510 to indicate the guard interval duration to be used by the participating stations in the second parts 542 and 562 of their respective uplink frames 530 and 550.

In one or more implementations, the AP may set the guard interval duration based on a communication environment. The communication environment utilized by the AP to determine the guard interval duration GI2 may include multi-path delay profile of a received signal, different propagation delay to and from multiple different stations (e.g., the participating stations), accuracy of timing alignment capabilities of the participating stations, and so on. For example, the participating stations may reside at different distances from the AP and/or in different environments (e.g., altitudes, atmosphere, density of buildings, temperature, etc.) such that propagation delay is different among the participating stations. The received signal may be a signal received at the stations, such as when the stations receive a signal transmitted to the stations by the AP. The received signal may be a signal received at the AP, such as when the AP receives a signal transmitted to the AP by the stations. In some cases, the guard interval duration GI2 is the same as the guard interval duration GI1. In other cases, the guard interval duration GI2 is different from the guard interval duration GI1.

In some aspects, the AP sets the guard interval duration GI2 to better accommodate the different propagation delays associated with the different stations. The AP may set the guard interval duration to a longer duration allowed by the IEEE 802.11 protocol to better accommodate the different propagation delays. For example, the AP may set the guard interval duration GI2 to a longest guard interval duration allowed by the IEEE 802.11 protocol (e.g., 3.2 μs). The use of a longer guard interval may allow the participating stations to synchronize the symbol duration, and the frames sent from the participating stations can avoid inter-symbol interferences caused, for example, by the propagation delay differences among participating stations.

In one or more implementations, the guard interval duration GI1 utilized by the first part (e.g., 520, 540, and 560) of the downlink frame 510 and the uplink frames 530 and 550 are predetermined (e.g., predetermined before the AP begins to create/prepare the downlink frame 510) such that APs and STAs participating in UL and DL OFDMA transmission throughout a network (e.g., an IEEE 802.1 lax-compliant network) utilize the guard interval duration GI1 for the first parts of their respective frames. A guard interval duration to be utilized for the guard interval duration GI2 may be adaptively determined by an AP. For example, the AP may adjust the guard interval duration GI2 based on changes in the communication environment. The definition of the guard interval durations to be used in the uplink frames (e.g., 530 and 550) of the participating stations allow synchronization of OFDM symbol boundaries of the uplink frames, since the OFDM symbol durations contained in the uplink frames are the same for each participating station. Although the number of symbols contained in the uplink frames (e.g., the number of symbols in the frame 530 compared to the number of

symbols in the frame 550) may be different. the respective OFDM symbol durations remain the same for the uplink frames.

In one or more aspects, the respective symbol durations of the uplink frames are the same, and the respective symbol boundaries are aligned. For example, a symbol duration 541c is the same as a symbol duration of 561c. A symbol duration 543c is the same as a symbol duration 563c. A symbol duration 544c is the same as a symbol duration 564c. Furthermore, a symbol boundary 541d is aligned with a symbol boundary of 561d. A symbol boundary 543d is aligned with a symbol boundary 563d. A symbol boundary 544d is aligned with a symbol boundary 564d.

In one or more implementations, the first part (e.g., 540 or 560) and the second part (e.g., 542 or 562) of an uplink frame (e.g., 530 or 560) may be (or may include, or may be a part of) the first part 420 and the second part 422, respectively, of the frame 400 described with reference to FIG. 4.

FIG. 6 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission. The description from FIG. 5 generally applies to FIG. 6, with examples of differences between FIG. 5 and FIG. 6 and other descriptions provided herein for purposes of clarity and simplicity.

In FIG. 6, the AP sends a downlink frame 610 to the participating stations during a time period T1. The downlink frame 610 includes a first part 620 that utilizes a guard interval duration GI1 and a second part 622 that utilizes a guard interval duration GI2. The downlink frame 610 may include an HE-STF field that is in between the first part 620 and the second part 622 of the downlink frame 610. The guard interval duration GI1 may be predetermined whereas the guard interval duration GI2 may be based on a communication environment. Information (e.g., a value) indicative of the guard interval duration GI2 may be stored in the first part 620 of the downlink frame 610, such as in an HE-SIG-A field, and may be utilized by a receiver of the downlink frame 610 to determine that the second part 622 of the downlink frame 610 utilizes guard intervals of the guard interval duration GI2.

When the participating stations receive the downlink frame 610 transmitted by the AP, the participating stations may decode the downlink frame 610 and identify that the participating stations are instructed to transmit their respective frames to the AP after a T2 time period after receiving the downlink frame 610. The participating stations use the predetermined guard interval duration GI1 for the first parts 640 and 660 of their respective uplink frames 630 and 650. The participating stations use another predetermined guard interval duration GI0 for the rest of their respective uplink frames (e.g., the second parts 642 and 662) when the participating stations transmit the respective uplink frames (e.g., 630 and 650) as part of OFDMA communication. The guard interval duration GI0 may be predetermined for UL OFDMA transmission throughout a network (e.g., an IEEE 802.1 lax-compliant network). As the guard interval duration GI0 is predetermined for UL OFDMA transmission throughout the network, the guard interval duration GI0 need not be explicitly indicated (e.g., signaled) to the participating stations. Utilization of the predetermined guard interval duration GI0 may reduce overhead for the OFDMA transmission, such as overhead of the downlink frame 610. The uplink frames 630 and 650 may include a respective HE-STF field that is in between the first parts 640 and 660 and the second parts 642 and 662 of the respective uplink frames frame 630 and 650.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014208

US 9,912,513 B2

**15**

In some aspects, to better accommodate the different propagation delays that may possibly be associated with the different stations, the guard interval duration GI0 may be set to a longer guard interval duration. For example, the guard interval duration GI0 may be predetermined to be set to the longest guard interval defined by the IEEE 802.11 protocol. The use of a longer guard interval may allow the participating stations to synchronize the symbol duration, and the frames sent from the participating stations can avoid inter-symbol interferences caused, for example, by the propagation delay differences among participating stations.

Utilizing of predetermined guard interval durations in the first part and second part of the uplink frames (e.g., 630 and 650) of the participating stations facilitate synchronization of OFDM symbol boundaries of the uplink frames, since the respective OFDM symbol durations contained in the uplink frames are the same for the participating stations. Although the number of symbols contained in the uplink frames may be different, the respective OFDM symbol durations remain the same and aligned for the uplink frames.

FIG. 7 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission. The description from FIG. 5 generally applies to FIG. 7, with examples of differences between FIG. 5 and FIG. 7 and other descriptions provided herein for purposes of clarity and simplicity.

In FIG. 7, during a time period T0 that occurs before the AP initiates OFDMA transmission from multiple participating stations, the AP sends a downlink frame 770 that includes information associated with OFDMA transmission, such as a guard interval duration GI3, to be used for UL OFDMA transmission. In one aspect, a payload of the downlink frame 770 includes information regarding GI3 (e.g., information or a value that can be used to identify GI3). In one aspect, the downlink frame 770 may be referred to as a management frame. The downlink frame 770 may be, may include, or may be a part of, a beacon frame that periodically broadcasts the guard interval duration GI3, among other information associated with the OFDMA transmission. The downlink frame 770 may be, may include, or may be a part of, a response frame sent to a station when the station requests to associate with a network associated with the AP and/or requests for capabilities/services of the network. The network may utilize different types of management frames (e.g., beacon frame, probe response frame, association response frame, etc.). For example, a beacon frame may be transmitted by the AP to participating stations on a periodic basis whereas a probe or association response frame may be sent in response to inquiries and/or requests from stations.

The downlink frame 770 includes a first part 780 and a second part 782. The downlink frame 770 may include an HE-STF field that is in between the first part 780 and the second part 782 of the downlink frame 770. A guard interval duration GI1 of the first part 780 of the downlink frame 770 is set at a predetermined duration, and a guard interval duration GI4 of the second part 782 of the downlink frame 770 can be set at another value (e.g., based on communication environment). In some cases, the guard interval duration GI4 is the same as the guard interval duration GI1. In other cases, the guard interval duration GI4 is different from the guard interval duration GI1. In one or more implementations, the downlink frame 770 is, includes, or is a part of, a probe response frame, an association response frame, or a beacon frame of the IEEE 802.11 protocol.

To initiate the OFDMA transmission, the AP sends a downlink frame 710 to the participating stations. The down-

**16**

link frame 710 may be a trigger frame. The downlink frame 710 includes a first part 720 that utilizes a guard interval duration GI1 and a second part 722 that utilizes a guard interval duration GI2. The downlink frame 710 may include an HE-STF field that is in between the first part 720 and the second part 722 of the downlink frame 710. The guard interval duration GI1 may be predetermined whereas the guard interval duration GI2 may be based on a communication environment. Information regarding the guard interval duration GI2 (e.g., a value indicative of GI2) may be stored in the first part 720 of the downlink frame 710, such as in an HE-SIG-A field, and may be utilized by a receiver of the downlink frame 710 to determine, e.g., for decoding purposes, that the second part 722 of the downlink frame 710 utilizes guard intervals of the guard interval duration GI2.

When the participating stations receive the downlink frame 710 from the AP, the participating stations may decode the downlink frame 710 and identify that the participating stations are supposed to transmit their uplink frames 730 and 750 after a T2 time period after receiving the downlink frame 710. The participating stations use the predetermined guard interval duration GI1 for the first parts 740 and 760 of their respective uplink frames 730 and 750. The participating stations use the guard interval duration GI3 indicated by the downlink frame 770 for UL OFDMA transmission for the second part of their respective uplink frames 730 and 750 (e.g., the remaining parts 742 and 762) when the participating stations transmit the uplink frames as part of OFDMA transmission. The uplink frames 730 and 750 may include a respective HE-STF field that is in between the first parts 740 and 760 and the second parts 742 and 762 of the respective uplink frames frame 730 and 750.

The IEEE 802.11 protocol guard interval durations include, for example, 0.4 μs, 0.8 μs, 1.6 μs, and 3.2 μs. In some aspects, the AP sets the guard interval duration GI3 to better accommodate the different propagation delays associated with the different stations. In one example, GI3 is different from GI1 or GI4. In one example, GI3 is different from GI2. In another example, GI3 is the same as GI2. In another example, GI3 is the same as GI4. In one or more implementations, the guard interval duration GI3 is set to a duration that is longer than any of the guard interval duration GI1, GI2, or GI4. For example, since GI3 is utilized by different STAs simultaneously, GI3 may be set to the longest guard interval defined by the IEEE 802.11 protocol (e.g., 3.2 μs) to better accommodate the different propagation delays associated with the different STAs.

Utilization of predetermined GI1 in the first parts (e.g., 740 and 760) of the uplink frames (e.g., 730 and 750) of the participating stations and utilization of GI3 in the second parts (e.g., 742 and 762) facilitate synchronization of OFDM symbol boundaries of the uplink frames, since the respective OFDM symbol durations contained in the uplink frames are the same for the participating stations. Although the number of symbols contained in the uplink frames may be different, the respective OFDM symbol durations remain the same and aligned for the uplink frames.

FIG. 8 illustrates a schematic diagram of an example of an exchange of frames among wireless communication devices for OFDMA transmission. The description from FIG. 5 generally applies to FIG. 8, with examples of differences between FIG. 5 and FIG. 8 and other descriptions provided herein for purposes of clarity and simplicity.

In FIG. 8, the AP sends a downlink frame 810 to the participating stations of the OFDMA transmission (e.g., STA1 and STA2) during a time period T1. The downlink

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014209

US 9,912,513 B2

17                                          18

frame 810 is utilized to initiate OFDMA transmission. The downlink frame 810 may be a trigger frame. The downlink frame 810 includes a first part 820 that utilizes a guard interval duration GI1 and a second part 822 that utilizes a guard interval duration GI2. The downlink frame 810 may include an HE-STF field that is in between the first part 820 and the second part 822 of the downlink frame 810. The guard interval duration GI1 may be predetermined whereas the guard interval duration GI2 may be based on a communication environment. Information regarding the guard interval duration GI2 (e.g., a value representing GI2) may be stored in the first part 820 of the downlink frame 810, such as in an HE-SIG-A field, and may be utilized by a receiver of the downlink frame 810 to determine, e.g., for decoding purposes, that the second part 822 of the downlink frame 810 utilizes guard intervals of the guard interval duration GI2. The downlink frame 810 may also include information on a guard interval duration GI3 (e.g., information or a value that can identify GI3) to be utilized by the participating stations. In one aspect, the information on the guard interval duration GI3 may be provided in a payload in the second part 822 of the downlink frame 810.

When the participating stations receive the downlink frame 810 transmitted by the AP, the participating stations may decode the downlink frame 810 and identify that the participating stations are supposed to transmit their own respective uplink frame 830 and 850 after a T2 time period after receiving the downlink frame 810. The participating stations may also identify the guard interval duration GI3 to be utilized in the second parts 842 and 862 of the respective uplink frames 830 and 850. The participating stations use the predetermined guard interval duration GI1 for the first parts 840 and 860 of their respective uplink frames 830 and 850. The participating stations use the guard interval duration GI3 indicated by the downlink frame 810 for UL OFDMA transmission for the second part of their respective uplink frames 830 and 850 (e.g., the remaining parts 842 and 862) when the participating stations transmit the uplink frame as part of OFDMA transmission. The uplink frames 830 and 850 may include a respective HE-STF field that is in between the first parts 840 and 860 and the second parts 842 and 862 of the respective uplink frames frame 830 and 850.

In some aspects, the AP sets the guard interval duration GI3 to better accommodate the different propagation delays associated with the different stations. In one example, GB is different from GI1 or GI2. In another example, GI3 is the same as GI2. In one or more implementations, the guard interval duration GI3 is set to a duration that is longer than any of the guard interval duration GI1 or GI2. For example, since GI3 is utilized by different STAs simultaneously, GI3 may be set to the longest guard interval defined by the IEEE 802.11 protocol (e.g., 3.2 µs) to better accommodate the different propagation delays associated with the different STAs.

Utilization of predetermined GI1 in the first parts (e.g., 840 and 860) of the uplink frames (e.g., 830 and 850) of the participating stations and utilization of GI3 in the second parts (e.g., 842 and 862) facilitate synchronization of OFDM symbol boundaries of the uplink frames, since the respective OFDM symbol durations contained in the uplink frames are the same for the participating stations. Although the number of symbols contained in the uplink frames may be different, the respective OFDM symbol durations remain the same and aligned for the uplink frames.

In one or more aspects, methods and systems allow aligning of symbol durations of multiple participating stations for UL OFDMA transmission by setting guard interval

durations to be utilized by the participating stations. The methods and systems may facilitate maintaining the same respective OFDM symbol durations and symbol synchronization (or alignment) across MU simultaneous transmission by the participating stations. Such aligning and synchronizing may facilitate decrease of receiver complexity and increase of overall network efficiency for simultaneous transmission as part of OFDMA transmission.

Like reference numerals may designate like elements. For example, same reference numerals GI1, GI2, GI3, T1, T2, and T3 are used in various figures for simplicity and convenience. These components with the same reference numerals have certain characteristics that are the same, but as different figures illustrate different examples, the same reference numeral does not indicate that a component with the same reference numeral has the exact same characteristics. While the same reference numerals are used for certain components, examples of differences with respect to a component are described throughout this disclosure.

FIGS. 9A through 9C illustrate flow charts of examples of methods for facilitating wireless communication. For explanatory and illustration purposes, the example processes 900, 920 and 930 may be performed by the wireless communication devices 111–115 of FIG. 1 and their components such as a baseband processor 210, a MAC processor 211, a MAC software processing unit 212, a MAC hardware processing unit 213, a PHY processor 215, a transmitting signal processing unit 280 and/or a receiving signal processing unit 290; however, the example processes 900, 920 and 930 are not limited to the wireless communication devices 111–115 of FIG. 1 or their components, and the example processes 900, 920 and 930 may be performed by some of the devices shown in FIG. 1, or other devices or components. For explanatory and illustration purposes, the blocks of the example processes 900, 920 and 930 are described herein as occurring in serial or linearly. However, multiple blocks of the example processes 900, 920 and 930 may occur in parallel. In addition, the blocks of the example processes 900, 920 and 930 need not be performed in the order shown and/or one or more of the blocks/actions of the example processes 900, 920 and 930 need not be performed.

Various examples of aspects of the disclosure are described below as clauses for convenience. These are provided as examples, and do not limit the subject technology. As an example, some of the clauses described below are illustrated in FIGS. 9A through 9C.

Clause A. An apparatus for facilitating wireless communication, the apparatus comprising: one or more memories; and one or more processors coupled to the one or more memories, the one or more processors configured to cause: determining a second cyclic prefix length based on a first frame received; generating a second frame that comprises a first set of symbols and a second set of symbols, the first set of symbols being associated with a first cyclic prefix length, the second set of symbols being associated with the cyclic prefix length; and providing the second frame for transmission.

Clause B. An apparatus for facilitating wireless communication, the apparatus comprising: one or more memories; and one or more processors coupled to the one or more memories, the one or more processors configured to cause: determining a cyclic prefix length for an uplink multi-user transmission based on a first frame received from an access point, wherein the first frame includes resource allocation information for the uplink multi-user transmission and the cyclic prefix length; generating a second frame using the

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,912,513 B2

19

20

cyclic prefix length for the uplink multi-user transmission; and transmitting the second frame using the resource allocation information.

Clause C. A computer-implemented method of facilitating wireless communication, the method comprising: generating a first frame that comprises a payload, the payload comprising information indicative of a cyclic prefix length for a plurality of stations; and providing the first frame for transmission directed to the plurality of stations.

In one or more aspects, additional clauses are described below.

A method comprising one or more methods or operations described herein.

An apparatus comprising one or more memories (e.g., 240, one or more internal, external or remote memories, or one or more registers) and one or more processors (e.g., 210) coupled to the one or more memories, the one or more processors configured to cause the apparatus to perform one or more methods or operations described herein.

An apparatus comprising means (e.g., 210) adapted for performing one or more methods or operations described herein.

A computer-readable storage medium (e.g., 240, one or more internal, external or remote memories, or one or more registers) comprising instructions stored therein, the instructions comprising code for performing one or more methods or operations described herein.

In one aspect, a method may be an operation, an instruction, or a function and vice versa. In one aspect, a clause may be amended to include some or all of the words (e.g., instructions, operations, functions, or components) recited in other one or more clauses, one or more sentences, one or more phrases, one or more paragraphs, and/or one or more claims.

To illustrate the interchangeability of hardware and software, items such as the various illustrative blocks, modules, components, methods, operations, instructions, and algorithms have been described generally in terms of their functionality. Whether such functionality is implemented as hardware or software depends upon the particular application and design constraints imposed on the overall system. Skilled artisans may implement the described functionality in varying ways for each particular application.

A reference to an element in the singular is not intended to mean one and only one unless specifically so stated, but rather one or more. For example, "a" module may refer to one or more modules. An element proceeded by "a," "an," "the," or "said" does not, without further constraints, preclude the existence of additional same elements.

Headings and subheadings, if any, are used for convenience only and do not limit the invention. The word exemplary is used to mean serving as an example or illustration. To the extent that the term include, have, or the like is used, such term is intended to be inclusive in a manner similar to the term comprise as comprise is interpreted when employed as a transitional word in a claim. Relational terms such as first and second and the like may be used to distinguish one entity or action from another without necessarily requiring or implying any actual such relationship or order between such entities or actions.

Phrases such as an aspect, the aspect, another aspect, some aspects, one or more aspects, an implementation, the implementation, another implementation, some implementations, one or more implementations, an embodiment, the embodiment, another embodiment, some embodiments, one or more embodiments, a configuration, the configuration, another configuration, some configurations, one or more

configurations, the subject technology, the disclosure, the present disclosure, other variations thereof and alike are for convenience and do not imply that a disclosure relating to such phrase(s) is essential to the subject technology or that such disclosure applies to all configurations of the subject technology. A disclosure relating to such phrase(s) may apply to all configurations, or one or more configurations. A disclosure relating to such phrase(s) may provide one or more examples. A phrase such as an aspect or some aspects may refer to one or more aspects and vice versa, and this applies similarly to other foregoing phrases.

