**2025-1039, -1076**

# United States Court of Appeals
# for the Federal Circuit

ATLAS GLOBAL TECHNOLOGIES LLC,

*Plaintiff-Appellee,*

— v. —

LIANZHOU TECHNOLOGIES CO., LTD., fka TP-Link Technologies Co.,
TP-LINK CORPORATION LTD., fka TP-Link International Ltd.,

*Defendants-Appellants.*

---

*On Appeal from the United States District Court for
the Eastern District of Texas in No. 2:21-cv-00430-JRG-RSP,
Honorable J. Rodney Gilstrap, Judge*

---

## BRIEF FOR PLAINTIFF-APPELLEE

JOSEPH S. GRINSTEIN
ALEJANDRA C. SALINAS
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
(713) 651-9366
jgrinstein@susmangodfrey.com
asalinas@susmangodfrey.com

KALPANA SRINIVASAN
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars,
 Suite 1400
Los Angeles, California 90067
(310) 789-3100
ksrinivasan@susmangodfrey.com

ALEXANDER AIKEN
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
(206) 516-3880
aaiken@susmangodfrey.com

MICHAEL F. HEIM
ERIC J. ENGER
ALDEN HARRIS
BLAINE LARSON
HEIM, PAYNE & CHORUSH LLP
609 Main Street, Suite 3200
Houston, Texas 77002
(713) 221-2000
mheim@hpcllp.com
eenger@hpcllp.com
aharris@hpcllp.com
blarson@hpcllp.com

*Counsel for Plaintiff-Appellee*

MAY 12, 2025

 COUNSEL PRESS    (800) 4-APPEAL • (379967)

## PATENT CLAIMS AT ISSUE

### U.S. Patent No. 9,532,187

**Claim 1.** A method for transmitting data to a plurality of Stations (STAs) through a transmission channel by an Access Point (AP) in a Wireless Local Area Network (WLAN) system, wherein the transmission channel is divided into a plurality of resource units which are allocated to the plurality of STAs respectively, the method comprising: interleaving a plurality of data units for the plurality of STAs based on sizes of the plurality of resource units allocated to the plurality of STAs to generate a plurality of interleaved data units; and transmitting, through the transmission channel, a Physical layer Protocol Data Unit (PPDU) frame including the plurality of interleaved data units respectively on the plurality of resource units to the plurality of STAs, wherein a set of sizes available to a resource unit allocated to a first STA among the plurality of STAs includes a first size and a second size, wherein the interleaving of the plurality of data units for the plurality of STAs comprises: when the size of the resource unit allocated to the first STA is the first size, interleaving a data unit for the first STA using a first set of interleaving parameter values; and when the size of the resource unit allocated to the first STA is the second size, interleaving the data unit for the first STA using a second set of interleaving parameter values, and wherein the first size is smaller than a size of the transmission channel, the second size is smaller than the first size, and the second set of interleaving parameter values is different from the first set of interleaving parameter value.

**Claim 4.** The method according to claim 1, wherein the set of sizes available to the resource unit allocated to the first STA among the plurality of STAs further includes a third size, wherein the interleaving of the plurality of data units for the plurality of STAs further comprises: when the size of the resource unit allocated to the first STA is the third size, interleaving the data unit for the first STA using a third set of interleaving parameter values, and wherein the third size is smaller than the second size, and the third set of interleaving parameter values is different from the second set of interleaving parameter values.

**Claim 12.** The method according to claim 10, wherein the set of sizes available to the resource unit allocated to the first STA further includes a third size, wherein the deinterleaving of the data unit for the first STA further comprises, when the size of the resource unit allocated to the first STA is the third size, deinterleaving the data unit for the first STA using a third set of interleaving parameter values, and wherein the third size is smaller than the second size, and the third set of interleaving parameter values is different from the second set of interleaving parameter values.

## U.S. Patent No. 9,763,259

**Claim 1.** A sounding method by a first receiving device, the method comprising: receiving a null data packet announcement (NDPA) frame from a transmitting device; receiving a null data packet (NDP) frame from the transmitting device after receiving the NPDA frame; and transmitting to the transmitting device a feedback frame including subchannel information measured on a first subchannel after receiving the NDP frame, the first subchannel being a subchannel that is allocated to the first receiving device among a plurality of subchannels into which a predetermined band is divided, wherein transmitting the feedback frame includes: transmitting the feedback frame to the transmitting device while a second feedback frame including subchannel information measured on the second subchannel is transmitted to the transmitting device by a second receiving device, the second subchannel being a subchannel that is allocated to the second receiving device among the plurality of subchannels.

**Claim 18.** A sounding method by a transmitting device, the method comprising: transmitting a null data packet announcement (NDPA) frame to a plurality of receiving devices; transmitting a null data packet (NDP) frame to the plurality of receiving devices after transmitting the NPDA frame; and receiving from each receiving device a feedback frame including subchannel information measured on a subchannel that is allocated to each receiving device among a plurality of subchannels into which a band is divided, after transmitting the NDP frame, wherein the plurality of feedback frames from the plurality of receiving devices are received at a same time, and the NDPA frame includes allocation information of the plurality of subchannels.

## U.S. Patent No. 9,825,738

**Claim 1.** A method of operating an access point in a wireless communication network, the method comprising: generating downlink data; generating uplink setup information, the uplink setup information including a first information to be used for uplink multi-user transmission; transmitting the downlink data and the uplink setup information in a single physical downlink frame to a plurality of stations; simultaneously receiving multiple uplink frames from multiple stations of the plurality of stations; and transmitting an acknowledgement frame to the multiple stations after a successful reception of the multiple uplink frames, wherein the uplink setup information includes a common information portion and a dedicated information portion, the common information portion includes a second information

being common to all of the plurality of stations to receive the uplink setup information, and the dedicated information portion includes respective third information specific to each of the plurality of stations to receive the uplink setup information, and wherein the second information is a function of a total number of space time streams to be used to transmit the multiple uplink frames.

## U.S. Patent No. 9,912,513

**Claim 1.** An apparatus for facilitating wireless communication, the apparatus comprising: one or more memories; and one or more processors coupled to the one or more memories, the one or more processors configured to cause: receiving, in a trigger frame transmitted by an access point, an indication of a first guard interval length, wherein the trigger frame allocates one or more resources for an uplink (UL) multi-user (MU) transmission and solicits the UL MU transmission, wherein a value of the first guard interval length is to be used by each of a plurality of stations, including the apparatus, associated with the UL MU transmission, generating an uplink frame for the UL MU transmission solicited by the trigger frame, wherein the uplink frame comprises a payload and a physical layer (PHY) header, and transmitting the uplink frame using a resource allocated by the trigger frame to the apparatus, wherein at least a portion of the payload of the uplink frame is associated with the first guard interval length.

**Claim 15.** A computer-implemented method of facilitating wireless communication, the method comprising: determining, by an access point, a first guard interval to be used by a set of stations participating in a multi-user (MU) uplink (UL) transmission; creating, by the access point, a trigger frame, wherein the trigger frame includes information indicating the first guard interval for the UL MU transmission, wherein the trigger frame allocates resources for the UL MU transmission and solicits the UL MU transmission; transmitting, by the access point, the trigger frame to the set of stations; and processing an uplink frame comprising a plurality of frames from the set of stations based on the resources for the UL MU transmission, wherein each of the plurality of frames comprises a respective payload, and wherein at least a portion of the respective payload is associated with the first guard interval.

## U.S. Patent No. 9,917,679

**Claim 1.** A method for transmitting an acknowledgement frame for notifying successful data reception by a station (STA) to an access point (AP) in a wireless local area network, the method comprising: receiving, from the AP, a downlink frame including a quality of service (QoS) control field including acknowledgement

information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and transmitting, to the AP, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame, wherein transmitting the acknowledgment frame comprises: when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format and the STA is allocated a resource, transmitting the acknowledgement frame in the MU format on the allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA, and when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, transmitting the acknowledgement frame in SU format.

**Claim 6.** A method for receiving an acknowledgement frame for notifying successful data reception by an access point (AP) from a station (STA) in a wireless local area network, the method comprising: transmitting, to the STA, a downlink frame including a quality of service (QoS) control field including acknowledgement information representing whether the STA is requested to transmit the acknowledgement frame in a single-user (SU) format or in a multiple-user (MU) format at a Short Inter-Frame Space (SIFS) time after the downlink frame; and receiving, from the STA, the acknowledgement frame based on the acknowledgement information at the SIFS time after the downlink frame, wherein receiving the acknowledgment frame comprises: when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the MU format, receiving the acknowledgement frame in the MU format on an allocated resource simultaneously with transmission of at least one acknowledgement frame from at least one other STA, and when the acknowledgment information represents that the STA is requested to transmit the acknowledgement frame in the SU format, receiving the acknowledgement frame in SU format.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-1039, -1076 |
| **Short Case Caption** | Atlas Global Technologies LLC v. TP-Link Technologies Co |
| **Filing Party/Entity** | Atlas Global Technologies LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 04/11/2025                    Signature:  /s/ Michael F. Heim

                                    Name:      Michael F. Heim

FORM 9. Certificate of Interest                           Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Atlas Global Technologies LLC | | Acacia Research Group |
| | | Acacia Research Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Max L. Tribble, Jr. | William B. Collier, Jr. | Robert Greenfeld |
| Oleg Elkhunovich | S. Calvin Capshaw | Elizabeth DeRieux |
| T. John Ward, Jr. | Andrea Fair | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................1

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ......................................................4

COUNTER-STATEMENT OF ISSUES ...............................................4

STATEMENT OF THE CASE...............................................................5

    A.    Defendants' Established Distribution Channel.................5

    B.    The Patented Inventions and Initiation of this Action ...................7

    C.    Defendants Obstruct Discovery, Leading to Sanctions ..................8

    D.    The Jury Finds Infringement............................................12

    E.    The Jury Awards $37.5 Million in Damages .................................12

SUMMARY OF ARGUMENT ..............................................................14

STANDARD OF REVIEW ...................................................................17

ARGUMENT ........................................................................................18

I.    THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER DEFENDANTS ...............................................................................18

    A.    Personal Jurisdiction Was Proper Under Rule 4(k)(2). .................18

    B.    Personal Jurisdiction Was Proper Under Rule 4(k)(1). .................21

        1.    Defendants Have Minimum Contacts with Texas..............22

        2.    Defendants Have Not Shown that Exercising Personal Jurisdiction Was Unreasonable.............................26

II.    THE DISTRICT COURT WAS WELL WITHIN ITS DISCRETION TO SANCTION DEFENDANTS FOR REPEATEDLY OBSTRUCTING DISCOVERY.............................................................................28

A.   The IDC Order Was "Just" and "Related" to Defendants' Misconduct. ...................................................................28

B.   Defendants Have Failed to Demonstrate an Abuse of Discretion. ......................................................................33

C.   Any Error Was Harmless. .............................................................38

III.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S INFRINGEMENT VERDICT ................................................................................41

A.   Substantial Evidence Showed Direct Infringement. ......................41

B.   Substantial Evidence Showed Indirect Infringement.....................44

1.   Substantial Evidence Showed Pre-Suit Knowledge. ...........44

2.   Defendants Waived Any Argument of Insufficient Evidence of Inducement. ....................................................46

3.   Substantial Evidence Showed Inducement.........................47

C.   Vacatur Is Not Required.................................................................51

IV.   THE DAMAGES AWARD SHOULD BE AFFIRMED ........................................52

A.   Defendants' Apportionment Challenges are Either Waived or Were Correctly Rejected by the District Court. ...........52

B.   The Contention that Mr. Weinstein's Opinions Were Contrary to the Hypothetical-Negotiation Framework Is Waived and Meritless.....................................................................56

1.   Defendants' Challenges Were Waived Because They Were Never Raised in Defendants' *Daubert* Motion.........................................................................57

2.   Substantial Evidence Supports the Jury's Decision to Give Defendants Only Certain Discounts. .......................59

CONCLUSION ...........................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*,
  817 F.3d 755 (Fed. Cir. 2016) ...................................................................23

*Adasa Inc. v. Avery Dennison Corp.*,
  55 F.4th 900 (Fed. Cir. 2022) ...................................................................17

*AlexSam, Inc. v. Aetna, Inc.*,
  119 F.4th 27 (Fed. Cir. 2024) ...................................................................45

*Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*,
  104 F.4th 1370 (Fed. Cir. 2024) ...............................................................50

*Asahi Metal Indus. Co. v. Superior Court of Calif., Solano Cty.*,
  408 U.S. 102 (1987)....................................................................22, 26, 50

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
  21 F.3d 1558 (Fed. Cir. 1994) .................................................22, 23, 25, 26

*Blanche Rd. Corp. v. Bensalem Twp.*,
  1996 WL 368347 (E.D. Pa. June 25, 1996)................................................39

*Breckenridge Pharm., Inc. v. Metabolite Lab'ys, Inc.*,
  444 F.3d 1356 (Fed. Cir. 2006) .................................................................27