A phrase "at least one of" preceding a series of items, with the terms "and" or "or" to separate any of the items, modifies the list as a whole, rather than each member of the list. The phrase "at least one of" does not require selection of at least one item; rather, the phrase allows a meaning that includes at least one of any one of the items, and/or at least one of any combination of the items, and/or at least one of each of the items. By way of example, each of the phrases "at least one of A, B, and C" or "at least one of A, B, or C" refers to only A, only B, or only C; any combination of A, B, and C; and/or at least one of each of A, B, and C.

It is understood that the specific order or hierarchy of steps, operations, or processes disclosed is an illustration of exemplary approaches. Unless explicitly stated otherwise, it is understood that the specific order or hierarchy of steps, operations, or processes may be performed in different order. Some of the steps, operations, or processes may be performed simultaneously. The accompanying method claims, if any, present elements of the various steps, operations or processes in a sample order, and are not meant to be limited to the specific order or hierarchy presented. These may be performed in serial, linearly, in parallel or in different order. It should be understood that the described instructions, operations, and systems can generally be integrated together in a single software/hardware product or packaged into multiple software/hardware products.

The disclosure is provided to enable any person skilled in the art to practice the various aspects described herein. In some instances, well-known structures and components are shown in block diagram form in order to avoid obscuring the concepts of the subject technology. The disclosure provides various examples of the subject technology, and the subject technology is not limited to these examples. Various modifications to these aspects will be readily apparent to those skilled in the art, and the principles described herein may be applied to other aspects.

All structural and functional equivalents to the elements of the various aspects described throughout the disclosure that are known or later come to be known to those of ordinary skill in the art are expressly incorporated herein by reference and are intended to be encompassed by the claims. Moreover, nothing disclosed herein is intended to be dedicated to the public regardless of whether such disclosure is explicitly recited in the claims. No claim element is to be construed under the provisions of 35 U.S.C. §112, sixth paragraph, unless the element is expressly recited using a phrase means for or, in the case of a method claim, the element is recited using the phrase step for.

The title, background, brief description of the drawings, abstract, and drawings are hereby incorporated into the disclosure and are provided as illustrative examples of the disclosure, not as restrictive descriptions. It is submitted with the understanding that they will not be used to limit the scope or meaning of the claims. In addition, in the detailed description, it can be seen that the description provides illustrative examples and the various features are grouped

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014211

JX005.00024

US 9,912,513 B2

21

together in various implementations for the purpose of streamlining the disclosure. The method of disclosure is not to be interpreted as reflecting an intention that the claimed subject matter requires more features than are expressly recited in each claim. Rather, as the following claims reflect, inventive subject matter lies in less than all features of a single disclosed configuration or operation. The following claims are hereby incorporated into the detailed description, with each claim standing on its own as a separately claimed subject matter.

The claims are not intended to be limited to the aspects described herein, but are to be accorded the full scope consistent with the language claims and to encompass all legal equivalents. Notwithstanding, none of the claims are intended to embrace subject matter that fails to satisfy the requirements of the applicable patent law, nor should they be interpreted in such a way.

What is claimed is:

1. An apparatus for facilitating wireless communication, the apparatus comprising:

one or more memories; and

one or more processors coupled to the one or more memories, the one or more processors configured to cause:

receiving, in a trigger frame transmitted by an access point, an indication of a first guard interval length, wherein the trigger frame allocates one or more resources for an uplink (UL) multi-user (MU) transmission and solicits the UL MU transmission, wherein a value of the first guard interval length is to be used by each of a plurality of stations, including the apparatus, associated with the UL MU transmission,

generating an uplink frame for the UL MU transmission solicited by the trigger frame, wherein the uplink frame comprises a payload and a physical layer (PHY) header, and

transmitting the uplink frame using a resource allocated by the trigger frame to the apparatus,

wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length.

2. The apparatus of claim 1, wherein the trigger frame comprises an implicit indication of when the uplink frame is to be transmitted as part of the UL MU transmission.

3. The apparatus of claim 1, wherein the one or more processors are further configured to cause transmitting the uplink frame at a predetermined time after receipt of a PHY protocol data unit (PPDU) that carries the trigger frame.

4. The apparatus of claim 1, wherein the UL MU transmission comprises an uplink Orthogonal-Frequency Division Multiple Access (OFDMA) transmission, and wherein the first guard interval length is for the uplink OFDMA transmission.

5. The apparatus of claim 1, wherein the PHY header is associated with a second guard interval length.

6. The apparatus of claim 5, wherein the payload is comprised of a first set of orthogonal frequency-division multiplexing (OFDM) symbols and each OFDM symbol in the first set of OFDM symbols includes a guard interval of the first guard interval length.

7. The apparatus of claim 6, wherein the PHY header is composed of a second set of OFDM symbols and a third set of OFDM symbols and each OFDM symbol in the second set of OFDM symbols includes a guard interval of the

22

second guard interval length and each OFDM symbol in the third set of OFDM symbols includes a guard interval of the first guard interval length.

8. The apparatus of claim 7, wherein the second set of OFDM symbols comprises a legacy short training field, a legacy long training field, a legacy signal field, and a high efficiency signal A field, and wherein the third set of OFDM symbols comprises a high efficiency long training field.

9. A method for facilitating wireless communications between a wireless device and an access point, the method comprising:

receiving, by the wireless device in a downlink frame from the access point, an indication of a first cyclic prefix (CP) length, wherein the downlink frame is for allocating resources for an uplink (UL) multi-user (MU) transmission and for soliciting the UL MU transmission, wherein the first CP length is the same length to be used for all of a plurality of stations addressed by the downlink frame in the UL MU transmission;

generating, by the wireless device, an uplink frame for the UL MU transmission solicited by the downlink frame, wherein the uplink frame comprises a payload; and

transmitting the uplink frame using a resource allocated by the downlink frame,

wherein at least a portion of the payload of the uplink frame is associated with the first CP length.

10. The method of claim 9, wherein the uplink frame further comprises a legacy header, and wherein at least a portion of the legacy header is associated with a second CP length.

11. The method of claim 10, wherein the payload is comprised of a first set of orthogonal frequency-division multiplexing (OFDM) symbols and each OFDM symbol in the first set of OFDM symbols includes a CP of the first CP length, and

wherein the legacy header is composed of a second set of OFDM symbols and each OFDM symbol in the second set of OFDM symbols includes a CP of the second CP length.

12. The method of claim 9, wherein the UL MU transmission is an Orthogonal Frequency-Division Multiple Access (OFDMA) transmission.

13. The method of claim 9, wherein the uplink frame is transmitted at a predetermined time after a physical layer protocol data unit (PPDU) that carries the downlink frame.

14. The method of claim 9, wherein a payload of the downlink frame comprises the indication of the first CP length.

15. A computer-implemented method of facilitating wireless communication, the method comprising:

determining, by an access point, a first guard interval to be used by a set of stations participating in a multi-user (MU) uplink (UL) transmission;

creating, by the access point, a trigger frame, wherein the trigger frame includes information indicating the first guard interval for the UL MU transmission, wherein the trigger frame allocates resources for the UL MU transmission and solicits the UL MU transmission;

transmitting, by the access point, the trigger frame to the set of stations; and

processing an uplink frame comprising a plurality of frames from the set of stations based on the resources for the UL MU transmission, wherein each of the plurality of frames comprises respective payload, and wherein at least a portion of the respective payload is associated with the first guard interval.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx219**

ATLAS-00014212

JX005.00025

US 9,912,513 B2

**23**

**24**

16. The computer-implemented method of claim **15**, wherein each of the plurality of frames comprises a respective non-legacy header, and wherein at least a portion of the respective non-legacy header is associated with the first guard interval.

17. The computer-implemented method of claim **16**, wherein for each of the plurality of frames, a second portion of the respective non-legacy header is associated with a second guard interval.

18. The computer-implemented method of claim **15**, wherein the trigger frame comprises an indication of when each of the plurality of frames is to be transmitted as part of the UL MU transmission.

19. The computer-implemented method of claim **15**, wherein the UL MU transmission is an Orthogonal Frequency-Division Multiple Access (OFDMA) transmission.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014213

JX006.00001



U 8146575

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

### UNITED STATES DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**August 23, 2021**

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

**U.S. PATENT:** *9,917,679*
**ISSUE DATE:** *March 13, 2018*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

JOINT
TRIAL EXHIBIT

**JX006**

ATLAS-00014730

**Appx221**

JX006.00002

US009917679B2

(12) **United States Patent**
Seok

(10) **Patent No.:**     **US 9,917,679 B2**
(45) **Date of Patent:**          **Mar. 13, 2018**

(54) **METHOD AND APPARATUS FOR TRANSMITTING RESPONSE FRAME BASED ON TYPE IN A HIGH EFFICIENCY WIRELESS LAN**

(71) Applicant: **NEWRACOM, INC.,** Irvine, CA (US)

(72) Inventor: **Yongho Seok,** Irvine, CA (US)

(73) Assignee: **NEWRACOM, INC.,** Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 76 days.

(21) Appl. No.: **14/931,753**

(22) Filed: **Nov. 3, 2015**

(65) **Prior Publication Data**

US 2016/0128057 A1     May 5, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/080,026, filed on Nov. 14, 2014, provisional application No. 62/074,514, filed on Nov. 3, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| ***H04L 5/00*** | (2006.01) |
| ***H04L 1/00*** | (2006.01) |
| *H04W 84/12* | (2009.01) |
| *H04W 72/04* | (2009.01) |

(52) **U.S. Cl.**
CPC .............. ***H04L 5/0055*** (2013.01); ***H04L 1/00*** (2013.01); ***H04L 5/0028*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...................................................... H04L 5/0055
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2011/0103280 A1* | 5/2011 | Liu ................... | H04W 52/0229 370/311 |
| 2012/0106531 A1* | 5/2012 | Seok .................... | H04B 7/0452 370/338 |

(Continued)

OTHER PUBLICATIONS

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE P802.11ah™/D5.0 Draft Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 2: Sub 1 GHz License Exempt Operation," Mar. 2015.

(Continued)

*Primary Examiner* — Brian D Nguyen
*Assistant Examiner* — Toan Nguyen
(74) *Attorney, Agent, or Firm* — McDermott Will & Emery LLP

(57)     **ABSTRACT**

The present disclosure relates to a method and apparatus for transmitting a response frame based on a type in a High Efficiency Wireless Local Area Network (WLAN) (HEW). According to an aspect, a method for transmitting an uplink frame by a station (STA) to an access point (AP) in a WLAN may be provided. The method may include receiving, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and transmitting, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA.

**10 Claims, 23 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx222**

## US 9,917,679 B2
Page 2

(52) **U.S. Cl.**
CPC ........... *H04L 5/0037* (2013.01); *H04L 5/0053* (2013.01); *H04L 5/0091* (2013.01); *H04L 5/008* (2013.01); *H04L 5/0023* (2013.01); *H04L 5/0048* (2013.01); *H04W 72/042* (2013.01); *H04W 84/12* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2013/0188627 A1* | 7/2013 | Cheong | H04W 4/08 | 370/338 |
| 2014/0126509 A1* | 5/2014 | You | H04B 7/04 | 370/329 |
| 2015/0085836 A1* | 3/2015 | Kang | H04W 74/0808 | 370/336 |

### OTHER PUBLICATIONS

LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications, Amendment 4: Enhancements for Very High Throughput for Operation in Bands below 6 GHz," 2013.
LAN/MAN Standards Committee of the IEEE Computer Society, "IEEE Standard for Information technology—Telecommunications and information exchange between systems Local and metropolitan area networks—Specific requirements, Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications," 2012.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**FIG. 1**



JX006.00005



FIG. 2

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX006.00006



FIG. 3

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014735

JX006.00007



FIG. 4

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014736

**FIG. 5**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014737

JX006.00009

Case: 25-1039    Document: 20    Page: 315    Filed: 02/07/2025



FIG. 6

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014738

JX006.00010



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014739

JX006.00011



FIG. 8

Case: 25-1039 Document: 20 Page: 317 Filed: 02/07/2025

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014740

**Appx231**

JX006.00012

Case: 25-1039     Document: 20     Page: 318     Filed: 02/07/2025

FIG. 9



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014741

JX006.00013

**U.S. Patent**     Mar. 13, 2018     Sheet 10 of 23     US 9,917,679 B2

**FIG. 10**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014742

**Appx233**

JX006.00014

**FIG. 11**

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA6) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA5) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA3, STA4) |
| | | | | HE-STF | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA1, STA2) |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014743

Case: 25-1039    Document: 20    Page: 320    Filed: 02/07/2025

**Appx234**

JX006.00015

Case: 25-1039    Document: 20    Page: 321    Filed: 02/07/2025

**FIG. 12**

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | |
|-------|-------|-------|----------|--------|--------|----------|--------|--------|--------|--------|----------|---|
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA6) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA5) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA3, STA4) |
| | | | | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(AP to STA1, STA2) |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014744

**Appx235**

**FIG. 13**

| L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA4 to AP) |
|-------|-------|-------|----------|--------|--------|----------|--------|--------|--------|--------|----------|------------------|
|       |       |       |          | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA3 to AP) |
|       |       |       |          | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA2 to AP) |
|       |       |       |          | HE-STF | HE-LTF | HE-SIG-B | HE-LTF | HE-LTF | HE-LTF | HE-LTF | HE-SIG-C | PSDU(STA1 to AP) |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039    Document: 20    Page: 322    Filed: 02/07/2025

ATLAS-00014745

Appx236

**FIG. 14**



JX006.00018

**FIG. 15**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014747

**Appx238**

JX006.00019

**FIG. 16**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX006.00020

**FIG. 17**



| | L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-SIG-B | PSDU(AP to STA12) |
| AP | | | | | | | | PSDU(AP to STA11) |
| | | | | | HE-STF | HE-LTF | HE-SIG-B | PSDU(AP to STA9, STA10) |
| | | | | | HE-STF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA7, STA8) |
| | L-STF | L-LTF | L-SIG | HE-SIG-A | HE-STF | HE-LTF | HE-SIG-B | PSDU(AP to STA6) |
| | | | | | HE-STF | HE-LTF | HE-SIG-B | PSDU(AP to STA5) |
| | | | | | HE-STF | HE-LTF | HE-LTF | HE-SIG-B | PSDU(AP to STA3, STA4) |
| | | | | | HE-STF | HE-LTF | HE-SIG-B | PSDU(AP to STA1, STA2) |

| | HE-STF | HE-LTF | HE-SIG-B | PSDU(AP to STA11) |

| STA21 | L-STF | L-LTF | L-SIG | HE-SIG-A |

ATLAS-00014749

Case: 25-1039    Document: 20    Page: 326    Filed: 02/07/2025

**Appx240**

JX006.00021

**FIG. 18**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014750

**Appx241**

JX006.00022

**FIG. 19**



| RTS PPDU (AP to STA1) | CTS PPDU (STA1 to AP) | DL MU DATA PPDU (AP to STA1,STA2,STA3,STA4) | Block ACK PPDU (STA1 to AP) | Block ACK Request PPDU (AP to STA2) | Block ACK PPDU (STA2 to AP) | Block ACK Request PPDU (AP to STA3) | Block ACK PPDU (STA3 to AP) | Block ACK Request PPDU (AP to STA4) | Block ACK PPDU (STA4 to AP) |

| RTS PPDU (AP to STA1) | CTS PPDU (STA1 to AP) |

| PHY Header | PSDU(AP to STA1) QoS Control Field -Ack Policy=Implicit Block ACK Request |
| PHY Header | PSDU(AP to STA2) QoS Control Field -Ack Policy=Block ACK |
| PHY Header | PSDU(AP to STA3) QoS Control Field -Ack Policy=Block ACK |
| PHY Header | PSDU(AP to STA4) QoS Control Field -Ack Policy=Block ACK |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039 Document: 20 Page: 328 Filed: 02/07/2025

ATLAS-00014751

**Appx242**

**FIG. 20**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX006.00024

**FIG. 21**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

Case: 25-1039  Document: 20  Page: 330  Filed: 02/07/2025

ATLAS–00014753

**Appx244**

JX006.00025

Case: 25-1039    Document: 20    Page: 331    Filed: 02/07/2025

**FIG. 22**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014754

Appx245

JX006.00026

**FIG. 23**



Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014755

**Appx246**

US 9,917,679 B2

**1**

# METHOD AND APPARATUS FOR TRANSMITTING RESPONSE FRAME BASED ON TYPE IN A HIGH EFFICIENCY WIRELESS LAN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefits of U.S. Provisional Application No. 62/074,514, filed on Nov. 3, 2014, and U.S. Provisional Application No. 62/080,026, filed on Nov. 14, 2014, which are hereby incorporated by reference as if fully set forth herein.

## BACKGROUND OF THE INVENTION

Field of the Invention

The present invention relates to a Wireless Local Area Network (WLAN), and more particularly, to a method, apparatus, and software for transmitting a response frame according to a type in a High Efficiency WLAN (HEW), and a recording medium that stores the software.

Discussion of the Related Art

Along with the recent development of information and telecommunication technology, various wireless communication techniques have been developed. Among them, the WLAN enables a user to wirelessly access the Internet based on radio frequency technology in a home, an office, or a specific service area using a portable terminal such as a Personal Digital Assistant (PDA), a laptop computer, a Portable Multimedia Player (PMP), a smartphone, etc.

To overcome limitations in communication speed that the WLAN faces, the recent technical standards have introduced a system that increases the speed, reliability, and coverage of a wireless network. For example, the Institute of Electrical and Electronics Engineers (IEEE) 802.11n standard has introduced Multiple Input Multiple Output (MIMO) that is implemented using multiple antennas at both a transmitter and a receiver in order to support High Throughput (HT) at a data processing rate of up to 540 Mbps, minimize transmission errors, and optimize data rates.

In recent times, to support increased numbers of devices supporting WLAN, such as smartphones, more Access Points (APs) have been deployed. Despite increase in use of WLAN devices supporting the Institute of Electrical and Electronics Engineers (IEEE) 802.11 ac standard, that provide high performance relative to WLAN devices supporting the legacy IEEE 802.11g/n standard, a WLAN system supporting higher performance is required due to WLAN users' increased use of high volume content such as a ultra high definition video. Although a conventional WLAN system has aimed at increase of bandwidth and improvement of a peak transmission rate, actual users thereof could not feel drastic increase of such performance.

In a task group called IEEE 802.11 ax, High Efficiency WLAN (HEW) standardization is under discussion. The HEW aims at improving performance felt by users demanding high-capacity, high-rate services while supporting simultaneous access of numerous stations in an environment in which a plurality of APs is densely deployed and coverage areas of APs overlap.

However, there is no specified method for protecting a transmitted frame and no specified method for determining the type of a response frame in a HEW.

**2**

## SUMMARY OF THE INVENTION

Objects of the present invention is to provide a method for protecting a transmitted frame and a method for determining the type of a response frame in a High Efficiency WLAN (HEW).

The objects of the present invention are not limited to the foregoing descriptions, and additional objects will become apparent to those having ordinary skill in the pertinent art to the present invention based upon the following descriptions.

In an aspect of the present invention, a method for transmitting an uplink frame by a station (STA) to an access point (AP) in a WLAN may be provided. The method may include receiving, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and transmitting, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA.

In another aspect of the present invention, a method for receiving an uplink frame by an AP from at least one STA in a WLAN may be provided. The method may include transmitting, to the at least one STA, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and receiving, from the at least one STA, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the at least one STA.

In another aspect of the present invention, a STA apparatus for transmitting an uplink frame to an AP in a WLAN may be provided. The STA apparatus may include a baseband processor, a Radio Frequency (RF) transceiver, a memory, etc. The baseband processor may be configured to receive, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and transmit, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA.