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...................................................................................58

*Celgard, LLC v. SK Innovation Co.*,
  792 F.3d 1373 (Fed. Cir. 2015) ...........................................................17, 25

*Clune v. Alimak AB*,
  233 F.3d 538 (8th Cir. 2000) ...............................................................25, 26

*Compaq Computer Corp. v. Ergonome Inc.*,
  387 F.3d 403 (5th Cir. 2004) .....................................................................32

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018) ...........................................................18, 45

*Cupit v. Whitley*,
   28 F.3d 532 (5th Cir 1994) ........................................................20

*Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*,
   297 F.3d 1343 (Fed. Cir. 2002) ..............................................26

*Dresser-Rand Co. v. Virtual Automation Inc.*,
   361 F.3d 831 (5th Cir. 2004) ....................................................38

*Echeverry v. Jazz Casino Co., L.L.C.*,
   988 F.3d 221 (5th Cir. 2021) ....................................................39

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
   955 F.3d 1317 (Fed. Cir. 2020) ..............................................21

*Ericsson, Inc. v. D-Link Sys.*,
   773 F.3d 1201 (Fed. Cir. 2014) ..........................................49, 51

*Fromson v. W. Litho Plate & Supply Co.*,
   853 F.2d 1568 (Fed. Cir. 1988) ..........................................61, 64

*Gant v. United States*,
   417 F.3d 1328 (Fed. Cir. 2005) ..............................................34

*Gomez v. St. Jude Med. Diag. Div. Inc.*,
   442 F.3d 919 (5th Cir. 2006) ....................................................18

*HTC Corp. v. IPCom GmbH & Co., KG*,
   667 F.3d 1270 (Fed. Cir. 2012) ..............................................47

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ..............................17, 18, 41, 51

*In re HTC Corp.*,
   889 F.3d 1349 (Fed. Cir. 2018) ..............................................20

*In re Loestrin 24 Fe Antitrust Litig.*,
   433 F. Supp. 3d 274 (D.R.I. 2019) ........................................54

*In re Stingray IP Sols., LLC*,
   56 F.4th 1379 (Fed. Cir. 2023) ..........................................*passim*

*In re TP-Link Techs. Co.*,
  No. 2023-123, 2023 WL 2881314 (Fed. Cir. Apr. 11, 2023) ..............................1

*In re Univ. of S. Calif. Tuition & Fees COVID-19 Refund Litig.*,
  695 F. Supp. 3d 1128 (C.D. Cal. 2023) .............................................53

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982)....................................................................32

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) .........................................................35

*Klayman v. Judicial Watch, Inc.*,
  6 F.4th 1301 (D.C. Cir. 2021)..........................................................20

*Law Funder, L.L.C. v. Munoz*,
  924 F.3d 753 (5th Cir. 2019) .........................................17, 28, 29, 36

*Linear Tech. Corp. v. Micrel, Inc.*,
  275 F.3d 1040 (Fed. Cir. 2001) .........................................................41

*Litecubes, LLC v. N. Light Prods.*,
  523 F.3d 1353 (Fed. Cir. 2008) .........................................................44

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...........................................18, 59, 61

*M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*,
  890 F.3d 995 (Fed. Cir. 2018) .........................................................18

*Marshall v. Chater*,
  75 F.3d 1421 (10th Cir. 1996) .........................................................20

*Midwest Feeders, Inc. v. Bank of Franklin*,
  886 F.3d 507 (5th Cir. 2018) .........................................................17

*Mondis Tech., Ltd. v. LG Elecs., Inc.*,
  2011 WL 2417367 (E.D. Tex. June 14, 2011) ................................60

*Munoz v. Strahm Farms, Inc.*,
  69 F.3d 501 (Fed. Cir. 1995) .........................................................38

*N. Am. Philips Corp. v. Am. Vending Sales, Inc.*,
    35 F.3d 1576 (Fed. Cir. 1994) ...............................................................44

*Open Sea Distribution Corp. v. Artemis Distribution, LLC*,
    692 F. Supp. 3d 1151 (M.D. Fla. 2023).................................................53

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) .........................................57, 58, 63, 64

*Pat. Rts. Prot. Grp., LLC v. Video Gaming Techs., Inc.*,
    603 F.3d 1364 (Fed. Cir. 2010) .....................................................26, 27

*Polar Electro Oy v. Suunto Oy*,
    829 F.3d 1343 (Fed. Cir. 2016) ............................................22, 25, 26

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
    127 F.4th 896 (Fed. Cir. 2025) .......................................23, 24, 25, 26

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
    853 F.3d 1370 (Fed. Cir. 2017) ............................................................17

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ..............................................................63

*Safeguard Base Operations, LLC v. United States*,
    989 F.3d 1326 (Fed. Cir. 2021) ............................................................21

*Salazar v. AT&T Mobility LLC*,
    64 F.4th 1311 (Fed. Cir. 2023) .....................................................47, 56

*Sanofi v. Watson Labs. Inc.*,
    875 F.3d 636 (Fed. Cir. 2017) ..............................................................49

*Sinclair Refin. Co. v. Jenkins Petroleum Process Co.*,
    289 U.S. 689 (1933).................................................................................62

*Smith v. Garlock Equipment Co.*,
    658 F. App'x 1017 (Fed. Cir. 2016)......................................................42

*Stevens v. Ford Motor Co.*,
    2022 WL 19978265 (S.D. Tex. Sept. 29, 2022).................................53

*Stingray IP Sols., LLC v. TP-Link Techs. Co.*,
    2022 WL 17357774 (E.D. Tex. Oct. 13, 2022) ............................................19, 21

*Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*,
    872 F.2d 978 (Fed. Cir. 1989) ...............................................................61

*Superior Indus., LLC v. Thor Glob. Enters. Ltd.*,
    700 F.3d 1287 (Fed. Cir. 2012) .............................................................51

*Synthes (U.S.A.) v. G.M. Dos Res Jr. Ind. Com de Equip. Medico*,
    563 F.3d 1285 (Fed. Cir. 2009) .............................................................27

*Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*,
    785 F.3d 625 (Fed. Cir. 2015) ...............................................................50

*Topalian v. Ehrman*,
    3 F.3d 931 (5th Cir. 1993) .............................................................36, 38

*Trimble v. PerDiemCo LLC*,
    997 F.3d 1147 (Fed. Cir. 2021) .............................................................27

*Trustees of Univ. of Pa. v. Eli Lilly & Co.*,
    2022 WL 3973276 (E.D. Pa. Jan. 14, 2022)........................................62

*United States v. Mount*,
    896 F.2d 612 (1st Cir. 1990).................................................................39

*United States v. Robinson*,
    87 F.4th 658 (5th Cir. 2023) .................................................................62

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013) ......................................54, 56, 57, 58

*Viam Corp. v. Iowa Exp.-Imp. Trading Co.*,
    84 F.3d 424 (Fed. Cir. 1996) .........................................................26, 28

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980).............................................................................24

*Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*,
    848 F.3d 1346 (Fed. Cir. 2017) .....................................................27, 28

x

**Statutes**

28 U.S.C. § 1331 ................................................................4

28 U.S.C. § 1338 ................................................................4

**Rules**

Fed. R. Civ. P. 4 .......................................................*passim*

Fed. R. Civ. P. 11 .........................................................36, 38

Fed. R. Civ. P. 30 ............................................................33

Fed. R. Civ. P. 37 ...............................................28, 36, 37, 38

Fed. R. Civ. P. 50 ...............................................46, 47, 56

Fed. R. Evid. 803(17)........................................................39

## STATEMENT OF RELATED CASES

This Court previously denied a mandamus petition from Appellants-Defendants challenging denial of their motion to transfer. *See In re TP-Link Techs. Co.*, No. 2023-123, 2023 WL 2881314, at *1 (Fed. Cir. Apr. 11, 2023) (Lourie, Prost, & Wallach, JJ.). Counsel for Atlas Global Technologies LLC is unaware of any case pending in this Court or any other court that will directly affect or be directly affected by the Court's decision in this appeal.

## INTRODUCTION

This is an unusual appeal from a patent jury verdict. Defendants do not contest any claim constructions. They do not dispute the mapping of the patent claims to their products. And they long ago conceded validity. Defendants' appeal is instead about decisions they made—both in licensing negotiations and this lawsuit—they now regret. Dissatisfied with the consequences, Defendants distort the record, ignore the many portions of it supporting the District Court's rulings and the jury's verdict, and rely heavily on arguments they failed to preserve. In the end, however, they cannot show any reversible error.

At the outset of the case, the District Court properly exercised personal jurisdiction over Defendants after they argued they were not subject to jurisdiction in any State in the United States and instead tried to consent to jurisdiction in

1

California. This gamesmanship gave the District Court personal jurisdiction under Federal Rule 4(k)(2), as this Court already held in another case where the *same Defendants* tried the *same tactic* and were rebuffed. *In re Stingray IP Sols., LLC*, 56 F.4th 1379, 1384–86 (Fed. Cir. 2023). The District Court alternatively had personal jurisdiction over Defendants under Rule 4(k)(1) because they deliberately used an established distribution channel to distribute TP-Link products nationwide, including in Texas.

Once in litigation, Defendants dragged their feet on producing sales data for months, forcing Atlas to move to compel. Defendants then repeatedly ignored the District Court's orders and warnings and obstructed Atlas's efforts to obtain accurate sales data. The District Court properly exercised its discretion and sanctioned Defendants for their behavior by holding that third-party industry data—which Defendants regularly rely on—would be used at trial and Defendants could not introduce their own sales data because of Defendants' obstructionism and unanswered questions concerning its veracity.

At trial, Defendants did not contest validity and barely disputed infringement. Atlas offered hours of expert testimony and documentary evidence showing that Defendants offer the Accused Products for sale on a website they control (as stated in terms of service) and import the products into the United States (as shown by shipping invoices)—establishing direct infringement of the lone apparatus claim.

2

Atlas also showed that Defendants knew of the Asserted Patents after Atlas sent three licensing letters and how Defendants' packaging and marketing materials induced customers to operate the Accused Products in an infringing manner— establishing indirect infringement. Faced with this evidence, Defendants' corporate witness went so far as to admit they "may infringe." Appx1701(694:15-25). Defendants now ask to re-weigh the evidence and make different credibility determinations than the jury, but that is not this Court's role.

Defendants finally take a stab at damages. Defendants attack the opinions of Atlas's expert as improper, but Defendants waived their arguments by failing to timely raise them below. Waiver aside, Defendants fail to identify any faults in the opinions offered. The royalty rate Atlas presented to the jury was derived from four licenses to the Asserted Patents and therefore could not include the value of any *unpatented* features of the Wi-Fi 6 standard. Nor are Defendants correct that the jury was *required* to give them credit for each discount that real-world licensees received for taking licenses to the Asserted Patents. Defendants ignore the testimony of their own expert that it was up to the jury to determine the applicable discounts (Appx1950(939:1-23)) and the substantial evidence showing Defendants would not receive each discount in the idealized circumstances of the hypothetical negotiation—again improperly attempting to usurp the jury's role.

The judgment should be affirmed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338. The District Court also had personal jurisdiction. *Infra* pp. 18-28.

## COUNTER-STATEMENT OF ISSUES

1.      Whether the District Court had personal jurisdiction over Defendants under Federal Rule 4(k)(2), given Defendants assertion they would not be subject to personal jurisdiction in any State and improper attempt to consent to jurisdiction.

2.      Alternatively, whether the District Court properly exercised personal jurisdiction over Defendants under Rule 4(k)(1) because they purposefully used an established distribution channel to sell TP-Link products throughout the United States, including Texas.

3.      Whether the District Court abused its discretion in sanctioning Defendants for failing to comply with its Orders and repeatedly obstructing discovery into their sales data.

4.      Whether substantial evidence supported the jury's finding that Defendants directly infringe by offering the Accused Products for sale on their U.S. website and importing the Accused Products into the United States.

5.      Whether substantial evidence supported the jury's finding that Defendants induce infringement, where the trial record showed both that Defendants

4

had pre-suit knowledge of the Asserted Patents and encouraged customers to use the Accused Products in an infringing manner.

6.      Whether the damages award should be affirmed either: (a) because Defendants waived their challenges to the opinions of Atlas's expert; or (b) because, on the merits, (1) the royalty rate Atlas presented did not include the value of unpatented features and (2) Defendants would not receive certain discounts in view of the assumptions of the hypothetical-negotiation framework.