In another aspect of the present invention, an AP apparatus for receiving an uplink frame from at least one STA in a WLAN may be provided. The AP apparatus may include a baseband processor, an RF transceiver, a memory, etc. The baseband processor may be configured to transmit, to the at least one STA, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and receive, from the at least one STA, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the at least one STA.

In another aspect of the present invention, a software or computer-readable medium having instructions executable for an STA to transmit an uplink frame to an AP in a WLAN

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,917,679 B2

3

may be provided. The executable instructions may cause the STA to receive, from the AP, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and transmit, to the AP, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the STA and at least one other STA.

In another aspect of the present invention, a software or computer-readable medium having instructions executable for an AP to receive an uplink frame from at least one STA in a WLAN may be provided. The executable instructions may cause the AP to transmit, to the at least one STA, a downlink frame including information related to a type of the uplink frame, the type of the uplink frame including a single-user (SU) type and a multiple-user (MU) type; and receive, from the at least one STA, the uplink frame having a type determined based on the information related to the type of the uplink frame, wherein, when the type of the uplink frame corresponds to the MU type, the uplink frame is simultaneously transmitted by a plurality of STAs including the at least one STA.

It is to be understood that both the foregoing summarized features are exemplary aspects of the following detailed description of the present invention without limiting the scope of the present invention.

According to the present invention, a method for protecting a transmitted frame and a method for determining the type of a response frame in a HEW can be provided.

The advantages of the present invention are not limited to the foregoing descriptions, and additional advantages will become apparent to those having ordinary skill in the pertinent art to the present invention based upon the following descriptions.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention and are incorporated in and constitute a part of this application, illustrate embodiment(s) of the invention and together with the description serve to explain the principle of the invention. In the drawings:

FIG. 1 is a block diagram of a Wireless Local Area Network (WLAN) device;

FIG. 2 is a schematic block diagram of an exemplary transmitting signal processing unit in a WLAN;

FIG. 3 is a schematic block diagram of an exemplary receiving signal processing unit in a WLAN;

FIG. 4 depicts a relationship between InterFrame Spaces (IFSs);

FIG. 5 is a conceptual diagram illustrating a procedure for transmitting a frame in Carrier Sense Multiple Access with Collision Avoidance (CSMA/CA) for avoiding collisions between frames in a channel;

FIG. 6 depicts an exemplary frame structure in a WLAN system;

FIG. 7 depicts an exemplary HE PPDU frame format.

FIG. 8 depicts an exemplary High Efficiency (HE) Physical layer Protocol Data Unit (PPDU) frame format according to the present invention;

FIG. 9 depicts subchannel allocation in a HE PPDU frame format according to the present invention;

FIG. 10 depicts a subchannel allocation method according to the present invention;

4

FIG. 11 depicts the starting and ending points of an High Efficiency Long Training Field (HE-LTF) field in a HE PPDU frame format according to the present invention;

FIG. 12 depicts a High Efficiency SIGnal B (HE-SIG-B) field and a High Efficiency SIGnal C (HE-SIG-C) field in the HE PPDU frame format according to the present invention;

FIG. 13 depicts another example of a HE PPDU frame format according to the present invention;

FIGS. 14 and 15 depict operating channels in a WLAN system;

FIG. 16 depicts a Network Allocation Vector (NAV) update operation of an STA according to the present invention;

FIG. 17 depicts an operation of a third-party STA when a Downlink (DL) Orthogonal Frequency Division Multiple Access (OFDMA) PPDU is transmitted according to the present invention;

FIG. 18 depicts a NAV update operation of an STA according to the present invention;

FIG. 19 depicts an exemplary operation for transmitting an ACKnowledgement (ACK) in response to DL Multi-User (MU) transmission in an Uplink (UL) Single User (SU) transmission scheme;

FIG. 20 depicts an exemplary operation for transmitting an ACK in response to UL MU transmission in a UL MU transmission scheme;

FIGS. 21 and 22 depict various types of UL responses to DL MU transmission; and

FIG. 23 depicts an exemplary method according to the present invention.

DETAILED DESCRIPTION OF THE INVENTION

In the following detailed description, only certain embodiments of the present invention have been shown and described, simply by way of illustration. As those skilled in the art would realize, the described embodiments may be modified in various different ways, all without departing from the spirit or scope of the present invention. Accordingly, the drawings and description are to be regarded as illustrative in nature and not restrictive. Like reference numerals designate like elements throughout the specification.

In a Wireless Local Area network (WLAN), a Basic Service Set (BSS) includes a plurality of WLAN devices. A WLAN device may include a Medium Access Control (MAC) layer and a PHYsical (PHY) layer according to Institute of Electrical and Electronics Engineers (IEEE) 802.11 series standards. In the plurality of WLAN devices, at least one the WLAN device may be an Access Point (AP) and the other WLAN devices may be non-AP Stations (non-AP STAs). Alternatively, all of the plurality of WLAN devices may be non-AP STAs in an ad-hoc networking environment. In general, AP STA and non-AP STA may be each referred to as a STA or may be collectively referred to as STAs. However, for ease of description herein, only the non-AP STAs may be referred to herein as the STAs.

FIG. 1 is a block diagram of a WLAN device.

Referring to FIG. 1, a WLAN device 1 includes a baseband processor 10, a Radio Frequency (RF) transceiver 20, an antenna unit 30, a memory 40, an input interface unit 50, an output interface unit 60, and a bus 70.

The baseband processor 10 may be simply referred to as a processor, performs baseband signal processing described in the present specification, and includes a MAC processor (or MAC entity) 11 and a PHY processor (or PHY entity) 15.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014757

US 9,917,679 B2

5

In an embodiment of the present invention, the MAC processor 11 may include a MAC software processing unit 12 and a MAC hardware processing unit 13. The memory 40 may store software (hereinafter referred to as 'MAC software') including at least some functions of the MAC layer. The MAC software processing unit 12 may execute the MAC software to implement some functions of the MAC layer, and the MAC hardware processing unit 13 may implement the remaining functions of the MAC layer in hardware (hereinafter referred to as 'MAC hardware'). However, the MAC processor 11 is not limited to the foregoing implementation examples.

The PHY processor 15 includes a transmitting (TX) signal processing unit 100 and a receiving (RX) signal processing unit 200.

The baseband processor 10, the memory 40, the input interface unit 50, and the output interface unit 60 may communicate with one another via the bus 70.

The RF transceiver 20 includes an RF transmitter 21 and an RF receiver 22.

The memory 40 may further store an Operating System (OS) and applications. The input interface unit 50 receives information from a user, and the output interface unit 60 outputs information to the user.

The antenna unit 30 includes one or more antennas. When Multiple Input Multiple Output (MIMO) or Multi-User MIMO (MU-MIMO) is used, the antenna unit 30 may include a plurality of antennas.

FIG. 2 is a schematic block diagram of an exemplary transmission signal processor in a WLAN.

Referring to FIG. 2, the transmitting signal processing unit 100 may include an encoder 110, an interleaver 120, a mapper 130, an Inverse Fourier Transformer (IFT) 140, and a Guard Interval (GI) inserter 150.

The encoder 110 encodes input data. For example, the encoder 110 may be a Forward Error Correction (FEC) encoder. The FEC encoder may include a Binary Convolutional Code (BCC) encoder followed by a puncturing device, or the FEC encoder may include a Low-Density Parity-Check (LDPC) encoder.

The transmitting signal processing unit 100 may further include a scrambler for scrambling the input data before encoding to reduce the probability of long sequences of 0s or 1s. If BCC encoding is used in the encoder 110, the transmitting signal processing unit 100 may further include an encoder parser for demultiplexing the scrambled bits among a plurality of BCC encoders. If LDPC encoding is used in the encoder 110, the transmitting signal processing unit 100 may not use the encoder parser.

The interleaver 120 interleaves the bits of each stream output from the encoder 110 to change the order of bits. Interleaving may be applied only when BCC encoding is used in the encoder 110. The mapper 130 maps the sequence of bits output from the interleaver 120 to constellation points. If LDPC encoding is used in the encoder 110, the mapper 130 may further perform LDPC tone mapping in addition to constellation mapping.

When MIMO or MU-MIMO is used, the transmitting signal processing unit 100 may use a plurality of interleavers 120 and a plurality of mappers 130 corresponding to the number of spatial streams, $N_{SS}$. In this case, the transmitting signal processing unit 100 may further include a stream parser for dividing outputs of the BCC encoders or output of the LDPC encoder into blocks that are sent to different interleavers 120 or mappers 130. The transmitting signal processing unit 100 may further include a Space-Time Block Code (STBC) encoder for spreading the constellation points

6

from the $N_{SS}$ spatial streams into $N_{STS}$ space-time streams and a spatial mapper for mapping the space-time streams to transmit chains. The spatial mapper may use direct mapping, spatial expansion, or beamforming.

The IFT 140 converts a block of constellation points output from the mapper 130 or the spatial mapper to a time-domain block (i.e., a symbol) by using Inverse Discrete Fourier Transform (IDFT) or Inverse Fast Fourier Transform (IFFT). If the STBC encoder and the spatial mapper are used, the IFT 140 may be provided for each transmit chain.

When MIMO or MU-MIMO is used, the transmitting signal processing unit 100 may insert Cyclic Shift Diversities (CSDs) to prevent unintentional beamforming. The CSD insertion may occur before or after IFT. The CSD may be specified per transmit chain or may be specified per space-time stream. Alternatively, the CSD may be applied as a part of the spatial mapper.

When MU-MIMO is used, some blocks before the spatial mapper may be provided for each user.

The GI inserter 150 prepends a GI to the symbol. The transmitting signal processing unit 100 may optionally perform windowing to smooth edges of each symbol after inserting the GI. The RF transmitter 21 converts the symbols into an RF signal and transmits the RF signal via the antenna unit 30. When MIMO or MU-MIMO is used, the GI inserter 150 and the RF transmitter 21 may be provided for each transmit chain.

FIG. 3 is a schematic block diagram of an exemplary receiving signal processor in a WLAN.

Referring to FIG. 3, the receiving signal processing unit 200 includes a GI remover 220, a Fourier Transformer (FT) 230, a demapper 240, a deinterleaver 250, and a decoder 260.

An RF receiver 22 receives an RF signal via the antenna unit 30 and converts the RF signal into symbols. The GI remover 220 removes the GI from the symbol. When MIMO or MU-MIMO is used, the RF receiver 22 and the GI remover 220 may be provided for each receive chain.

The FT 230 converts the symbol (i.e., the time-domain block) into a block of constellation points by using a Discrete Fourier Transform (DFT) or a Fast Fourier Transform (FFT). The FT 230 may be provided for each receive chain.

When MIMO or MU-MIMO is used, the receiving signal processing unit 200 may include a spatial demapper for converting Fourier Transformed receiver chains to constellation points of the space-time streams, and an STBC decoder for despreading the constellation points from the space-time streams into the spatial streams.

The demapper 240 demaps the constellation points output from the FT 230 or the STBC decoder to bit streams. If LDPC encoding is applied to the received signal, the demapper 240 may perform LDPC tone demapping before constellation demapping. The deinterleaver 250 deinterleaves the bits of each stream output from the demapper 240. Deinterleaving may be applied only when BCC encoding scheme is applied to the received signal.

When MIMO or MU-MIMO is used, the receiving signal processing unit 200 may use a plurality of demappers 240 and a plurality of deinterleavers 250 corresponding to the number of spatial streams. In this case, the receiving signal processing unit 200 may further include a stream deparser for combining streams output from the deinterleavers 250.

The decoder 260 decodes the streams output from the deinterleaver 250 or the stream deparser. For example, the decoder 260 may be an FEC decoder. The FEC decoder may include a BCC decoder or an LDPC decoder. The receiving

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014758

US 9,917,679 B2

7                                                    8

signal processing unit **200** may further include a descrambler for descrambling the decoded data. If BCC decoding is used in the decoder **260**, the receiving signal processing unit **200** may further include an encoder deparser for multiplexing the data decoded by a plurality of BCC decoders. If LDPC decoding is used in the decoder **260**, the receiving signal processing unit **200** may not use the encoder deparser.

In a WLAN system, Carrier Sense Multiple Access with Collision Avoidance (CSMA/CA) is a basic MAC access mechanism. The CSMA/CA mechanism is referred to as Distributed Coordination Function (DCF) of IEEE 802.11 MAC, shortly as a 'listen before talk' access mechanism. According to the CSMA/CA mechanism, an AP and/or a STA may sense a medium or a channel for a predetermined time before starting transmission, that is, may perform Clear Channel Assessment (CCA). If the AP or the STA determines that the medium or channel is idle, it may start to transmit a frame on the medium or channel. On the other hand, if the AP and/or the STA determines that the medium or channel is occupied or busy, it may set a delay period (e.g., a random backoff period), wait for the delay period without starting transmission, and then attempt to transmit a frame. By applying a random backoff period, a plurality of STAs are expected to attempt frame transmission after waiting for different time periods, resulting in minimizing collisions.

FIG. 4 depicts a relationship between InterFrame Spaces (IFSs).

WLAN devices may exchange data frames, control frames, and management frames with each other.

A data frame is used for transmission of data forwarded to a higher layer. The WLAN device transmits the data frame after performing backoff if a Distributed Coordination Function IFS (DIFS) has elapsed from a time when the medium has been idle. A management frame is used for exchanging management information which is not forwarded to the higher layer. The WLAN device transmits the management frame after performing backoff if an IFS such as the DIFS or a Point Coordination Function IFS (PIFS) has elapsed. Subtype frames of the management frame include a beacon frame, an association request/response frame, a probe request/response frame, and an authentication request/response frame. A control frame is used for controlling access to the medium. Subtype frames of the control frame include a Request-To-Send (RTS) frame, a Clear-To-Send (CTS) frame, and an ACKnowledgement (ACK) frame. In the case that the control frame is not a response frame to another frame, the WLAN device transmits the control frame after performing backoff if the DIFS has elapsed. In case that the control frame is a response frame to another frame, the WLAN device transmits the control frame without performing backoff if a Short IFS (SIFS) has elapsed. The type and subtype of a frame may be identified by a type field and a subtype field in a Frame Control (FC) field.

On the other hand, a Quality of Service (QoS) STA transmits a frame after performing backoff if an Arbitration IFS (AIFS) for an associated Access Category (AC), i.e., AIFS[i] is determined based on AC) has elapsed. In this case, the AIFC[i] may be used for a data frame, a management frame, or a control frame that is not a response frame.

In the example illustrated in FIG. 4, upon generation of a frame to be transmitted, a STA may transmit the frame immediately, if it determines that the medium is idle for the DIFS or AIFS[i] or longer. The medium is busy for a time period during which the STA transmits the frame. During the time period, upon generation of a frame to be transmitted, another STA may defer access by confirming that the

medium is busy. If the medium gets idle, the STA that intends to transmit the frame may perform a backoff operation after a predetermined IFS in order to minimize collision with any other STA. Specifically, the STA that intends to transmit the frame selects a random backoff count, waits for a slot time corresponding to the selected random backoff count, and then attempt transmission. The random backoff count is determined based on a Contention Window (CW) parameter and the medium is monitored continuously during count-down of backoff slots (i.e. decrement a backoff countdown) according to the determined backoff count. If the STA monitors the medium as busy, the STA discontinues the count-down and waits, and then, if the medium gets idle, the STA resumes the count-down. If the backoff slot count reaches 0, the STA may transmit the next frame.

FIG. 5 is a conceptual diagram illustrating a CSMA/CA-based frame transmission procedure for avoiding collisions between frames in a channel.

Referring FIG. 5, a first STA (STA1) is a transmit WLAN device for transmitting data, a second STA (STA2) is a receive WLAN device for receiving the data from STA1, and a third STA (STA3) is a WLAN device which may be located in an area where a frame transmitted from STA1 and/or a frame transmitted from STA2 can be received by STA3.

STA1 may determine whether the channel is busy by carrier sensing. The STA1 may determine the channel occupation based on an energy level on the channel or correlation of signals in the channel, or may determine the channel occupation by using a Network Allocation Vector (NAV) timer.

After determining that the channel is not being used by other devices during DIFS (that is, the channel is idle), STA1 may transmit an RTS frame to STA2 after performing backoff. Upon receiving the RTS frame, STA2 may transmit a CTS frame as a response to the CTS frame after SIFS.

When STA3 receives the RTS frame, STA3 may set the NAV timer for a transmission duration of subsequently transmitted frame by using duration information included in the RTS frame. For example, the NAV timer may be set for a duration of SIFS+CTS frame duration+SIFS+data frame duration+SIFS+ACK frame duration. When STA3 receives the CTS frame, it may set the NAV timer for a transmission duration of subsequently transmitted frames by using duration information included in the CTS frame. For example, the NAV timer may be set for a duration of SIFS+a data frame duration+SIFS+an ACK frame duration. Upon receiving a new frame before the NAV timer expires, STA3 may update the NAV timer by using duration information included in the new frame. STA3 does not attempt to access the channel until the NAV timer expires.

When STA1 receives the CTS frame from STA2, it may transmit a data frame to STA2 after SIFS elapsed from the CTS frame has been completely received. Upon successfully receiving the data frame, STA2 may transmit an ACK frame as a response to the data frame after SIFS elapsed.

When the NAV timer expires, STA3 may determine whether the channel is busy through the use of carrier sensing. Upon determining that the channel is not in use by other devices during DIFS and after the NAV timer has expired, STA3 may attempt channel access after a contention window after a random backoff has elapsed.

FIG. 6 depicts an exemplary frame structure in a WLAN system.

PHY layer may prepare a transmission MAC PDU (MPDU) in response to an instruction (or a primitive, which is a set of instructions or a set of parameters) by the MAC layer. For example, upon receipt of an instruction requesting

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,917,679 B2

9      10

transmission start from the MAC layer, the PHY layer may switch to a transmission mode, construct a frame with information (e.g., data) received from the MAC layer, and transmit the frame.

Upon detection of a valid preamble in a received frame, the PHY layer monitors a header of the preamble and transmits an instruction indicating reception start of the PHY layer to the MAC layer.

Information is transmitted and received in frames in the WLAN system. For this purpose, a Physical layer Protocol Data Unit (PPDU) frame format is defined.

A PPDU frame may include a Short Training Field (STF) field, a Long Training Field (LTF) field, a SIGNAL (SIG) field, and a Data field. The most basic (e.g., a non-High Throughput (non-HT)) PPDU frame may include only a Legacy-STF (L-STF) field, a Legacy-LTF (L-LTF) field, a SIG field, and a Data field. Additional (or other types of) STF, LTF, and SIG fields may be included between the SIG field and the Data field according to the type of a PPDU frame format (e.g., an HT-mixed format PPDU, an HT-greenfield format PPDU, a Very High Throughput (VHT) PPDU, etc.).

The STF is used for signal detection, Automatic Gain Control (AGC), diversity selection, fine time synchronization, etc. The LTF field is used for channel estimation, frequency error estimation, etc. The STF and the LTF fields may be referred to as signals for OFDM PHY layer synchronization and channel estimation.

The SIG field may include a RATE field and a LENGTH field. The RATE field may include information about a modulation scheme and coding rate of data. The LENGTH field may include information about the length of the data. The SIG field may further include parity bits, SIG TAIL bits, etc.

The Data field may include a SERVICE field, a Physical layer Service Data Unit (PSDU), and PPDU TAIL bits. When needed, the Data field may further include padding bits. A part of the bits of the SERVICE field may be used for synchronization at a descrambler of a receiver. The PSDU corresponds to a MAC PDU defined at the MAC layer and may include data generated/used in a higher layer. The PPDU TAIL bits may be used to return an encoder to a zero state. The padding bits may be used to match the length of the Data filed in predetermined units.

A MAC PDU is defined according to various MAC frame formats. A basic MAC frame includes a MAC header, a frame body, and a Frame Check Sequence (FCS). The MAC frame includes a MAC PDU and may be transmitted and received in the PSDU of the data part in the PPDU frame format.