## STATEMENT OF THE CASE

### A.      Defendants' Established Distribution Channel

Defendants have an established distribution channel to sell TP-Link products nationwide, including in Texas. Defendant TP-Link China designs, develops, and manufactures the Accused Products and sells them to Defendant TP-Link Hong Kong. Appx20668(Interrogatory 1).[1] TP-Link Hong Kong then sells and delivers the Accused Products to third-party TP-Link USA—Defendants' sole U.S. distributor. Appx20668(Interrogatory 1). TP-Link USA, in turn, distributes the products nationwide, including in Texas, subject to the duties and obligations Defendants

---

[1] Atlas uses Defendants' nomenclature, referring to Defendant-Appellant Lianzhou Technologies Co., Ltd. (formerly TP-Link Technologies Co., Ltd.) as TP-Link China, Defendant-Appellant TP-Link Corporation Ltd. (formerly TP-Link International Ltd.) as TP-Link Hong Kong, and third-party TP-Link Systems (formerly TP-Link USA Corporation) as TP-Link USA. Appellants-Defendants Brief ("Br.") at 5. All emphases are added unless otherwise noted.

impose via a Distribution Agreement. Appx20668(Interrogatory 1); Appx20675-20682(Agreement).

The Distribution Agreement authorizes TP-Link USA to distribute TP-Link products throughout the United States. Appx20675 (third "whereas" clause); Appx20699(124:2-8). The agreement requires TP-Link USA to obtain permission before it uses any TP-Link trademark or intellectual property or enters into any agreement or conducts any activities in the name of TP-Link. Appx20676-20677(§§2.4, 2.6). The agreement requires TP-Link Hong Kong to train TP-Link USA employees on the operation of TP-Link products and obligates TP-Link USA to "promote the full range" of TP-Link products and "maximize sales of those products." Appx20676(§§2.1, 2.2). And the agreement provides that TP-Link USA will advertise TP-Link products nationwide and inform TP-Link Hong Kong "of all advertisements and promotions," with TP-Link Hong Kong having "the right of written approval with respect thereto." Appx20677(§2.5).

Defendants have never prohibited or restricted sales to Texas. Appx20714(Interrogatory 8). And the Accused Products are sold by major retailers in the State, as Defendants touted at trial, including Walmart and Best Buy. Appx20716-20734; Appx1730(723:16-724:3).

### B.    The Patented Inventions and Initiation of this Action

The patented technology was invented by Newracom, a U.S. company formed by a group of highly skilled engineers from the South Korean research organization ETRI. Appx1236(232:5-12); Appx1239(235:5-236:15). Newracom was the fourth most active contributor to the 802.11ax (Wi-Fi 6) standard, receiving approximately 250 patents for its inventions and contributions. Appx1240-1245(236:23-241:13); Appx1416(412:2-25). Faced with cash flow issues, Newracom agreed to sell its Wi-Fi 6 portfolio to Atlas, while retaining a 50/50 interest in licensing proceeds. Appx1245-1246(241:19-242:6);    Appx1253(249:12-25);    Appx1279(275:3-25). The five patents asserted at trial[2] are essential to the Wi-Fi 6 standard and some of the most important in the Newracom portfolio, being critical to benefits achieved from downlink and uplink OFDMA, and uplink multiuser transmissions. Appx1417-1430(413:13-426:2).

Before this suit, Atlas sent three letters to executives within the TP-Link organization, offering a license. No one responded. Appx1306-1308(302:18-304:24). Atlas filed suit, naming Defendants as the entities responsible for designing, developing, and importing the Accused Products. Appx20001-20046; *supra* pp. 5-6. Atlas sued in Texas because that is Atlas's headquarters and principal place of business. Appx20895(¶5).

---

[2] U.S. Patent Nos. 9,532,187; 9,763,259; 9,825,738; 9,912,513; and 9,917,679.

## C.    Defendants Obstruct Discovery, Leading to Sanctions

Defendants repeatedly obstructed discovery concerning their U.S. sales and were properly sanctioned for it. Defendants refused to produce sales data for more than six months. Appx21454-21455. Defendants then produced data showing 1.3 million sales less (2.2 million v. 3.5 million) than attributed to them by widely-used third-party data from International Data Corporation (IDC)[3]—a significant discrepancy. Appx21508-21509; Appx21519-21523. So, Atlas asked Defendants to produce sales data in their control from TP-Link USA—to see whether it matched. Appx21509. Defendants refused. Altas moved to compel. Appx21453-21470.

Plaintiffs presented evidence that Defendants controlled TP-Link USA and had access to TP-Link USA's data. This included publicly available filings showing common ownership and the Distribution Agreement discussed above, which gave Defendants significant control over TP-Link USA's sales activities. Appx21456-21458. By contrast, at the first discovery hearing on Defendants' insufficient production, Defendants could not answer basic questions about the relationship between Defendants and TP-Link USA, leading the District Court to conclude: "[I]t's not believable … that there is no corporate relationship between [Defendants]

---

[3] IDC is "the premier global provider of market intelligence, advisory services, and events for the information technology, telecommunications, and consumer technology markets." Appx21509. Defendants regularly rely on its data. Appx21509.

and TP-Link USA" and that "the evidence that we have indicates that [Defendants are] deliberately trying to hide their relationship with TP-Link USA." Appx23025-23033(22:13-30:20). The Court ordered Defendants to produce fulsome sales data—including "the sales and financial information attributable to TP-Link USA," since the Court found "at least one of" Defendants "has sufficient control over TP-Link USA to gather and produce the requested information." Appx21489-21490.

Defendants refused. They "maintained they were unable to get detailed sales and financial information" from TP-Link USA and issued a farcical subpoena to TP-Link USA—essentially subpoenaing themselves. This flouted the District Court's finding that Defendants had sufficient control over TP-Link USA to obtain and produce its information without a subpoena. Appx74. TP-Link USA then produced data that was limited by objections and inconsistent with the sales data produced by Defendants. Appx21525-21526 (differences).

Atlas raised Defendants' violations of the District Court's order and the data discrepancies at a second hearing. Defendants again could not answer the same questions about the relationship between Defendants and TP-Link USA, so the District Court reiterated that it found "it implausible that a major manufacturer of sophisticated electronic equipment, like TP-Link Corporation, has no knowledge of the current owner of its sole U.S. distributor, TP-Link USA, and is unable to get any detailed sales and financial information regarding sales of TP-Link products in the

U.S." Appx23061. More succinctly, "I find [that] position unworthy of belief." Appx23086-23087(23:8-24:1). The District Court "warned Defendants that consequences based on their apparent misrepresentations would be determined after depositions." Appx23061.

Atlas deposed Defendants' corporate representative four days later. Defendants' corporate representative had not investigated and could not explain the discrepancies between Defendants' and TP-Link USA's sales data—despite the Court's warning and Atlas's raising this issue just days earlier. Appx21511-21512; Appx21527-21542 (dep. excerpts). Defendants' corporate representative also failed to investigate and did not know who owns or controls TP-Link USA, its direct parent (TP-Link UK), or its indirect parent (Ivy Grove Limited) (Appx21511-21512; Appx21527-21542)—even though this was the subject of two discovery hearings and despite Defendants promising the District Court they would seek additional information on the "current corporate structure" (Appx23028(25:1-7)).

Considering Defendants' conduct, Atlas filed a motion asking the District Court to impose the sanction the court had previewed at the second discovery hearing: finding "certain facts … established" concerning "the sales of [TP-Link] products in the United States" since Defendants did not "engage honestly in discovery about those facts." Appx21514; Appx23085(22:20-23:3).

Atlas's motion did not end Defendants' evasive conduct. Weeks after Atlas filed its motion and after the close of discovery, Defendants produced a third set of sales data that was inconsistent with their prior production and the production from TP-Link USA, and which still showed one million fewer unit sales than the IDC data. Appx23160-23161. The production created yet more questions, but Atlas could not probe them because discovery was closed. Appx23160-23161. Then, on July 20, 2023—less than one month before trial—"Defendants quietly filed a supplemental corporate disclosure statement" acknowledging "common ownership" with "TP-Link USA" for the first time, after spending the entire litigation disclaiming any connection. Appx74. The timeline of events is below:



Citing and recounting Defendants' repeated obstructionism and evasive conduct, the District Court granted Atlas's motion and held "that the sales figures" in the IDC report "shall be deemed established and may not be attacked by

Defendants." Appx76-78. The "IDC Order" was inextricably linked to Defendants' repeated misconduct, as the District Court explained and is discussed further below.

### D.    The Jury Finds Infringement

At trial, Atlas asserted direct infringement for (apparatus) claim 1 of the '513 patent and indirect infringement for each claim in the five Asserted Patents. Appx2013(999:20-25). Atlas's infringement evidence was overwhelming and barely contested. Atlas relied on the expert testimony of Dr. Matthew Shoemake, the chairperson for two separate revisions to the Wi-Fi standard. Appx1379(375:5-13). Dr. Shoemake explained over two days how Defendants infringed. Appx1378-1473; Appx1481-1562; Appx1578-1585.

Defendants spent a fraction of that time crossing Dr. Shoemake. Appx1562-1578. They then offered limited testimony from their own expert, Dr. Christopher Hansen. Appx1735-1760; Appx1775-1799; Appx1837-1841. Atlas impeached Dr. Hansen with a prior admission he had *not* actually analyzed whether Defendants infringe.    Appx1803-1806(792:2-795:7).    Worse,    Defendants'    corporate representative admitted Defendants "may infringe." Appx1701(694:15-25). Not surprisingly, the jury found infringement. Appx69.

### E.    The Jury Awards $37.5 Million in Damages

Atlas presented the expert testimony of Mr. Roy Weinstein on damages. Mr. Weinstein has decades of relevant licensing and damages experience.

Appx1612-1614(605:7-607:12). Mr. Weinstein testified that a lump-sum reasonable royalty would be $37,481,264. Appx1608-1609(601:17-602:7). He explained that the parties to the hypothetical negotiation would start with the undiscounted royalty rate of $0.92 in four licenses to Atlas's patent portfolio. Appx1623-1633(616:6-626:22). Mr. Weinstein then apportioned that rate to $0.79 by "subtract[ing] out for" the "functionality and benefits that are contained in the entire patent portfolio" licenses but "not part of this case" to "reflect[] the value of the patents just in the case." Appx1639-1642(632:17-635:10). Finally, Mr. Weinstein opined that Defendants in the hypothetical negotiation would receive two of the four discounts that real-world licensees have received—(1) lump-sum and (2) volume discounts but not (3) litigation-stage or (4) early-adopter discounts—taking the rate to $0.335. Appx1645-1647(638:23-640:3); Appx2080-2081(1066:23-1067:7).

Defendants presented Dr. Thomas McGahee, who has little relevant expertise compared to Mr. Weinstein. Appx1905-1907(894:18-896:8). Dr. McGahee was impeached trying to embellish that experience. *Compare* Appx1905-1907(894:18-896:2), *with* Appx1849(838:9-18). Dr. McGahee opined that Defendants should pay $730,000 to $871,000. Appx1855(844:6-13). He arrived at this figure by multiplying the license rate he derived from Atlas's licenses by the ratio of patent families licensed thereunder compared to patent families in the litigation. Appx1868-1869(857:4-858:4). Dr. McGahee assumed each patent family has equal value—

even though Dr. McGahee has written elsewhere that patents have different values and patents asserted in litigation tend to be six times more valuable than those that are not. Appx1936-1941(925:20-930:8).

Weighing the competing evidence and expert testimony, the jury agreed with Atlas and awarded $37,481,264 in damages. Appx70.

## SUMMARY OF ARGUMENT

**I.**     The District Court correctly exercised personal jurisdiction over Defendants. Personal jurisdiction was proper under Rule 4(k)(2) because Defendants argued they were not subject to personal jurisdiction in any State in the United States and instead tried to consent to jurisdiction in California. This Court held in another case where the same Defendants tried the same tactic that consenting is insufficient to escape the reach of Rule 4(k)(2). *In re Stingray IP Sols., LLC*, 56 F.4th 1379, 1384–86 (Fed. Cir. 2023). Personal jurisdiction alternatively was proper under Rule 4(k)(1) because Defendants deliberately distributed the infringing products nationwide, including in Texas, through an established distribution channel.

**II.**     The District Court justifiably sanctioned Defendants. Defendants repeatedly obstructed discovery into their sales data, including by failing to produce data and information ordered by the District Court. The District Court and Atlas were left with several sets of contradictory data. Defendants then stymied discovery into the inconsistencies by failing to adequately prepare their corporate

14

representative or explaining the discrepancies during discovery, despite the District Court's warnings, leaving a host of unanswered questions concerning the veracity and completeness of their data. Rather than allowing Defendants to present suspect data to the jury, the District Court correctly exercised its discretion to hold that admissible IDC data would be used instead. At minimum, any alleged error was harmless. The District Court separately admitted the IDC data in an unchallenged ruling, so the jury could have relied on it regardless of the IDC Order. Further, Atlas could have advanced the same narrative that Defendants now complain of— Defendants made a bad faith licensing offer—by relying on Defendants' own data.

**III.**    Atlas offered substantial evidence of Defendants' direct infringement of the sole apparatus claim. Atlas showed the jury that Defendants offer the Accused Products for sale on a website that Defendants control, as the website states in its terms of use. Atlas further presented invoices demonstrating that Defendants import the Accused Products into the United States. Defendants' assertion that TP-Link USA controls the website and imports the products relies on self-serving testimony from Defendants' witnesses that contradicts Defendants' own documents. The jury was entitled to reject that testimony and did.