The MAC header includes a Frame Control field, a Duration/Identifier (ID) field, an Address field, etc. The Frame Control field may include control information required for frame transmission/reception. The Duration/ID field may be set to a time for transmitting the frame. For

details of Sequence Control, QoS Control, and HT Control subfields of the MAC header, refer to the IEEE 802.11-2012 technical specification.

The Frame Control field of the MAC header may include Protocol Version, Type, Subtype, To DS, From DS, More Fragment, Retry, Power Management, More Data, Protected Frame, and Order subfields. For the contents of each subfield in the Frame Control field, refer to the IEEE 802.11-2012 technical specification.

A Null-Data Packet (NDP) frame format is a frame format that does not include a data packet. In other words, the NDP frame format includes only a Physical Layer Convergence Protocol (PLCP) header part (i.e., the STF, LTF, and SIG fields) of the general PPDU frame format, without the remaining part (i.e., the Data field) of the general PPDU frame format. The NDP frame format may be referred to as a short frame format.

The IEEE 802.11 ax task group is discussing a WLAN system, called a High Efficiency WLAN (HEW) system, that operates in 2.4 GHz or 5 GHz and supports a channel bandwidth (or channel width) of 20 MHz, 40 MHz, 80 MHz, or 160 MHz. The present invention defines a new PPDU frame format for the IEEE 802.11ax HEW system. The new PPDU frame format may support MU-MIMO or OFDMA. A PPDU of the new format may be referred to as a 'HEW PPDU' or 'HE PPDU' (similarly, HEW xyz may be referred to as 'HE xyz' or 'HE-xyz' in the following descriptions).

In present specification, the term 'MU-MIMO or OFDMA mode' includes MU-MIMO without using OFDMA, or OFDMA mode without using MU-MIMO in an orthogonal frequency resource, or OFDMA mode using MU-MIMO in an orthogonal frequency resource.

FIG. 7 depicts an exemplary HE PPDU frame format.

A transmitting STA may generate a PPDU frame according to the HE PPDU frame format as illustrated in FIG. 7 and transmit the PPDU frame to a receiving STA. The receiving STA may detect a PPDU and then process the PPDU.

The HE PPDU frame may broadly include two parts: the first part including an L-STF field, an L-LTF field, an L-SIG field, an RL-SIG field, a HE-SIG-A field, and a HE-SIG-B field and the second part including a HE-STF field, a HE-LTF field, and a HE-DATA field. 64-FFT based on a channel bandwidth of 20 MHz may be applied to the first part and a basic subcarrier spacing of 312.5 kHz and a basic DFT period of 3.2 μs may be included in the first part. 256-FFT based on a channel bandwidth of 20 MHz may be applied to the second part and a basic subcarrier spacing of 75.125 kHz and a basic DFT period of 12.8 μs may be included in the second part.

The HE-SIG-A field may include $N_{HESIGA}$ symbols, the HE-SIG-B field may include $N_{HESIGB}$ symbols, the HE-LTF field may include $N_{HELTF}$ symbols, and the HE-DATA field may include $N_{DATA}$ symbols.

A detailed description of the fields included in the HE PPDU frame format is given in Table 1.

TABLE 1

| Element | definition | duration | DFT period | GI | Subcarrier spacing | Description |
|---------|-----------|----------|-----------|-----|-----------|-----------|
| Legacy(L)-STF | Non-high throughput(HT) Short Training field | 8 μs | — | — | equivalent to 1,250 kHz | L-STF of a non-trigger based PPDU has a periodicity of 0.8 μs with 10 periods. |
| L-LTF | Non-HT Long Training field | 8 μs | 3.2 μs | 1.6 μs | 312.5 kHz | |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

JX006.00032

US 9,917,679 B2

11                                                                              12

TABLE 1-continued

| Element | definition | duration | DFT period | GI | Subcarrier spacing | Description |
|---------|-----------|----------|-----------|-----|-------------------|-------------|
| L-SIG | Non-HT SIGNAL field | 4 μs | 3.2 μs | 0.8 μs | 312.5 kHz | |
| RL-SIG | Repeated Non-HT SIGNAL field | 4 μs | 3.2 μs | 0.8 μs | 312.5 kHz | |
| HE-SIG-A | HE SIGNAL A field | $N_{HESIGA}$ * 4 μs | 3.2 μs | 0.8 μs | 312.5 kHz | HE-SIG-A is duplicate on each 20 MHz segment after the legacy preamble to indicate common control information. $N_{HESIGA}$ means the number of OFDM symbols of the HE-SIG-A field and is equal to 2 or 4. |
| HE-SIG-B | HE SIGNAL B field | $N_{HESIGB}$ * 4 μs | 3.2 μs | 0.8 μs | 312.5 kHz | $N_{HESIGB}$ means the number of OFDM symbols of the HE-SIG-B field and is variable. DL MU packet contains HE-SIG-B. SU packets and UL Trigger based packets do not contain HE-SIG-B. |
| HE-STF | HE Short Training field | 4 or 8 μs | — | — | non-Trigger-based PPDU: (equivalent to) 1,250 kHz; trigger-based PPDU: (equivalent to) 625 kHz | HE-STF of a non-trigger-based PPDU has a periodicity of 0.8 μs with 5 periods. A non-trigger-based PPDU is not sent in response to a trigger frame. The HE-STF of a trigger-based PPDU has a periodicity of 1.6 μs with 5 periods. A trigger-based PPDU is an UL PPDU sent in response to a trigger frame. |
| HE-LTF | HE Long Training field | $N_{HELTF}$ * (DFT period + GI) μs | 2xLTF: 6.4 μs 4xLTF: 12.8 μs | supports 0.8, 1.6, 3.2 μs | 2xLTF: (equivalent to) 156.25 kHz; 4xLTF: 78.125 kHz | HE PPDU shall support 2xLTF mode and 4xLTF mode. In the 2xLTF mode, HE-LTF symbol excluding GI is equivalent to modulating every other tone in an OFDM symbol of 12.8 μs excluding GI, and then removing the second half of the OFDM symbol in time domain. $N_{HELTF}$ means the number of HE-LTF symbols and is equal to 1, 2, 4, 6, 8. |
| HE-DATA | HE DATA field | $N_{DATA}$ * (DFT period + GI) μs | 12.8 μs | supports 0.8, 1.6, 3.2 μs | 78.125 kHz | $N_{DATA}$ means the number of HE data symbols. |

L-STF is a non-HT Short Training field and may have a duration of 8 μs and a subcarrier spacing equivalent to 1250 kHz. L-STF of a PPDU which is not based on a trigger may have a periodicity of 0.8 μs with 10 periods. Herein, the trigger corresponds to scheduling information for UL transmission.

L-LTF is a non-HT Long Training field and may have a duration of 8 μs, a DFT period of 3.2 μs, a Guard Interval (GI) of 1.6 μs, and a subcarrier spacing of 312.5 kHz.

L-SIG is a non-HT SIGNAL field and may have a duration of 4 μs, a DFT period of 3.2 μs, a GI of 0.8 μs, and a subcarrier spacing of 312.5 kHz.

RL-SIG is a Repeated Non-HT SIGNAL field and may have a duration of 4 μs, a DFT period of 3.2 μs, a GI of 0.8 μs, and a subcarrier spacing of 312.5 kHz.

L-STF, L-LTF, L-SIG, and RL-SIG may be called legacy preambles.

HE-SIG-A is a HE SIGNAL A field and may have a duration of $N_{HESIGA}$*4 μs, a DFT period of 3.2 μs, a GI of 0.8 μs, and a subcarrier spacing of 312.5 kHz. HE-SIG-A may be duplicated on each 20 MHz segment after the legacy preambles to indicate common control information. $N_{HESIGA}$ represents the number of OFDM symbols of the HE-SIG-A field and may have a value of 2 or 4.

HE-SIG-B is a HE SIGNAL B field and may have a duration of $N_{HESIGB}$*4 μs, a DFT period of 3.2 μs, a GI of 0.8 μs, and a subcarrier spacing of 312.5 kHz. $N_{HESIGB}$ represents the number of OFDM symbols of the HE-SIG-B field and may have a variable value. In addition, although a DL Multi-User (MU) packet may include the HE-SIG-B field, a Single-User (SU) packet and a UL trigger based packet may not include the HE-SIG-B field.

HE-STF is a HE Short Training field and may have a duration of 4 or 8 μs. A non-trigger based PPDU may have a subcarrier spacing equivalent to 1250 kHz and a trigger based PPDU may have a subcarrier spacing equivalent to 625 kHz. HE-STF of the non-triggered PPDU may have a periodicity of 0.8 μs with 4 periods. The non-triggered PPDU is not transmitted in response to a trigger field. HE-STF of the trigger based PPDU may have a periodicity of 1.6 μs with 5 periods. The trigger based PPDU is a UL PPDU transmitted in response to the trigger frame.

HE-LTF is a HE Long Training field and may have a duration of $N_{HELTF}$*(DFT period+GI)μs. $N_{HELTF}$ represents the number of HE-LTF symbols and may have a value of 1, 2, 4, 6, or 8. A HE PPDU may support a 2×LTF mode and a 4×LTF mode. In the 2×LTF mode, a HE-LTF symbol except for a GI is equivalent to a symbol obtained by

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx252**

ATLAS-00014761

US 9,917,679 B2

**13**

modulating every other tone in an OFDM symbol of 12.8 µs excluding a GI and then eliminating the first half or the second half of the OFDM symbol in the time domain. In the 4×LTF mode, a HE-LTF symbol excluding a GI are equivalent to a symbol obtained by modulating every fourth tone in an OFDM symbol of 12.8 µs excluding a GI and then eliminating the first three-fourths or the last three-fourths of the OFDM symbol in the time domain. 2×LTF may have a DFT period of 6.4 µs and 4×LTF may have a DFT period of 12.8 µs. A GI of HE-LTF may support 0.8 µs, 1.6 µs, and 3.2 µs. 2×LTF may have a subcarrier spacing equivalent to 156.25 kHz and 4×LTF may have a subcarrier spacing of 78.125 kHz.

HE-DATA is a HE DATA field and may have a duration of, $N_{DATA}$*(DFT period+GI)µs. $N_{DATA}$ represents the number of HE-DATA symbols. HE-DATA may have a DFT period of 12.8 µs. A GI of HE-DATA may support 0.8 µs, 1.6 µs, and 3.2 µs. HE-DATA may have a subcarrier spacing of 78.125 kHz.

The above description of the fields included in the HE PPDU frame format may be combined with exemplary HE PPDU frame formats described below. For example, characteristics of fields exemplarily described below may be applied while a transmission order of the fields of the HE PPDU frame format of FIG. 7 is maintained.

FIG. 8 depicts an exemplary HE PPDU frame format according to the present invention.

Referring to FIG. 8, the vertical axis represents frequency and the horizontal axis represents time. It is assumed that frequency and time increase in the upward direction and the right direction, respectively.

In the example of FIG. 8, one channel includes four subchannels. An L-STF, an L-LTF, an L-SIG, and an HE-SIG-A may be transmitted per channel (e.g., 20 MHz), a HE-STF and a HE-LTF may be transmitted on each subchannel being a basic subchannel unit (e.g., 5 MHz), and a HE-SIG-B and a PSDU may be transmitted on each of subchannels allocated to a STA. A subchannel allocated to a STA may have a size required for PSDU transmission to the STA. The size of the subchannel allocated to the STA may be N (N=1, 2, 3, . . . ) times as large as the size of basic subchannel unit (i.e., a subchannel having a minimum size). In the example of FIG. 8, the size of a subchannel allocated to each STA is equal to the size of the basic subchannel unit. For example, a first subchannel may be allocated for PSDU transmission from an AP to STA1 and STA2, a second subchannel may be allocated for PSDU transmission from the AP to STA3 and STA4, a third subchannel may be allocated for PSDU transmission from the AP to STA5, and a fourth subchannel may be allocated for PSDU transmission from the AP to STA6.

**14**

While the term subchannel is used in the present disclosure, the term subchannel may be referred to as Resource Unit (RU) or subband. In particular, the terms like OFDMA subchannel, OFDMA RU, OFDMA subband can be used in embodiments for OFDMA in the present disclosure. Terms like a bandwidth of a subchannel, a number of tones (or subcarriers) allocated to a subchannel, a number of data tones (or data subcarriers) allocated to a subchannel can be used to express a size of a subchannel. A subchannel refers to a frequency band allocated to a STA and a basic subchannel unit refers to a basic unit used to represent the size of a subchannel. While the size of the basic subchannel unit is 5 MHz in the above example, this is purely exemplary. Thus, the basic subchannel unit may have a size of 2.5 MHz.

In FIG. 8, a plurality of HE-LTF elements are distinguished in the time and frequency domains. One HE-LTF element may correspond to one OFDM symbol in time domain and one subchannel unit (i.e., a subchannel bandwidth allocated to a STA) in frequency domain. The HE-LTF elements are logical units, and the PHY layer does not necessarily operate in units of an HE-LTF element. In the following description, a HE-LTF element may be referred to shortly as a HE-LTF.

A HE-LTF symbol may correspond to a set of HE-LTF elements in one OFDM symbol in time domain and in one channel unit (e.g., 20 MHz) in frequency domain.

A HE-LTF section may correspond to a set of HE-LTF elements in one or more OFDM symbols in time domain and in one subchannel unit (i.e., a subchannel bandwidth allocated to a STA) in frequency domain.

A HE-LTF field may be a set of HE-LTF elements, HE-LTF symbols, or HE-LTF sections for a plurality of stations.

The L-STF field is used for frequency offset estimation and phase offset estimation, for preamble decoding at a legacy STA (i.e., a STA operating in a system such as IEEE 802.11a/b/g/n/ac). The L-LTF field is used for channel estimation, for the preamble decoding at the legacy STA. The L-SIG field is used for the preamble decoding at the legacy STA and provides a protection function for PPDU transmission of a third-party STA (e.g., a third-party STA is not allowed to transmit during a certain period based on the value of a LENGTH field included in the L-SIG field).

HE-SIG-A (or HEW SIG-A) represents High Efficiency Signal A (or High Efficiency WLAN Signal A), and includes HE PPDU (or HEW PPDU) modulation parameters, etc. for HE preamble (or HEW preamble) decoding at a HE STA (or HEW STA). The parameters set included in the HEW SIG-A field may include one or more of Very High Throughput (VHT) PPDU modulation parameters transmitted by IEEE 802.11 ac stations, as listed in [Table 2] below, to ensure backward compatibility with legacy STAs (e.g., IEEE 802.11ac stations).

TABLE 2

| Two parts of VHT-SIG-A | Bit | Field | Number of bits | Description |
|---|---|---|---|---|
| VHT-SIG-A1 | B0-B1 | BW | 2 | Set to 0 for 20 MHz, 1 for 40 MHz, 2 for 80 MHz, and 3 for 160 MHz and 80 + 80 MHz |
| | B2 | Reserved | 1 | Reserved. Set to 1. |
| | B3 | STBC | 1 | For a VHT SU PPDU: Set to 1 if space time block coding is used and set to 0 otherwise. For a VHT MU PPDU: Set to 0. |
| | B4-B9 | Group ID | 6 | Set to the value of the TXVECTOR parameter GROUP_ID. A value of 0 or 63 indicates a VHT SU PPDU; otherwise, indicates a VHT MU PPDU. |

·Copy provided by USPTO from the PIRS Image Database on 08-13-2021·

**Appx253**

ATLAS-00014762

US 9,917,679 B2

15                                                                                    16

TABLE 2-continued

| Two parts of VHT-SIG-A | Bit | Field | Number of bits | Description |
|---|---|---|---|---|
| | B10-B21 | NSTS/Partial AID | 12 | For a VHT MU PPDU: NSTS is divided into 4 user positions of 3 bits each. User position p, where $0 \le p \le 3$, uses bits $B(10 + 3p)$ to $B(12 + 3p)$. The number of space-time streams for user u are indicated at user position $p = \text{USER\_POSITION}[u]$ where $u = 0, 1, \ldots, \text{NUM\_USERS} - 1$ and the notation A[b] denotes the value of array A at index b. Zero space-time streams are indicated at positions not listed in the USER_POSITION array. Each user position is set as follows:<br>Set to 0 for 0 space-time streams<br>Set to 1 for 1 space-time stream<br>Set to 2 for 2 space-time streams<br>Set to 3 for 3 space-time streams<br>Set to 4 for 4 space-time streams<br>Values 5-7 are reserved<br>For a VHT SU PPDU:<br>B10-B12<br>Set to 0 for 1 space-time stream<br>Set to 1 for 2 space-time streams<br>Set to 2 for 3 space-time streams<br>Set to 3 for 4 space-time streams<br>Set to 4 for 5 space-time streams<br>Set to 5 for 6 space-time streams<br>Set to 6 for 7 space-time streams<br>Set to 7 for 8 space-time streams<br>B13-B21<br>Partial AID: Set to the value of the TXVECTOR parameter PARTIAL_AID. Partial AID provides an abbreviated indication of the intended recipient(s) of the PSDU (see 9.17a). |
| | B22 | TXOP_PS_NOT_ALLOWED | 1 | Set to 0 by VHT AP if it allows non-AP VHT STAs in TXOP power save mode to enter Doze state during a TXOP. Set to 1 otherwise.<br>The bit is reserved and set to 1 in VHT PPDUs transmitted by a non-AP VHT STA. |
| | B23 | Reserved | 1 | Set to 1 |
| VHT-SIG-A2 | B0 | Short GI | 1 | Set to 0 if short guard interval is not used in the Data field. Set to 1 if short guard interval is used in the Data field. |
| | B1 | Short GI $N_{SYM}$ Disambiguation | 1 | Set to 1 if short guard interval is used and $N_{SYM}$ mod $10 = 9$; otherwise, set to 0. $N_{SYM}$ is defined in 22.4.3. |
| | B2 | SU/MU[0] Coding | 1 | For a VHT SU PPDU, B2 is set to 0 for BCC, 1 for LDPC For a VHT MU PPDU, if the MU[0] NSTS field is nonzero, then B2 indicates the coding used for user u with USER_POSITION[u] = 0; set to 0 for BCC and 1 for LDPC. If the MU[0] NSTS field is 0, then this field is reserved and set to 1. |
| | B3 | LDPC Extra OFDM Symbol | 1 | Set to 1 if the LDPC PPDU encoding process (if an SU PPDU), or at least one LDPC user's PPDU encoding process (if a VHT MU PPDU), results in an extra OFDM symbol (or symbols) as described in 22.3.10.5.4 and 22.3.10.5.5. Set to 0 otherwise. |
| | B4-B7 | SU VHT-MCS/MU[1-3] Coding | 4 | For a VHT SU PPDU:<br>VHT-MCS index<br>For a VHT MU PPDU:<br>If the MU[1] NSTS field is nonzero, then B4 indicates coding for user u with USER_POSITION[u] = 1: set to 0 for BCC, 1 for LDPC. If the MU[1] NSTS field is 0, then B4 is reserved and set to 1.<br>If the MU[2] NSTS field is nonzero, then B5 indicates coding for user u with USER_POSITION[u] = 2: set to 0 for BCC, 1 for LDPC. If the MU[2] NSTS field is 0, then B5 is reserved and set to 1.<br>If the MU[3] NSTS field is nonzero, then B6 indicates coding for user u with USER_POSITION[u] = 3: set to 0 for BCC, 1 for LDPC. If the MU[3] NSTS field is 0, then B6 is reserved and set to 1.<br>B7 is reserved and set to 1 |
| | B8 | Beamformed | 1 | For a VHT SU PPDU:<br>Set to 1 if a Beamforming steering matrix is applied to the waveform in an SU transmission as described in 20.3.11.11.2, set to 0 otherwise.<br>For a VHT MU PPDU:<br>Reserved and set to 1<br>NOTE - If equal to 1 smoothing is not recommended. |

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014763

US 9,917,679 B2

**17**                                                                **18**

TABLE 2-continued

| Two parts of VHT-SIG-A | Bit | Field | Number of bits | Description |
|---|---|---|---|---|
| | B9 | Reserved | 1 | Reserved and set to 1 |
| | B10-B17 | CRC | 8 | CRC calculated as in 20.3.9.4.4 with c7 in B10. Bits 0-23 of HT-SIG1 and bits 0-9 of HT-SIG2 are replaced by bits 0.23 of VHT-SIG-A1 and bits 0-9 of VHT-SIG-A2, respectively. |
| | B18-B23 | Tail | 6 | Used to terminate the trellis of the convolutional decoder. Set to 0. |

[Table 2] illustrates fields, bit positions, numbers of bits, and descriptions included in each of two parts, VHT-SIG-A1 and VHT-SIG-A2, of the VHT-SIG-A field defined by the IEEE 802.11ac standard. For example, a BW (BandWidth) field occupies two Least Significant Bits (LSBs), B0 and B1 of the VHT-SIG-A1 field and has a size of 2 bits. If the 2 bits are set to 0, 1, 2, or 3, the BW field indicates 20 MHz, 40 MHz, 80 MHz, or 160 and 80+80 MHz. For details of the fields included in the VHT-SIG-A field, refer to the IEEE 802.11ac-2013 technical specification. In the HE PPDU frame format of the present invention, the HE-SIG-A field may include one or more of the fields included in the VHT-SIG-A field, and it may provide backward compatibility with IEEE 802.11ac stations.