Atlas also offered substantial evidence that Defendants induced infringement of the asserted claims. Atlas showed that Defendants encouraged customers to use the Accused Products in an infringing manner and designed the products in a manner

that would result in an infringing use. Atlas also introduced circumstantial evidence to rebut Defendants' contention that they never received three letters that Atlas sent. Defendants ask the Court to ignore the evidence presented by Atlas and usurp the jury's fact-finding role, but that is improper.

**IV.**    Finally, there is no reason to vacate the damages verdict. Defendants challenge the admissibility of Mr. Weinstein's testimony on grounds they failed to preserve. Their challenges also fall far short on the merits. The royalty rate Mr. Weinstein presented did not, as Defendants contend, include the value of unpatented features of the Wi-Fi 6 standard—the rate was predicated on prior licenses to Atlas's patents and thus limited to the value of patented features. Separately, substantial evidence supported the jury's finding that Defendants should not receive a (1) litigation-stage or (2) early-adopter discount. The first discount accounts for the potential costs of litigation and risks of noninfringement or invalidity and has therefore been given to licensees to incentivize them to take a license without the need to incur those risks or costs. But the hypothetical negotiation—in sharp contrast to real-world licensing—assumes the asserted patents are valid and infringed. Accordingly, Defendants would not receive a discount in the hypothetical negotiation to account for the risks of adverse results because there would be no such risk. The second discount is offered to prospective licensees to incentivize them to take a license without waiting to see what their competitors do.

16

Defendants would not receive this discount at the hypothetical negotiation because they would have to take a license—they could not wait and see. They would also be aware that others entered licenses and they were not early adopters.

## STANDARD OF REVIEW

This Court "review[s] a district court's determination on personal jurisdiction without deference," applying Federal Circuit law. *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1377 (Fed. Cir. 2015).

Sanctions are reviewed under regional circuit law. *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 916 (Fed. Cir. 2022). The Fifth Circuit "review[s] the imposition of discovery sanctions for abuse of discretion," *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018), and "the district court's factual findings underpinning its sanction order for clear error," *Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019).

This Court "review[s] denials of JMOL de novo." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010). When a jury returns a general verdict, as here on infringement, this Court "presume[s] that the jury resolved the underlying factual disputes in favor of the verdict winner and leave[s] those presumed findings undisturbed if they are supported by substantial evidence." *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1378 (Fed. Cir. 2017) (quotation

omitted). Damages are also reviewed for substantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309–10 (Fed. Cir. 2009).

This Court must "view[] all evidence in [the] light most favorable to the verdict," *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018), "resolve all conflicting evidence in favor of [the verdict]," and "refrain from weighing the evidence or making credibility determinations," *Gomez v. St. Jude Med. Diag. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006). Evidentiary rulings are reviewed for abuse of discretion. *i4i Ltd. P'ship*, 598 F.3d at 852.

## ARGUMENT

## I. THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER DEFENDANTS

The District Court had personal jurisdiction over Defendants under either Federal Rule 4(k)(2) or Federal Rule 4(k)(1).

### A. Personal Jurisdiction Was Proper Under Rule 4(k)(2).

Federal Rule 4(k)(2) "allows a court to exercise personal jurisdiction over a defendant if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process." *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995, 999 (Fed. Cir. 2018) (cleaned up). Defendants dispute the second prong only. Br. 34–35. Defendants bear the burden of showing at least one State where they are subject to personal jurisdiction. *In re Stingray IP Sols.,*

18

*LLC*, 56 F.4th 1379, 1384 (Fed. Cir. 2023). Consenting to jurisdiction in a State is not enough to satisfy that burden and escape Rule 4(k)(2). *Id.* at 1385.

This Court's decision in *In re Stingray* is dispositive. In *In re Stingray*, the *same Defendants* tried to satisfy the second prong by arguing they would "submit to jurisdiction in the CDCA" and were "amenable to suit in the CDCA." *Stingray IP Sols., LLC v. TP-Link Techs. Co.*, 2022 WL 17357774, at *9 (E.D. Tex. Oct. 13, 2022). This Court rebuffed Defendants, holding that a "defendant (such as TP-Link) cannot simply use a unilateral statement of consent" to satisfy its burden under Rule 4(k)(2). *In re Stingray*, 56 F.4th at 1385 (cleaned up).

Defendants relied on the same tactic here. Defendants argued that neither "directs or controls importing, marketing, advertising, offering to sell, or selling the accused products … *anywhere … in the United States*"—rendering jurisdiction improper in any State. Appx20363-20364; *see also* Appx20850 (asserting "you would need to ask TP-Link USA Corporation for" relevant information). Thus, instead of trying to show they were subject to personal jurisdiction in any State—as Rule 4(k)(2) requires—Defendants tried to consent to jurisdiction in California, stating they would "submit to jurisdiction in the CDCA" and were "amenable to suit in the CDCA." Appx20392; Appx20368. This is the exact same tactic from the same Defendants that this Court already held is insufficient to escape Rule 4(k)(2). *In re Stingray*, 56 F.4th at 1384–86.

Defendants strain but fail to avoid the obvious applicability of *In re Stingray*. Defendants contend they established jurisdiction in California by arguing "that 'venue [would be] proper' in the Central District of California, which could be true only if there were personal jurisdiction over [Defendants] there." Br. 35 (citations omitted). But the statement that "venue [would be] proper" is an alteration of a case quoted by Defendants, not Defendants' argument. Appx20368. Moreover, it is untrue that *venue* could be proper in the Central District of California only if there was also *personal jurisdiction* over Defendants there. Foreign corporations "are wholly outside the operation of all the federal venue laws" and are "subject to suit in any judicial district." *In re HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018) (cleaned up). Thus, venue would lie in California even without personal jurisdiction. Arguing there was venue in California is not the same as showing personal jurisdiction.

Defendants also contend that, when they objected to the Magistrate Judge's Report and Recommendation, they showed for the first time "that jurisdiction would be proper in California." Br. 35 (citing Appx21446-21447). Even if true, that was too late. "[I]ssues raised for the first time in objections to [a] magistrate judge's recommendation are deemed waived." *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996); *accord Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1312 (D.C. Cir. 2021); *Cupit v. Whitley*, 28 F.3d 532, 535 & n.5 (5th Cir 1994).

Waiver aside, Defendants urged that the same "stream of commerce" theory that the District Court found established personal jurisdiction over Defendants in Texas would establish personal jurisdiction in California, asserting that "accused products may ultimately arrive" in either State "via the stream of commerce." Appx21446-21447. This argument did not undermine the District Court's exercise of jurisdiction. At best, it was an admission that Defendants were subject to jurisdiction in either Texas or California. Defendants never argued to the District Court they were subject to personal jurisdiction in California but *not* Texas, which is what Defendants assert on appeal for the first time. That argument is untimely.[4]

### B. Personal Jurisdiction Was Proper Under Rule 4(k)(1).

Alternatively, personal jurisdiction was proper under Rule 4(k)(1). The only question on appeal is whether *specific* personal jurisdiction existed over Defendants in Texas. This Court "appl[ies] a three-prong test," asking: "(1) whether the defendant purposefully directed activities at residents of the forum; (2) whether the

---

[4] Defendants state in passing that Atlas disavowed any reliance on Rule 4(k)(2). Br. 34. Defendants do not, however, urge this as grounds for reversal. Nor could they. The District Court "had an opportunity to, and did, address the issue with finality," so this Court may review it. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1323 (Fed. Cir. 2020). Further, "[t]his court may affirm on any basis supported by the record," and the record shows that jurisdiction was proper under Rule 4(k)(2). *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1348 (Fed. Cir. 2021). Finally, any "disavowal" was before this Court held in *In re Stingray* that consent is not enough and at a time when it appeared a defendant could escape Rule 4(k)(2) by consenting to jurisdiction, as Defendants had. *E.g.*, *Stingray IP Sols.*, 2022 WL 17357774, at *9 (accepting consent).

claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair." *Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343, 1348 (Fed. Cir. 2016) (quotation omitted). Atlas "bears the burden of establishing minimum contacts"—the first two prongs. *Id.* Atlas need only "make a prima facie showing," with all "factual disputes [resolved] in [Atlas's] favor." *Id.* at 1347–48. Defendants bear the burden of showing "that the exercise of jurisdiction would be unreasonable." *Id.* at 1348.

### 1.    Defendants Have Minimum Contacts with Texas.

A party may establish minimum contacts under a stream-of-commerce theory. While the bounds remain unsettled after *Asahi Metal Industry Co. v. Superior Court of California, Solano County*, 408 U.S. 102 (1987), this Court has not "take[n] a side on the *Asahi* divide" and does not need to here. *Polar Electro*, 829 F.3d at 1350 (quotation omitted). This Court has repeatedly held that a defendant's purposeful use of an established distribution channel to indirectly sell a product in a forum suffices to establish minimum contacts under any articulation of the stream-of-commerce theory.

Starting in *Beverly Hills Fan Company v. Royal Sovereign Corporation*, this Court found the exercise of personal jurisdiction in Virginia over a foreign manufacturer proper where the manufacturer "purposefully shipped the accused fan into Virginia through an established distribution channel"—from the manufacturer

to an out-of-state distributor to an in-state retailer. 21 F.3d 1558, 1565 (Fed. Cir. 1994). This Court explained that the relationship of the three parties "was ongoing," from which "it can be presumed that the distribution channel … was intentionally established, and that [the manufacturer] knew, or reasonably could have foreseen, that a termination point of the channel was Virginia." *Id.* at 1564.

Most recently, this Court considered a case where the defendant had "entered into an elaborate distribution agreement" to market, distribute, and sell the at-issue drug through a "nationwide" distribution channel. *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896, 909 (Fed. Cir. 2025). This Court held that these facts showed that the defendant "intends to distribute [the drug] nationwide, including in West Virginia"—establishing personal jurisdiction over the defendant in West Virginia—since the "purposeful shipment" of a product "through an established distribution channel" into a State "can establish personal jurisdiction." *Id.* at 908–09 (citing *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755, 763 (Fed. Cir. 2016), and *Beverly Hills*, 21 F.3d at 1565).

The District Court correctly found that Defendants were subject to personal jurisdiction in Texas, consistent with this line of cases, because Defendants "purposefully shipped" the Accused Products indirectly into Texas "through an established distribution channel"—TP-Link USA. *Beverly Hills*, 21 F.3d at 1565; *accord Regeneron*, 127 F.4th at 909. Defendants purposefully entered an "elaborate

distribution agreement" with TP-Link USA "detailing the … companies' responsibilities and rights," *Regeneron*, 127 F.4th at 909, to sell Defendants' products across the United States. *Supra* pp. 5-6. Consistent with the nationwide scope of the Distribution Agreement, Defendants have never prohibited or restricted sales in Texas. Appx20714(Interrogatory 8). They have "not sought to limit the States where [the Accused Products] will be marketed, distributed, or sold." *Regeneron*, 127 F.4th at 909. And consistent with Defendants' established nationwide distribution channel, the Accused Products are sold by major retailers in Texas, as Defendants' corporate witness testified at trial in testimony elicited by Defendants, including at Walmart and Best Buy. Appx20716-20734; Appx1730(723:16-724:3).

Thus, the "record as a whole supports the district court's finding that [Defendants] intend[] to distribute" the Accused Products "nationwide, including in [Texas]." *Regeneron*, 127 F.4th at 908. The sale of Defendants' products in Texas was "not simply an isolated occurrence, but arises from the efforts of [Defendants] to serve … indirectly … the market for [their] products." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Defendants have sufficient minimum contacts with the State.

Defendants' contrary arguments fail to persuade. Defendants contend that they do not have a presence in Texas or *directly* distribute the Accused Products in

Texas. Br. 22. But there is no "bright-line constitutional difference between" a defendant "doing its own distribution" within a State and "contracting with a national distributor" to do so. *Regeneron*, 127 F.4th at 909–10.

Defendants argue that personal jurisdiction is improper because they did not specifically target Texas, as opposed to the "United States as a whole." Br. 24–25, 29–31. This Court rejected this argument in *Regeneron*, explaining there "is simply no good reason, under the constitutional standard, for demanding such singling-out evidence as a substitute for persuasive evidence of nationwide targeting without a carve-out" for any State. 127 F.4th at 910. The Eighth Circuit—in a decision *Regeneron* cited favorably—dismissed a similar argument, explaining that a "foreign manufacturer that successfully employs" a distributor or distributors "to cover the United States intends to reap the benefits of sales in *every state* where the distributors market." *Clune v. Alimak AB*, 233 F.3d 538, 544 (8th Cir. 2000).