FIG. 9 depicts subchannel allocation in the HE PPDU frame format according to the present invention.

In FIG. 9, it is assumed that information indicating subchannels allocated to STAs in HE PPDU indicates that 0 MHz subchannel is allocated to STA1 (i.e., no subchannel is allocated), a 5-MHz subchannel is allocated to each of STA2 and STA3, and a 10-MHz subchannel is allocated to STA4.

In the example of FIG. 9, an L-STF, an L-LTF, an L-SIG, and a HE-SIG-A may be transmitted per channel (e.g., 20 MHz), a HE-STF and a HE-LTF may be transmitted on each of subchannels being basic subchannel units (e.g., 5 MHz), and a HE-SIG-B and a PSDU may be transmitted on each of subchannels allocated to STAs. A subchannel allocated to a STA has a size required for PSDU transmission to the STA. The size of the subchannel allocated to the STA may be an N (N=1, 2, 3, . . . ) multiple of the size of the basic subchannel unit (i.e., a minimum-size subchannel unit). In the example of FIG. 9, the size of a subchannel allocated to STA2 is equal to that of the basic subchannel unit, the size of a subchannel allocated to STA3 is equal to that of the basic subchannel unit, and the size of a subchannel allocated to STA4 is twice larger than that of the basic subchannel unit.

FIG. 9 illustrates a plurality of HE-LTF elements and a plurality of HE-LTF subelements which are distinguished in the time and frequency domains. One HE-LTF element may correspond to one OFDM symbol in the time domain and one subchannel unit (i.e., the bandwidth of a subchannel allocated to a STA) in the frequency domain. One HE-LTF subelement may correspond to one OFDM symbol in the time domain and one basic subchannel unit (e.g. 5 MHz) in the frequency domain. In the example of FIG. 9, one HE-LTF element includes one HE-LTF subelement in the 5-MHz subchannel allocated to STA2 or STA3. On the other hand, one HE-LTF element includes two HE-LTF subelements in the third subchannel, i.e., 10-MHz subchannel, allocated to STA4. A HE-LTF element and a HE-LTF subelement are logical units and the PHY layer does not always operate in units of a HE-LTF element or HE-LTF subelement.

A HE-LTF symbol may correspond to a set of HE-LTF elements in one OFDM symbol in the time domain and one channel unit (e.g. 20 MHz) in the frequency domain. That is, one HE-LTF symbol may be divided into HE-LTF elements by a subchannel width allocated to a STA and HE-LTF subelements by the width of the basic subchannel unit in the frequency domain.

A HE-LTF section may correspond to a set of HE-LTF elements in one or more OFDM symbols in the time domain and one subchannel unit (i.e. the bandwidth of a subchannel allocated to a STA) in the frequency domain. A HE-LTF subsection may correspond to a set of HE-LTF elements in one or more OFDM symbols in the time domain and one basic subchannel unit (e.g., 5 MHz) in the frequency domain. In the example of FIG. 9, one HE-LTF section includes one HE-LTF subsection in the 5-MHz subchannel allocated to STA2 or STA3. On the other hand, one HE-LTF section includes two HE-LTF subsections in the third subchannel, i.e., 10-MHz subchannel, allocated to STA4.

A HE-LTF field may correspond to a set of HE-LTF elements (or subelements), HE-LTF symbols, or HE-LTF sections (or subsections) for a plurality of stations.

For the afore-described HE PPDU transmission, subchannels allocated to a plurality of HE STAs may be contiguous in the frequency domain. In other words, for HE PPDU transmission, the subchannels allocated to the HE STAs may be sequential and any intermediate one of the subchannels of one channel (e.g., 20 MHz) may not be allowed to be unallocated or empty. Referring to FIG. 8, if one channel includes four subchannels, it may not be allowed to keep the third subchannel unallocated and empty, while the first, second, and fourth subchannels are allocated to STAs. However, the present invention does not exclude non-allocation of an intermediate subchannel of one channel to a STA.

FIG. 10 depicts a subchannel allocation method according to the present invention.

In the example of FIG. 10, a plurality of contiguous channels (e.g., 20-MHz-bandwidth channels) and boundaries of the plurality of contiguous channels are shown. In FIG. 10, a preamble may correspond to an L-STF, an L-LTF, an L-SIG, and a HE-SIG-A as illustrated in the examples of FIGS. 8 and 9.

A subchannel for each HE STA may be allocated only within one channel, and may not be allocated with partially overlapping between a plurality of channels. That is, if there are two contiguous 20-MHz channels CH1 and CH2, channels for STAs paired for MU-MIMO-mode or OFDMA-mode transmission may be allocated either within CH1 or within CH2, and it may be prohibited that one part of a subchannel exists in CH1 and another part of the subchannel exists in CH2. This means that one subchannel may not be allocated with crossing a channel boundary. From the perspective of RUs supporting the MU-MIMO or OFDMA mode, a bandwidth of 20 MHz may be divided into

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx255**

ATLAS–00014764

US 9,917,679 B2

**19**

one or more RUs, and a bandwidth of 40 MHz may be divided into one or more RUs in each of two contiguous 20-MHz bandwidths, and no RU is allocated with crossing the boundary between two contiguous 20-MHz bandwidths.

As described above, it is not allowed that one subchannel belongs to two or more 20-MHz channels. Particularly, a 2.4-GHz OFDMA mode may support a 20-MHz OFDMA mode and a 40-MHz OFDMA mode. In the 2.4-GHz OFDMA mode, it may not be allowed that one subchannel belongs to two or more 20-MHz channels.

FIG. 10 is based on the assumption that subchannels each having the size of a basic subchannel unit (e.g., 5 MHz) in CH1 and CH2 are allocated to STA1 to STA7, and subchannels each having double the size (e.g., 10 MHz) of the basic subchannel unit in CH4 and CH5 are allocated to STA8, STA9, and STA10.

As illustrated in the lower part of FIG. 9, although a subchannel allocated to STA1, STA2, STA3, STA5, STA6, or STA7 is fully overlapped only with one channel (i.e., without crossing the channel boundary, or belonging only to one channel), a subchannel allocated to STA4 is partially overlapped with the two channels (i.e., crossing the channel boundary, or belonging to the two channels). In the forgoing example of the present invention, the subchannel allocation to STA4 is not allowed.

As illustrated in the upper part of FIG. 9, although a subchannel allocated to STA8 or STA10 is fully overlapped only with one channel (i.e., without crossing the channel boundary, or belonging only to one channel), a subchannel allocated to STA9 is partially overlapped with two channels (i.e., crossing the channel boundary, or belonging to the two channels). In the forgoing example of the present invention, the subchannel allocation to STA9 is not allowed.

On the other hand, it may be allowed to allocate a subchannel partially overlapped between a plurality of channels (i.e., crossing the channel boundary, or belonging to two channels). For example, in SU-MIMO mode transmission, a plurality of contiguous channels may be allocated to a STA and any of one or more subchannels allocated to the STA may cross the boundary between two contiguous channels.

While the following description is given with an assumption that one subchannel has a channel bandwidth of 5 MHz in one channel having a channel bandwidth of 20 MHz, this is provided to simplify the description of the principle of the present invention and thus should not be construed as limiting the present invention. For example, the bandwidths of a channel and a subchannel may be defined or allocated as values other than the above examples. In addition, a plurality of subchannels in one channel may have the same or different channel widths.

FIG. 11 depicts the starting and ending points of a HE-LTF field in the HE PPDU frame format according to the present invention.

To support the MU-MIMO mode and the OFDMA mode, the HE PPDU frame format according to the present invention may include, in the HE-SIG-A field, information about the number of spatial streams to be transmitted to a HE STA allocated to each subchannel.

If MU-MIMO-mode or OFDMA-mode transmission is performed to a plurality of HE STAs on one subchannel, the number of spatial streams to be transmitted to each of the HE STAs may be provided in the HE-SIG-A or HE-SIG-B field, which will be described later in detail.

FIG. 11 is based on the assumption that a first 5-MHz subchannel is allocated to STA1 and STA2 and two spatial streams are transmitted to each STA in a DL MU-MIMO or OFDMA mode (i.e., a total of four spatial streams are

**20**

transmitted on one subchannel). For this purpose, a HE-STF, a HE-LTF, a HE-LTF, a HE-LTF, a HE-LTF, and a HE-SIG-B follow the HE-SIG-A field on the subchannel. The HE-STF is used for frequency offset estimation and phase offset estimation for the 5-MHz subchannel. The HE-LTFs are used for channel estimation for the 5-MHz subchannel. Since the subchannel carries four spatial streams, as many HE-LTFs (i.e., HE-LTF symbols or HE-LTF elements in a HE-LTF section) as the number of the spatial streams, that is, four HE-LTFs are required to support MU-MIMO transmission.

According to an example of the present invention, relationship between a total number of spatial streams transmitted on one subchannel and a number of HE-LTFs is listed in [Table 3].

TABLE 3

| Total number of spatial streams transmitted on one subchannel | Number of HE-LTFs |
| --- | --- |
| 1 | 1 |
| 2 | 2 |
| 3 | 4 |
| 4 | 4 |
| 5 | 6 |
| 6 | 6 |
| 7 | 8 |
| 8 | 8 |

Referring to [Table 3], if one spatial stream is transmitted on one subchannel, at least one HE-LTF needs to be transmitted on the subchannel. If an even number of spatial streams are transmitted on one subchannel, at least as many HE-LTFs as the number of the spatial streams need to be transmitted. If an odd number of spatial streams greater than one are transmitted on one subchannel, at least as many HE-LTFs as a number of adding 1 to the number of the spatial streams need to be transmitted.

Referring to FIG. 11 again, it is assumed that the second 5-MHz subchannel is allocated to STA3 and STA4 and one spatial streams per STA is transmitted in the DL MU-MIMO or OFDMA mode (i.e., a total of two spatial streams are transmitted on one subchannel). In this case, two HE-LTFs need to be transmitted on the second subchannel, however, in the example of FIG. 11, a HE-STF, a HE-LTF, a HE-LTF, a HE-LTF, a HE-LTF, and a HE-SIG-B follow the HE-SIG-A field on the subchannel (i.e., four HE-LTFs are transmitted). This is for setting the same starting time of PSDU transmission for subchannels allocated to other STAs paired with STA3 and STA4 for MU-MIMO transmission. If only two HE-LTFs are transmitted on the second subchannel, PSDUs are transmitted at different time points on the first and second subchannels. PSDU transmission on each subchannel at a different time point results in discrepancy between OFDM symbol timings of subchannels, thereby no orthogonality is maintained. To overcome this problem, an additional constraint need to be imposed for HE-LTF transmission.

Basically, transmission of as many HE-LTFs as required is sufficient in an SU-MIMO or non-OFDMA mode. However, timing synchronization (or alignment) with fields transmitted on subchannels for other paired STAs is required in the MU-MIMO or OFDMA mode. Accordingly, the numbers of HE-LTFs may be determined for all other subchannels based on a subchannel having the maximum number of streams in MU-MIMO-mode or OFDMA-mode transmission.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx256**

ATLAS-00014765

US 9,917,679 B2

21

Specifically, the numbers of HE-LTFs may be determined for all subchannels according to the maximum of the numbers of HE-LTFs (HE-LTF symbols or HE-LTF elements in a HE-LTF section) required according to the total numbers of spatial streams transmitted on each subchannel, for a set of HE STAs allocated to each subchannel. A "set of HE STAs allocated to each subchannel" is one HE STA in the SU-MIMO mode, and a set of HE STAs paired across a plurality of subchannels in the MU-MIMO mode. The 'number of spatial streams transmitted on each subchannel' is the number of spatial streams transmitted to one HE STA in the SU-MIMO mode, and the number of spatial streams transmitted to a plurality of HE STAs paired on the subchannel in the MU-MIMO mode.

That is, it may be said that a HE-LTF field starts at the same time point and ends at the same time point in a HE PPDU for all users (i.e. HE STAs) in MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that the lengths of HE-LTF sections are equal on a plurality of subchannels for all users (i.e. HE STAs) in MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that the number of HE-LTF elements included in each HE-LTF section is equal on a plurality of subchannels for all users (i.e. HE STAs) in MU-MIMO-mode or OFDMA-mode transmission. Accordingly, PSDU transmission timings may be synchronized among a plurality of subchannels for all HE STAs in MU-MIMO-mode or OFDMA-mode transmission.

As described above, the number of HE-LTF symbols (refer to FIG. 8) may be 1, 2, 4, 6, or 8 in HE PPDU transmission in the MU-MIMO or OFDMA mode, determined according to the maximum of the numbers of spatial streams on each of a plurality of subchannels. A different number of spatial streams may be allocated to each of a plurality of subchannels, and the number of spatial streams allocated to one subchannel is the number of total spatial streams for all users allocated to the subchannel. That is, the number of HE-LTF symbols may be determined according to the number of spatial streams allocated to a subchannel having a maximum number of spatial streams by comparing the number of total spatial streams for all users allocated to one of a plurality of subchannels with the number of total spatial streams for all users allocated to another subchannel.

Specifically, in HE PPDU transmission in the OFDMA mode, the number of HE-LTF symbols may be 1, 2, 4, 6, or 8, determined based on the number of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels. Further, in HE PPDU transmission in the OFDMA mode, the number of HE-LTF symbols may be determined based on whether the number of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels is odd or even (refer to [Table 3]). That is, in HE PPDU transmission in the OFDMA mode, when the number (e.g., K) of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels is an even number, the number of HE-LTF symbols may be equal to K. In HE PPDU transmission in the OFDMA mode, when the number, K, of spatial streams transmitted in a subchannel having a maximum number of spatial streams across a plurality of subchannels is an odd number greater than one, the number of HE-LTF symbols may be equal to K+1.

When only one STA is allocated to one subchannel in OFDMA mode (i.e., OFDMA mode without using MU-MIMO), a subchannel having a maximum number of spatial streams across a plurality of subchannels may be determined by the number of spatial streams for a STA allocated to each

22

subchannel. When more than one STA is allocated to one subchannel in OFDMA mode (i.e., OFDMA mode using MU-MIMO), a subchannel having a maximum number of spatial streams across a plurality of subchannels may be determined by the number of STAs allocated to each subchannel and the number of spatial streams for each STA allocated to each subchannel (e.g., if STA1 and STA2 are allocated to one subchannel, sum of the number of spatial streams for STA1 and the number of spatial streams for STA2).

When transmitting a HE PPDU frame in the MU-MIMO or OFDMA mode, a transmitter may generate P (P is an integer equal to or larger than 1) HE-LTF symbols (refer to FIG. 8) and transmit a HE PPDU frame including at least the P HE-LTF symbols and a Data field to a receiver. The HE PPDU frame may be divided into Q subchannels in the frequency domain (Q is an integer equal to or larger than 2). Each of the P HE-LTF symbols may be divided into Q HE-LTF elements corresponding to the Q subchannels in the frequency domain. That is, the HE PPDU may include P HE-LTF elements on one subchannel (herein, the P HE-LTF elements may belong to one HE-LTF section on the subchannel).

As described above, the number of HE-LTF elements (i.e., P) in one of the Q subchannels may be equal to the number of HE-LTF elements (i.e. P) of another subchannel. Also, the number of HE-LTF elements (i.e., P) included in a HE-LTF section in one of the Q subchannels may be equal to the number of HE-LTF elements (i.e. P) included in a HE-LTF section in another subchannel. The HF-LTF section of one of the Q subchannels may start and end at the same time points as the HE-LTF section of another subchannel. Also, the HE-LTF sections may start and end at the same time points across the Q subchannels (i.e., across all users or stations).

Referring to FIG. 11 again, the third 5-MHz subchannel is allocated to STA5 and one spatial stream is transmitted on the subchannel in SU-MIMO (considering all subchannels, a plurality of spatial streams are transmitted to STA1 to STA6 in MU-MIMO or OFDMA mode). In this case, although transmission of one HE-LTF is sufficient for the subchannel, as many HE-LTFs as the maximum of the numbers of HE-LTFs on the other subchannels, that is, four HE-LTFs are transmitted on the subchannel in order to align the starting points and ending points of the HE-LTF fields of the subchannels.

The fourth 5-MHz subchannel is allocated to STA6 and one spatial stream is transmitted on the subchannel in SU-MIMO (considering all other subchannels, a plurality of spatial streams are transmitted to STA1 to STA6 in MU-MIMO or OFDMA mode). In this case, although transmission of one HE-LTF is sufficient for the subchannel, as many HE-LTFs as the maximum of the numbers of HE-LTFs on the other subchannels, that is, four HE-LTFs are transmitted on the subchannel in order to align the starting points and ending points of the HE-LTF fields of the subchannel.

In the example of FIG. 11, the remaining two HE-LTFs except two HE-LTFs required for channel estimation of STA3 and STA4 on the second subchannel, the remaining three HE-LTFs except one HE-LTF required for channel estimation of STA5 on the third subchannel, and the remaining three HE-LTFs except one HE-LTF required for channel estimation of STA6 on the fourth subchannel may be said to be placeholders that are actually not used for channel estimation at the STAs.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

**Appx257**

ATLAS-00014766

JX006.00038

US 9,917,679 B2

23

FIG. 12 depicts a HE-SIG-B field and a HE-SIG-C field in the HE PPDU frame format according to the present invention.

To effectively support MU-MIMO-mode or OFDMA-mode transmission in the HE PPDU frame format according to the present invention, independent signaling information may be transmitted on each subchannel. Specifically, a different number of spatial streams may be transmitted to each of a plurality of HE STAs that receive an MU-MIMO-mode or OFDMA-mode transmission simultaneously. Therefore, information about the number of spatial streams to be transmitted should be indicated to each HE STA.

Information about the number of spatial streams on one channel may be included in, for example, a HE-SIG-A field. A HE-SIG-B field may include spatial stream allocation information about one subchannel. Also, a HE-SIG-C field may be transmitted after transmission of HE-LTFs, including Modulation and Coding Scheme (MCS) information about a PSDU and information about the length of the PSDU, etc.

With reference to the foregoing examples of the present invention, mainly the features of a HE PPDU frame structure applicable to a DL MU-MIMO-mode or OFDMA-mode transmission that an AP transmits simultaneously to a plurality of STAs have been described. Now, a description will be given of the features of a HE PPDU frame structure applicable to a UL MU-MIMO-mode or OFDMA-mode transmission that a plurality of STAs transmits simultaneously to an AP.

The above-described various examples of structures of the HE PPDU frame format supporting MU-MIMO-mode or OFDMA-mode transmission should not be understood as applicable only to DL without applicable UL. Rather, the examples should be understood as also applicable to UL. For example, the above-described exemplary HE PPDU frame formats may also be used for a UL HE PPDU transmission that a plurality of STAs simultaneously transmits to a single AP.