Defendants counter that this Court's decisions in *Celgard*, *Polar Electro*, and *Beverly Hills* demonstrate that personal jurisdiction is improper. Br. 25–26. Not so. *Celgard* is easily distinguishable. The plaintiff there failed to show that any "products actually enter[ed] the forum state." *Celgard*, 792 F.3d at 1382. There is no dispute that Defendants' products are sold in Texas. While *Polar Electro* found personal jurisdiction where a defendant directly shipped products into the forum, 829 F.3d at 1350, that does not mean that such a showing is necessary. *Regeneron*,

*Beverly Hills*, and *Clune*—none of which involved a direct shipment—show that it is not. Finally, *Beverly Hills* supports Atlas, not Defendants, as discussed.

Defendants finally argue that this Court should take sides in the *Asahi* split. Br. 28–30. But there is no reason to do so. Under this Court's precedent applying both tests, Defendants have sufficient minimum contacts with Texas. *See Regeneron*, 127 F.4th at 908–10; *Beverly Hills*, 21 F.3d at 1563, 1565–66.

### 2. Defendants Have Not Shown that Exercising Personal Jurisdiction Was Unreasonable.

Defendants "bear[] the burden to prove unreasonableness." *Polar Electro*, 829 F.3d at 1351. The inquiry involves "a balancing of (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the interest of the states in furthering their social policies." *Viam Corp. v. Iowa Exp.-Imp. Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1996). It is only in "rare circumstances" that a "defendant may defeat the exercise of personal jurisdiction." *Polar Electro*, 829 F.3d at 1351.

This is not one of those rare circumstances. Texas "has a substantial interest in preventing patent infringement within its borders." *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1356 (Fed. Cir. 2002). Texas also "has an interest in providing a convenient forum for all [Texas] citizens." *Pat. Rts. Prot. Grp., LLC v. Video Gaming Techs., Inc.*, 603 F.3d 1364, 1370 (Fed.

26

Cir. 2010). That includes Atlas, which is headquartered and has its principal place of business in Texas. Appx20895(¶5). Atlas, for its part, "has an interest in obtaining convenient and effective relief from a nearby federal court." *Breckenridge Pharm., Inc. v. Metabolite Lab'ys, Inc.*, 444 F.3d 1356, 1367 (Fed. Cir. 2006) (cleaned up).

Defendants argue this Court should entirely disregard these interests because Atlas's connection to Texas is allegedly "gossamer-thin." Br. 32. Defendants are wrong on the facts and law. Factually, Texas is the only state where Atlas has meaningful connections: Atlas is headquartered in Texas, its lone office is there, and the lone employee responsible for its day-to-day activities primarily lives and works in Texas. Appx20895(¶5); Appx21089(36:10-37:5); Appx21098(73:15-23). Legally, Defendants fail to cite any apposite authority. Defendants' lone case addressed an entirely different issue: the burden on a defendant of litigating in one forum compared to another. *Trimble v. PerDiemCo LLC*, 997 F.3d 1147, 1158 (Fed. Cir. 2021).

Against the interests of Texas and Atlas, Defendants "have not made any demonstration that it would be unduly burdensome" for them "to litigate in [Texas]." *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1358 (Fed. Cir. 2017). Nor can they. "[M]odern transportation and communications have made it much less burdensome for a party sued to defend itself." *Pat. Rts. Prot. Grp.*, 603 F.3d at 1370 (quotation omitted); *see also Synthes (U.S.A.) v. G.M. Dos Res Jr. Ind.*

27

*Com de Equip. Medico*, 563 F.3d 1285, 1299–1300 (Fed. Cir. 2009) (not

prohibitively burdensome for a Brazilian defendant to defend itself in California).

And Defendants, of course, litigated this case through verdict.

The remaining factors either favor a finding of jurisdiction or are neutral.

Exercising jurisdiction over Atlas's claim in Texas would, and did, "result in an

efficient resolution of the controversy." *Xilinx*, 848 F.3d at 1356. And there is no

"conflict between the interests of [Texas] and any other state, because the same body

of federal patent law would" apply "irrespective of the forum." *Id.* (cleaned up).

Defendants' arguments accordingly "fall far short of" showing "that it would be

inherently unfair" for them to litigate in Texas. *Viam Corp.*, 84 F.3d at 429.

## II.    THE DISTRICT COURT WAS WELL WITHIN ITS DISCRETION TO SANCTION DEFENDANTS FOR REPEATEDLY OBSTRUCTING DISCOVERY

The IDC Order was well supported by Defendants' discovery misconduct.

Appx72-78. Defendants' contrary arguments miss the forest for the trees, improperly

isolating certain obstructionist conduct while ignoring the full scope that caused the

District Court to sanction them. Any error was, at minimum, harmless.

### A.    The IDC Order Was "Just" and "Related" to Defendants' Misconduct.

"Rule 37(b)(2)(A) allows a district court to impose a sanction when a party

fails to comply with a discovery order, and the court has *broad* discretion in

fashioning its sanction when it does so." *Law Funder*, 924 F.3d at 758. For a "lesser

sanction," including deeming facts established, the Fifth Circuit only "require[s] the district court to determine the sanctions are 'just' and related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* (cleaned up). The IDC Order readily satisfies this standard.

First, the District Court's imposition of sanctions was just. For the better part of a year, Defendants delayed, obfuscated, and misrepresented information about their U.S. sales and their ability to obtain information about those sales from their sole U.S. distributor, TP-Link USA (*supra* pp. 8-12):

1.  Defendants refused to produce sales data for months and claimed they did not control and could not produce sales data from TP-Link USA, so Atlas moved to compel.

2.  Atlas presented evidence that Defendants controlled TP-Link USA, while Defendants—in *two* separate discovery hearings—could not answer the Court's basic questions about their relationship with TP-Link USA. The Court found, not once but twice, that Defendants' assertions they had no corporate relationship with TP-Link USA and could not obtain sales and financial information were incredible.

3.  The Court ordered Defendants to produce complete and accurate sales data, including from TP-Link USA.

4.    Defendants refused. Ignoring and violating the District Court's order, Defendants asserted they could not obtain sales information from TP-Link USA and issued a subpoena—to which TP-Link USA produced incomplete sales data limited by objections.

5.    Defendants then produced a corporate representative for deposition who could not explain and had not investigated (1) the differences between Defendants' and TP-Link USA's sales data and (2) Defendants' relationship to TP-Link USA.

6.    Finally, after Atlas sought sanctions, Defendants doubled down. They produced another set of data that was inconsistent with their prior production and the information from TP-Link USA while making a host of new factual assertions. Atlas could not explore any of the questions raised by this late disclosure or the discrepancies observed because discovery was closed. Defendants then filed a corporate disclosure statement shortly before trial acknowledging common ownership with TP-Link USA.

As a result of Defendants' obfuscation and games, Atlas received vastly inconsistent data sets from Defendants. The data was also seemingly incomplete, with even the last set of data produced after the close of discovery showing significantly fewer sales (one million) than third-party IDC data over the same

30

period. Appx23161. Compounding the problem, Defendants stymied discovery into the inconsistencies—failing to adequately prepare their corporate representative or explain the discrepancies during discovery, despite the District Court's warnings. Defendants instead buried their heads in the sand, leaving a host of unanswered questions concerning the veracity and completeness of the data produced.

Given Defendants' obstructionism and the unexplained inconsistencies within Defendants' own data productions and compared to the IDC data, it was more than reasonable and just for the District Court to conclude that Defendants had violated its order to produce complete sales data, including from TP-Link USA, and to sanction Defendants for their conduct. As the District Court explained when Defendants tried to claim they had done all they could by issuing a subpoena to TP-Link USA: "I … don't believe that the only access your clients have to financial information about the sales of their products within the United States is what can be obtained by a subpoena to the distributor…. I find [that] position unworthy of belief." Appx23086(23:19-24:7).

Second, the District Court's IDC Order was directly related to the misconduct, as the District Court explained. Appx76-78. Ordering the use of the same, neutral third-party data that Defendants and economists regularly rely on (Appx1693(686:9-22); Appx21509) appropriately blocked Defendants from improperly trying to limit damages through incomplete data. Appx77. It also avoided the "added complexity

31

in presenting two separate sets of Defendants' sales data" to the jury and prevented Defendants from "undercut[ting] the reliability of the IDC sales data" in front of the jury without the jury "having the information" from the discovery fights to "be able to fully evaluate" the reliability of the competing data. Appx77.

Third, case law confirms the IDC Order was not an abuse of discretion. For example, in *Compaq Computer Corp. v. Ergonome Inc.*, the Fifth Circuit affirmed a sanction deeming a third party to be the alter ego of the defendant after the plaintiff "struggled for well over two years to obtain sufficient alter ego discovery from [the defendants and the third party]." 387 F.3d 403, 413–14 (5th Cir. 2004). Here, the District Court likewise deemed facts regarding Defendants' sales to be established only after Atlas struggled for the better part of a year to obtain fulsome discovery from Defendants about those sales.

And in *Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee*, the Supreme Court affirmed sanctions where the district court had warned the defendants on several occasions that continued delay and disregard of its orders would result in the imposition of sanctions. 456 U.S. 694, 707 (1982). Here, too, the District Court warned Defendants that there could be consequences for their delay and obfuscation, but it did not change their behavior.

**B.    Defendants Have Failed to Demonstrate an Abuse of Discretion.**

Defendants failed to show in the District Court that the IDC Order was an abuse of discretion despite copious opportunities to do so, "including in three hearings" and across "seven briefs." Appx10. Defendants press the same arguments on appeal, but they are no more persuasive now than they were when rejected below.

Defendants principally, but incorrectly, assert that the District Court erroneously sanctioned them relying *exclusively* on "two bases": (1) Defendants' 30(b)(6) deposition and (2) Defendants' corporate disclosure statement. Br. 36. That is incorrect. As explained, the IDC Order was properly based on repeated misconduct spanning months of discovery and continuing for months after the close of discovery—all of which the District Court recounted at length before imposing sanctions (Appx76-77) and reiterated in denying Defendants' motion for a new trial (Appx11-13). Defendants fail to acknowledge, much less explain, why the Court should ignore the entirety of Defendants' misconduct. Thus, even if Defendants were correct there were no infirmities in the 30(b)(6) testimony or the corporate disclosure statement, the District Court had ample reason to sanction Defendants.

Turning to the "two bases" Defendants improperly isolate, Defendants first spill significant ink attacking the District Court's reliance on their inadequate Rule 30(b)(6) testimony, arguing that "Atlas's notice did not list any topics" covering the testimony that Atlas and the District Court took issue with. Br. 36–38. That is wrong.

33

The questions and testimony concerned Defendants' U.S. sales, including the differences between the data Defendants produced and TP-Link USA produced, and the relationship between Defendants and TP-Link USA. Appx21527-21542 (relevant questions highlighted).

These topics were squarely covered by Atlas's deposition notice, which Defendants never sought to quash. Topics 15, 16, and 18, respectively, sought testimony concerning (a) the "[i]dentification of the entity/(ies) that make, use, sell, offer to sell and/or import the Accused Products in the United States," (b) "[t]he manner in which You sell and/or distribute each Accused Product" in the U.S., and (c) "Your monthly U.S. sales (units and revenue), costs (variable and fixed), and profits (gross, incremental, and operating) for each Accused Product." Appx21511. The notice defined "You" to mean Defendants and their "agents" or "representatives" (Appx21511) and thus plainly covered Defendants' U.S. distributor—TP-Link USA.[5] The District Court's reliance on Defendants' deficient testimony was entirely appropriate. Unlike here, not one of the cases Defendants

---

[5] Defendants argue for the first time in a footnote on appeal that "You" did not encompass TP-Link USA because "TP-Link USA was [Defendants'] customer, not its agent or representative." Br. 38 n.7. Because Defendants failed to raise this specific argument to the District Court, it is waived and need not be addressed. *Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005). It fails, in any event, because it ignores the District Court's findings and the undisputed relationship between Defendants and TP-Link USA. TP-Link USA was not a mere "customer." It was Defendants' sole U.S. distributor and representative or agent in the United States. Appx20674-20682.

string cite considered, much less reversed, a sanctions order that was based on a party's failure to answer properly noticed questions. Br. 37–38. That Defendants are reduced to parsing the wording of a 30(b)(6) notice demonstrates how squarely this issues fits within the appropriate discretion of the District Court.

As to the other of the District Court's alleged "two bases," Defendants argue they did not misrepresent their relationship to TP-Link USA, and it "was clearly erroneous" for the District Court to "treat" Defendants' "July 20 disclosure as demonstrating" this. Br. 38–40. Not so. Defendants again ignore the totality of their conduct. The District Court had before it evidence of prior common ownership (Appx21456-21458), Defendants' inability at two hearings to answer the Court's questions about their relationship to TP-Link USA (*supra* pp. 8-10), and a subsequent admission of current common ownership (Appx21724) made shortly before trial. From this, it was entirely reasonable for the District Court to find Defendants' "representations that TP-Link USA was an unrelated entity" incredible and that Defendants had been misleading the Court for months (Appx77), particularly because such credibility determinations are subject to heavy deference and "can virtually never be clear error." *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334 (Fed. Cir. 2005) (quotation omitted).