However, in the case of a DL MU-MIMO-mode or OFDMA-mode HE PPDU transmission that an AP simultaneously transmits to a plurality of STAs, the transmission entity, AP has knowledge of the number of spatial streams transmitted to a HE STA allocated to each of a plurality of subchannels. Therefore, the AP may include, in a HE-SIG-A field or a HE-SIG-B field, information about the total number of spatial streams transmitted across a channel, a maximum number of spatial streams transmitted (i.e., information being a basis of the number of HE-LTF elements (or the starting point and ending point of a HE-LTF section) on each subchannel, and the number of spatial streams transmitted on each subchannel. In contrast, in the case of a UL MU-MIMO-mode or OFDMA-mode HE PPDU transmission that a plurality of STAs simultaneously transmits to an AP, each STA being a transmission entity may be aware only of the number of spatial streams in a HE PSDU that it will transmit, without knowledge of the number of spatial streams in a HE PSDU transmitted by another STA paired with the STA. Accordingly, the STA may determine neither the total number of spatial streams transmitted across a channel nor a maximum number of spatial streams.

To solve this problem, a common parameter (i.e., a parameter applied commonly to STAs) and an individual parameter (a separate parameter applied to an individual STA) may be configured as follows in relation to a UL HE PPDU transmission.

For simultaneous UL HE PPDU transmissions from a plurality of STAs to an AP, a protocol may be designed in

24

such a manner that the AP sets a common parameter or individual parameters (common/individual parameters) for the STAs for the UL HE PPDU transmissions and each STA operates according to the common/individual parameters. For example, the AP may transmit a trigger frame (or polling frame) for a UL MU-MIMO-mode or OFDMA-mode transmission to a plurality of STAs. The trigger frame may include a common parameter (e.g., the number of spatial streams across a channel or a maximum number of spatial streams) and individual parameters (e.g., the number of spatial streams allocated to each subchannel), for the UL MU-MIMO-mode or OFDMA-mode transmission. As a consequence, a HE PPDU frame format applicable to a UL MU-MIMO or OFDMA mode may be configured without a modification to an exemplary HE PPDU frame format applied to a DL MU-MIMO or OFDMA mode. For example, each STA may configure a HE PPDU frame format by including information about the number of spatial streams across a channel in a HE-SIG-A field, determining the number of HE-LTF elements (or the starting point and ending point of a HE-LTE section) on each subchannel according to the maximum number of spatial streams, and including information about the number of spatial streams for the individual STA in a HE-SIG-B field.

Alternatively, if the STAs operate always according to the common/individual parameters received in the trigger frame from the AP, each STA does not need to indicate the common/individual parameters to the AP during a HE PPDU transmission. Therefore, this information may not be included in a HE PPDU. For example, each STA may have only to determine the total number of spatial streams, the maximum number of spatial streams, and the number of spatial streams allocated to individual STA, as indicated by the AP, and configure a HE PPDU according to the determined numbers, without including information about the total number of spatial streams or the number of spatial streams allocated to the STA in the HE PPDU.

On the other hand, if the AP does not provide common/individual parameters in a trigger frame, for a UL MIMO-mode or OFDMA-mode HE PPDU transmission, the following operation may be performed.

Common transmission parameters (e.g., channel Band-Width (BW) information, etc.) for simultaneously transmitted HE PSDUs may be included in the HE-SIG-A field, but parameters that may be different for individual STAs (e.g., the number of spatial streams, an MCS, and whether STBC is used or not, for each individual STA) may not be included in HE-SIG-A field. Although the individual parameters may be included in HE-SIG-B field, information about the number of spatial streams and information indicating whether STBC is used or not, need to be transmitted before a HE-LTF field because the number of spatial streams and the information indicating whether STBC is used or not are significant to determination of configuration information about a preamble and a PSDU in a HE PPDU frame format (e.g., the number of HE-LTF elements is determined according to a combination of the number of spatial streams and the information indicating whether STBC is used or not). For this purpose, a HE PPDU frame format as illustrated in FIG. 13 may be used for a UL HE PPDU transmission.

FIG. 13 depicts another exemplary HE PPDU frame format according to the present invention. The HE PPDU frame format illustrated in FIG. 13 is characterized in that a structure of HE-SIG-A, HE-SIG-B, and HF-SIG-C fields similar to in FIG. 12 is used for a UL PPDU transmission.

As described before, if a UL MU-MIMO-mode or OFDMA-mode transmission is performed by triggering of

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014767

JX006.00039

US 9,917,679 B2

25

an AP (according to common/individual parameters provided by the AP), an individual STA may not need to report an individual parameter to the AP. In this case, one or more of a HE-SIG-B field, a HE-SIG-C field, and a first HE-LTF element (i.e., a HE-LTF between a HE-STF field and a HE-SIG-B field) illustrated in FIG. 13 may not exist. In this case, a description of each field given below may be applied only in the presence of the field.

In the example of FIG. 13, a HE-SIG-A field is transmitted per channel (i.e., per 20-MHz channel) and may include transmission parameters common to simultaneously transmitted HE PSDUs. Since the same information is transmitted in up to HE-SIG-A fields in UL PPDUs transmitted by HE STAs allocated to subchannels, the AP may receive the same signals from the plurality of STAs successfully.

A HE-SIG-B field is transmitted per subchannel in one channel. The HE-SIG-B field may have an independent parameter value according to the transmission characteristics of a HE PSDU transmitted on each subchannel. The HE-SIG-B field may include spatial stream allocation information and information indicating whether STBC is used or not, for each subchannel. If MU-MIMO is applied to a subchannel (i.e., if a plurality of STAs perform transmission on a subchannel), the HE-SIG-B field may include a common parameter for the plurality of STAs paired on the subchannel.

A HE-SIG-C field is transmitted on the same subchannel as the HE-SIG-B field and may include information about an MCS and a packet length. If MU-MIMO is applied to a subchannel (i.e., if a plurality of STAs perform transmission on a subchannel), the HE-SIG-C field may include respective individual parameters for each of the plurality of STAs paired on the subchannel.

Similarly to DL MU-MIMO-mode or OFDMA-mode HE PPDU transmission, transmissions of PSDUs may start at different time points on subchannels in UL MU-MIMO-mode or OFDMA-mode HE PPDU transmission, and if OFDM symbols are not aligned accordingly, then the implementation complexity of an AP that receives a plurality of PSDUs is increased. To solve this problem, 'the number of HE-LTFs may be determined for all subchannels according to the maximum of the numbers of HE LTFs required according to the total numbers of spatial streams transmitted on each subchannel for a set of HE STAs allocated to each of subchannels' as described with reference to the example of FIG. 11.

This feature may mean that the HE-LTF field start at the same time point and end at the same time point across all users (i.e., HE STAs) in UL MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that the HE-LTF sections of a plurality of subchannels have the same length across all HE STAs in UL MU-MIMO-mode or OFDMA-mode transmission. Or it may be said that each of the HE-LTF sections of a plurality of subchannels includes the same number of HE-LTF elements across all HE STAs in UL MU-MIMO-mode or OFDMA-mode transmission. Therefore, PSDU transmission timings are synchronized between a plurality of subchannels across all HE STAs in UL MU-MIMO-mode or OFDMA-mode transmission.

As described before, a plurality of STAs may simultaneously transmit PSDUs in a HE PPDU frame format on their allocated subchannels or on their allocated spatial streams to an AP (i.e., referred to as UL MU-MIMO or OFDMA transmission or "UL MU transmission") and may simultaneously receive PSDUs in the HE PPDU frame format on their allocated subchannels on their allocated spatial streams

26

from the AP (i.e., referred to as DL MU-MIMO or OFDMA transmission or "DL MU transmission").

FIGS. 14 and 15 depict operating channels in a WLAN system.

Basically, the WLAN system may support a single channel having a bandwidth of 20 MHz as a BSS operating channel. The WLAN system may also support a BSS operating channel having a bandwidth of 40 MHz, 80 MHz, or 160 MHz by bonding a plurality of contiguous 20-MHz channels (refer to FIG. 14). Further, the WLAN system may support a BSS operating channel having a bandwidth of 160 MHz including non-contiguous 80-MHz channels (called a bandwidth of 80+80 MHz) (refer to FIG. 15).

As illustrated in FIG. 14, one 40-MHz channel may include a primary 20-MHz channel and a secondary 20-MHz channel which are contiguous. One 80-MHz channel may include a primary 40-MHz channel and a secondary 40-MHz channel which are contiguous. One 160-MHz channel may include a primary 80-MHz channel and a secondary 80-MHz channel which are contiguous. As illustrated in FIG. 15, one 80+80-MHz channel may include a primary 80-MHz channel and a secondary 80-MHz channel which are non-contiguous.

A primary channel is defined as a common channel for all STAs within a BSS. The primary channel may be used for transmission of a basic signal such as a beacon. The primary channel may also be a basic channel used for transmission of a data unit (e.g., a PPDU). If an STA uses a channel width larger than the channel width of the primary channel, for data transmission, the STA may use another channel within a corresponding channel, in addition to the primary channel. This additional channel is referred to as a secondary channel.

A STA according to an Enhanced Distributed Channel Access (EDCA) scheme may determine a transmission bandwidth (or a transmission channel width) as follows.

Upon generation of a transmission frame, an STA (e.g., an AP or a non-AP STA) may perform a back-off procedure on a primary channel in order to acquire a Transmission Opportunity (TXOP). For this purpose, the STA may sense the primary channel during a DIFS or AIFS[i]. If the primary channel is idle, the STA may attempt to transmit the frame. The STA may select a random back-off count, wait for a slot time corresponding to the selected random back-off count, and then attempt to transmit the frame. The random back-off count may be determined to be a value ranging from 0 to CW (CW is a value of a contention window parameter).

When the random back-off procedure starts, the STA may activate a back-off timer according to the determined back-off count and decrement the back-off count by 1 each time. If the medium of the corresponding channel is monitored as busy, the STA discontinues the count-down and waits. If the medium is idle, the STA resumes the count-down. If the back-off timer reaches 0, the STA may determine a transmission bandwidth by checking whether the secondary channel is idle or busy at the corresponding time point.

For example, the STA may monitor a channel-idle state during a predetermined IFS (e.g., DIFS or AIFS[i]) on the primary channel and determine a transmission start timing on the primary channel by the random back-off procedure. If the secondary channel is idle during a PIFS shortly before the determined transmission start timing of the primary channel, the STA may transmit a frame on the primary channel and the secondary channel.

As described above, when the back-off timer reaches 0 for the primary channel, the STA may transmit an X-MHz mask

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014768

US 9,917,679 B2

PPDU (e.g., X is 20, 40, 80, or 160) on channels including an idle secondary channel(s) according to the CCA result of the secondary channel(s).

The X-MHz mask PPDU is a PPDU for which a TXVECTOR parameter, CH_BANDWIDTH is set to CBW X. That is, if the X-MHz mask PPDU can be transmitted, this means that a PPDU satisfying a spectrum mask for X-MHz transmission can be transmitted. The X-MHz mask PPDU may include a PPDU transmitted in a bandwidth equal to or smaller than X MHz.

For example, if an 80-MHz mask PPDU can be transmitted, this means that a PPDU having a channel width of 80 MHz or a PPDU having a channel width smaller than 80 MHz (e.g., 40 MHz, 20 MHz, etc.) can be transmitted within a Power Spectral Density (PSD) limit of a spectrum mask for 80-MHz transmission.

As described before, if a STA is allowed to start a TXOP and has at least one MAC Service Data Unit (MSDU) to be transmitted under the Access Category (AC) of the TXOP allowed for the STA, the STA may perform one of the following a), b), c), d), or e) (in the following description, FIGS. 14 and 15 may be referred to for a primary channel (i.e., a primary 20-MHz channel) a secondary channel (i.e., a secondary 20-MHz channel), a secondary 40-MHz channel, and a secondary 80-MHz channel).

a) If the secondary channel, the secondary 40-MHz channel, and the secondary 80-MHz channel are idle during a PIFS shortly before the start of the TXOP, a 160-MHz or 80+80-MHz mask PPDU may be transmitted.

b) If both the secondary channel and the secondary 40-MHz channel are idle during the PIFS shortly before the start of the TXOP, an 80-MHz mask PPDU may be transmitted on a primary 80-MHz channel.

c) If the secondary channel is idle during the PIFS shortly before the start of the TXOP, a 40-MHz mask PPDU may be transmitted on a primary 40-MHz channel.

d) A 20-MHz mask PPDU may be transmitted on the primary 20-MHz channel.

e) A channel access attempt may be resumed by performing a back-off procedure as in the case where the medium is indicated as busy on the primary channel by one of physical carrier sensing and virtual carrier sensing and a back-off timer has a value of 0.

Now, a description will be given of a method for performing UL SU PPDU transmission or UL MU PPDU transmission according to the type of a response to DL MU transmission and a method for protecting a DL/UL HE PPDU in a WLAN system supporting DL/UL MU transmission.

The method for protecting a DL/UL HE PPDU will first be described below.

Transmission of a HE PPDU may be protected by preventing another STA (e.g., a third-party STA) from accessing a wireless channel during transmission of the HE PPDU. For this purpose, a specific field included in the HE PPDU may be used.

That is, the third-party STA may regard the channel as busy during a corresponding time period based on duration information included in a PHY header (e.g., an L-SIG, a HE-SIG-A, a HE-SIG-B, etc.) of the HE PPDU.

For example, the third-party STA (e.g., including a legacy STA that is not capable of decoding a HE preamble and a data part of the HE PPDU and a HE STA capable of decoding the HE PPDU) may not perform transmission during the corresponding time period based on a duration (i.e., an L-SIG duration) determined according to a parameter (e.g., a L_LENGTH subfield or an L_DATARATE

subfield) included in the L-SIG field of the HE PPDU. As a consequence, since the third-party STA does not attempt to access the channel during the time period determined based on the L-SIG duration even though the channel is physically idle, the HE PPDU transmission may be protected.

For example, the parameter, L_LENGTH or L_DATARATE included in the L-SIG field may be set as follows by [Equation 1].

$$L\_LENGTH = \left\lceil \frac{(TXTIME - Signal\ Extension) - (aPreambleLength + aPHYHeaderLength)}{aSymbolLength} \right\rceil \times N_{OPS} + \left\lceil \frac{aPHYServiceLength + aPHYConvolutionTailLength}{8} \right\rceil$$ [Equation 1]

In [Equation 1], $\lceil \ \rceil$ represents a ceiling operation and $1 \times 1$ represents the least integer equal to or larger than x.

If a TXVECTOR parameter, NO_SIG_EXTN is set to True, SignalExtension may have a value of 0 μs. On the other hand, if the TXVECTOR parameter, NO_SIG_EXTN is set to False, SignalExtension may have a value corresponding to a duration defined by an aSignalExtension parameter (6 μs in 2.4 GHz and 0 μs in 5 GHZ).

aSymbolLength may have a value corresponding to a symbol duration (in μs). In general, aSymbolLength may have a fixed value of 4.

(aPreambleLength+aPHYHeaderLength) may have a value corresponding to the durations of a non-HT PHY preamble and an L-SIG (in μs), and may follow what is defined in a PLME-CHARACTERISTICS.confirm primitive.

If a rate specified by L_DATARATE is used, $N_{OPS}$ may have a value corresponding to the number of octets transmitted during a time period indicated by aSymbolLength. In general, L_DATARATE may have a fixed value of 6 Mbps. In this case, $N_{OPS}$ may have a fixed value of 4.

aPHYServiceLength may have a value corresponding to the number of bits of a PHY SERVICE field.

aPHYConvolutionalTailLength may have a value corresponding to the number of bits of a convolutional code tail bit sequence.

In the case of a HE PPDU, if (aPreambleLength+aPHY-HeaderLength)=20, aSymbolLength=4, $N_{OPS}$=3, and 24≤(aPHYServiceLength+aPHYConvolutionalTailLength)<32 in the above [Equation 1], the value of the L_LENGTH subfield may be expressed as [Equation 2].

$$L\_LENGTH = \left\lceil \frac{((TXTIME - Signal\ Extension) - 20)}{4} \right\rceil \times 3 - 3$$ [Equation 2]

In [Equation 2], TXTIME represents the duration of the HE PPDU, defined by [Equation 3].

$$TXTIME = T_{L-STF} + T_{L-LTF} + T_{L-SIG} + T_{HE-SIG-A} + \left\lceil \frac{T_{HE-STF} + N_{HELTF} \times T_{HE-LTF} + T_{HE-SIG-B} + N_{SYM} \times T_{SYM0}}{T_{SYML}} \right\rceil$$

US 9,917,679 B2

29                                          30

In [Equation 3], $T_{L-STF}$ may have a value corresponding to the duration of a Non-HT STF field (e.g., 8 μs).

$T_{L-LTF}$ may have a value corresponding to the duration of a Non-HT LTF field (e.g., 8 μs).

$T_{L-SIG}$ may have a value corresponding to the duration of a Non-HT SIGNAL field (e.g., 4 μs).

$T_{HE-SIG-A}$ may have a value corresponding to the duration of a HE-SIG-A field (e.g., 8 μs or 12 μs). Or $T_{HE-SIG-A}$ may have a value based on a duration of $N_{HESIGA}*4$ μs and a GI of 0.8 μs, as illustrated in [Table 1].

If a HE-SIG-B field is not included in the HE PPDU, $T_{HE-SIG-B}$ may have a value of 0, and if the HE-SIG-B field is included in the HE PPDU, $T_{HE-SIG-B}$ may have a value corresponding to the duration of the HE-SIG-B field (e.g., 16 μs or 15.6 μs). Or $T_{HE-SIG-B}$ may have a value based on a duration of $N_{HESIGB}*4$ μs and a GI of 0.8 μs, as illustrated in [Table 1].

$T_{HE-STF}$ may have a value corresponding to the duration of a HE-STF field (e.g., 16 μs or 15.6 μs). Or $T_{HE-STF}$ may have a value of 4 μs or 8 μs, as illustrated in [Table 1].

$T_{HEW-LTF}$ may have a value corresponding to the duration of a HE-LTF field (e.g., 16 μs or 15.6 μs). Or $T_{HEW LTF}$ may have a value of $N_{HELTF}*$(DFT interval+GI)μ, as illustrated in [Table 1].

$N_{HELTF}$ may have a value corresponding to the number of HE-LTF symbols.

$T_{SYM2}$ may have a value corresponding to a double GI symbol interval (e.g., 16 μs or 15.6 μs).

$T_{SYML}$ may have a value corresponding to a long GI symbol interval (e.g., 4 μs).

$N_{SYM}$ may have a value corresponding to the non-OFDMA symbols of a DATA (or HE-DATA) field.

As illustrated in [Equation 3], since the HE-STF, HE-LTF, HE-SIG-B, and DATA (or HE-DATA) fields have variable durations (e.g. in view of an included variable GI) in the HE PPDU, a ceiling operation may be applied in consideration that division of the durations by the number of OFDM symbols results in a remainder.

Further, $T_{RL-SIG}$ having a value corresponding to the duration of an RL-SIG field of the HE PPDU may be added to TXTIME depicted in [Equation 3].

In another example of protecting transmission of a HE PPDU using a specific field included in the HE PPDU from a third-party STA, a Duration/ID field (or a Duration field) included in the MAC header of a data unit (e.g., a PSDU field, a DATA field, or a HE-DATA field) in the HE PPDU may be used. As a third-party STA (e.g., a HE STA capable of decoding the HE PPDU) sets a NAV, the Duration field of the MAC header may induce the third-party STA to regard a channel as busy for a corresponding time period. Therefore, even though the channel is physically idle during a time period to which the NAV is set, the third-party STA may not attempt to access the channel, thereby protecting the HE PPDU transmission.

FIG. 16 depicts a NAV update operation of an STA according to the present invention.

Upon detection of a PPDU (S1610), the STA may determine the type of the PPDU (S1620). According to an embodiment, the PPDU may have a first type or a second type. Specifically, the first type may be a non-OFDMA PPDU type or an SU type, and the second type may be an OFDMA PPDU type or an MU type.