Beyond incorrectly arguing the District Court had only two reasons to sanction Defendants—and then failing to show those two purported reasons were

clear error—Defendants argue the sanctions were not "tailored to fit the particular wrong" because (1) "TP-Link USA's corporate ownership had nothing to do with the reliability of" Defendants' data and (2) Defendants explained the discrepancies in their sales data after discovery closed, so the District Court erred in finding it unreliable. Br. 40–41. Defendants' arguments are flawed legally and factually.

Legally, Defendants rely on the wrong standard. Defendants cite *Topalian v. Ehrman* (Br. 40), but that case did not evaluate a sanction under Rule 37(b). 3 F.3d 931, 936 (5th Cir. 1993). Rather, *Topalian* evaluated a sanction under Rule 11—a different standard. *Id.* at 934–38. Here, because of the District Court's "broad discretion" under Rule 37, the sanction was only required to be "just" and "related" to the Defendants' misconduct. *Law Funder*, 924 F.3d at 758. It was, as explained.

Factually, (1) the IDC Order was not based exclusively on Defendants' obfuscation regarding their affiliation with TP-Link USA. The IDC Order was based on nearly a year of delay, inconsistencies, and other misconduct related to Defendants' sales data, as shown by the District Court's recitation of this conduct before awarding sanctions. Appx76-77. In any event, Defendants' obfuscation of its relationship with TP-Link USA was undeniably linked to the sanctions. This obfuscation precluded Atlas from determining who would have the relevant sales information, how to get it, and meaningfully exploring the numerous discrepancies between Defendants' and TP-Link USA's sales data.

36

(2) Defendants' after-the-fact "explanations" for the discrepancies between their data and TP-Link USA's data were and are too little, too late. Defendants first tried to explain the discrepancies on May 12, 2023, weeks after fact discovery closed. Appx21553-21554 (cited at Br. 40–41). Atlas never had the opportunity to test the veracity of Defendants' assertions. Worse, the "explanations" Defendants cite are unsubstantiated attorney argument, not sworn statements. Given Defendants' untimely "explanations" were not tested in discovery and were unsubstantiated, the District Court was not required to accept them. Plenty of questions lingered concerning the veracity of Defendants' data. And even if Defendants were correct that they satisfactorily explained the inconsistences in their data (they did not), the District Court still had ample reason to question the data's reliability: it showed far fewer sales (one million fewer) than the well-respected IDC data over the same period. Appx23161. The District Court did not err, much less clearly, in finding Defendants' data unreliable and precluding its use at trial.

Defendants next contend that "the accuracy of [their] sales data should have been a factual issue for the jury." Br. 41. But this argument ignores that Rule 37(b)(2)(A) explicitly permits courts to "direct[]" that "designated facts be taken as established for purposes of the action" and to "prohibit[]" a party "from introducing designated matters in evidence." The District Court imposed that sanction and was well within its discretion to do so (as argued throughout).

Finally, Defendants argue the IDC Order unfairly prejudiced them and, quoting *Topalian* again, "was far from 'the least severe sanctions adequate to accomplish the purpose for which the sanction was imposed.'" Br. 41. Defendants were not unfairly prejudiced, as discussed in the next section. And Defendants' suggestion that the District Court needed to impose the least severe sanction relies on a Rule 11 case, *Topalian*, not a Rule 37 case. They have the standard incorrect.

## C. Any Error Was Harmless.

Even if the Court determines that the IDC Order exceeded the District Court's broad discretion, reversal is still not warranted. This Court must "disregard any errors … that do not affect the substantial rights of the parties." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 842 (5th Cir. 2004). "The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right of a party." *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504 (Fed. Cir. 1995). "The burden of proving substantial error and prejudice is upon" Defendants. *Dresser-Rand.*, 361 F.3d at 842. Defendants have not met their burden here. They have not shown that the outcome at trial would have been any different had the IDC Order not been entered, so any error was harmless.

First, Defendants are wrong that the IDC Order permitted Atlas to ask for $15 million more in damages than it could have otherwise. Br. 41. The District Court admitted the IDC data in a separate ruling independent of the IDC Order.

Appx23362-23363(39:21-40:2);    Appx23371(48:14-19);    Appx23374(51:13-20);

Appx23489.

Defendants do not appeal that ruling, which was correct. The IDC data falls
under Federal Rule of Evidence 803(17) and is not inadmissible hearsay, as the
District Court correctly found, because it is regularly relied upon by people in the
industry. Defendants themselves rely on IDC reports in their business (Appx21509),
and Atlas's damages expert testified that economists and damages experts regularly
treat IDC reports as the "gold standard" (Appx1693(686:9-22)). *See United States v.
Mount*, 896 F.2d 612, 625 (1st Cir. 1990) (testimony that "dealers like herself" relied
on report satisfied "foundational requirements"); *Blanche Rd. Corp. v. Bensalem
Twp.*, 1996 WL 368347, at *2 (E.D. Pa. June 25, 1996) ("sales data" published by
real estate firm and "customarily relied upon by valuation experts" fell under
exception).

Accordingly, the IDC data would have been presented to the jury regardless
of the IDC Order, and the jury could have relied on it to render the exact same
damages verdict. Any error was harmless. *See Echeverry v. Jazz Casino Co., L.L.C.*,
988 F.3d 221, 235 (5th Cir. 2021) ("When a party fails to show that excluding the
evidence would have altered the outcome of the case, the party has not met its burden
for a new trial.").

Second, contrary to Defendants' argument, the IDC Order did not enable Atlas to improperly attack Defendants' credibility by highlighting to the jury that Defendants made a bad-faith licensing offer. Br. 42. Defendants admit that the licensing offer in question relied on "11.3 million units" while their own expert projected—using Defendants' data, not the IDC data—sales of "25-35 million accused units." Br. 42–43. Thus, as the District Court explained, there was nothing "false" in Atlas highlighting to the jury that Defendants offered a license for fewer units than their expert projected. Appx15-16. Atlas could have advanced the same narrative using Defendants' data.

Defendants try to re-write their expert's report, urging that the "25-35-million-unit estimate … included future sales of *Wi-Fi 7, Wi-Fi 8, and beyond*." Br. 42–43. But this argument runs headlong into the actual report. The 25-35-million-unit estimate was for "projected total sales of *Accused Products*" (Appx22025(¶111 & n. 202))—that is, the *accused Wi-Fi 6 products* (Appx21970-21971(¶2); Appx21985-21987(¶¶34-36)). The report says nothing about the sales of future, *unaccused* Wi-Fi 7 or Wi-Fi 8 products. There was no harm on this point, or any other, from the IDC Order.[6]

_____

[6] Should the Court conclude that the District Court erred and it was not harmless, the proper course is a new trial on damages, not on "all issues," including infringement, as Defendants request. Br. 42. Defendants assert that the IDC Order permitted Atlas to "paint[] [Defendants] as bad-faith negotiators," which purportedly "infected"

**III.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S INFRINGEMENT VERDICT**

Trial featured a vast gulf in the infringement evidence presented. Atlas presented hours of testimony establishing infringement, while Defendants barely contested the issue. The jury sided with Atlas. *Supra* p. 12. Defendants gloss over the disparity in evidence and focus on three discrete issues: (1) direct acts of infringement by Defendants, (2) Defendants' pre-suit knowledge of the patents, and (3) inducement. The evidence Atlas presented on each was more than sufficient.

**A.    Substantial Evidence Showed Direct Infringement.**

Substantial evidence showed that Defendants directly infringe claim 1 of the '513 Patent by offering for sale *and* importing the Accused Products into the United States. *Either* theory is sufficient to affirm the jury's finding of direct infringement. *See i4i Ltd. P'Ship*, 598 F.3d at 849.

First, Defendants directly infringe by offering the Accused Products for sale in the United States. An offer for sale gives the recipient the understanding that acceptance will complete the transaction. *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001). Defendants' website contains a "Shop Now"

---

every issue at trial. Br. 43. But as discussed, Atlas could have made the exact same argument about Defendants' lowball offer with Defendants own data. Moreover, Defendants do not explain how this singular point so infected every other issue as to warrant an entirely new trial when Atlas highlighted many other instances where Defendants misled the jury. Appx2070-2081. Indeed, it would be particularly inappropriate to order a new trial on infringement since Defendants have largely conceded the issue.

feature with all the characteristics of an offer for sale—product, price, quantity, and a button to purchase:



Appx7908(PX10) (boxes added); Appx1432-1433(428:19-429:7). The jury was free to credit this evidence and find that someone viewing Defendants' website would regard the "Shop Now" button as a manifestation of Defendants' intent to be bound to a sales contract. Appx39.

Defendants contend their website was merely an "advertisement," not an offer, citing *Smith v. Garlock Equipment Co.*, 658 F. App'x 1017, 1028 (Fed. Cir. 2016). Br. 46. But the *Smith* advertisement is easily distinguishable—it offered further information only, with a button stating: "Click Here for More Info!" *Id*. There was no offer with material terms to be accepted, as there was here.

Defendants further contend they do not control the website, citing their employees' testimony. Br. 47. But Atlas presented ample evidence contradicting this self-serving testimony. Atlas showed the jury the "Terms of Use" stating the website is "provided by TP-Link Corporation Limited" (aka TP-Link Hong Kong):

**TERMS OF USE**

Welcome to TP-Link!

The Services defined herein are provided by TP-Link Corporation Limited., located at Room 901,9/F., New East Ocean Centre, 9 Science Museum Road, Tsim Sha Tsui, Kowloon, Hong Kong, its affiliates and subsidiaries. This document may refer to the service provider as "TP-Link Corporation Limited.," "TP-Link," "we," "us," or "our."

TP-Link provides:

(1) TP-Link hardware products ("Products"), (2) website(s) that may be accessed at https://www.tp-link.com/us/ and www.kasasmart.com ("Sites") and https://www.tapo.com/us/, (3) services, including technical support and services accessible through the Site(s) ("Web Apps"), (4) software that may be downloaded to your smartphone or tablet to access services ("Mobile Apps"), and (5) subscription services, including services that can be accessed using the Web Apps and Mobile Apps ("Subscription Services"). The term "Services" means the Sites, Web Apps, Mobile Apps, and Subscription Services, which may be used in conjunction with Products and in other ways provided by TP-Link. Some Products and Services of TP-Link can be used together or in ways that integrate with products and services from third parties.

Appx6195 (highlighting added); Appx1433-1435(429:13-431:9); Appx1819-1821(808:23-810:20). Atlas also showed the jury that "TP-Link Corporation" (TP-Link Hong Kong) owns the website copyright. Appx6186(PX18); Appx1823(812:1-21). The jury was free to credit Atlas's evidence over the interested testimony of Defendants' employees.

Second, Defendants directly infringe by importing the Accused Products into the United States. Atlas presented invoices showing that TP-Link International (TP-Link Hong Kong) ships the Accused Products to TP-Link USA in the United States. Appx5018-5040(JX22); Appx1435-1436(431:10-432:12). Defendants argue the phrase "FCA Hong Kong" on the invoices establishes that Defendants are not the entity importing into the United States (Br. 48), but as the District Court correctly

43

noted, this is simply a factual dispute the jury resolved against Defendants (Appx34).

Moreover, courts have rejected such a rigid characterization of sales. *See Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1358, 1371 (Fed. Cir. 2008) (holding that products shipped FOB from Canada to the United States were "sold" in the United States); *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (rejecting argument that sale must necessarily be "where the goods change hands").

### B.    Substantial Evidence Showed Indirect Infringement.

#### 1.    Substantial Evidence Showed Pre-Suit Knowledge.

Turning to indirect infringement, substantial evidence supports the jury's finding that Defendants had knowledge of the Asserted Patents as of June 8, 2021, the day Atlas sent emails and letters to three executives within the TP-Link organization. Appx5001-5009(JX19). [7] Each letter introduced Atlas, explained that Atlas owns a portfolio of 75 families of standard-essential patents, and encouraged Defendants to enter licensing discussions. Appx5001-5009(JX19).

Defendants raise two challenges, neither of which has merit. First, Defendants argue the letters do not list specific patent numbers. Br. 50. Defendants do not cite any authority holding that an identification of patent families is insufficient and

---

[7] Defendants do not and cannot contend they lacked knowledge of the Asserted Patents once the lawsuit was filed.

44

specific patent numbers are required. *Cf. AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 46 (Fed. Cir. 2024) (notice letters do not require claim-by-claim identification). Even if patent-by-patent notice were required, however, there is substantial evidence that the letters provided such notice. Each letter explained that Atlas owned "75 granted patent families." Appx5001-5009(JX19). The letters then included a URL to Atlas's website, inviting Defendants to visit and review specific patents. Appx5001-5009(JX19). This is sufficient evidence from which the jury could have concluded that Defendants knew of the Asserted Patents or willfully blinded themselves.

Defendants also argue there was no evidence they received the three letters. Br. 51. This argument requires drawing all reasonable inferences *against* Atlas and in favor of Defendants, which is improper. *Core Wireless*, 880 F.3d at 1361. The District Court identified three pieces of circumstantial evidence from which the jury could have determined that Defendants received the letters. Appx51-52.