If the types allowed for a PPDU include the non-OFDMA PPDU type as the first type and the OFDMA PPDU type as the second type, the STA may perform NAV update depending on whether the received PPDU is an OFDMA PPDU. The STA may determine whether the received PPDU is an

OFDMA PPDU by checking whether a transmission channel bandwidth of the (HE) PPDU is equal to a transmission channel bandwidth of a PSDU. A NAV may be updated in different manners in the cases of reception of an OFDMA PPDU and reception of a non-OFDMA PPDU.

If the PPDU is of the first type, particularly the non-OFDMA PPDU type, the STA performs a NAV update operation for a first-type PPDU (non-OFDMA PPDU) (S1630). When the PPDU is of the first type, the STA performs NAV update based on the Duration/ID field of a frame received on a primary channel. If the transmission channel bandwidth of a (HE) PPDU is equal to the transmission channel bandwidth of a PSDU, a (HE) STA receiving the (HE) PPDU may set a NAV as defined as follows: If a Receiver Address (RA) matching to the MAC address of the (HE) STA is not included in any frame received in a 20-MHz (HE) PPDU on a primary 20-MHz channel, in a 40-MHz (HE) PPDU on a primary 40-MHz channel, in a 80-MHz (HE) PPDU on a primary 80-MHz channel, or in a 160-MHz or 80+80-MHz (HE) PPDU, a NAV of the (HE) STA is updated using the Duration/ID field (or the Duration field) of the frame. Specifically, if the STA receives a frame that belongs to a secondary channel (a secondary 20-MHz channel, a secondary 40-MHz channel, or a secondary 80-MHz channel) but does not belong to a primary channel (a primary 20-MHz channel, a primary 40-MHz channel, or a primary 80-MHz channel), the STA does not perform the NAV update.

On the other hand, if the PPDU is of the second type, particularly the OFDMA PPDU type, the STA performs a NAV update operation for a second-type PPDU (OFDMA PPDU) (S1640). If the PPDU is of the second type, the STA may perform NAV update based on the Duration/ID field of a frame received on a subchannel, irrespective of a channel to which the received subchannel belongs (i.e., without considering whether the received subchannel carrying the PPDU belongs to a primary channel or a secondary channel). In the case of a HE PPDU supporting DL/UL OFDMA transmission, the channel bandwidth of a PSDU for a specific HE STA may be smaller than the channel bandwidth of the HE PPDU. In the example of FIG. 13, a HE PPDU has a transmission channel bandwidth of 20 MHz, and a PSDU for STA1 has a transmission channel bandwidth (i.e., a subchannel bandwidth) of 5 MHz. If a PSDU has a smaller transmission channel bandwidth than a HE PPDU as in the example, a HE STA receiving the HE PPDU may set a NAV as defined as follows. If an RA matching to the MAC address of the HE STA is not included in any frame received on any subchannel of a 20-MHz HE PPDU (or a 20-MHz OFDMA PPDU) on a primary 20-MHz channel, any subchannel of a 40-MHz HE PPDU (or a 40-MHz OFDMA PPDU) on a primary 40-MHz channel, any subchannel of a 80-MHz HE PPDU (or a 80-MHz OFDMA PPDU) on a primary 80-MHz channel, or any subchannel of a 160-MHz or 80+80-MHz HE PPDU (or a 160-MHz or 80+80-MHz OFDMA PPDU), the HE STA updates its NAV using the Duration/ID field (or the Duration field) of the frame.

Specifically, if a HE STA receives a frame including an RA that does not match to the MAC address of the HE STA on any subchannel, the HE STA updates its NAV using the Duration/ID field (or the Duration field) of the frame, irrespective of whether the subchannel belongs to the primary 20-MHz channel, the secondary 20-MHz channel, the secondary 40-MHz channel, or the secondary 80-MHz channel.

More specifically, if the RA matching to the MAC address of the HE STA is not included in any frame received on any

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,917,679 B2

**31**

subchannel of a 40-MHz HE PPDU (or a 40-MHz OFDMA PPDU) on the primary 40-MHz channel, the HE STA updates its NAV using the Duration/ID field (or the Duration field) of the frame, irrespective of whether the subchannel belongs to the primary 20-MHz channel or the secondary 20-MHz channel. If the RA matching to the MAC address of the HE STA is not included in any frame received on any subchannel of a 80-MHz HE PPDU (or a 80-MHz OFDMA PPDU) on the primary 80-MHz channel, the HE STA updates its NAV using the Duration/ID field (or the Duration field) of the frame, irrespective of whether the subchannel belongs to the primary 20-MHz channel, the secondary 20-MHz channel, or the secondary 40-MHz channel. If the RA matching to the MAC address of the HE STA is not included in any frame received on any subchannel of a 160-MHz HE PPDU (or a 160-MHz OFDMA PPDU) or a 80+80-MHz HE PPDU (or a 80+80-MHz OFDMA PPDU) on a 160-MHz or 80+80-MHz channel, the HE STA updates its NAV using the Duration/ID field (or the Duration field) of the frame, irrespective of whether the subchannel belongs to the primary 20-MHz channel, the secondary 20-MHz channel, the secondary 40-MHz channel, or the secondary 80-MHz channel.

The HE PPDU may also include a resource unit having a channel bandwidth equal to or smaller than the channel bandwidth of the HE PPDU. HE PPDU protection may be implemented in the case where a HE PPDU is received on a secondary channel as well as in the case where a HE PPDU is received on a primary channel. Accordingly, NAV setting of a HE STA receiving a HE PPDU may be defined as follows. If an RA matching to the MAC address of the HE STA is not included in any frame received in any 20-MHz or less resource unit of a 20-MHz HE PPDU (or 20-MHz OFDMA PPDU) on the primary or secondary 20-MHz channel, in any 40-MHz or less resource unit of a 40-MHz HE PPDU (or 40-MHz OFDMA PPDU) on the primary or secondary 40-MHz channel, in any 80-MHz or less resource unit of a 80-MHz HE PPDU (or 80-MHz OFDMA PPDU) on the primary or secondary 80-MHz channel, in any 160-MHz or less resource unit of a 160-MHz or 80+80-MHz HE PPDU (or 160-MHz or 80+80-MHz OFDMA PPDU), the NAV of the HE STA is updated using the Duration/ID field (or the Duration field) of the frame.

FIG. 17 depicts an operation of a third-party STA, when a DL OFDMA PPDU is transmitted according to the present invention.

While FIG. 17 illustrates an exemplary case where the transmission times of PSDUs are different on subchannels (i.e., the lengths of HE-LTF sections are different on the subchannels) in a HE PPDU format transmitted on each of a plurality of channels, a HE PPDU format in which the transmission times of PSDUs are identical on subchannels (i.e., the lengths of HE-LTF sections are equal on the subchannels) as illustrated in the examples of FIGS. 11, 12, and 13, and a UL HE PPDU format are also applicable.

FIG. 17 illustrates an operation of a third-party HE STA, STA21, when a DL OFDMA PPDU is transmitted to STA1, STA2, STA3, STA4, STA5, STA6, STA7, STA8, STA9, STA10, STA11, and STA12.

A HE preamble of the HE PPDU may include resource allocation information. For example, a plurality of destination STAs may acquire information about subchannels allocated to the STAs from the HE preamble (e.g., a HE-SIG (HE-SIG-A or HE-SIG-B) field) of the DL OFDMA PPDU. That is, the HE preamble of the HE PPDU may include STA identification information identifying an STA(s) allocated to a specific subchannel (or resource unit).

**32**

Because the size (e.g., the number of available bits) of information that can be included in the HE preamble is limited, STA identification information for a specific subchannel (or resource unit) may not specify only one STA. For example, the Association ID (AID) of an STA may be defined in 16 bits. If STA identification information identifying an STA allocated to a specific resource unit includes a partial AID (e.g., X (X<16) Least Significant Bits (LSBs) of an AID), one piece of STA identification information may identify a plurality of STAs. Or if an STA belonging to a BSS (OBSS) overlapping with a BSS of an AP receives a DL OFDMA PPDU, STAs of the different BSSs may correspond to one piece of STA identification information.

In this case, although an STA receiving the DL OFDMA PPDU may determine that it is a destination STA of the DL OFMDA PPDU based on the resource allocation information (e.g., STA identification information for a specific subchannel (or resource unit)) included in the HE preamble, the STA may not be an STA to which the AP has actually allocated resources. That is, although resources are not actually allocated to the STA, the STA may consider that resources are allocated to it based on the resource allocation information of the DL OFDMA PPDU.

The example of FIG. 17 illustrates a case in which subchannel allocation information is shared between STA11 and STA21. That is, although STA21 may consider that a subchannel is allocated to STA21 based on information of a HE preamble, STA11 and STA12 may not actually be serviced simultaneously in a DL OFDMA PPDU.

Specifically, although resources of a third 5-MHz subchannel of a second 20-MHz channel (an upper 20-MHz channel in FIG. 17) are actually allocated to STA11, STA21 may determine that the subchannel resources are allocated to STA21 from the HE preamble (e.g., HE-SIG-A) of the DL OFDMA PPDU in the example of FIG. 17. Therefore, after receiving the HE-SIG-A field, STA21 may move to its allocated subchannel and start to receive a HE-STF, a HE-LTF, a HE-SIG-B, and a PSDU. However, STA21 may be aware from the RA field of the MAC header of the PSDU that the actual destination STA of the PSDU is STA11. In this case, STA21 may perform the afore-described NAV update operation. That is, since the value of the RA field of a frame received on any subchannel of a 40-MHz OFDMA PPDU on a primary 40-MHz channel does not match to the MAC address of STA21, STA21 may set a NAV value based on the value of the Duration field of the MAC header of the PSDU.

As described above, if a third-party STA receiving a HE PPDU supporting DL/UL OFDMA determines that the third-party STA is not an actual destination STA of a frame received even on a part (e.g., a subchannel) of a transmission channel bandwidth of the HE PPDU (e.g., the RA value of the received frame does not match to the address of the third-party STA), the third-party STA may perform NAV update based on the Duration field of the MAC header of the frame.

Even though the HE PPDU supporting DL/UL OFDMA received at the third-party STA has been transmitted on a secondary 20-MHz, 40-MHz, or 80-MHz channel, not on a primary 20-MHz, 40-MHz, or 80-MHz channel, if the third-party STA determines that the third-party STA is not an actual destination of the received frame (e.g., the RA value of the received frame does not match to the address of the third-party STA), the third-party STA may perform NAV update based on the Duration field of the MAC header of the frame.

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,917,679 B2

33

In the example of FIG. 17, if resource allocation information for the other third-party STA(s) except for STA21 is not included in the received PPDU, the other third-party STA(s) may determine that the other third-party STA(s) is not a destination STA of the HE PPDU. In this case, the other STA(s) may not perform transmission during a time period determined based on duration information included in a PHY header (e.g., L-SIG, HE-SIG-A, HE-SIG-B) and may not process a data unit (e.g. a PSDU) following the PHY header. Meanwhile, although resource allocation information for STA21 is included in the received PPDU and thus STA21 determines that it is a destination STA of the HE PPDU, STA21 may finally determine that it is not a destination STA by checking the RA field of the MAC header of the received frame and thus may perform NAV update using the Duration field of the MAC header in the example of FIG. 17.

FIG. 18 depicts a NAV update operation of an STA according to the present invention.

Upon detection of reception of a HE PPDU in step S1810, an STA may determine whether the detected HE PPDU is of the first type (e.g., the non-OFDMA PPDU type) or of the second type (e.g., the OFDMA PPDU type) in step S1820.

If the type of the PPDU is the first type, particularly the non-OFDMA PPDU type, the STA may determine whether the value of the RA field of the MAC header of a data unit in the non-OFDMA PPDU matches to an address of the STA in step S1830.

If the STA determines that the value of the RA field of the MAC header of the data unit matches to the address of the STA, the STA may process (e.g., decode) the data unit in step S1840.

On the contrary, if the STA determines that the value of the RA field of the MAC header of the data unit does not match to the address of the STA, the STA may perform NAV update according to a NAV update operation for an STA receiving a non-OFDMA PPDU in step S1850. Specifically, the STA performs NAV update based on the Duration/ID field of a frame received on a primary channel. If the STA receives a frame that belongs to a secondary channel, not the primary channel, the STA does not perform NAV update. The examples described in relation to step S1630 of FIG. 16 are also applicable to step S1850 of FIG. 18.

If the type of the PPDU is the second type, particularly the OFDMA PPDU type, the STA may determine whether it is a destination STA of the PPDU in step S1860. The STA may determine whether it is a destination STA of the PPDU based on information included in the PHY header (e.g., HE-SIG-A or HE-SIG-B) of the detected PPDU. For example, upon detection of the HE PPDU, if resource allocation information included in the HE-SIG-A or HE-SIG-B field of the HE PPDU indicates the presence of a resource unit allocated to the STA, the STA may determine that it is a destination STA of the HE PPDU, and otherwise, the STA may determine that it is not a destination STA of the HE PPDU.

If the STA determines that it is not a destination STA of the HE PPDU in step S1860, the STA may not process a data unit (e.g., a PSDU) following the PHY header in step S1865. In addition, the STA may not perform transmission during a time period determined based on duration information included in the PHY header (e.g., L-SIG, HE-SIG-A, or HE-SIG-B).

If the STA determines that it is a destination STA of the HE PPDU in step S1860, the STA may determine whether the value of the RA field of the MAC header of a data unit in the OFDMA PPDU (i.e., a data unit received in a resource

34

unit indicated by the resource allocation information of the HE preamble of the OFDMA PPDU) matches to the address of the STA in step S1870.

If the value of the RA field of the MAC header of the data unit received in the resource unit allocated to the STA matches to the address of the STA, the STA may process (e.g., decode) the data unit received in the resource unit allocated to the STA in step S1880.

On the contrary, if the value of the RA field of the MAC header of the data unit received in the resource unit allocated to the STA does not match to the address of the STA, the STA may perform NAV update according to a NAV update operation for an STA receiving an OFDMA PPDU in step S1890. That is, if the type of the PPDU is the second type, the STA may perform NAV update based on the Duration/ID field of a frame received on a subchannel irrespective of a channel to which the received subchannel belongs (i.e., without considering whether the subchannel carrying the PPDU belongs to a primary channel or a secondary channel). The examples described in relation to step S1640 of FIG. 16 is also applicable to step S1890 of FIG. 18.

Now, a description will be given of a method for performing UL SU PPDU transmission or UL MU PPDU transmission according to the type of a response to DL MU transmission. For example, while UL SU transmission of a response to DL MU transmission is basically supported, if responses to DL MU transmission can be transmitted in UL MU transmission, system performance such as DL throughput may be significantly increased.

UL MU-MIMO transmission is taken as an example of UL MU transmission in the following examples of the present invention. However, the examples of the present invention are also applicable in the same manner to UL OFDMA transmission in which one transmission channel is divided into a plurality of subchannels and each STA performs simultaneous UL transmission on an allocated subchannel. Similarly, DL MU-MIMO transmission is taken as an example of DL MU transmission in the following examples of the present invention. However, the examples of the present invention are also applicable in the same manner to DL OFDMA transmission in which one transmission channel is divided into a plurality of subchannels and simultaneous DL transmission is performed on respective subchannels allocated to STAs. That is, UL MU transmission includes UL MU-MIMO transmission or UL OFDMA transmission, and DL MU transmission includes DL MU-MIMO transmission or DL OFDMA transmission, in the following description.

FIG. 19 depicts an exemplary UL SU transmission-based ACK procedure in response to DL MU transmission.

In a DL MU transmission operation, an AP may transmit a DL MU PPDU to destination STAs of the DL MU transmission after exchanging an RTS frame and a CTS frame with one of the STAs of the DL MU transmission. The QoS Control fields of the MAC headers of a plurality of data units (e.g., PSDUs) in the DL MU PPDU may include ACK Policy subfields. While the ACK Policies of the destination STAs of the DL MU PPDU may be set to Block ACK, the ACK Policy of one of the destination STAs may be set to Implicit Block ACK Request. Thus, the STA for which the ACK Policy is set to Implicit Block ACK Request may transmit a block ACK frame to the AP a predetermined IFS (e.g., an SIFS) after receiving the DL MU PPDU, without receiving a block ACK request frame. On the other hand, an STA(s) for which the ACK Policy is set to Block ACK may

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014772

US 9,917,679 B2

35

transmit a block ACK frame to the AP a predetermined IFS (e.g., an SIFS) after receiving a block ACK request frame from the AP.

The DL MU PPDU may include information requesting one STA to transmit an immediate response to the DL MU PPDU (e.g., a UL response transmitted a predetermined IFS (e.g., an SIFS) after receiving the DL MU PPDU), that is, information triggering UL SU transmission (or a UL SU transmission trigger frame).

If the ACK Policy is set to Implicit Block ACK Request for two or more of the destination STAs of the DL MU transmission, the plurality of STAs may transmit block ACK frames simultaneously (i.e., a predetermined IFS (e.g., an SIFS) after reception of the DL MU PPDU), thereby causing collision between them. Therefore, the ACK Policy for the DL MU PPDU should be set to Implicit Block ACK Request only for one STA, and otherwise, Implicit Block ACK Request may not be used.

In the example of FIG. 19, before transmitting a DL MU PPDU to a plurality of STAs (e.g., STA1, STA2, STA3, and STA4) on a 40-MHz channel, the AP may transmit an RTS frame to one (e.g., STA1) of the plurality of STAs in duplicated PPDUs on a primary 20-MHz channel (i.e., a lower-frequency 20-MHz channel) and a secondary 20-MHz channel (i.e., a higher-frequency 20-MHz channel). STA1 may transmit a CTS frame to the AP in duplicated PPDUs on the primary 20-MHz channel and the secondary 20-MHz channel in response to the received RTS frame.

The DL MU DATA PPDU transmitted by the AP may include PSDUs directed to STA1, STA2, STA3, and STA4. The ACK Policy of a PSDU may be set to Implicit Block ACK Request for STA1, and to Block ACK for STA2, STA3, and STA4. Therefore, STA1 may determine from the PSDU of the DL MU DATA PPDU that the ACK Policy is Implicit Block ACK Request and transmit a block ACK PPDU to the AP a predetermined IFS (e.g., an SIFS) after receiving the DL MU DATA PPDU. To receive block ACK PPDUs from STA2, STA3, and STA4, the AP may transmit block ACK request PPDUs sequentially STA2, STA3, and STA4.

FIG. 20 depicts an exemplary UL MU transmission-based ACK procedure in response to DL MU transmission.

To improve the performance of a procedure for performing DL MU transmission and transmitting an ACK in response to the DL MU transmission, block ACKs may be transmitted in UL MU transmission. For example, if all of the destination STAs of a DL MU DATA PPDU support UL MU transmission, a procedure for receiving block ACK PPDUs from the STAs may be simplified and thus the use efficiency of a wireless channel may be increased.

As illustrated in the example of FIG. 20, after the AP and STA1 exchange an RTS frame and a CTS frame on a 40-MHz channel, the AP may transmit a DL MU DATA PPDU to STA1, STA2, STA3, and STA4 on the 40-MHz channel. If all of STA1, STA2, STA3, and STA4 support UL MU transmission, STA1, STA2, STA3, and STA4 may simultaneously transmit a UL MU block ACK PPDU to the AP a predetermined IFS (e.g., an SIFS) after receiving the DL MU DATA PPDU.

For example, STA1, STA2, STA3, and STA4 may be allocated distinguishable streams and simultaneously transmit block ACK frames in a UL PPDU having a transmission channel bandwidth of 40 MHz to the AP in UL MU-MIMO transmission. Or STA1, STA2, STA3, and STA4 may all be allocated subchannels each having a bandwidth less than 40 MHz in a 40-MHz UL PPDU and transmit block ACK frames simultaneously to the AP in UL OFDMA.