First, Defendants and TP-Link USA "are related entities and share a close business relationship." Appx51. At the time of trial, TP-Link USA and TP-Link Hong Kong shared common ownership (Appx1720-1721(713:17-714:8)), and TP-Link USA has been Defendants' sole U.S. distributor for years (Appx1712(705:17-19)). Defendants quibble with the timing of their corporate restructuring, but they do not dispute that TP-Link USA is (and always has been) Defendants' sole U.S. distributor. Br. 52.

45

Second, as the District Court correctly observed, TP-Link USA had "strong incentives" to share the letters with Defendants, suggesting it did. Appx51-52. The Distribution Agreement contains an indemnity provision requiring TP-Link Hong Kong to indemnify TP-Link USA for allegations of patent infringement—as Atlas was making—but only if TP-Link Hong Kong is "notified promptly in writing" of the allegations. Appx1715-1717(708:10-710:7); Appx7005(§6.2). A reasonable jury could have concluded that TP-Link USA abided by its obligations.

Third, Defendants failed to disprove receiving the three letters. Appx52. Defendants' corporate representative testified she *personally* did not receive the letters, but she did not (and could not) testify that *Defendants* never received them— since she conceded she never even asked two of the three letter recipients. Appx1711-1712(704:20-705:16). Observing that Defendants failed to disprove they received the letters does not flip the burden of proof from Atlas to Defendants. *Contra* Br. 52. It is one piece of evidence from which the jury could reasonably conclude, along with the other evidence, that Defendants received the letters and thus received pre-suit notice of the Asserted Patents.

### 2.    Defendants Waived Any Argument of Insufficient Evidence of Inducement.

Defendants next contend that Atlas failed to present sufficient evidence of inducement. Br. 53–55. This argument was waived, as the District Court found (Appx54 n.10), because Defendants did not raise it in their Rule 50(a) motion

(Appx1970-1973(959:21-962:1)). *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1318–19 (Fed. Cir. 2023).

Defendants concede waiver but argue this Court should nonetheless consider the merits because the District Court did so as an alternative holding. Br. 53 n.10. The circumstances identified in Defendants' cases for excusing waiver, however, are not present here. A sufficiency-of-the evidence challenge does not present a pure question of law. *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1282 (Fed. Cir. 2012). A resolution in Defendants' favor is not "beyond any doubt," as discussed below. *Id.* Defendants had the "opportunity to raise the objection" to the District Court in their Rule 50(a) motion but did not. *Id.* The question does not "present[] significant questions of general impact or of great public concern." *Id.* And "the interest of substantial justice is" not "at stake." *Id.*

### 3.    Substantial Evidence Showed Inducement.

If the Court reaches the issue despite Defendants' waiver, Atlas presented significant, diverse evidence that Defendants intended to induce infringement of the Asserted Patents:

1.    Defendants' website encourages customers to purchase and use the Accused Products in an infringing manner. Appx1436-1437(432:18-433:5); Appx7109-7909(PX10).

2.    Defendants issue press releases touting the benefits of Wi-Fi 6 to encourage the purchase and use of fundamental Wi-Fi 6 features. Appx1437(433:6-12); Appx7106-7108(JX60).

3.    Defendants' marketing and instructional videos encourage use of Wi-Fi 6. Appx1437(433:13-25); Appx5082-5092(JX61).

4.    Defendants encourage customers to "upgrade to Wi-Fi 6." Appx1438(434:1-10).

5.    Defendants provide user guides and manuals recommending how to set up and use the Accused Products in an infringing manner. Appx1438-1439(434:11-19); Appx1439(435:13-21); Appx1588-1589(581:1-582:2); Appx5097-5383(PX8).

6.    Defendants hire social media influencers to promote the brand. Appx1438-1439(434:20-435:5); Appx6212-6213(PX20).

7.    Defendants' product packaging emphasizes the benefits of Wi-Fi 6 to encourage use, including with multiple users. Appx1439(435:6-12); Appx5097-5383(PX8).

8.    Defendants provide customer support on how to use the Accused Products in an infringing manner. Appx1439-1440(435:22-436:6); Appx1589(582:3-17); Appx6183-6186(PX18).

Any of these categories constitutes substantial evidence. All eight are powerful evidence supporting the jury's verdict, particularly because "[q]uestions of intent are quintessential jury questions." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014) (substantial evidence supported the verdict where the defendant "knew that the patents potentially were essential to the 802.11(n) standard—a standard with which [the defendant] intentionally complied"); *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 644–45 (Fed. Cir. 2017) (affirming inducement where the product labeling encouraged customers to perform the claimed method).

Moreover, Atlas did not simply present evidence that Defendants intended to induce use of the Wi-Fi 6 standard in general; Atlas presented evidence that Defendants induced the use of the specific features covered by the Asserted Patents. Atlas's expert Dr. Shoemake testified that the Asserted Patents enable three main features of Wi-Fi 6: downlink OFDMA, uplink OFDMA, and uplink MU-MIMO. Appx1417-1424(413:13-424:4).

Defendants market these features—in their promotional materials, user guides, packaging, and website—as the primary reasons for customers to upgrade to and use the Accused Products. For example, Defendants advertise that the Accused Products provide "up to 4x larger capacity" and can "handle more devices" using UL and DL OFDMA and UL MU-MIMO. Appx7011(JX23). Defendants tell their customers that "[u]se of MU-MIMO, DL/UL OFDMA" is required to achieve

significant performance improvements. Appx7036-7037(JX24). And Defendants advertise OFDMA and MU-MIMO on the front, back, and side of their product packaging. Appx1588-1589(581:1-582:2); Appx5099(PX8); Appx5101(PX8); Appx5113(PX8); Appx5167(PX8); Appx5171(PX8); Appx5172(PX8); Appx5230 (PX8); Appx5236(PX8). As one example (Appx5237(PX8)):



Defendants cite several cases, but none supports their position. *Amarin* held that marketing materials, public statements, and product labeling *satisfied* the pleading standard for induced infringement. *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1379 (Fed. Cir. 2024). The only evidence of inducement in *Takeda* was a product label encouraging patients to consult their "healthcare provider" if they have a "gout flare while taking Mitigare," which the plaintiff argued would "lead to physicians" who were consulted to "increase their dose of Mitigare." *Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 632 (Fed. Cir. 2015). This case looks nothing like *Takeda*. Finally, the "press releases" in *Superior* merely "provide[d] model numbers for the accused products."

50

*Superior Indus., LLC v. Thor Glob. Enters. Ltd.*, 700 F.3d 1287, 1295–96 (Fed. Cir. 2012). This is far short of the evidence presented to the jury here of Defendants encouraging infringing uses.

### C.   Vacatur Is Not Required.

Defendants contend that this Court must vacate the entire judgment if it finds there was insufficient evidence to support the jury's verdict of *either* direct infringement of claim 1 of the '513 Patent *or* indirect infringement of the asserted claims. Br. 55–56. This is wrong. This Court has explicitly rejected the argument that an infringement verdict must be set aside unless both alternative infringement theories are supported by substantial evidence, explaining that a court will uphold a general verdict "if there was sufficient evidence to support *any* of the plaintiff's alternative factual theories." *i4i Ltd. P'Ship*, 598 F.3d at 849–50 (emphasis in original). Thus, even if the Court sets aside the jury's direct infringement verdict, "that error is not enough to set aside the jury verdict because the jury's finding also could have been premised on indirect infringement," or vice versa. *Ericsson*, 773 F.3d at 1222.

Defendants also suggest, without elaboration, that there must be a "damages retrial" if the Court concludes there was insufficient evidence of pre-suit indirect infringement *but* sufficient evidence of direct infringement *and* post-suit indirect infringement. Br. 53 n.10. Not so. Atlas would still be entitled to damages on all pre-

51

suit sales of the Accused Products encompassed by the jury's verdict by virtue of Defendants' direct infringement. And Atlas would be entitled to damages on all post-suit sales encompassed by the jury's verdict by virtue of Defendants' direct infringement and post-suit indirect infringement. Accordingly, there would be no difference in the royalty base and no need for a retrial.

## IV.   THE DAMAGES AWARD SHOULD BE AFFIRMED

Atlas presented the opinions of a damages expert with sterling credentials and extensive experience. Defendants offered the opinions of a relative neophyte who was caught embellishing his credentials and offering opinions that contradict views he expressed outside this litigation. The jury sided with Atlas. *Supra* pp. 12-14. Defendants challenge the apportionment methodology and discounting opinions offered by Atlas's expert, but neither argument supports reversal.

### A.   Defendants' Apportionment Challenges are Either Waived or Were Correctly Rejected by the District Court.

Starting with apportionment, Defendants contend that Mr. Weinstein's apportionment methodology "should have been excluded as unreliable" for three reasons. Br. 57. None has merit.

First, Defendants do not contest that Mr. Weinstein apportioned and reduced the $0.92 undiscounted royalty rate in four Atlas portfolio licenses he started with— to $0.79—by "subtract[ing] out for" the "functionality and benefits that are contained in the entire patent portfolio" licenses but "not part of this case" to

"reflect[] the value of the patents just in the case." Appx1639-1642(632:17-635:10).
Defendants, however, argue that if Mr. Weinstein instead inexplicably removed the
value of features and benefits associated covered by the Asserted Patents as well,
except one or two, the rate would have increased—which they decry as an "absurd
result." Br. 57–58.

Defendants' hypotheticals are divorced from reality. Mr. Weinstein's actual
methodology and opinions do not produce any "absurd results." He removed the
value of three benefits (out of eleven total) covered by Atlas's portfolio licenses but
not the Asserted Patents, decreasing (not increasing) the royalty rate. There is
nothing absurd in that result. Regardless, assertions that an expert's methodology
produces "absurd results" go to the weight of the testimony, not its admissibility, as
courts across the country hold. *E.g.*, *Open Sea Distribution Corp. v. Artemis
Distribution, LLC*, 692 F. Supp. 3d 1151, 1235 (M.D. Fla. 2023) ("Best addressed
by cross-examination and not by exclusion of his testimony are the claimed
absurdity" of an expert's opinions.).[8] The District Court did not abuse its discretion
in admitting Mr. Weinstein's testimony over this objection. Appx23177-23178.

---

[8] *See also In re Univ. of S. Calif. Tuition & Fees COVID-19 Refund Litig.*, 695 F.
Supp. 3d 1128, 1149–50 (C.D. Cal. 2023) (critiques that an expert's "results were
'absurd'" were "an appropriate basis for … cross-examination" but were not "a
proper basis to exclude" the opinions); *Stevens v. Ford Motor Co.*, 2022 WL
19978265, at *13 (S.D. Tex. Sept. 29, 2022) ("Even assuming without deciding that
Mr. Gaski's survey produces absurd results …, the Court agrees with Plaintiffs

Second, Defendants contend that the District Court should have excluded Mr. Weinstein's opinions because the $0.92 un-apportioned, starting rate is allegedly predicated on the "entire value" of eleven benefits of Wi-Fi 6 even though "those benefits also depend on unpatented features" of the Wi-Fi 6 standard. Br. 59–60. Defendants, however, never raised this argument when they moved to exclude Mr. Weinstein's opinions. Appx21579-21594. As the District Court correctly held, Appx63, and Defendants do not dispute, they waived it. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) (post-trial motions are an "improper context for deciding … the admissibility of evidence").

Defendants' argument also fails on the merits because it fundamentally misunderstands Mr. Weinstein's opinions. The $0.92 un-apportioned rate Mr. Weinstein offered at trial was derived from *Atlas licenses*. Appx1623-1633(616:6-626:22). It was not derived by starting with the rate for a Wi-Fi 5 patent pool owned by third-party Sisvel and scaling that rate "based on alleged improvements in Wi-Fi 6 over Wi-Fi 5," as Defendants argue. Br. 57. Properly understood, the $0.92 starting point was thus already and necessarily limited to the value of Atlas's Wi-Fi 6 patents and did not extend to the value of the unpatented

---

that—at best—this attack goes to weight, not admissibility."); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 324 (D.R.I. 2019) (contention that an expert's "methodologies [led] to absurd results" was "fodder for cross-examination, not a basis for exclusion").

Wi-Fi 6 features cited by Defendants (such as 1024 QAM). Br. 59–60. Defendants' damages expert admitted this. Appx1945(934:3-20). There was thus no need "to apportion for [unpatented] features that make up no part of the royalty rate in the first place." Appx64.

Relying on Dr. Shoemake, Mr. Weinstein also recognized that the Asserted Patents do not cover certain features of Wi-Fi 6 that are covered by Atlas's portfolio licenses—including the use of midambles—so he apportioned the $0.92 rate to eliminate the value of those features. Appx1430-1431(426:20-427:15); Appx1639-1642(632:17-635:10). Defendants are thus wrong that Mr. Weinstein needed to apportion to remove the value of Wi-Fi 6 features covered by Atlas's portfolio licenses but not the Asserted Patents (*e.g.*, midambles). Mr. Weinstein already did so. *Contra* Br. 60. Defendants are equally wrong that Dr. Shoemake did not review Atlas's unasserted patents to be able to render the opinions on which Mr. Weinstein relied. Br. 60. Dr. Shoemake unequivocally testified that he did and those other patents "enable [] benefits" that are not covered by the Asserted Patents (including midambles). Appx1431(427:9-15).