36

To enable STA2, STA3, and STA4 to simultaneously transmit a UL MU block ACK PPDU, the ACK Policy may be set to Implicit Block ACK Request for STA1, STA2, STA3, and STA4 in the DL MU DATA PPDU.

As described above, information eliciting a plurality of STAs to transmit immediate responses (e.g., UL responses transmitted a predetermined IFS (e.g., an SIFS) after reception of a DL MU PPDU) to the DL MU PPDU, that is, information triggering UL MU transmission (or a UL MU transmission trigger frame) may be included in the DL MU PPDU.

As described with reference to the examples of FIGS. 19 and 20, an immediate response to a DL MU PPDU may be of a UL SU transmission type or a UL MU transmission type. The type of the immediate response may be indicated by information included in the DL MU PPDU (e.g., a block ACK request). That is, information indicating the type of the immediate response to the DL MU PPDU (e.g., a response frame transmitted in UL SU transmission or a response frame transmitted in UL MU transmission) may be included in the DL MU PPDU (e.g., a block ACK request included in the DL MU PPDU). Also, the DL MU PPDU may include a block ACK request PPDU for the plurality of STAs.

FIGS. 21 and 22 depict various types of UL responses to DL MU transmission.

All destination STAs of a DL MU DATA PPDU may not be assumed to support UL MU transmission. Therefore, the destination STAs of the DL MU DATA PPDU may be classified into UL MU transmission supported STAs and UL MU transmission non-supported STAs, and a UL transmission scheme may be determined for the DL MU DATA PPDU accordingly.

The AP may request a UL MU transmission supported STA to transmit a UL MU block ACK PPDU (i.e., the AP may provide a response request (or trigger) indicating the UL MU transmission-based response type). Meanwhile, the AP may request a UL MU transmission non-supported STA to transmit a UL SU block ACK PPDU (e.g., a legacy block ACK PPDU) (i.e., the AP may provide a response request (or trigger) indicating the UL SU transmission-based response type).

Such different types of UL responses may not be transmitted simultaneously. Therefore, a UL response request (or trigger) may be provided such that different types of UL responses to a DL MU DATA PPDU may be transmitted at different time points. For example, to receive block ACK PPDUs from a plurality of STAs including UL MU transmission supported STAs and a UL MU transmission non-supported STA(s), the AP may include an implicit block ACK request in the DL MU PPDU or an explicit block request in a separate block ACK request PPDU, and transmit the DL MU PPDU sequentially to the UL MU transmission supported STAs and the UL MU transmission non-supported STA(s).

In the examples of FIGS. 21 and 22, it is assumed that STA1, STA2, and STA3 are UL MU transmission supported STAs and STA4 is a UL MU transmission non-supported STA. If the destination STAs of a DL MU DATA PPDU include both a UL MU transmission supported STA and a UL MU transmission non-supported STA, the ACK Policy may be set to Implicit Block ACK Request for one or more STAs supporting one (a first type) of different UL immediate response types and to Block ACK for one or more STAs supporting the other type (a second type). Herein, the first type may be the UL MU transmission-based response type and the second type may be the UL SU transmission-based response type. Or the first type may be the UL SU trans-

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014773

US 9,917,679 B2

37                                                                    38

mission-based response type and the second type may be the
UL MU transmission-based response type.

In the example of FIG. 21, the ACK Policy is set to
Implicit Block ACK Request for STA1, STA2, and STA3
supporting UL MU transmission (i.e., supporting the UL 5
MU transmission-based response type) in a DL MU DATA
PPDU. In this case, STA1, STA2, and STA3 may transmit a
UL MU Block ACK PPDU to the AP a predetermined IFS
(e.g., an SIFS) after receiving the DL MU DATA PPDU.
That is, the UL MU transmission supported STAs (i.e., STAs 10
supporting the UL MU transmission-based response type),
STA1, STA2, and STA3 may simultaneously transmit block
ACK frames in UL MU transmission. Since different chan-
nel estimation sequences (e.g., HE-STF and HE-LTF 15
sequences) are used for the plurality of STAs participating in
the UL MU transmission, the AP may receive the block ACK
frames from the plurality of STAs without collision.

Since a UL MU transmission non-supported STA (i.e., an
STA supporting the UL SU transmission-based 20
response type) is not allowed to transmit a block ACK fame
simultaneously with other STAs, the ACK Policy may not be
set to Implicit Block ACK Request for the UL MU trans-
mission non-supported STA except for the case where the
ACK Policy is set to Implicit Block ACK Request for only 25
one STA in a DL MU DATA PPDU.

In the example of FIG. 21, since the ACK Policy is set to
Implicit Block ACK Request for STA1, STA2, and STA3,
the ACK Policy may be set to not Implicit Block ACK
Request but Block ACK for STA4 that does not support UL 30
MU transmission (i.e., supporting only the UL SU transmis-
sion-based response type). In this case, STA4 may transmit
a legacy block ACK PPDU (or a UL SU block ACK PPDU)
a predetermined IFS (e.g., an SIFS) after receiving a block
ACK request PPDU from the AP. 35

Meanwhile, in the example of FIG. 22, the ACK Policy is
set to Block ACK for STA1, STA2, and STA3 supporting UL
MU transmission (i.e., supporting the UL MU transmission-
based response type) and to Implicit Block ACK Request for
STA4 that does not support UL MU transmission (i.e., 40
supporting only the UL SU transmission-based response
type) in a DL MU DATA PPDU. In this case, STA4 may
transmit a block ACK PPDU (e.g., a legacy block ACK
PPDU or a UL SU block ACK PPDU) a predetermined IFS
(e.g., an SIFS) after receiving the DL MU DATA PPDU 45
from the AP. STA1, STA2, and STA3 may transmit a UL MU
block ACK PPDU to the AP a predetermined IFS (e.g., an
SIFS) after receiving a block ACK request PPDU from the
AP. That is, the UL MU transmission supported STAs (i.e.,
STAs supporting the UL MU transmission-based response 50
type), STA1, STA2, and STA3 may simultaneously transmit
block ACK frames in UL MU transmission. Since different
channel estimation sequences (e.g., different scrambling
codes used in generation of HE-STFs and HE-LTFs are
used for the plurality of STAs participating in the UL MU 55
transmission, the AP may receive the block ACK frames
from the plurality of STAs without collision.

As described above with reference to the examples of
FIGS. 21 and 22, the PPDU type of an immediate response
to a DL MU PPDU (i.e., a UL response transmitted a 60
predetermined IFS (e.g., an SIFS) after reception of a DL
MU PPDU) may be of the UL SU transmission type (e.g. a
legacy PPDU type) or the UL MU transmission type (e.g., a
UL MU PPDU type), and the type of the immediate response
to the DL MU PPDU may be determined based on infor- 65
mation (e.g., information triggering UL transmission)
included in the DL MU PPDU.

If the immediate response to the DL MU PPDU is of the
UL MU transmission type, identification information about
different channel estimation sequences (e.g., HE-STF and
HE-LTF sequences) to be used in UL MU PPDU transmis-
sion by a plurality of STAs may be included in the DL MU
PPDU. The identification information about the channel
estimation sequences may be defined as information indi-
cating one element of a set including a plurality of elements
corresponding to a plurality of channel estimation sequences
(or scrambling codes for generation of the channel estima-
tion sequences). That is, the identification information about
the channel estimation sequences corresponds to informa-
tion that allocates resources (e.g., sequence resources or
code resources) distinguishable for a plurality of STAs in UL
MU transmission of the STAs.

Further, the identification information about the channel
estimation sequences for the UL MU transmission may be
included in a frame (e.g., a DL MU PPDU) eliciting the UL
MU transmission. For example, the identification informa-
tion about the channel estimation sequences for the UL MU
transmission may be included in a UL MU transmission
trigger frame (i.e., a frame including information triggering
a UL MU transmission-based response) in the DL MU
PPDU. Or the identification information about the channel
estimation sequences for the UL MU transmission may be
included in each of a plurality of PSDUs of the DL MU
PPDU. More specifically, a UL MU Sequence ID subfield of
the QoS Control field of the MAC header in the DL MU
DATA PPDU may indicate a channel estimation sequence
for the UL MU transmission. Or the identification informa-
tion (e.g., the UL MU Sequence ID subfield) about the
channel estimation sequences for the UL MU transmission
may be included in a VHT Control field, a HE Control field,
a Service field, etc.

If the identification information (e.g., the UL MU
Sequence ID subfield) about the channel estimation
sequences for the UL MU transmission has a specific value
(e.g., 0), it may indicate that a UL immediate response
PPDU transmitted a predetermined IFS (e.g., an SIFS) after
reception of the DL MU PPDU is of the UL SU PPDU type
(or the legacy PPDU type). On the other hand, if the
identification information (e.g., the UL MU Sequence ID
subfield) about the channel estimation sequences for the UL
MU transmission has a value other than the specific value
(e.g., 0), it may indicate that the UL immediate response
PPDU transmitted a predetermined IFS (e.g., an SIFS) after
reception of the DL MU PPDU is of the UL MU PPDU type.
In this case, one channel estimation sequence (or one
scrambling code for generation of the channel estimation
sequence) may be determined from a set of a plurality of
channel estimation sequences (or scrambling codes for gen-
eration of the channel estimation sequences) based on the
identification information (e.g., the UL MU Sequence ID
subfield) about the channel estimation sequences for the UL
MU transmission.

Referring to FIG. 21 again, the ACK Policy is set to
Implicit Block ACK Request commonly for the UL MU
transmission supported STAs (i.e., STAs supporting the UL
MU transmission-based response type), STA1, STA2, and
STA3, and the values of UL MU Sequence ID subfields are
1, 2, and 3, respectively for STA1, ST2, and STA3. When
STA1, STA2, and STA3 transmit the UL MU block ACK
PPDU to the AP a predetermined IFS (e.g., an SIFS) after
receiving the DL MU DATA PPDU, STA1, STA2, and STA3
may perform the UL MU transmission using different chan-
nel estimation sequences corresponding to the values of the
UL MU Sequence ID subfields, 1, 2, and 3. On the other

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

US 9,917,679 B2

**39**

hand, the value of the UL MU Sequence ID subfield is set to 0 for the UL MU transmission non-supported STA (i.e., the STA supporting only the UL SU transmission-based response type), STA4, and STA4 may transmit a legacy block ACK PPDU (or a UL SU block ACK PPDU) to the AP a predetermined IFS (e.g., an SIFS) after receiving a block ACK request PPDU from the AP.

Referring to FIG. 22 again, the ACK Policy is set to Implicit Block ACK Request for the UL MU transmission non-supported STA (i.e., the STA supporting only the UL SU transmission-based response type), STA4, and the value of the UL MU Sequence ID subfield is set to 0 for STA4. STA4 may transmit a legacy block ACK PPDU (or a UL SU block ACK PPDU) to the AP a predetermined IFS (e.g., an SIFS) after receiving the DL MU DATA PPDU from the AP. On the other hand, the ACK Policy is set to Implicit Block ACK Request commonly for the UL MU transmission supported STAs (i.e., STAs supporting the UL MU transmission-based response type), STA1, STA2, and STA3, and the values of UL MU Sequence ID subfields are 1, 2, and 3, respectively for STA1, ST2, and STA3. When STA1, STA2, and STA3 transmit a UL MU block ACK PPDU to the AP a predetermined IFS (e.g., an SIFS) after receiving a block ACK request PPDU, STA1, STA2, and STA3 may perform the UL MU transmission using different channel estimation sequences corresponding to the values of the UL MU Sequence ID subfields, **1**, **2**, and **3**.

Like the afore-described DL MU PPDU, the block ACK request PPDU that the AP transmits to the plurality of STAs (e.g., STA1, STA2, and STA3) may include information indicating the type of a UL transmission PPDU (e.g., a UL MU transmission-based PPDU type) as an immediate response to the block ACK request PPDU, and channel estimation sequence identification information (e.g., a UL MU Sequence ID subfield) for UL MU transmission for each STA participating in the UL MU transmission.

Additionally, if the UL MU transmission supported STAs (i.e., the STAs supporting the UL MU transmission-based response type) simultaneously transmit block ACK frames in a UL MU PPDU to the AP, the transmission times of the block ACK frames transmitted by the plurality of STAs may be identical. If the transmission times of the block ACK frames transmitted simultaneously by the plurality of STAs are different, the load of processing the block ACK frames at the AP increases. To prevent the increase of the load, the transmission times of the block ACK frames transmitted by the plurality of STAs may be made identical (e.g., the block ACK frames may be made start at the same time and end at the same time). The same transmission time of the block ACK frames transmitted by the plurality of STAs may mean the same transmission MCS of the block ACK frames transmitted by the plurality of STAs.

In the example of FIG. 21, to make the transmission times of the UL MU block ACK PPDU transmitted by STA1, STA2, and STA3 supporting UL MU transmission (i.e., the UL MU transmission-based response type) identical, MCS information may be included in the DL MU DATA PPDU. That is, the plurality of STAs participating in UL MU transmission may use an MCS value indicated by the MCS information for the UL MU transmission, included in the DL MU DATA PPDU, for transmission of the UL MU PPDU including the block ACK frames. Specifically, a UL MU MCS subfield of the QoS Control field of the MAC header in the DL MU DATA PPDU may indicate an MCS value for the UL MU transmission. Or the MCS information for the UL MU transmission. Or the MCS information for the

**40**

UL MU transmission (e.g., the UL MU MCS subfield) may be included in a VHT Control field, a HE Control field, a Service field, etc.

In the example of FIG. 22, to make the transmission times of the UL MU block ACK PPDUs transmitted by STA1, STA2, and STA3 supporting UL MU transmission (i.e., the UL MU transmission-based response type) identical, MCS information for the UL MU transmission may be included in the block ACK request PPDU.

As described before, a frame eliciting UL MU transmission may include information based on which at least one of the type of a UL MU PPDU, resources for use in the UL MU transmission, and an MCS of the UL MU transmission. That is, a frame (e.g., a DL MU DATA PPDU or a block ACK request PPDU for a plurality of STAs) eliciting UL MU transmission (e.g., a UL immediate response) may include at least one of information based on which a UL MU PPDU type (i.e., the UL MU transmission-based PPDU type or the UL SU transmission-based PPDU type) is determined, information based on which distinguishable resources for use in the UL MU transmission (e.g., sequence resources or code resources) are determined, information based on which a UL MU transmission time is determined, and information based on which an MCS applied to the UL MU transmission is determined.

If UL MU transmission supported STAs (i.e., STAs supporting the UL MU transmission-based response type) simultaneously transmit block ACK frames in a UL MU PPDU, the Duration fields of the block ACK frames may have the same value. The value of the Duration fields included in the UL MU PPDU may be set to a value calculated by subtracting a transmission time of the UL MU transmission and a predetermined IFS (e.g., an SIFS) from the value of the Duration field included in the frame eliciting the transmission of the UL MU PPDU (e.g., the DL MU DATA PPDU, or the block ACK request PPDU for a plurality of STAs). In this case, if a third-party STA receiving the UL MU PPDU determines that it is not a destination STA of the received frame even in a part of the transmission channel bandwidth of the UL MU PPDU (e.g., a subchannel) (e.g., if the RA value of the received frame does not match to the address of the third-party STA), the third-party STA may perform NAV update based on the value of the Duration field set in the above manner.

FIG. 23 depicts an exemplary method according to the present invention.

In step S2310, an AP may transmit a DL frame to an STA group including one or more STAs. The DL frame may correspond to a DL MU DATA PPDU or a block ACK request PPDU described in the foregoing examples. The DL frame may include information about the type of a UL frame transmitted as an immediate response (i.e., transmitted a predetermined IFS (e.g., an SIFS) after reception of the DL frame). The UL frame may correspond to a block ACK PPDU described in the foregoing examples. The type of the UL frame may be an SU type or an MU type. If the information about the type of a UL frame, included in the DL frame is the MU type, the DL frame may further include resource allocation information, transmission time information, and MCS information for a plurality of STAs, for transmission of UL frames (i.e., a UL MU frame).

In step S2320, each STA of the STA group may determine the type of the UL frame elicited by the DL frame based on the information (e.g., the information about the type of a UL frame) included in the received DL frame. If the type of the UL frame is the MU type, the STA may determine UL MU transmission parameters (e.g., a resource index for the STA,

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS-00014775

**Appx266**

US 9,917,679 B2

41

for transmission of the UL MU frame, a transmission time of the UL MU frame, and an MCS to be applied to the UL MU frame) based on the information included in the DL frame (e.g., the resource allocation information, the transmission time information, and the MCS information). Therefore, a plurality of STAs may simultaneously transmit a UL MU frame to the AP in step S2340.

If the type of the UL frame is determined to be the SU type in step S2320, one STA may transmit a UL SU frame to the AP in step S2350.

While the afore-described exemplary methods of present invention have been described as a series of operations for simplicity of description, this does not limit the sequence of steps. When needed, steps may be performed at the same time or in a different sequence. All of the exemplary steps are not always necessary to implement the method proposed by the present invention.

The foregoing embodiments of the present invention may be implemented separately or combinations of two or more of the embodiments may be implemented simultaneously, for the afore-described exemplary methods of present invention.

The present invention includes an apparatus for processing or performing the method of the present invention (e.g., the wireless device and its components described with reference to FIGS. 1, 2, and 3).

The present invention includes software (an operating system (OS), an application, firmware, a program, etc.) for executing the method of the present invention in a device or a computer, and a medium storing the software that can be executed in a device or a computer.

While various embodiments of the present invention have been described in the context of an IEEE 802.11 system, they are applicable to various mobile communication systems.

What is claimed is:

**1.** A method for transmitting an acknowledgement frame for notifying successful data reception by a station (STA) to an access point (AP) in a wireless local area network, the method comprising:

receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and

transmitting, to the AP, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame,

wherein transmitting the acknowledgment frame comprises:

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource, transmitting the acknowledgement frame in the MU format on the allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA, and

when the acknowledgment information represents that the STA is requested to transmit the acknowl-

42

edgement frame in the SU format, transmitting the acknowledgement frame in SU format.

**2.** The method according to claim **1,**

wherein the downlink frame further includes Modulation and Coding Scheme (MCS) information for the acknowledgement frame.

**3.** The method according to claim **2,**

wherein a same MCS based on the MCS information is applied to the acknowledgement frame by the STA and the at least one other STA.

**4.** The method according to claim **1,**

wherein the downlink frame includes downlink data for a plurality of STAs including the STA and the at least one other STA.

**5.** The method according to claim **1,**

wherein the downlink frame includes block acknowledgement (ACK) requests for a plurality of STAs including the STA and the at least one other STA.

**6.** A method for receiving an acknowledgement frame for notifying successful data reception by an access point (AP) from a station (STA) in a wireless local area network, the method comprising:

transmitting, to the STA, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format at a Short Inter-Frame Space (SIFS) time after the downlink frame,

receiving, from the STA, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame,

wherein receiving the acknowledgement frame comprises:

when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format, receiving the acknowledgement frame in the MU format on an allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA, and

when the acknowledgement information represents that the STA is requested to transmit the acknowledgement frame in the SU format, receiving the acknowledgement frame in SU format.

**7.** The method according to claim **6,**

wherein the downlink frame further includes Modulation and Coding Scheme (MCS) information for the acknowledgement frame.

**8.** The method according to claim **7,**

wherein a same MCS based on the MCS information is applied to the acknowledgement frame by the STA and the at least one other STA.

**9.** The method according to claim **6,**

wherein the downlink frame includes downlink data for a plurality of STAs including the STA and the at least one other STA.

**10.** The method according to claim **6,**

wherein the downlink frame includes block acknowledgement (ACK) requests for a plurality of STAs including the STA and the at least one other STA.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08-13-2021

ATLAS–00014776

**Appx267**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of February, 2025, I filed the Non-Confidential Brief for Defendants-Appellants Lianzhou Technologies Co., Ltd. and TP-Link Corporation Ltd. with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.  The filing has been prepared using a proportionally-spaced typeface and includes 13,982 words.

2.  The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

February 7, 2025