Third and finally, Defendants contend that the published rate for Sisvel's Wi-Fi 6 portfolio is less than Mr. Weinstein "projected," allegedly confirming Mr. Weinstein's opinions are unreliable. Br. 60–61. This argument was waived twice: first when Defendants failed to raise it in their *Daubert* motion (Appx21579-

55

21594), *Versata*, 717 F.3d at 1264, and then again when they did not raise it in any Rule 50 motion (Appx23206-23208), *Salazar*, 64 F.4th at 1318–19.

Even if Defendants had not waived this argument, it fails. Defendants cite an analysis (Br. 60 (citing Appx5071(JX30)) that Mr. Weinstein created before this litigation where he took the rate for *Sisvel's Wi-Fi 5* portfolio—and others—and determined possible rates for *Atlas's Wi-Fi 6* portfolio. Appx1282(278:4-21) (explaining context of JX30). He never sought to predict the value of *Sisvel's Wi-Fi 6* portfolio, as Defendants urge. And, as already explained, Mr. Weinstein's damages opinions were predicated on licenses to the Asserted Patents, not scaling the rate for Sisvel's Wi-Fi 5 portfolio as Mr. Weinstein did before litigation. Defendants' final criticism thus has no bearing on Mr. Weinstein's litigation opinions.

## B. The Contention that Mr. Weinstein's Opinions Were Contrary to the Hypothetical-Negotiation Framework Is Waived and Meritless.

At trial, Mr. Weinstein testified that Defendants should receive two of the four discounts that real-world licensees to Atlas's patents have received: (1) lump-sum and (2) volume discounts, but not (3) litigation-stage or (4) early-adopter discounts. Appx1645-1647(638:23-640:4). Defendants' attacks on these opinions are waived because they were not raised in Defendants' *Daubert* motion, and they fail, on the merits, because Defendants ignore all the reasons supporting the jury's decision *not* to give Defendants credit for the final two discounts.

56

1.     Defendants' Challenges Were Waived Because They Were Never Raised in Defendants' *Daubert* Motion.

Mr. Weinstein's expert report disclosed that Defendants would not receive the litigation-stage or early-adopter discounts. Appx21612-21613(¶¶161-166). Defendants never moved to exclude these opinions. Appx21579-21594. Defendants thus failed to preserve their arguments, as the District Court correctly held. Appx57.

Trying to escape waiver, Defendants couch their arguments as challenges to the sufficiency of Atlas's evidence, but they are not. *Contra* Br. 64–65. *Versata* is dipositive. In *Versata*, the appellant argued that "the jury's lost profits award should be set aside" because the plaintiff's expert "did not adhere to the *Panduit* framework." 717 F.3d at 1264. This Court held that this argument should have been raised and "resolved under the framework of the Federal Rules of Evidence and through a challenge" under *Daubert*, not "[u]nder the guise of sufficiency of the evidence." *Id.* Because it was not, it was "improperly raised" on appeal. *Id.*

Defendants' arguments here are indistinguishable. Defendants contend that Mr. Weinstein "failed to adhere to the willing-licensee assumption of the hypothetical-negotiation framework," Br. 3, "failed to apply the basic hypothetical-negotiation assumption that the alleged infringer is a willing licensee," Br. 20, and that Mr. Weinstein's opinions were "not supported by the evidence *in view of the hypothetical-negotiation framework*," Br. 65. These are all variations of the same assertion: Mr. Weinstein did not adhere to the *Georgia-Pacific* framework. This

57

contention is no different from the one this Court found waived in *Versata*: an expert "did not adhere" to the governing legal framework—*Panduit* in *Versata*, *Georgia-Pacific* here. *Versata*, 717 F.3d at 1264. By failing to raise this challenge in their *Daubert* motion, Defendants cannot raise it now. As the District Court aptly explained, "[t]o allow Defendants to raise this argument after the trial would throw a wrench into the orderly, timely, and ideally final resolution of parties' disputes. The time to raise an issue with an expert's methodology is before that testimony is presented to the jury, not after the jury has returned an unfavorable verdict." Appx57.

Defendants conspicuously ignore *Versata*'s on-point holding and instead cite two other arguments *Versata* held were not waived. Br. 65. Those arguments, however, look nothing like Defendants'. Both were straightforward challenges to the sufficiency of the evidence, challenging what was presented concerning demand for a product and "market forces." *Versata*, 717 F.3d at 1264–67. Neither argument asserted an expert failed to adhere to the governing legal framework, which is what Defendants argue. That argument is waived.

Defendants' reliance on *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), is equally misplaced. *Brooke Group* held that the evidence cited by an expert was "insufficient" to meet the plaintiff's burden in another straightforward sufficiency of the evidence challenge. *Id.* at 238–42. It did not address waiver.

2.      Substantial Evidence Supports the Jury's Decision to Give
        Defendants Only Certain Discounts.

On the merits, Defendants' waived arguments do not support vacating the jury's verdict. Defendants argue the jury had *no* choice but to give them the litigation-stage and early-adopter discounts. Br. 62–65. But that argument improperly seeks to usurp the role of the jury. Defendants' own damages expert testified—in response to questioning *from Defendants*—that it was "up to the jury" to decide which discounts (if any) Defendants should receive. Appx1950(939:1-23); Appx1951(940:16-20). The parties presented competing testimony and evidence. The jury sided with Atlas. Substantial evidence supports that decision.

The litigation-stage discount reflects and accounts for the risk and expense of litigation and is meant to incentivize parties to take a license without the need for litigation and its attendant risks and costs. Appx1284(280:11-22); Appx7039(JX26) (§3.6 – acknowledging and explaining discount in one license); Appx7074(JX27) (same in another); Appx1914-1915(903:13-904:4). But the hypothetical negotiation assumes the patents are valid and infringed and the parties will agree to a license. *Lucent*, 580 F.3d at 1325. Accordingly, the jury could conclude that, under the hypothetical negotiation framework, there would be no reason to give Defendants a litigation-stage discount to reflect the costs or risks of an adverse decision in litigation. There would be no such costs or risk because there could be no litigation. Appx1668(661:5-14). "[A]s compared to the 'real-world' in which" the parties

would have to negotiate a license recognizing the potential risks of litigation, "the patentee in the 'hypothetical-world' is in a better bargaining position." *Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 2417367, at *4 (E.D. Tex. June 14, 2011).

Moreover, as Mr. Weinstein testified and the jury was instructed, the parties would have access "to all the relevant information" at the hypothetical negotiation, including "[e]vidence of things that happened after the infringement first began." Appx1662(655:22-25); Appx2026(1012:13-18). The parties would thus be aware of the subsequent litigation and that Defendants did not take a license before trial, so the jury could reasonably conclude that Defendants would not receive the litigation-stage discount. Appx1645-1646(638:23-639:23).

The early-adopter discount is intended "to encourage companies to take a license early" without "wait[ing] to see what their peers do in the industry." Appx1285(281:3-13). But at the hypothetical negotiation, Defendants would have to take a license; they could not hold out. Appx1619-1621(612:4-614:15) (Weinstein); Appx1857(846:17-21) (McGahee). The parties would also be aware that Atlas has entered licenses with third parties and that Defendants "weren't" early adopters. Appx1662-1663(655:22-656:11),    Appx1670-1671(663:20-664:1)    (Weinstein); Appx1931-1932(920:17-921:4) (McGahee). From this, the jury could reasonably conclude Defendants would not receive the early-adopter discount because they

would not need to be incentivized not to holdout (they couldn't) and would know others had taken a license and they were not early adopters.

None of Defendants' contrary arguments undermine this evidence. Defendants' assertion that any decision that does not give them credit for the litigation-stage and early-adopter discounts "violate[s] the hypothetical-negotiation framework" is backwards. Br. 63. Defendants ignore that the hypothetical negotiation assumes the patents are valid and infringed and an agreement must be reached. *Lucent*, 580 F.3d at 1325. Accordingly, there would be no need to offer Defendants the litigation-stage discount, and they would not receive one, to account for the risk of adverse findings in litigation. There would be no such risk in a world where it is assumed the patents are valid and infringed. There would likewise be no need to offer Defendants the early-adopter discount to incentivize them taking a license without waiting to see what their peers do. They could not hold out.

Defendants also ignore the well-established principle that the hypothetical negotiation "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds* 383 F.3d 1337 (Fed. Cir. 2004). Such evidence can include the fact of subsequent litigation or events thereof. *See Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 994 (Fed. Cir. 1989),

*overruled on other grounds* 960 F.2d 1020 (Fed. Cir. 1992) ("[The hypothetical negotiators need not act as if there had been no infringement [or] no litigation…."); *Trustees of Univ. of Pa. v. Eli Lilly & Co.*, 2022 WL 3973276, at *17–18 (E.D. Pa. Jan. 14, 2022) (considering a claim being found invalid by the PTAB). It can also include post-negotiation licenses. Appx1662-1663(655:22-656:11); Appx1931-1932(920:17-921:4). Considering that Defendants did not take a license before trial and were not early adopters—and therefore did not qualify for the relevant discounts—is fully consistent with the purpose and limits of the "Book of Wisdom." Such evidence "expose[s] [to] light the elements of value that were there from the beginning": the value of Asserted Patents without inapplicable discounts. *Sinclair Refin. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

Defendants' assertion that "the jury assumed" Defendants "were unwilling licensees … that would refuse a license" at the hypothetical negotiation lacks any support. Br. 63 The jury was instructed that the parties would agree to a license. Appx2025-2026(1011:25-1012:9). The jury is "presumed to follow" these instructions. *United States v. Robinson*, 87 F.4th 658, 676 (5th Cir. 2023). Moreover, neither side argued Defendants would refuse a license at the hypothetical negotiation. On the contrary, the experts agreed Defendants must take a license. Appx1619-1621(612:4-614:15); Appx1857(846:17-21). Defendants simply would not receive the two discounts they claim entitlement to because, as argued, there

62

would be no reason the discounts—in view of their purposes—would be offered and, under the Book of Wisdom, the negotiators would be aware of post-negotiation evidence.

Finally, Defendants' assertion that not crediting them with all four discounts "punishes" them and "is tantamount to awarding enhanced damages or attorneys' fees" is hyperbole. Br. 63–64. Defendants are not entitled to every discount because they are not similarly situated to other licensees. The license with Defendants results from the idealized hypothetical-negotiation framework, not real-world circumstances where there is a risk of adverse findings of noninfringement or invalidity, or of holdout. Defendants accordingly would not receive discounts meant to account for such risks.

At bottom, Defendants—dissatisfied with the jury's verdict—want the license they could have voluntarily agreed to. "The setting of a reasonable royalty," however, "cannot be treated . . . as the equivalent of ordinary royalty negotiations among truly 'willing' patent owners and licensees." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978). Thus, "a reasonable royalty may permissibly reflect the fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (cleaned up).

Were the rule otherwise, prospective infringers might perceive "that blatant, blind appropriation of inventions . . . is the profitable, can't-lose course." *Fromson* 853 F.2d at 1575. They "would have nothing to lose, and everything to gain" from infringement because they "could count on paying only the normal, routine royalty non-infringers might have paid." *Panduit*, 575 F.2d at 1158. And patentees would be discouraged (particularly in FRAND cases) from licensing their patents at a lower, pre-litigation rate (to account for litigation risk), reducing or eliminating pre-trial settlements.

Defendants had the opportunity to get the discounts they now wished they had, but they refused and elected to litigate this case to the bitter end. They cannot now complain that the jury awarded a higher damages verdict supported by the evidence.

## CONCLUSION

The judgment should be affirmed.

Dated: May 12, 2025                    Respectfully submitted,

                                       */s/ Joseph S. Grinstein*
                                       Joseph S. Grinstein
                                       Alejandra C. Salinas
                                       SUSMAN GODFREY LLP
                                       1000 Louisiana Street, Suite 5100
                                       Houston, Texas 77002
                                       (713) 651-9366

Kalpana Srinivasan
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100

Alexander W. Aiken
SUSMAN GODFREY LLP
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 516-3880

Michael F. Heim
Eric J. Enger
Blaine A. Larson
Alden G. Harris
HEIM, PAYNE & CHORUSH, LLP
609 Main Street, Suite 3200
Houston, Texas 77002
 (713) 221-2000

*Attorneys for Plaintiff*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2025-1039, -1076

**Short Case Caption:**  Atlas Global Technologies LLC v. TP-Link Technologies Co.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,884  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/12/2025          Signature:   /s/ Joseph S. Grinstein

                          Name:      Joseph S. Grinstein